# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:15-cv-02362-WYD

DANA ALIX ZZYYM,

      Plaintiff,

vs.

JOHN F. KERRY, in his official capacity as Secretary of State; and
SHERMAN D. PORTELL, in his official capacity as the Director of the Colorado Passport
Agency for the United States Department of State,

      Defendants.

---

## PLAINTIFF ZZYYM'S OPENING BRIEF IN SUPPORT OF DECLARATORY, INJUNCTIVE, AND OTHER RELIEF AND OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ...................................................................................................3

I.       INTERSEX PEOPLE EXIST THROUGHOUT THE WORLD ........................................3

II.      ZZYYM IS DESIGNATED TO ATTEND THE 2014 INTERSEX
         WORLD CONFERENCE..................................................................................4

III.     THE STATE DEPARTMENT DENIES ZZYYM A U.S. PASSPORT ...........................4

STATUTORY AND REGULATORY BACKGROUND..............................................................5

STANDARD OF REVIEW ...................................................................................................6

ARGUMENT ......................................................................................................................7

I.       THE DEPARTMENT VIOLATED THE ADMINISTRATIVE
         PROCEDURE ACT..........................................................................................7

         A.       The Department's Actions Are Arbitrary and Capricious ......................................7

                  1.       The Department Failed to Provide a Reasoned Basis for
                           Denying Zzyym's Passport Application ......................................8

                  2.       The Department Ignored Its Own Gender Policy without
                           Explanation ................................................................................9

                  3.       The Post-Hoc Explanations Fail to Demonstrate Reasoned
                           Decisionmaking .......................................................................11

                  4.       The Department Failed to Consider a Third Gender Marker
                           as a Viable Alternative..............................................................14

         B.       The Department Exceeded Its Authority under the Passport Act ..........................16

II.      THE GENDER POLICY MUST BE SUBJECTED TO HEIGHTENED
         SCRUTINY....................................................................................................18

         A.       The Gender Policy Warrants Heightened Scrutiny Because It
                  Discriminates Based on Gender...............................................................19

                  1.       The Department's Policy Expressly Classifies Persons
                           Based on Gender.......................................................................19

2. The Policy Constitutes Gender Discrimination for the Additional Reason That It Enforces Conformity with Gender-Based Expectations or Stereotypes ...............................................20

3. Express Governmental Exclusions of Intersex People or Those Who Are Neither Male Nor Female Constitute Discrimination Based on Sex....................................................21

B. Even Absent a Suspect Classification, the Department's Actions Must Be Subject to Strict Scrutiny Because They Prohibit Zzyym From Exercising the Fundamental Right to Travel and Other Fundamental Liberty Interests ...............................................................22

III. THE DEPARTMENT'S REFUSAL TO ISSUE AN ACCURATE PASSPORT TO ZZYYM INTERFERES WITH PLAINTIFF'S FUNDAMENTAL RIGHT TO TRAVEL AND OTHER LIBERTY INTERESTS ..................................................................................................22

A. The Department's Actions Infringe upon the Fundamental Right to International Travel....................................................................................23

B. The Department's Actions Infringe upon the Fundamental Right to Individual Dignity and Autonomy.........................................................25

IV. THE POLICY CANNOT SURVIVE UNDER ANY LEVEL OF SCRUTINY.....................................................................................................27

A. The Decision to Deny Zzyym a Passport Is Irrational in Light of the Department's Own Policy to Establish Identity with Primary Identification "in the Old Gender"..........................................................27

B. The Policy Undermines the Department's Own Interest in Ensuring the Integrity of the Passport Because It Requires Zzyym to Adopt an Inaccurate Gender Marker....................................................................28

C. Adherence to a Discriminatory Status Quo Offers No Independent and Legitimate Basis to Perpetuate Discrimination Against Zzyym....................29

V. ZZYYM HAS STATED A CLAIM FOR MANDAMUS RELIEF ...................................30

CONCLUSION......................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Aptheker v. Secretary of State*,
    378 U.S. 500 (1964) ................................................................................................18, 24, 25

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*,
    412 U.S. 800 (1973) ................................................................................................8

*Bd. of Trustees of the Univ. of Ala. v. Garrett*,
    531 U.S. 356 (2001) ................................................................................................29

*Bowers v. Hardwick*,
    478 U.S. 186 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003) .........................23

*Browder v. United States*,
    312 U.S. 335 (1941) ................................................................................................24

*Califano v. Goldfarb*,
    430 U.S. 199 (1977) ................................................................................................20

*Carpet, Linoleum & Resilient Tile Layers v. Brown*,
    656 F.2d 564 (10th Cir. 1981) ................................................................................................30

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971) ................................................................................................6, 7

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ................................................................................................27, 28, 29

*Craig v. Boren*,
    429 U.S. 190 (1976) ................................................................................................21

*Ctr. for Native Ecosystems v. Cables*,
    509 F.3d 1310 (10th Cir. 2007) ................................................................................................10

*Custer Cnty. Action Ass'n v. Garvey*,
    256 F.3d 1024 (10th Cir. 2001) ................................................................................................7

*DeNieva v. Reyes*,
    966 F.2d 480 (9th Cir. 1992) ................................................................................................23

*Dickson v. Secretary of Defense*,
    68 F.3d 1396 (D.C. Cir. 1995) ................................................................................................8

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972)........................................................................................29

*Fabian v. Hosp. of Cent. Conn.*,
  No. 3:12-CV-1154 (SRU), 2016 WL 1089178 (D. Conn. Mar. 18, 2016)..............21

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)........................................................................................10

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)........................................................................................20

*G.G. ex rel. Grimm v. Gloucester Cnty. Pub. Sch. Bd.*,
  No. 15-2056, 2016 WL 1567467 (4th Cir. Apr. 19, 2016)..................................21

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) .......................................................................21

*Greater Bos. Television Corp. v. FCC*,
  444 F.2d 841 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923 (1971)...............7-8, 9-10

*Griswold v. Connecticut*,
  381 U.S. 479 (1965)........................................................................................22

*Haig v. Agee*,
  453 U.S. 280 (1981)...........................................................................17, 18, 25

*Heller v. Doe*,
  509 U.S. 312 (1993)..............................................................................27, 29

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1992)..............................................................................19, 20

*Kansas v. United States*,
  249 F.3d 1213 (10th Cir. 2001) .........................................................................8

*Kent v. Dulles*,
  357 U.S. 116 (1958)...................................................................16, 17, 18, 23

*Lawrence v. Texas*,
  539 U.S. 558 (2003)..............................................................................23, 30

*Lodge Tower Condo. Ass'n v. Lodge Props., Inc.*,
  880 F. Supp. 1370 (D. Colo. 1995) ...................................................................7

*Loving v. Virginia*,
  388 U.S. 1 (1967)............................................................................................20

*Lynd v. Rusk,*
　389 F.2d 940 (D.C. Cir. 1967) ............................................................................24

*Miss. Univ. for Women v. Hogan,*
　458 U.S. 718 (1982)...........................................................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,*
　463 U.S. 29 (1983)....................................................................................... passim

*Obergefell v. Hodges,*
　135 S. Ct. 2584 (2015)...........................................................................25, 26, 27

*Olenhouse v. Commodity Credit Corp.,*
　42 F.3d 1560 (10th Cir. 1994)...........................................................................6, 7, 11

*Orr v. Orr,*
　440 U.S. 268 (1979)...........................................................................................20

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,*
　494 F.3d 188 (D.C. Cir. 2007) .............................................................................9

*P.R. Sun Oil Co. v. EPA,*
　8 F.3d 73 (1st Cir. 1993) ....................................................................................7

*Planned Parenthood of Se. Pa. v. Casey,*
　505 U.S. 833 (1992)...........................................................................................26

*Plyler v. Doe,*
　457 U.S. 202 (1982)......................................................................................18, 27

*Rios v. Ziglar,*
　398 F.3d 1201 (10th Cir. 2005) ...........................................................................30

*Romer v. Evans,*
　517 U.S. 620 (1996)......................................................................................27, 29

*Schroer v. Billington,*
　424 F. Supp. 2d 203 (D.D.C. 2006) ................................................................19, 21

*Schweiker v. Wilson,*
　450 U.S. 221 (1981)...........................................................................................27

*Skinner v. Oklahoma,*
　316 U.S. 535 (1942)...........................................................................................22

*Smith v. City of Salem, Ohio,*
　378 F.3d 566 (6th Cir. 2004) ...........................................................................21

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973)...................................................................................27

*United States v. Burlington N.R. Co.*,
   200 F.3d 679 (10th Cir. 1999).................................................................14

*United States v. Virginia*,
   518 U.S. 515 (1996).................................................................................19

*United States v. Windsor*,
   133 S. Ct. 2675 (2013).............................................................................18

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
   305 F.3d 1152 (10th Cir. 2002)...............................................................11

*Wardair Can. Inc. v. Fla. Dep't of Revenue*,
   477 U.S. 1 (1986).....................................................................................15

*Whitewood v. Wolf*,
   992 F. Supp. 2d 410 (M.D. Pa. 2014).....................................................29

*Woodward v. Rogers,*
   344 F. Supp. 974 (D.D.C. 1972), *aff'd*, 486 F.2d 1317 (D.C. Cir. 1973)................................17

*Worthy v. United States*,
   328 F.2d 386 (5th Cir. 1964)...................................................................23

*Zablocki v. Redhail*,
   434 U.S. 374 (1978).................................................................................22

*Zemel v. Rusk*,
   381 U.S. 1 (1965).....................................................................................24

## FEDERAL STATUTES

18 U.S.C. § 1542...........................................................................6, 12, 24

22 U.S.C. § 5501...................................................................................15

Administrative Procedure Act, 5 U.S.C. § 701 et seq................................6

Immigration and Nationality Act, 8 U.S.C. § 1185..............................5, 24

Passport Act of 1926, 22 U.S.C. § 211a et seq ............................... passim

## REGULATIONS

22 C.F.R. §§ 51.1-.74................................................5, 9, 12, 13, 28

**OTHER AUTHORITIES**

Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 10.1 (4th ed. 2011) ........................................................................................................................22

Lauren Bishop, *Gender and Sex Designations for Identification Purposes: A Discussion on Inclusive Documentation for a Less Assimilationist Society*, 30 WIS. J.L. GENDER & SOC'Y 131, 142 (2015) ..........................................................................................16

## <u>INTRODUCTION</u>

When Plaintiff Dana Alix Zzyym ("Zzyym") applied for a passport from the U.S. Department of State (the "Department"),[1] the application form presented Zzyym with an impossible task: select either the male ("M") or female ("F") gender marker, and do so truthfully. Zzyym was born intersex, with ambiguous genitalia, and their[2] gender identity—the innate sense of being male, female, both, or neither—is neither male nor female. Zzyym explained this on the passport application and provided medical records—including sworn statements from Veterans Affairs physicians—and other documents demonstrating that Zzyym is intersex. Zzyym also provided a separate letter clarifying that "I'm not male or female." On the face of the application, Zzyym accurately listed "Intersex" instead of checking "M" or "F," and signed the application subject to criminal sanctions for making a false statement.

Despite the abundance of information and evidence presented, the Department denied Zzyym's passport application because it "requires the sex field on United States passports to be listed as 'M' or 'F'." In its motion, the Department has, for the first time, offered trifling explanations of its denial, claiming that Zzyym's application form was "incomplete" and otherwise inconsistent with Zzyym's driver's license—which was just one of *several* forms of identification that Zzyym presented in connection with their application. But these post-hoc rationalizations fail to address the actual controversy: Zzyym is neither male nor female, and therefore cannot truthfully identify as "M" or "F" on a passport application. The Department

---

[1] Unless otherwise indicated, references to the Department indicate Defendant Kerry and Defendant Portell, in their official capacities on behalf of the U.S. Department of State.

[2] As an intersex person who does not identify as either male or female, Zzyym uses the singular "they," "them," and "their" third-person gender-neutral pronouns. *See* R.L.G., *Singular They: Why 2015's Word Of The Year Is Rather Singular*, Economist, Jan. 15, 2016, *available at* http://www.economist.com/blogs/prospero/2016/01/johnson-singular-they.

contends that limiting passport gender markers to "M" or "F" is necessary to "ensure the integrity of U.S. passports as proof of identify and citizenship." Defs.' Mot. for J. on the Administrative R. on Counts One & Two & Mot. to Dismiss Counts Three, Four & Five [Dkt. 35], at 8 [hereinafter "Motion"]. Yet it has not attempted to explain how forcing Zzyym to provide inaccurate information concerning their identity ensures the integrity of a document intended to demonstrate proof of that identity. In fact, the Department requires truthfulness on application materials, under penalty of criminal sanctions, and the United States recognizes passports from other nations that designate a gender other than "male" or "female."

The Department's policy requiring applicants to declare themselves to be male or female unconstitutionally discriminates against individuals like Zzyym, who are neither. The policy prohibits Zzyym from ever obtaining a passport, because of their gender. It discriminates against people who are neither male nor female not because of what they do, but because of who they are. It furthermore produces absurd results: Zzyym—a U.S. citizen and military veteran—cannot leave the country they defended -- not because they lied on an application or presented false information to the government, but because Zzyym refused to do so. Such a policy does not pass the rules of logic, much less constitutional muster.

The Department violated the Administrative Procedure Act ("APA") by its arbitrary and capricious denial of Zzyym's passport application and its refusal to provide a reasoned basis for its decision. The Department exceeded its authority under the Passport Act of 1926 ("Passport Act") when it refused to issue Zzyym an accurate passport. And it violated Zzyym's constitutional rights by implementing a policy that impermissibly discriminates against Zzyym on the basis of gender, and by infringing unconstitutionally on Zzyym's fundamental rights. This Court should hold unlawful and set aside the Department's decision denying Zzyym a passport

2

and provide relief to afford Zzyym (and those similarly situated) the opportunity to obtain a passport by means of a true and accurate application.

## STATEMENT OF FACTS

Born in Michigan in 1958, Dana Alix Zzyym is a U.S. citizen and U.S. Navy veteran. Administrative R. [Dkt. 34] [hereinafter "AR"], 00005, 00008-09, 00029. Because Zzyym was born intersex with ambiguous external sex characteristics, the sex field on Zzyym's birth certificate was initially left blank, then altered, and now accurately states "Unknown." *Id.* at 00005, 00010. Similar to many other intersex children, Zzyym, by age 5, had been subjected to irreversible, invasive, painful, and medically unnecessary surgeries designed to make Zzyym's body conform to sex stereotypes of either male or female. Compl. ¶ 15. The surgeries immediately failed and caused permanent scarring and damage. *Id.* None of the surgeries Zzyym underwent altered, or even fully disguised, Zzyym's intersex nature. *See* AR 00011, 00033.

## I.    INTERSEX PEOPLE EXIST THROUGHOUT THE WORLD

Moments after a child is born, the general practice is for a physician to visually assess the newborn's genitalia and assign the newborn's sex as "male" or "female" on that basis. Sex, however, is much more complex, and is determined by a number of factors, including chromosomes, gonads, hormones, genitalia and gender identity. Compl. ¶ 12; *see also* AR 00015. When a child is born with mixed or ambiguous markers of sex, doctors traditionally try to determine which sex is likely to match the child's gender identity. It is impossible, however, to predict with certainty how an intersex infant's gender identity will develop. Compl. ¶ 13. "Intersex" is an umbrella term used to describe a wide range of natural bodily variations. Intersex people are born with sex characteristics that do not fit typical binary notions of bodies designated "male" or "female." Experts estimate that between 0.05% and 1.7% of the population is born with intersex traits. *Id.* ¶ 11.

## II.    ZZYYM IS DESIGNATED TO ATTEND THE 2014 INTERSEX WORLD CONFERENCE

Zzyym became an advocate for intersex people—nationally and internationally—through raising awareness and sharing their own personal story. AR 00017, 00029. To that end, Zzyym joined Organisation Intersex International USA ("OII-USA"), the U.S. affiliate of the world's largest organization of intersex people.[3] *Id.* at 00015. In 2014, OII-USA Director Hida Viloria invited Zzyym—then the Rocky Mountain Regional Representative—to represent and vote on behalf of the organization at the Fourth International Intersex Forum ("Intersex World Conference") in Mexico City on October 27-31, 2014. *Id.* at 00015, 00028. In order to attend the Intersex World Conference and other international conferences in the future, Zzyym needed to obtain a U.S. passport. *Id.* at 00015.

## III.    THE STATE DEPARTMENT DENIES ZZYYM A U.S. PASSPORT

Zzyym traveled to the Colorado Passport Agency ("CPA") and submitted the Department's Application for a U.S Passport ("Application") on September 2, 2014. *Id.* at 00002-3. In the "sex" field of the Application, Zzyym accurately wrote "Intersex"—instead of selecting "M" or "F"—and, by separate letter, clarified, "I'm not male or female." *Id.* at 00004, 00011. Zzyym requested an "X" to be placed in the sex field because the "X" gender marker conforms to the standards of the International Civil Aviation Organization ("ICAO"), a United Nations agency that sets forth passport specifications. *Id.* Zzyym also submitted their Michigan Certificate of Live Birth, a court-ordered name-change document, two photo identification cards from the U.S. Department of Veterans Affairs ("VA"), and a valid Colorado driver's license,

---

[3] OII-USA, now known as the Intersex Campaign for Equality, advocates for equality and human rights for intersex people, particularly the rights of physical integrity, self-determination, legal recognition, and de-pathologization. OII United States, http://oii-usa.org (last visited Apr. 17, 2016); *see also* AR 00016.

4

along with a photograph and payment of appropriate fees. *Id.* at 00004-11. Zzyym also appended a letter from a VA doctor specifying that Zzyym was born intersex. *Id.* at 00010.

In a letter dated September 24, 2014 ("First Response"), the Department notified Zzyym that it "requires the sex field on United States passports to be listed as 'M' or 'F'" and that it was "unable to fulfill your request to list your sex as 'X'." *Id.* at 00018. The First Response instructed Zzyym to select a binary gender marker (either male or female), or withdraw the Application. *Id.* On December 19, 2014, Zzyym returned to the CPA office to present medical documentation from additional VA physicians attesting—under penalty of perjury—to Zzyym's intersex classification, and Zzyym reiterated a request for a third gender marker. *Id.* at 00029-35. On December 29, 2014, Defendant Portell denied Zzyym's Application, stating "your application did not meet our requirements" and repeating that "the [Department] requires the sex field on United States passports to be listed as 'M' or 'F'." *Id.* at 00036.

## STATUTORY AND REGULATORY BACKGROUND

An U.S. citizen's right to travel is regulated under the Passport Act, 22 U.S.C. § 211a, which provides that the Secretary of State "may grant and issue passports, and cause passports to be granted, issued and verified in foreign countries . . . under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports." The Department has set forth regulations governing granting, issuing, and verifying passports at 22 C.F.R. Part 51, including specific reasons for mandatory and discretionary denials and restrictions of passport in 22 C.F.R. § 51.60.

The Immigration and Nationality Act makes it "unlawful for any citizen of the United States to depart or enter . . . the United States unless he bears a valid U.S. passport." 8 U.S.C. § 1185(b). To obtain a U.S. passport, an applicant "shall subscribe to and submit a written

application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport." 22 U.S.C. § 213. The applicant is subject to criminal sanctions for "willfully and knowingly mak[ing] any false statement in an application for a passport with intent to induce or secure the issuance of a passport under the authority of the United States, either for his own use or the use of another." 18 U.S.C. § 1542.

The policies that govern the Department's operations regarding passports appear in the Foreign Affairs Manual ("FAM") at 7 FAM § 1300, which "applies to all passport-issuing offices, including U.S. passport agencies and processing centers . . . ." 7 FAM § 1312(a). Appendix M "provides policy and procedures passport specialists must follow" regarding a gender marker on a U.S. passport. 7 FAM § 1310(a) App. M; *see also* AR 00020-27 ("Gender Policy" or "Policy").[4] "An individual's gender is an integral part of that person's identity." 7 FAM § 1310(c) App. M.

## STANDARD OF REVIEW

Judicial review of agency action is governed by the APA, which provides that a "reviewing court shall. . . hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2); *see Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413 (1971); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573 (10th Cir. 1994). "These standards require the

---

[4] The Department revised the Gender Policy, 7 FAM § 1300 Appendix M, on March 31, 2016, resulting in some organizational differences. For references to the Policy, Zzyym cites to the FAM sections as they exist in the Administrative Record. *See* AR 00020-27.

reviewing court to engage in a 'substantial inquiry.' An agency's decision is entitled to a presumption of regularity, 'but that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review.'" *Olenhouse*, 42 F.3d at 1574 (citing *Overton Park*, 401 U.S. at 415).

A court reviewing agency action under the "'arbitrary and capricious' standard must ascertain whether the agency examined the relevant information and articulated a rational connection between the facts and the decision made." *Olenhouse,* 42 F.3d at 1574. Agency action should be set aside "if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). "In addition to requiring a reasoned basis for agency action, the 'arbitrary and capricious' standard requires an agency's action to be supported by the facts in the record." *Olenhouse,* 42 F.3d at 1575.

Questions of law, including Constitutional claims, are entitled to *de novo* review. *See Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1030 (10th Cir. 2001).

## ARGUMENT

## I.    THE DEPARTMENT VIOLATED THE ADMINISTRATIVE PROCEDURE ACT

### A.    The Department's Actions Are Arbitrary and Capricious

"The 'arbitrary or capricious' concept . . . embraces a myriad of possible faults and depends heavily on the circumstances of the case." *Lodge Tower Condo. Ass'n v. Lodge Props., Inc.*, 880 F. Supp. 1370, 1376 (D. Colo. 1995) (quoting *P.R. Sun Oil Co. v. EPA*, 8 F.3d 73, 77 (1st Cir. 1993)). The Court's supervisory function calls on it to intervene "if the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a

'hard look' at the salient problems, and has not genuinely engaged in reasoned decision making." *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923 (1971). With danger signals rampant throughout the administrative record, the Department's decision to deny Zzyym's application for a passport was arbitrary and capricious in violation of the APA.

### 1.    The Department Failed to Provide a Reasoned Basis for Denying Zzyym's Passport Application

The APA embodies a basic and core concept of administrative law: agencies are required to articulate a satisfactory explanation for their actions. *See Kansas v. United States*, 249 F.3d 1213, 1228-29 (10th Cir. 2001). The requirement that agency action not be arbitrary and capricious means, in particular, that the agency must adequately explain its result so that a reviewing court is able to discern the agency's rationale. "The arbitrary and capricious standard of the APA mandates that an agency take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision." *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1404 (D.C. Cir. 1995); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 805-06 (1973). When the court cannot tell from the decision what those policies are, the decision is unlawful under the APA and cannot be sustained. *Atchison*, 412 U.S. at 806.

In denying Zzyym's application for a passport, the Department failed to set forth any grounds upon which it acted. The Department's December 2014 letter provided a single conclusory sentence: "[T]he Department of State requires the sex field on the United States passports to be listed as 'M' or 'F'." AR 00036. The Department provided no discussion of the salient facts, relevant factors considered, or rationale for its conclusion. Nor did the Department suggest that any of the provisions of 22 C.F.R. § 51.60, setting forth reasons for mandatory and

8

discretionary denials or restrictions of passports, applied. As a result, neither Zzyym nor a reviewing court can ascertain what the agency relied upon. AR 00036 (stating it had denied the application only "[b]ecause your application did not meet our requirements," absent elaboration).

Without any way to determine the Department's basis for denying the passport, Zzyym asked the Department to reconsider its decision or, in the alternative, to provide an administrative hearing. *See* Letter from Dana Zzyym to Sherman D. Portell, Director, Colorado Passport Agency (Feb. 26, 2015), attached hereto as Exhibit 1. Zzyym noted that "[t]he Notification of Denial did not set forth any explanation, specific reason, or legal basis for the assertion that [the State Department] '*requires* the sex field on United States passports to be listed as 'M' or 'F'" and that "[a]t minimum, [the agency] must articulate the reasoning behind its conclusion that Dana is not entitled to a U.S. passport for international travel with an accurate sex marker[.]" *Id.* at 2. Yet, not only did the Department deny Zzyym's request for both reconsideration and a hearing, it also declined the opportunity to cure its APA deficiency. Compl. Ex. A.

Thus, the Department failed to satisfy the basic APA requirements that "[the] 'agency must cogently explain why it exercised its discretion in a given manner' . . . and that explanation must be 'sufficient to enable us to conclude that the agency's action was the product of reasoned decision making.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (citing *State Farm*, 463 U.S. at 48, 52). For this reason alone, the Department's decision must be set aside as arbitrary and capricious.

### 2.    *The Department Ignored Its Own Gender Policy without Explanation*

The Department's actions are arbitrary and capricious also because it failed to follow definitive, on-point procedures regarding the processing of passports for intersex applicants—without any explanation, rationale, or even an acknowledgment that such procedures exist. An agency cannot change its policies, without first "supply[ing] a reasoned analysis indicating that

9

prior policies and standards are being deliberately changed, not casually ignored." *Greater Bos. Television Corp.*, 444 F.2d at 852; *see also Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1327 (10th Cir. 2007). To satisfy the "reasoned analysis" standard, an agency first must "display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Once the agency has identified a conflicting past practice, it must suitably justify any deviation. *Greater Bos. Television Corp.*, 444 F.2d at 852 ("[I]f an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.").

Here, the Department has failed even to acknowledge its own procedures applicable to intersex persons who seek an accurate gender maker on their passports—even though the Department, in fact, considered its Gender Policy when it deprived Zzyym of a passport. *See* AR 00020-27. Within the Policy, which prescribes procedures for any person seeking an accurate gender marker on a U.S. passport, the Department reserves a section for people born with sex characteristics that do not fit typical binary notions of male and female. 7 FAM § 1350 App. M ("Intersex Conditions"), AR 00026; *see also* FAM § 1350(a) App. M (observing intersex applicants "do[] not fit typical definitions of male or female"), AR 00026. The Gender Policy states intersex applicants who do not provide medical certification of "gender correction" to male or female will be required to use the gender listed on the applicants' birth documentation. 7 FAM § 1350(c) App. M., AR 00026.

In this case, Zzyym took steps to comply with the Gender Policy, notwithstanding the discriminatory language restricting an applicant's options to male or female. Zzyym submitted a letter explaining, "I am an intersex person" and, "[a]s an intersex person, I'm not male or female." AR 00010. Zzyym also submitted medical certification from licensed VA physicians

confirming Zzyym was born intersex, *id.*, and received "clinical treatment" for being "intersex," *id.* at 00031; *see also id.* at AR 00033; 7 FAM § 1310(e) ("Medical certification . . . is the only documentation of gender change required."). Moreover, the gender listed on Zzyym's certified Michigan birth certificate states "unknown." AR 00005. Thus, by the Department's own policy, the gender marker on the passport should also be "unknown" (i.e., a marker other than "M" or "F"). Yet, the Department disregarded its own procedures without explanation. Ignoring agency procedures applicable to intersex people without explanation is exactly the type of arbitrary and capricious decisionmaking that runs afoul of the APA. The Department cannot jettison its own policy, as a matter of agency discretion, without explanation.

### 3. The Post-Hoc Explanations Fail to Demonstrate Reasoned Decisionmaking

In considering whether the agency took a "hard look," a court may only consider the agency's reasoning at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs or argument. *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1165 (10th Cir. 2002) (citing *Olenhouse*, 42 F.3d at 1565). Yet, for the first time in its Motion, the Department presents purported rationales for denying Zzyym's passport application: (1) an incomplete application form, and (2) the gender listed on Zzyym's passport application is inconsistent with the gender marker on Zzyym's driver's license. *See* Motion 8-10. These purported rationales were never before provided to Zzyym, constituting a violation of the APA. Even if the Department had adequately provided notice to Zzyym of these reasons, neither passes APA muster, because they are insufficient to enable this Court to determine whether the denial resulted from reasoned decisionmaking. *State Farm*, 463 U.S. at 52.

First, the Department claims Zzyym did not "complete" the passport application because Zzyym did not mark either "M" or "F" on the application form." Motion 2, 8-9. The Department

cites to its regulation stating "an application for a passport . . . must be completed using the forms the Department prescribes." 22 C.F.R. § 51.20(a). Yet the assertion that Zzyym failed to comply with the regulation is not supported by the record. Zzyym not only submitted Form DS-11—the form prescribed by the Department for first-time passport applicants—but Zzyym also completed the sex field by responding "Intersex." AR 00002-3. "Intersex" is an accurate description of Zzyym's gender, *see supra* Argument, Part I.A.2, and the Department's cited regulation warns that "[t]he passport applicant must truthfully answer all questions" and "a person providing false information as part of a passport application . . . is subject to prosecution under applicable Federal criminal statutes." 22 C.F.R. § 51.20(b); *see also* 18 U.S.C. § 1542 (imposing criminal sanctions for willfully and knowingly making any false statement in an application for passport); 22 U.S.C. § 213 (verification by oath of passport application). Moreover, it would be indefensible for the Department to argue that an applicant must fill out each and every field or blank space even if the response were inapplicable or untruthful.[5] The Department's strained view of the regulation as requiring either a "male" or "female" selection makes it impossible for Zzyym to ever acquire a passport, an unconstitutional result. *See infra* Argument, Parts II-IV.

Second, the Department claims it "acted reasonably in refusing to issue a passport listing a sex inconsistent with the identifying document submitted in support of the Plaintiff's

---

[5] For example, the Department does not reject other passport applications because the applicant does not specify a middle name (when there is none); prior names (when there are none); name of spouse (when applicant is unmarried); and occupation and employer (when unemployed). But even if responding "Intersex" for the sex field is not "completing" the form, the lack of an accurate gender marker option and the Department's male-or-female-only requirement is precisely what Zzyym is challenging.

application, a Colorado driver's license that listed Plaintiff's sex as 'F'." Motion 9. Yet, as explained above, the Department "provides policy and procedures that passport specialists . . . *must* follow in cases in which an applicant requests a gender on the passport application *different* from the one reflected on some or all of the submitted citizenship and/or identity evidence . . . ." 7 FAM § 1310(a) App. M (emphasis added), AR 00020. The Department's acknowledgement that in some cases the applicant's gender may differ from proffered identity evidence shows that the purported "inconsistency" itself cannot be a valid and reasoned basis for the denial.

The Department then attempts to justify its actions by simply stating that "it has brought its expertise to bear" by "promulgating a regulatory framework that governs the passport application process." Motion 10 (citing 22 C.F.R. §§ 51.1-.74). Part of that framework requires that passport applicants bear the burden of establishing their identity. *See* 22 C.F.R. § 51.23(a). Identity is established "by the submission of a previous passport, other state, local, or federal government officially issued identification with photograph, or other identifying evidence which may include an affidavit of an identifying witness." *Id.* § 51.23(b). Out of an abundance of caution, Zzyym provided to the Department *multiple* identity documents: two Veteran ID cards (federally-issued identification with photograph) and a Colorado driver's license (state-issued identification with photograph). AR 00007-9. Given that a discrepancy in gender markers among documents does not *per se* prohibit a passport applicant from establishing identity (as the Policy itself acknowledges), the lack of reasoned decision-making becomes all the more apparent.

13

Zzyym met the burden of establishing identity by presenting a valid driver's license—one of the five "primary identification" documents permissible to establish identity. 7 FAM § 1320.[6] Indeed, the Gender Policy recognizes that "state law and foreign laws vary as to whether a driver's license . . . may be issued reflecting a gender change" and, therefore, an applicant may establish "evidence of identity" with "acceptable primary ID *in the old gender*." 7 FAM § 1320(2)(c) App. M (emphasis added), AR 00021. Moreover, despite the Department's protestations that Zzyym requested a gender marker inconsistent with the proffered driver's license showing a female gender marker, the Department nevertheless offered Zzyym the option of utilizing the Policy "to receive a passport listing you as male," AR 00018, thus acknowledging that the passport gender designation may differ from the gender on a proffered identity document. As a result, Zzyym's driver's license listing a female gender marker is not a reasoned basis for the Department's refusal to issue the passport. The Department's decision "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The required rational connection is missing, making the decision arbitrary and capricious.

### 4. The Department Failed to Consider a Third Gender Marker as a Viable Alternative

The Department's actions are also arbitrary and capricious because they failed to give any consideration to the viability of a third gender marker on a U.S. passport. Agency action is arbitrary and capricious if the agency has failed to consider an important aspect of the problem. *United States v. Burlington N.R. Co.*, 200 F.3d 679, 689 (10th Cir. 1999). In *Motor Vehicle*

---

[6] *See also* Bureau of Consular Affairs, U.S. Dep't of State, Passports First Time Applicants, Present Identification, https://travel.state.gov/content/passports/en/passports/first-time.html#step4 (last visited Apr. 4, 2016).

*Manufacturers Association v. State Farm Mutual Auto Insurance Co.*, the Supreme Court highlighted such an inadequacy when the National Highway Traffic Safety Administration's (NHTSA) failed to consider whether airbag technology alone, as opposed to a manufacturer's choice between passive seatbelts and airbags, could effectively meet the agency's desired safety standards. *See* 463 U.S. at 46-57. In holding NHTSA's decision arbitrary and capricious, the Court did not focus on whether airbags were a desirable safety improvement or whether it would have been rational for an agency to reach that conclusion, but instead focused solely on the fact that the agency "apparently gave no consideration whatever" to the viability of an airbag-only requirement. *Id.* at 43.

Here, the Department failed to consider the already existing option to use a third gender marker that adheres to international standards. The content, design, and format of U.S. passports are informed by standards developed by the ICAO.[7] ICAO's Technical Assistance Group, comprised of government officials who specialize in the issuance and border inspection of passports, develops the passport specifications in ICAO Document 9303. *See, e.g.*, 7 FAM § 1310(c)(2) (stating ICAO "has set international specification for machine-readable passports"). In addition to "M" and "F," the "X" gender marker conforms to ICAO standards for entry in the sex field.[8] Indeed, because the "X" gender marker has been adopted by a growing number of

---

[7] The United States is an active member of ICAO, established by the Convention on Civil Aviation of 1944 (Chicago Convention). *See Wardair Can. Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 9-10 (1986); *see also* 22 U.S.C. § 5501 ("It is the policy of the United States . . . to work through the [ICAO] to improve aviation security internationally."). ICAO is the sole international body that establishes global standards for travel document content and format.

[8] *Machine Readable Travel Documents*, ICAO Document 9303, Part IV at 14 (7th ed. 2015) ("Sex of the holder, to be specified by . . . the capital letter F for female, M for male, or X for unspecified."), *available at* http://www.icao.int/Security/mrtd/Pages/Document9303.aspx. ICAO Document 9303 was in its 6th edition when Zzym applied for a passport. While 9303 has since been updated, the relevant provision remains the same.

countries around the world[9] and conforms to ICAO standards, Zzyym requested an "X" gender marker. AR 00004, 29; *see also id.* at 00015. Additionally, the federal government permits foreign nationals who have the gender marker "X" listed on their passports to enter and exit the United States. *See, e.g.*, *id.* at 00028 (regarding Australian citizen Morgan Carpenter). Like the agency communication in *State Farm*, none of the Department's correspondence to Zzyym discussed consideration of a viable alternative—in this case, a third marker on the passport. Where "[t]here are no findings and no analysis here to justify the choice made, no indication of the basis on which the [agency] exercised its expert discretion," the Department's action in denying Zzyym's passport is arbitrary and capricious. *See State Farm*, 463 U.S. at 48.

## B.     The Department Exceeded Its Authority under the Passport Act

When it refused to issue Zzyym a passport, the Department exceeded its statutory authority under the Passport Act. 22 U.S.C. § 211a (authorizing the Secretary to "grant and issue passports… under such rules as the President shall designate and prescribe for and on behalf of the United States . . . ."). Although issuance is discretionary, the scope of the Secretary's passport power is grounded in, and dependent upon, legislative approval. *See Kent v. Dulles*, 357 U.S. 116, 128 (1958) ("We . . . hesitate to impute to Congress . . . a purpose to give [the Secretary of State] unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose.").

In *Kent v. Dulles*, the Court struck down the Secretary's practice of denying passports based on Communist affiliation because, "[w]ithout explicit congressional authorization to refuse

---

[9] Australia, India, Malta, Nepal, and New Zealand are among the growing number of countries offering passports with gender markers other than "M" or "F." *See* Lauren Bishop, *Gender and Sex Designations for Identification Purposes: A Discussion on Inclusive Documentation for a Less Assimilationist Society*, 30 Wis. J.L. Gender & Soc'y 131, 142 (2015).

passports on the basis of beliefs or associations, the Secretary could not employ such a standard." *Id.* at 127, 129. The Court stressed that applicants were "not seeking to escape the law or violate it," but were denied passports based on beliefs entitled to First Amendment protections: "Where activities of enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them." *Id.* at 129; *see also Woodward v. Rogers,* 344 F. Supp. 974, 985 (D.D.C. 1972), *aff'd*, 486 F.2d 1317 (D.C. Cir. 1973) ("[O]nly the clearest of such evidence will permit this Court to consider Congressional silence to be a substitute for explicit and affirmative legislative action in limiting the free exercise of important rights.").

The Department concedes that the Passport Act "does not expressly grant the denial of passport applications, nor specify particular reasons they may be denied." Motion 11. And the Department provides *no* evidence that Congress granted the Secretary—through acquiescence or any other means—the alleged right to deny an intersex applicant who is neither male nor female an accurate gender marker on a passport. *See Haig v. Agee*, 453 U.S. 280, 306 (1981) (requiring a pattern of actual enforcement or evidence that the agency has openly asserted the power at issue to infer congressional approval). The Department cannot cite to its own procedural regulations that do not clearly address gender markers on passports as evidence of legislative acquiescence. *See* Motion 11. Nor can the Department seek shelter under 22 U.S.C. § 213, where express statutory language requires the passport application "contain a *true recital* of each and every matter of fact which may be required by law or by any rules authorized by law." (emphasis added). As shown in the record, Zzyym's gender is not male and not female, but rather intersex—a third gender.

Like the applicant in *Kent*, Zzyym does not to seek to acquire a passport for an unlawful or improper purpose. Compl. ¶ 43. Nor do the Department's grounds for refusal relate to Zzyym's citizenship or allegiance, or to criminal or unlawful conduct. *Id.* ¶ 42; AR 00018-19, 00036. As an intersex advocate, Zzyym simply sought the passport to attend the Intersex World Conference on behalf of OII-USA. Thus, "there [is] in reality [no] definite policy in which Congress could have acquiesced" to providing the Secretary with authority to deny passports to citizens based only upon personal characteristics. *See Haig*, 453 U.S. at 303.

## II.    THE GENDER POLICY MUST BE SUBJECTED TO HEIGHTENED SCRUTINY

The Department's policy of denying passports to people who cannot truthfully describe themselves as being either male or female is antithetical to the basic principle of equal protection of laws, which ensures that similarly situated persons are not treated differently simply because of their membership in a class. *Plyler v. Doe*, 457 U.S. 202, 216 (1982).[10] It creates a permanent underclass of people who are singled out and denied a passport for travel and identification based simply on their constitutionally protected personal characteristics. This stigmatized, second-class status cannot be squared with the basic dictates of equal protection under the Due Process Clause of the Fifth Amendment, which "withdraws from the Government the power to degrade or demean" in the way this binary, male-or-female-only gender maker policy does. *See United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013).

---

[10] Zzyym, an intersex U.S. citizen, is similarly situated to people who identify exclusively as male or female in all of the characteristics relevant to issuance of a passport by the Department. Zzyym, like other citizens or non-citizen nationals, may seek to travel abroad for job and business opportunities; for cultural, political and social activities; or for all the reasons any other person may have. *See Aptheker v. Secretary of State*, 378 U.S. 500, 519-20 (1964) (Douglas, J., concurring).

### A. The Gender Policy Warrants Heightened Scrutiny Because It Discriminates Based on Gender

"'[A]ll gender-based classifications today' warrant 'heightened scrutiny.'" *United States v. Virginia*, 518 U.S. 515, 555 (1996) (quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1992)). Heightened scrutiny applies whether the asserted justification for discrimination is benign or invidious. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). The "analysis and level of scrutiny applied to determine the validity of the classification do not vary simply because the objective appears acceptable . . . ." *Id.* at 724 n.9. Classifications based on gender are invalid absent an "exceedingly persuasive justification" showing they substantially further important governmental interests. *Virginia*, 518 U.S. at 534. The initial relevant inquiry is whether the law treats an individual differently because of gender. *See J.E.B.*, 511 U.S. at 146.

#### 1. The Department's Policy Expressly Classifies Persons Based on Gender

The policy warrants heightened scrutiny because it facially relies upon and classifies persons on the basis of gender. *See* AR 00036. The Department of State's requirement that "the sex field on the United States passports []be listed as 'M' or 'F'" is literally a gender classification, including only males and females, and excluding all other genders. *See, e.g.*, 7 FAM § 1350(a) App. M (acknowledging intersex applicants "do[] not fit typical definitions of male or female."); *see also Schroer v. Billington*, 424 F. Supp. 2d 203, 211 (D.D.C. 2006) (noting that gender "is not a cut-and-dried matter of chromosomes"). In other words, if Zzyym were male or female, Zzyym would receive a passport for international travel.

The Department's policy, which expressly relies on gender as a condition of passport eligibility, cannot escape heightened scrutiny based on the argument that it is a "generally applicable" requirement that applicants complete the form and "indicate their sex by checking either 'M' or 'F.'" Motion 18. *See J.E.B.*, 511 U.S. at 146 (holding that government may not

19

strike jurors based on sex, even though such a practice, as a whole, does not favor one sex over the other). *Cf. Loving v. Virginia*, 388 U.S. 1, 8 (1967) (discarding "the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations"). Consider a scenario where the passport application provided only female and third-gender options, and did not provide a "box" for males. Would the government argue that the limited designations were permissible because the requirement of completing the form with 'F' or 'X' equally applied to everyone, even though there was no male option? The express facial classification of the policy based on gender requires the application of heightened scrutiny.

> **2.      *The Policy Constitutes Gender Discrimination for the Additional Reason That It Enforces Conformity with Gender-Based Expectations or Stereotypes***

The Supreme Court's gender-discrimination case law has focused not only on the harm of restricting an individual's opportunities based on facial gender-based classifications, but also on the harm inflicted when government requires people to conform to traditional gender-based stereotypes and expectations. The Court has recognized "the real danger that government policies that professedly are based on reasonable considerations in fact may be reflective of 'archaic and overbroad' generalizations about gender . . . ." *J.E.B.*, 511 U.S. at 135; *see also Orr v. Orr*, 440 U.S. 268, 283 (1979) (invalidating measure that "carrie[d] with it the baggage of sexual stereotypes"); *Califano v. Goldfarb*, 430 U.S. 199, 217 (1977) (finding unconstitutional a Social Security provision treating nondependent widows and widowers differently based on stereotypical generalizations) (citation omitted); *Frontiero v. Richardson*, 411 U.S. 677, 685 (1973) (discussing how "our statute books gradually became laden with gross, stereotyped distinctions between the sexes").

The policy impermissibly seeks to enforce the gender-based expectation that every person must be either male or female, and that there are no other possibilities to consider. The existence of intersex individuals controverts the underlying assumption that gender is binary. Indeed, "intersex individuals are real, and cannot be ignored." *Schroer*, 424 F. Supp. 2d at 213 n.5. "Hence, 'archaic and overbroad' generalizations . . . [cannot] justify use of a gender line in determining eligibility for certain government entitlements." *Craig v. Boren*, 429 U.S. 190, 198 (1976) (internal citations omitted). All persons, whether intersex or not, are protected from discrimination on the basis of gender-based preferences, assumptions, expectations, stereotypes, or norms. *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1319 (11th Cir. 2011), *Smith v. City of Salem, Ohio*, 378 F.3d 566, 572 (6th Cir. 2004). Such gender stereotyping is constitutionally impermissible, and the Department's policy therefore cannot withstand heightened scrutiny.

### 3.    *Express Governmental Exclusions of Intersex People or Those Who Are Neither Male Nor Female Constitute Discrimination Based on Sex*

"Discrimination on the basis of . . . being . . . intersex, or sexually indeterminate, constitutes discrimination on the basis of the properties or characteristics typically manifested in sum as male and female—and that discrimination is literally discrimination 'because of sex.'" *Fabian v. Hosp. of Cent. Conn.*, No. 3:12-CV-1154 (SRU), 2016 WL 1089178, at *13 (D. Conn. Mar. 18, 2016); *see also Schroer*, 424 F. Supp. at 213, n.5 (same). *Cf. G.G. ex rel. Grimm v. Gloucester Cnty. Pub. Sch. Bd.*, No. 15-2056, 2016 WL 1567467, at *7 n.7 (4th Cir. Apr. 19, 2016) ("Modern definitions of 'sex' also implicitly recognize the limitations of a nonmalleable binary conception of sex.") Intersex individuals possess traits generally associated with both males and females and, thus, defy traditional categorization as either. Therefore, discrimination

on the basis of intersex status constitutes a *per se* gender classification entitled to heightened scrutiny.[11]

> **B.    Even Absent a Suspect Classification, the Department's Actions Must Be Subject to Strict Scrutiny Because They Prohibit Zzyym From Exercising the Fundamental Right to Travel and Other Fundamental Liberty Interests**

Strict scrutiny is also required because the policy discriminates with respect to the exercise of a fundamental right. *See infra* Argument, Part III. When a legislative classification interferes with exercising a fundamental right, it must be narrowly tailored to advance a compelling governmental interest. *See Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942); Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 10.1 (4th ed. 2011).

## III.    THE DEPARTMENT'S REFUSAL TO ISSUE AN ACCURATE PASSPORT TO ZZYYM INTERFERES WITH PLAINTIFF'S FUNDAMENTAL RIGHT TO TRAVEL AND OTHER LIBERTY INTERESTS

The Due Process Clause of the Fifth Amendment also protects individuals from arbitrary governmental intrusion into fundamental rights. *See*, *e.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 484-86 (1965). When laws burden the exercise of a fundamental right, the government must show that the intrusion is narrowly tailored to serve a compelling government interest. *See Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). The Department cannot show that the policy is rationally related—much less narrowly tailored—to its purported interests. Thus, as described below, the policy does not survive rational basis review, let alone strict scrutiny.

The Department attempts to discount the fundamental rights and liberty interests at stake by asserting that Zzyym seeks to invoke a new right, the "right to be issued a U.S. passport that

---

[11]The Department's assertion that Zzyym's acknowledgement that the question of whether intersex status constitutes a *per se* gender classification has not reached the Supreme Court and, therefore, automatically relegated to rational basis review is confounding. Motion 19. Most cases are developed and decided by lower courts empowered to make thoughtful and reasoned decisions in the first instance.

indicates Plaintiff's sex with an 'X',", rather than the same right to a key identity document and associated ability to travel exercised by others. Motion 13. Here, Zzyym does not seek a new right to a passport containing particular information, but rather seeks to exercise the right to international travel as well as the right to individual dignity and autonomy.[12] Compl. ¶¶ 69-72.

### A.     The Department's Actions Infringe upon the Fundamental Right to International Travel

The right to international travel is "part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." *Kent*, 357 U.S. at 126.

> Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values.

*Id.* The right of the citizen to travel freely around the world is closely guarded by our Constitution. *See, e.g.*, *DeNieva v. Reyes*, 966 F.2d 480, 485 (9th Cir. 1992) ("[T]he Supreme Court has explicitly recognized the right to international travel since 1958."); *Worthy v. United States*, 328 F.2d 386, 392 (5th Cir. 1964) ("The right to travel outside the United States is a right within the protection of the Constitution."). Absent compelling circumstances, depriving a U.S. citizen—who has committed no unlawful act—of the right to leave the country transforms a citizen into a prisoner.

---

[12] The Department's attempt to supplant the central right with its own narrow formulation echoes the flawed reasoning of the Supreme Court's decision in *Bowers v. Hardwick,* 478 U.S. 186 (1986), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003), which delineated the right at issue as a "fundamental right" of "homosexuals to engage in sodomy," rather than a right, shared by all adults, to consensual intimacy with the person of one's choice. *Lawrence*, 539 U.S. at 566-67 (quoting *Bowers*, 478 U.S. at 190). *Lawrence* held that *Bowers* "fail[ed] to appreciate the extent of the liberty at stake." 539 U.S. at 567

As a threshold matter, the Department seeks to shirk its heavy burden for intruding upon the right to international travel by offering Zzyym the Hobson's choice of obtaining a passport with an incorrect gender marker or not obtaining a passport. *See* Motion 14. The erasure of intersex people and lack of protections for the intersex community are precisely the problems Zzyym sought to address at the International Intersex Forum world conference in Mexico City.[13] AR 00015. But in addition to the dignitary harm inflicted by the Department's suggestion that Zzyym should not live openly and truthfully as an intersex person who is neither male nor female, the "option" proposed by the Department exposes Zzyym to criminal penalty for dishonesty in obtaining the passport. *See, e.g.*, *Browder v. United States*, 312 U.S. 335, 337-40 (1941) (upholding conviction under 18 U.S.C. § 1542 for benign use of a passport secured by a false statement). Contrary to the Department's suggestion, Zzyym does not seek "particular information" on the passport, Motion 13, only accuracy. Thus, the Department's policy precluding any gender marker other than "male" or "female" and its denial of a U.S. passport with an accurate gender marker are direct impediments to Zzyym's fundamental right to international travel. *See Lynd v. Rusk*, 389 F.2d 940, 942 (D.C. Cir. 1967) (recognizing "denial of a passport has the undoubted practical consequence of effectively limiting travel"); 8 U.S.C. § 1185 (prohibiting international travel without a passport).

Fifth Amendment liberty interests—including the right to international travel—cannot be cabined by a scheme that leaves exercise of liberty to the whim of the agency. The Supreme Court has repeatedly stated that restrictions on international travel must be justified by the "weightiest considerations of national security." *Zemel v. Rusk*, 381 U.S. 1, 16 (1965).

---

[13] "Freedom of movement is kin to the right of assembly and the right of association." *Aptheker v. Secretary of State*, 378 U.S. 500, 520 (1964) (Douglas, J., concurring).

Furthermore, "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Aptheker*, 378 U.S. at 508 (striking down a law denying passports to members of a Communist organization). Government action interfering with international travel must be "narrowly drawn to prevent the supposed evil" and "precision must be the touchstone of legislation affecting basic freedoms." *Id*. at 514.

The Department, citing *Haig v. Agee*, 453 U.S. 280 (1981), proposes an entirely toothless rule suggesting the right to international travel must yield any time the government decides a passport restriction is appropriate. Rather, *Haig* confirmed the strict scrutiny standard employed in *Apetheker*. In *Haig*, the Court upheld the revocation of the passport of a former CIA employee, Philip Agee, who admitted that he was publicly exposing undercover CIA agents and thus was causing "serious damage" to national security interests. "It is 'obvious and unarguable' that no governmental interest is more *compelling* than the security of the nation." *Haig*, 453 U.S. at 307 (emphasis added). Demonstrating the Department's cancellation of Agee's passport was narrowly tailored, the Court concluded that "[r]estricting Agee's foreign travel . . . is the only avenue open to the Government to limit these activities." *Id*. Contrary to the conduct at issue in *Haig*, the purpose for Zzyym's trip was neither unlawful nor improper and posed no danger to national interests. Thus, the Department's *carte blanche* approach of unfettered, standard-less discretion stands in stark contrast to the Supreme Court's application of strict scrutiny in cases infringing upon the fundamental right to international travel.

### B.    The Department's Actions Infringe upon the Fundamental Right to Individual Dignity and Autonomy

"The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*,

135 S. Ct. 2584, 2593 (2015); *see also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992) (the right of self-definition is at the heart of liberty shielded by the due process guarantee against unwarranted government interference). Here, the government's actions denying a core part of Zzyym's identity and forcing Zzyym to lie about their personal identity offend the essence of the Due Process guarantee's regard for individual dignity and autonomy. It would clearly be a great intrusion on individual autonomy and self-definition to have the government require that a woman identify herself incorrectly as a man on a passport application, and force her to accept and use a government-issued identity document incorrectly identifying her as male, or to mandate that a man similarly incorrectly identify himself as a woman and accept and use an identity document incorrectly identifying him as female. The requirement at issue here for Zzyym is no different. Being able, when asked "Who are you?" to show accurate support for that answer allows one to move freely through societal challenges.

For centuries, government deemed lesbians and gay men as without "dignity in their own distinct identity." The Department has similarly disparaged Zzyym and their ability to live openly and honestly as an intersex person by mandating that Zzyym's passport—a core identity document—erase their identity and personal history, and thereby Zzyym's dignity and personhood. *See Obergefell*, 135 S. Ct. at 2596. As the Department itself notes, "[a]n individual's gender is an integral part of that person's identity." 7 FAM § 1310(c) App. M. The Department's actions put the imprimatur of the federal government itself on an exclusion that demeans or stigmatizes Zzyym. The limitation of passports to binary sex markers may long have seemed natural and just, but its inconsistency with the Due Process Clause's protection for individual dignity and autonomy is now apparent. *See Obergefell*, 135 S. Ct. at 2598 (noting our founders "did not presume to know the extent of freedom in all its dimensions, and so they

entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning."). The Department's policy "impose[s] stigma and injury of the kind prohibited by our basic charter." *Obergefell*, 135 S. Ct. at 2602. Consequently, the Department's insistence on issuing a passport incorrectly identifying Zzyym's gender deprives Zzyym of their fundamental liberty interest to dignity and autonomy, absent any justification at all, let alone the compelling justification required, and therefore violates the Due Process Clause.

## IV.    THE POLICY CANNOT SURVIVE UNDER ANY LEVEL OF SCRUTINY

The Department does not argue that the challenged policy meets any level of heightened scrutiny—nor could it, because the policy utterly fails even rational basis review. Importantly, rational-basis review in this context is not toothless. *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981). "[E]ven in the ordinary equal protection cases calling for the most deferential of standards, [the Court] insist[s] on knowing the relation between the classification adopted and the object to be obtained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). The justifications offered must have a "footing in the realities of the subject . . . ." *Heller v. Doe*, 509 U.S. 312, 321 (1993); *Plyler*, 457 U.S. at 223-30; *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533-38 (1973). And even when the government offers an ostensibly legitimate purpose, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). None of the Department's justifications meet this standard.

### A.    The Decision to Deny Zzyym a Passport Is Irrational in Light of the Department's Own Policy to Establish Identity with Primary Identification "in the Old Gender"

The Department's contention that a passport applicant is *per se* precluded from establishing identity where the gender marker in the identification document differs from the gender on the application is entirely without merit. *See supra* Argument, Part I.A.3. Fully

acknowledging that a gender marker could be different from "some or all of the submitted . . . identity evidence" for applicants seeking an accurate gender marker, the Gender Policy allows the applicant to establish "evidence of identity," with "acceptable primary ID *in the old gender*." *See* FAM §§ 1310(a), 1320(2)(c) App. M; *see also* 22 C.F.R. § 51.23(b). The Department does not contend that Zzyym is not the person who submitted the application, nor is there any evidence suggesting that the Department was ever concerned that Zzyym might be attempting to obtain a fraudulent passport. Compl., ¶¶ 42-43. The justification is irrational in light of the Department's own policy and procedures for applicants seeking an accurate gender marker.

**B.      The Policy Undermines the Department's Own Interest in Ensuring the Integrity of the Passport Because It Requires Zzyym to Adopt an Inaccurate Gender Marker**

The Department articulates "a legitimate governmental interest in ensuring the integrity of the U.S. passport such that it remains a secure and unassailable proof of identity and citizenship." Motion 15. Yet rather than support and promote the integrity of the identity document, the policy as applied to a person who is neither male nor female undermines the very interest that the Department seeks to further. Zzyym submitted multiple medical certifications from licensed physicians attesting that Zzyym is neither male nor female, but intersex. Through its policy, the Department asks Zzyym to disregard fact, and to arbitrarily pick one of two genders when neither would be accurate. There is no rational connection between forcing an applicant to be dishonest about their gender and the Department's interest in maintaining the integrity of the passport.

The proffered justification is all the more problematic when examined in context of how the United States processes visas of foreign nationals who have an "X" on their passports. U.S.

Customs and Border Protection allows foreign nationals with an "X" gender marker on their passports to enter and exit the United States freely (assuming they meet all other requirements).[14] In contrast, United States citizens who are neither male nor female are on nationwide house arrest without any ability to leave the country.

The Department's goals of accuracy and "integrity" regarding the passport holder's identity cannot justify the line drawn by the policy. *See Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001) (finding no rational basis in *Cleburne* because "purported justifications for the ordinance made no sense in light of how the city treated other groups similarly situated in relevant respects"); *Romer*, 517 U.S. at 635 (protecting freedom of association and conserving resources could not explain why antidiscrimination protections were barred for gay people and no one else); *Eisenstadt v. Baird*, 405 U.S. 438, 449 (1972) (finding no rational basis where law was "riddled with exceptions" for similarly situated groups).

### C.   Adherence to a Discriminatory Status Quo Offers No Independent and Legitimate Basis to Perpetuate Discrimination Against Zzyym

The Department asserts "the common practice of identifying individuals in government identification as either male or female," Motion 20, but tradition does not legalize discrimination—regardless of the age of the tradition. *See Heller v. Doe*, 509 U.S. 312, 326-27 (1993) ("Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis."); *Whitewood v. Wolf*, 992 F. Supp. 2d 410, 431 (M.D. Pa. 2014) ("Nor can past tradition trump the bedrock constitutional guarantees of due process and equal protection."). That

---

[14] U.S. Dep't of Homeland Security, U.S. Customs & Border Protection, Frequently Asked Questions about the Visa Waiver Program (VWP) and the Electronic System for Travel Authorization (ESTA), http://www.cbp.gov/travel/international-visitors/frequently-asked-questions-about-visa-waiver-program-vwp-and-electronic-system-travel (last visited Apr. 11, 2016).

is because "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Lawrence*, 539 U.S. at 579. With respect to a policy denying Zzyym a passport, the justification of "tradition" does not explain the classification; it merely repeats it.

## V.    ZZYYM HAS STATED A CLAIM FOR MANDAMUS RELIEF

The Department's constitutional violations demonstrate that Zzyym is entitled to mandamus relief. Pursuant to the Passport Act, the Secretary of State has the power to grant, issue, and cause passports to be granted. Processing applications is a ministerial task that is appropriately the subject of mandamus relief. *See Rios v. Ziglar*, 398 F.3d 1201, 1207 (10th Cir. 2005). Zzyym's claim for mandamus relief is pled in the alternative to the claims for relief under the APA. *See Carpet, Linoleum & Resilient Tile Layers v. Brown*, 656 F.2d 564, 567 (10th Cir. 1981) (allowing plaintiff to assert alternative jurisdiction under APA and Mandamus and Venue Act in a single action). Zzyym is entitled to mandamus relief because Zzyym has established a clear right to that relief, the Department's duty to avoid constitutional violations is clearly defined and preemptory, and no other adequate remedy is available for the Department's Constitutional violations. *See* Compl. ¶¶ 91-95.

## CONCLUSION

For all the foregoing reasons, this Court should hold unlawful and set aside the Department's decision to deny Zzyym's passport application based on personal characteristics and declare that the Department violated the APA and infringed upon Zzyym's constitutional rights. The Court should further enjoin the Department from relying upon its binary-only gender-marker policy to withhold U.S. passports from Zzyym and others who are similarly situated.

Respectfully submitted this 22nd day of April, 2016.


_s/ Paul D. Castillo_____

Michael A. Ponto
Emily E. Chow
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Phone: (612) 766-7000
Fax: (612) 766-1600
michael.ponto@faegrebd.com
emily.chow@faegrebd.com


Thomas G. Hackney
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203-4532
Phone: (303) 607-3500
Fax: (303) 607-3600
tom.hackney@faegrebd.com


Jessica Kunevicius
Kristin Petri
THE LAW OFFICE OF JESSICA KUNEVICIUS, LLC
695 South Colorado Blvd., Suite 480
Denver, CO 80246
Phone: (303) 459-2806
Fax: (303) 722-7281
jessica@denverimmigrationlaw.com
kristin@denverimmigrationlaw.com

Paul D. Castillo
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219-6722
Phone: (214) 219-8585
Fax: (214) 219-4455
pcastillo@lambdalegal.org


Hayley Gorenberg
M. Dru Levasseur
Demoya R. Gordon
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 1005
Phone: (212) 809-8585
Fax: (212) 809-0055
hgorenberg@lambdalegal.org
dlevasseur@lambdalegal.org
dgordon@lambdalegal.org


Camilla B. Taylor
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
105 West Adams Street, Suite 2600
Chicago, IL 60603-6256
Phone: (312) 663-4413
Fax: (312) 663-4307
ctaylor@lambdalegal.org


*Attorneys for Plaintiff Dana Alix Zzyym*

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of April, 2016, I electronically filed the above and foregoing PLAINTIFF ZZYYM'S OPENING BRIEF IN SUPPORT OF DECLARATORY, INJUNCTIVE, AND OTHER RELIEF AND OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND MOTION TO DISMISS with the Court using the CM/ECF system and served the following via CM/ECF:

- Ryan Bradley Parker
  ryan.parker@usdoj.gov


*s/ Paul D. Castillo*
Paul D. Castillo