sex by "surgical procedure" and provide a court order to that effect.[1] Additionally, the MSVSA recommended that the correction be kept private.[2]

Over the past three decades, transgender legal rights have advanced and understanding of transgender medicine has evolved. Experts in transgender law and medicine entirely reject the idea that recognition of a person's gender should come only after surgery. This notion has also been significantly eroded in law and policy. Yet, with the exception of new laws and/or policies in three states,[3] birth certificate statutes and policies have yet to be modernized in this respect.

Other scholars have examined the harms to transgender people caused by medically out-of-date policies related to updating gender markers on identity documents and have suggested general frameworks for updating these policies.[4] This Article focuses more specifically on birth certificates by providing a detailed analysis of the rules governing a change in gender markers for all United States jurisdictions that issue them. It also presents policymakers with model statutory and policy language and is the first to resolve this issue within the framework of good government practices in addition to transgender rights.

This Article explains why and how state, local, and territorial birth certificate laws and regulations ought to be revised based on changes in law and medicine. In addition, the Article discusses public policy factors that governments should consider when modernizing their policies, including the cost of various policies and the policies' legal and practical effects on the lives of transgender people.

After providing important background information about gender transition and the state of the law in Section I, the Article discusses three aspects of birth certificate laws and policies. In Section II, it examines the standard of proof—the evidence a person must demonstrate to be eligible for the correction. In Section III, the Article considers the procedure by which the correction is authorized—primarily whether an individual must

---

1. MODEL STATE VITAL STATISTICS ACT AND REGULATIONS § 21(e) (Ctr. for Disease Control & Prevention 1992), *available at* http://www.cdc.gov/nchs/data/misc/mvsact92b.pdf.
2. *See infra* notes 245–48 and accompanying text.
3. The exceptions are California, Washington, and Vermont, each of which has updated statutes or policies in the last several years. *See infra* Part II. A. 2.
4. *See* Dean Spade, *Documenting Gender*, 59 HAST. L.J. 731 (2008); Harper Jean Tobin, *Against the Surgical Requirement for Change of Legal Sex*, 38 CASE W. RES. J. INT'L L. 393 (2005) [hereinafter Tobin, *Against the Surgical Requirement*]; Harper Jean Tobin, *Fair and Accurate Identification for Transgender People*, HARV. KENNEDY SCH. LGBTQ POL'Y J. (2011), *available at* http://isites.harvard.edu/icb/icb.do?key word=k78405&pageid-icb.page414493 [hereinafter Tobin, *Fair and Accurate Identification*].

obtain a court order or whether that individual can go directly to the vital statistics agency for the correction. In Section IV, the Article analyzes privacy protections, or their lack thereof, that exist in these policies.

In each of these sections, the Article documents the state of the law, presents issues to consider when designing a new policy, including constitutional considerations, and provides detailed recommendations for a modernized statute. The Article reviews the relevant MSVSA provisions, provides an overview of birth certificate laws in the fifty-seven state, local, and territorial jurisdictions[5] that administer birth certificates, and examines in greater detail the laws of states which have policies that might serve as models. Where relevant, the Article also describes the 2010 policy regarding federal birth certificate equivalents (known as "Consular Reports of Birth Abroad") for U.S. citizens born outside of the country, as well as the approaches taken by the United Kingdom and Argentina.

Ultimately, in Section V, the Article delineates a model statute for the 21st century, recommending statutory language to be used by state, local, and territorial legislatures, vital statistics agencies, and the U.S. Department of Health and Human Services in future revisions of the MSVSA.[6] Adoption of the language presented here will ensure implementation of a vital statistics system that meets four goals: (1) issuance of accurate birth certificates in accordance with contemporary medical standards, (2) efficient use of government resources, 3) respect for constitutional rights, and (4) proper consideration of both the human and legal effect of an accurate birth certifi-

---

5. The fifty-seven jurisdictions are the fifty states, Guam, Puerto Rico, United States Virgin Islands, American Samoa, Commonwealth of the Northern Mariana Islands, New York City, and the District of Columbia. *See infra* app. A.

6. The U.S. Department of Health and Human Services is currently revising the Model State Vital Statistics Act. *See* Ctrs. For Disease Control & Prevention, *2011 – Model Law Revision*, http://www.cdc.gov/nchs/nvss/model_law_revision.htm (last updated Nov. 10, 2009). I am indebted to my colleagues Mara Keisling and Harper Jean Tobin of the National Center for Transgender Equality, Masen Davis and Kristina Wertz of the Transgender Law Center, Dean Spade of the Sylvia Rivera Law Project, Dru Levasseur of Lambda Legal, Shannon Minter of the National Center for Lesbian Rights, and Jennifer Levi and Janson Wu of the Gay & Lesbian Advocates & Defenders with whom I have discussed and debated extensively the best legislation and policy in this arena. My recommendations are sharper because of their insight. Furthermore, our organizations were, in 2009, able to make a collective recommendation to the Model State Vital Statistics Working Group of the National Center for Health Statistics of the U.S. Department of Health and Human Services, as it considers revisions to the MSVSA. *See* Harper Jean Tobin, Nat'l Ctr. Transgender Equality, Comments of Legal and Public Policy Organizations on Corrected Birth Certificates for Transgender People (Sept. 8, 2009) (on file with author). The recommended legislation in this Article deviates from that collective recommendation in some important respects and should not be taken as the recommendation of my colleagues.

cate. In certain states, this recommended statutory language could be adopted as regulations or written policy to the same positive effect.

While the changes discussed in this Article to vital statistics laws and policies can seem technical in nature, the effect of not having government documentation that matches one's gender identity is tremendous. Although for many, lack of accurate documentation may trigger smaller problems caused by undesired disclosure of their transgender status, for others, the lack of government documentation can have dire effects. Policies that provide transgender people with identity documents that match their gender identity give them a better chance to live life in their gender, and avoid bias, discrimination, and violence in the areas most critical to quality of life, such as employment, housing, and education.

Finally, there is another benefit—to governments and to transgender people—that may result from modernizing birth certificate statutes and policies. Currently, courts struggle to determine the appropriate assessment of legal gender, and often settle on finding physical attributes or presumed genetic traits of the body to be determinative.[7] Transgender rights litigators, aware that relying upon bodily attributes to define legal gender leaves a large majority of transgender people without recognition, often with disastrous consequences, instead point to gender identity—a person's innate sense of themselves as male or female—as the relevant legal determinant.[8] If birth certificate laws and policies were reformed in the manner described in this Article, both courts and litigators could find a mutually satisfactory path forward. Courts would be able to defer to a person's official gender marker on his or her birth certificate, and transgender rights litigators would be satisfied because the ability to change the gender marker on one's certificate would be accessible to all transgender people who undergo gender transition.

## I. Understanding The Problem

### A. A Brief Overview of the Legal Landscape with Regard to Correcting Gender on Birth Certificates

For decades, various government agencies have recognized that those who transition gender should be able to correct the gender on their identity documents. The following section provides an overview of the legal and

---

7. See, e.g., In re Estate of Gardiner, 42 P.3d 120 (Kan. 2002); Littleton v. Prange, 9 S.W.3d 223 (Tex. Ct. App. 1999); Kantaras v. Kantaras, 884 So. 2d 155 (Fla. Dist. Ct. App. 2004).

8. Interview with Dru Levasseur, Transgender Rights Attorney, Lambda Legal in New York, N.Y. (October 12, 2012).

policy approaches taken in the United States related to correcting gender
markers, as well as information about the approaches taken in the United
Kingdom and Argentina for comparison.

### 1. The Model State Vital Statistics Act (MSVSA)

The first Model State Vital Statistics Act[9] was issued in 1907 by the
United States Census Bureau.[10] The stated purpose of having an MSVSA is
to "promote uniformity among States in definitions, registration practices,
disclosure and issuance procedures, and in many other functions that com-
prise a State system of vital statistics."[11]

Since its inception, the MSVSA has been updated only five times,
with the most recent version being released in 1992. The 1977 version of
the MSVSA was the first to address corrections to gender markers. The
1992 revision did not alter the language regarding gender markers; thus,
today, the MSVSA reflects the best thinking of 1977 on gender corrections.
It is quite remarkable that the MSVSA included language regarding these
corrections in 1977, as transgender people had only been in national public
consciousness beginning in the 1950s.[12]

The MSVSA is currently under review for additional revisions, a
multi-year process that started in 2009 and was expected to conclude in
2011, although it has not yet been completed.[13] Organizations engaging in

---

9. Although I abbreviate the Model State Vital Statistics Act as MSVSA, the U.S. De-
partment of Health and Human Services refers to it as the "Model Law" or "Model
Law and Regulations." *See* MODEL STATE VITAL STATISTICS ACT AND REGULA-
TIONS (1992), *available at* http://www.cdc.gov/nchs/data/misc/mvsact92b.pdf. Be-
cause this Article sets out its own model law, I use the MSVSA abbreviation to avoid
confusion for the reader.

10. The 1942 version was also drafted by the Census Bureau. NAT'L CTR. FOR HEALTH
STATISTICS, U.S. DEP'T OF HEALTH & HUMAN SERVS., U.S. VITAL STATISTICS
SYSTEM: MAJOR ACTIVITIES AND DEVELOPMENTS, 1950–95 5 (1997), *available at*
http://www.cdc.gov/nchs/data/misc/usvss.pdf. In 1946, the responsibility for the
MSVSA was transferred to the U.S. Department of Health, Education and Welfare,
which issued the 1959 version. *Id.* at 6. The Department of Health, Education and
Welfare was split, and became the Department of Health and Human Services
(HHS) and Department of Education. HHS now issues the MSVSA.

11. CTR. FOR DISEASE CONTROL & PREVENTION, *Preface* to MODEL STATE VITAL STA-
TISTICS ACT AND REGULATIONS (1992).

12. In the early 1950s, Christine Jorgensen's gender transition was well-documented by
national media. *See Medicine: The Case of Christine*, TIME, Apr. 20, 1953, http://
www.time.com/time/magazine/article/0,9171,822780,00.html.

13. Cathy Molchan Donald, Karen Hampton & Linette Scott, Model Law Work Group
Progress Report at The Joint Annual Conference of National Association for Public
Health Statistics and Information Systems and the National Center for Health Statis-
tics (June 7, 2010) (PowerPoint presentation available at http://www.naphsis.org/
mtg/Pages/2010AnnualMeetingPowerPointPresentationLibrary.aspx).

Zzyym v. Tillerson – AR 0227

advocacy for the lesbian, gay, bisexual, and transgender (LGBT) communities have submitted recommendations to the Department of Health and Human Services on this issue, but it is not yet clear to what extent these will be adopted.[14]

### 2. Current U.S. State Law and Policies Overview

In addition to the fifty states, birth certificates are issued by the District of Columbia, New York City, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the United States Virgin Islands.

Twenty-nine of these fifty-seven jurisdictions[15] explicitly allow for gender corrections on birth certificates in their statutory codes, potentially with accompanying policies or regulations to implement the statute. Nine more jurisdictions[16] deal with gender corrections only in their regulations while two have written, sub-regulatory policies.[17] Ten operate without a written policy, or at least not one available to the public, but will correct the birth certificate upon court order or doctor's affidavit, generally using the same procedure for other corrections.[18]

In total, forty-six states, the District of Columbia, New York City, Guam, and Northern Mariana Islands clearly allow people to correct their gender marker.[19] Oklahoma, Texas, and American Samoa do not have clear policies on whether or not changes are actually allowed. Tennessee has the only explicit statutory ban on correcting gender markers;[20] for various reasons, Idaho, Ohio, and Puerto Rico also do not allow individuals to correct gender. Ohio does not correct gender markers as a result of a trial court decision that interpreted its ambiguous statute regarding birth certificate

---

14. Tobin, *supra* note 6.

15. The twenty-nine jurisdictions are Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Illinois, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nebraska, New Jersey, New Hampshire, New Mexico, North Carolina, Oregon, Utah, Vermont, Virginia, Wisconsin, the District of Columbia, Guam, and the Commonwealth of Northern Mariana Islands. For citations to the relevant laws in these jurisdictions, *see infra* app. A.

16. These are Delaware, Kansas, Maine, Mississippi, Montana, North Dakota, Nevada, Wyoming, and New York City. *See infra* app. A.

17. These are New York State and Washington. *See infra* app. A.

18. These are Alaska, Florida, Indiana, Minnesota, Pennsylvania, Rhode Island, South Carolina, South Dakota, West Virginia, and United States Virgin Islands. *See infra* app. A.

19. *See infra* app. A for a comprehensive listing of these statutes and regulations.

20. "The sex of an individual will not be changed on the original certificate of birth as a result of sex change surgery." TENN. CODE. ANN. § 68-3-203(d) (West 1997).

amendments to disallow gender marker corrections.[21] Idaho's state vital statistics agency does not interpret its general authority to make corrections on certificates to include the authority to make corrections for gender markers.[22] Puerto Rico does not make corrections based on a 2005 Puerto Rico Supreme Court decision.[23]

Of the fifty-three jurisdictions that allow gender marker changes to birth certificates, twenty-five require a court order,[24] twenty-one utilize an administrative process,[25] and a handful allow either process[26] or have unclear procedures.[27] Most jurisdictions do not have clear policies carefully guarding the privacy of people who have corrected their gender. The poli-

---

21. *In re* Ladrach, 513 N.E.2d 828 (Ohio Prob. Ct. 1987) (finding the statute only authorized corrections if there was an error at the time of birth, thus only permitting a probate court to correct a fact that was inaccurate at the time of birth in the court's view). However, since the case was decided, the statute related to corrections (now also called amendments) has changed. The current provision is now titled "Amended records" (changed from "[c]orrection of birth record") and refers to corrections and amendments, whereas the old statute referred only to facts that have "not been properly and accurately recorded." *Compare* OHIO REV. CODE ANN. § 3705.20 (Lexis-Nexis 1980) *with* OHIO REV. CODE ANN. § 3705.22 (West 2011). Therefore, there is a textual argument that the new text is not as limiting, and that the measure of accurateness could be taken as a contemporary measure, as opposed to one connected to a person's time of birth.

22. The Idaho statute provides that "alterations" may be made to birth records in accordance with the statute or rules promulgated by the State Board of Health and Welfare. *See* IDAHO CODE ANN. § 39-250 (West 2010). Lambda Legal indicates that there is anecdotal evidence that the agency does not allow gender changes on birth certificates. *Sources of Authority to Amend Sex Designation on Birth Certificates*, LAMBDA LEGAL, http://www.lambdalegal.org/publications/sources-of-authority-to-amend (last updated Oct. 3, 2012). Idaho's statute also notes that an amendment denied by the Registrar may be appealed to a court of law. *See* IDAHO CODE ANN. § 39-250(5) (West 2010). However, there is no published case law of a person attempting to appeal a denial to a court; thus, there could be an opening for an individual to achieve gender change through a court appeal.

23. *Ex Parte* Alexis Delgado Hernandez, 2005 TSPR 95 (P.R. 2005) (holding that a transgender person may not correct the gender on one's birth certificate).

24. The twenty-five jurisdictions that require a court order are Alabama, Alaska, Arkansas, California, Colorado, Delaware, Georgia, Indiana, Louisiana, Maryland, Missouri, Mississippi, Montana, New Hampshire, Nevada, Oregon, South Dakota, Utah, the Virgin Islands, Virginia, Vermont, Wisconsin, Wyoming, the District of Columbia, and the Northern Mariana Islands. *See infra* app. A.

25. The twenty-one jurisdictions that do not require a court order are Arizona, Connecticut, Florida, Hawaii, Iowa, Illinois, Kansas, Kentucky, Massachusetts, Maine, Michigan, Nebraska, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, Washington, New York City, and Guam. *See infra* app. A.

26. Minnesota, Pennsylvania, and West Virginia allow individuals to use either a court order or an administrative process. *See infra* app. A.

27. Four jurisdictions have unclear procedures: Oklahoma, South Carolina, Texas, and American Samoa. *See infra* app. A.

cies of all fifty-seven U.S. jurisdictions that administer birth certificates are
summarized in a chart in Appendix A.

3. New Policy on Consular Reports of Birth Abroad and Passports

The U.S. Department of State, in June of 2010, updated its policy
with regard to Consular Reports of Birth Abroad of U.S. Citizens (CRBAs)
and passports.[28] CRBAs are provided to U.S. citizens who were born outside
the U.S., where the fifty-seven birth certificate issuing agencies do not have
jurisdiction. CRBAs are functionally equivalent to birth certificates for
those born in the United States; they prove citizenship, identity, and other
information about the person's circumstances of birth.

Since at least 1992, the Department of State has required proof of "sex
reassignment surgery" to correct gender on passports, and the same policy
was presumably applied to CRBAs.[29] In an effort to modernize its policy in
accord with medical standards, the Department of State adopted a new pol-
icy simply requiring that an applicant's treating or evaluating physician
write a letter certifying that a person "has had appropriate clinical treatment
for gender transition to the new gender."[30]

28. *New Policy on Gender Change in Passports Announced*, U.S. DEP'T OF STATE (June 9,
2010), http://www.state.gov/r/pa/prs/ps/2010/06/142922.htm. There were slight,
but important, changes to the policy in January 2011. *VICTORY: State Department
Makes Additional Changes*, ADVANCING TRANSGENDER EQUALITY (Jan. 28, 2011,
6:58 PM), http://transgenderequality.wordpress.com/2011/01/28/victory-state-de-
partment-makes-additional-changes.

29. The 1992 State Department policy regarding passports required "sex reassignment
surgery" to permanently change the gender marker on one's passport and on its face
did not deal with CRBAs. U.S. DEP'T OF STATE, PASSPORT BULLETIN 92-22
(1992). However, in the new policy for passports, the Foreign Affairs Manual ex-
plains that: "The . . . Consular Report of Birth Abroad of Citizen of the United
States of America, can be amended by the Vital Records Section of Passport Ser-
vices . . . to reflect the change in gender. The same documentary requirements speci-
fied above for passport services would pertain to amending gender in a [CRBA]."
U.S. DEP'T OF STATE, 7 FOREIGN AFFAIRS MANUAL 1340 app. M (2012), *available
at* http://www.state.gov/documents/organization/143160.pdf. I have not located an
old policy that specifically applies to CRBAs. It is also possible that: (1) gender
corrections on CRBAs were denied entirely, (2) gender corrections were processed
under an old policy that is not publicly available, or (3) gender corrections were
processed utilizing no written policy and therefore were not standardized. Regardless,
because the Passport Vital Records section processes the corrections, the standard of
proof for CRBAs was likely the same as that for passports.

30. U.S. DEP'T OF STATE, 7 FOREIGN AFFAIRS MANUAL 1320 app. M(b)(1)(g) (2012),
*available at* http://www.state.gov/documents/organization/143160.pdf.

Case No. 1:15-cv-02362-RBJ    Document 64-11    filed 09/11/17    USDC Colorado    pg
8 of 22

### 4. The U.K. Approach: The Gender Recognition Act of 2004

The United Kingdom enacted a groundbreaking statute in 2004 when it passed the Gender Recognition Act. This statute is understood as the first national statute to recognize the gender of transgender people who transition without surgical procedures. Other countries have considered and adopted similar approaches, some being more or less restrictive.[31]

The Gender Recognition Act, passed in response to the 2002 decision in *Goodwin v. United Kingdom*, required the government to develop a system to recognize the post-transition gender of transgender people, finding that failure to provide such recognition was a human rights violation.[32]

The Gender Recognition Act does not require any specific medical treatment; however, it requires: (1) a diagnosis of Gender Dysphoria,[33] (2)

---

31. The United Kingdom law is included here because it is the basis for many of the other laws, and full texts of other laws, other than Argentina's, are not available in English. In 2007, Spain passed a law similar to the Gender Recognition Act, although hormonal treatment is required unless advanced age or medical concerns exist. Marc-Roger Lloveras Ferrer, *A Spanish Law for Transsexual Citizens*, InDret (2008), http://ssrn.com/abstract=1371559. In 2009, Uruguay passed a law that allows gender amendments after a showing the person has gender dysphoria, with no medical treatment required, but the diagnosis has to be persistent and stable for two years, and amendments are only available to those over eighteen. Derecho A La Identidad De Género Y Al Cambio De Nombre Y Sexo En Documentos Identificatorios (Parliament Law No. 18, 620/2009) (Uruguay), *available at* http://www0.parlamento.gub.uy/leyes/AccesoTextoLey.asp?Ley=18620&Anchor=. In 2011, Portugal enacted a law, considered less restrictive than both the United Kingdom and Spanish laws, which replaced its law requiring a court order and sex reassignment surgery. The Portuguese law requires a report from medical professionals to be submitted to the Civil Registry, one being a psychiatrist and the other a psychologist, with no reported apparent time or age requirement. Cria o procedimento de mudança de sexo e de nome próprio no registo civil e procede à décima étima alteração ao Código do Registo Civil (No. 7/2011) (Portugal), *available at* http://dre.pt/pdf1sdip/2011/03/05200/0145001451.pdf.
32. Goodwin v. United Kingdom, VI Eur. Ct. H.R. (2002).
33. "*Gender dysphoria* refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)." World Prof'l Ass'n for Transgender Health, Standards of Care 5 (7th ed. 2011). Currently, the Diagnostic and Statistical Manual, published by the American Psychiatric Association, uses the slightly different diagnostic term, "Gender Identity Disorder," and the International Classification of Diseases uses the diagnostic term "transsexualism." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual 576 (4th ed., 2000); *see also* World Health Org., International Classification of Diseases (10th ed. 2010), http://apps.who.int/classifications/icd10/browse/2010/en#/F64. The next version of the DSM, to be officially released in 2013, will use "Gender Dysphoria." *See* Rosie Mestel, *Changes to the Psychiatrists' Bible, DSM: Some Reactions*, L.A. Times, December 9, 2012, http://www.latimes.

Zzyym v. Tillerson – AR 0231

that people live in their "acquired gender" for at least two years and intend to do so until death, and (3) documentation from two medical profession-als.[34] Upon submitting satisfying evidence to the Gender Recognition Panel,[35] people receive a Gender Recognition Certificate, a new entry in the birth registry,[36] and general recognition that they are the new gender as a legal matter.[37] The law requires that information about the gender correction is kept confidential throughout the process.

### 5. Argentina's New Law

In May of 2012, Argentina became the first country to allow trans-gender people to update the gender marker on their birth certificates with no requirement for them to show any medical condition or supervision.[38] People over eighteen have the right to update gender markers and first

---

com/health/boostershots/la-heb-dsm5-american-psychiatric-association-20121207,0, 1392058.story. Despite the different terminology, these are roughly equivalent diag-noses. All of the diagnoses are controversial. *See, e.g.,* Kate Richmond & Kate Sheese, *Gender Interrupted: Controvery & Concerns about Gender Identity Disorder (GID)*, ASS'N FOR WOMEN IN PSYCHOLOGY, http://www.awpsych.org/index.php?option=com_content&view=article&id=96&catid=74&Itemid=126 (last visited Dec. 25, 2011).

34. Gender Recognition Act 2004, c. 7 § 2 (U.K.).

35. *Id.* at c. 7 § 1 (U.K.).

36. *Id.* at c. 7 § 10 sch. 3 (U.K.).

37. Generally, having a Gender Recognition Certificate entitles the holder to be legally recognized as that gender for the majority of purposes. *Id.* at c. 7 §§ 9–21 (U.K.). Exceptions include: religious officials do not need to perform marriages involving a holder of a Gender Recognition Certificate, sports organizations are exempt from recognizing the gender if it would affect "fair competition" or the "safety of competi-tors," and, for crimes where gender is a relevant factor, the acquired gender will not be recognized. *Id.* at c. 7 § 11 sch. 4, c. 7 §§ 19–20 (U.K.). One very controversial part of the law is the provision of only Interim Recognition Certificates to trans-gender people who are married at the time of application. *Id.* at c. 7 § 4 (U.K.). The individual must either divorce or get an annulment in order to receive a full Gender Recognition Certificate. *Id.* Couples in this situation who desire to stay in a legally-recognized relationship must then receive a "Civil Partnership" which provides some, but not all, the rights and responsibilities of marriage to same-sex couples in the U.K. Civil Partnership Act 2004, ch. 33 (U.K.). This has been criticized by Press for Change, the U.K.'s transgender advocacy group, as requiring individuals to choose between "their marriage and another human right." Camillo Fracassini, *Sex-Change Couple Seek Marriage Recognition*, THE SUNDAY TIMES, Oct. 30, 2005, http://www.timesonline.co.uk/tol/news/uk/scotland/article584590.ece.

38. The new law, Regime for Recognition and Respect for Gender Identity, also granted updated national identity cards as well as a right to medical treatment under all health care systems and plans in the country. Law No. 26.743, May 23, 2012, 32.404 B.O. 1, 2 (Arg.), *available at* http://www1.hcdn.gov.ar/proyxml/expediente.asp?fundamentos=si&numexp=8126-D-2010. An English translation is available at http://www.msmgf.org/files/msmgf//Advocacy/Argentina_GenderIdentity_Law.pdf.

Zzyym v. Tillerson - AR 0232

names upon request. Those under eighteen must also have their legal representative (which will likely be their parent) or a judge agree to the correction. The law is explicit that no surgical, hormonal, or psychological treatment of any kind can be required.[39] The birth certificate and information about the corrections are kept confidential and are accessible only by court order.

Although this law is relatively new and has not yet been emulated by other countries, the explicit shift from any proof of gender identity, other than the person's statement, is enlightening and encouraging.[40]

### B. An Overview of Gender Transition and its Relation to Corrections on Birth Certificates

A short review of terminology related to transgender people and gender transition is helpful before going any further.

*Transgender* is used generally as a broad term to refer to all of those whose gender identity[41] or expression[42] does not match the social attributes of the gender that they were assigned at birth.[43] While the term "transgender" is used appropriately to refer to a range of people, including transsexuals, cross-dressers, genderqueers, the androgynous, and many other identities, this Article only addresses one specific type of transgender per-

---

39. *Id.* at Art. 4.
40. While Argentina's new law should be considered for the basis of the recommendations made in this Article, I have chosen to factor in the political landscape of this country in shaping the more conservative recommendations found herein.
41. *Gender identity* is used to mean an individual's internal sense of being male, female, or another gender.
42. *Gender expression* is used to mean how individuals outwardly indicate their gender identity to others, often through behavior, clothing, hairstyle, voice or body characteristics.
43. National Center for Transgender Equality, *Transgender Terminology* (May 2009), http://transequality.org/Resources/NCTE_TransTerminology.pdf.

Zzyym v. Tillerson – AR 0233

son—those who undergo gender transition to live their life as a gender different from their sex[44] assigned at birth.[45]

*Gender transition* is the process of beginning to live and outwardly express a gender different from one's assigned gender at birth.[46] Gender transition is not undertaken casually, as it is often accompanied by a wide range of negative social consequences, including rejection by friends or family, losing one's job, or even being physically attacked. Gender transition is

---

44. Throughout this article, the terms *sex* and *gender* are used interchangeably, with a tendency for *sex* to be used in contexts where a statute uses that term, and "gender" to be used otherwise. Some believe that the two terms have different meanings and should be used accordingly. *What Do We Mean by "Sex" and "Gender"?*, WORLD HEALTH ORGANIZATION, http://www.who.int/gender/whatisgender/en/ (last visited Dec. 25, 2011). In that conception, *sex* refers to one's biological status and *gender* refers to the social identity and expression of being male and/or female. *Id.* However, the Supreme Court uses both terms in its jurisprudence relating to women's constitutional rights and Congress also has used both *sex* and *gender* in different civil rights statutes, while not intending a different meaning. *See* Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (collapsing the distinction between biological status and social expectations for the purposes of Title VII analysis); Schwenk v. Hartford, 204 F.3d 1187 (9th Cir. 2000) (using the framework of *sex* under Title VII to *gender* under the Gender Motivated Violence Act). This Article uses the terms interchangeably because interpreting them in a legal context to mean separate things would lead to absurd results. Furthermore, the conception of sex being biologically based tends to imply, incorrectly, that the biology of sex is clear cut and easy to measure, when in fact, much more diversity exists. *See* Erwin K. Koranyi, *Transsexuality Revisited*, 16 AUSTRL. J. OF FORENSIC SCI. 34, 37 (1983) *available at* http://www.tandfonline.com/doi/abs/10.1080/00450618309410678 ("Sex of a person—a simple 'yes' or 'no' before—was broken down by Science to chromosomal sex, nuclear sex, hormonal sex, gonadal sex, and gender sex- to the dismay of courts, finding scientists in argument over as 'simple' a question as whether the subject is male or female.").

45. This subset of the transgender community are sometimes called *transsexuals* to distinguish them from others covered by the broad term *transgender*. However, many transsexual people, as well as advocates for equality, disfavor the term *transsexual* as overly medical, scientific, and technical, or because the word's integration of the term *sex* could be taken to sexualize the person. In addition, *transsexual* is often used by those who oppose equal rights as an inflammatory and disrespectful term. *See, e.g., 'Speechless' awaits March premiere*, AM. FAMILY ASS'N J., Feb. 2008, http://www.afajournal.org/0208afa_insp.asp (referring to homosexuals and transsexuals with regard to federal legislation); *Transgendered Confu-; Homosexual movement takes U.S. into bizarre world*, AM. FAMILY ASS'N, Oct. 2000, http://www.afajournal.org/2000/102000AFAJ.pdf (using the term transsexual repeatedly to refer to transgender people). This phenomenon is similar to how many gay and lesbian people prefer these identity terms over the more scientific and sexualizing term "homosexual." GLAAD, MEDIA REFERENCE GUIDE 6, 8 (8th ed. 2010) (noting that many transgender people prefer "transgender" to "transsexual"). In respect for the generally favored terminology preferences of the community, this article uses the term "transgender" throughout, unless describing case law that uses other terminology.

46. Gender transition may happen, or appear to happen, over a short period of time or a long period of time, depending on the individual.

often mistaken as referring only to the process of altering one's hormonal makeup and other bodily characteristics to match one's gender identity. However, gender transition actually refers primarily to the *social process* of transition, and includes the process of changing one's name (if needed or desired), updating identity documents and records (if able to do so), in addition to taking medical steps, depending on the individual.

The medical processes, for those who undergo them, are incredibly important. The American Medical Association has recognized that treatment is effective and medically necessary and has recommended that public and private health insurance systems cover care related to gender transition.[47] According to the expert medical consensus,[48] treatment can consist of four therapeutic options: 1) changes in gender expression or role, 2) hormone therapy, 3) various surgeries,[49] and 4) psychotherapy.[50] Whether a person should undergo all four or just one of the options is determined based on the needs of the individual. It is important to realize that those who undergo only changes in their gender expression or role (the first option) are still considered to have made a *medical* transition.[51]

Name and gender are the two pieces of information that transgender people typically seek to correct on their birth certificates. Although the process and accessibility of *name* changes are not going to be addressed by this Article,[52] the Article will address the privacy concerns regarding name

47. AM. MED. ASS'N HOUSE OF DELEGATES, RESOLUTION 122 (2008).

48. *See* WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, *supra* note 33; *infra* Section II.B.1.

49. Despite the popular conception of one surgery that completely transforms a person's gender, in reality, there are many different surgical options. For example, breast or chest surgery, metoidioplasty, phalloplasty, penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty, hysterectomy/ovariectomy, facial feminization surgery, voice surgery, thyroid cartilage reduction, vaginectomy, scrotoplasty, and implantation of erection and/or testicular prostheses are some of the primary surgical options, although others exist. *See* WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, *supra* note 33, at 57–58, 62–64.

50. Psychotherapy may be important for: "exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience." *Id.* at 10.

51. The medical seriousness of changing gender role is apparent throughout the WPATH Standards of Care. For example, changes in gender role are supposed to be recorded in a person's medical chart and changes in gender role are required for 12 months before genital surgeries. *Id.* at 61.

52. To receive a name change, one typically has to receive a court order and go through a publication process, although sometimes courts allow the publication requirement to be waived due to privacy concerns. *See, e.g.,* TRANSGENDER LAW CENTER, ID PLEASE. . . 9–22, 31–32 (2010) *available at* http://transgenderlawcenter.org/issues/id/id-please.

changes related to gender transition. Importantly, not all transgender people
choose to change their names. Some may have a gender-neutral name and
keep it, or may initially keep it and decide to change it later. Others may
choose to keep what others consider a gender-specific[53] name for personal
reasons, despite the fact that it does not "match" their gender identity. Re-
gardless, not all transgender people change their name and name changes
will not necessarily occur before or simultaneously with the request to cor-
rect their gender marker.

### C. Data on the Ability to Correct Gender Markers on Birth Certificates

In order to understand the impact of birth certificate laws and poli-
cies, newly available data describing the ability of transgender people to
correct gender on their birth certificates in the United States should be ex-
amined. Specifically, reporting on only those individuals who are already
living full-time as a gender different from the gender that they were assigned
at birth, the National Transgender Discrimination Survey[54] found:

- 24% were able to correct the gender marker on their birth
  certificates;

- 18% were denied the correction, and;

- 53% had not attempted to correct their birth certificate.[55]

Many of the 53% who did not attempt to correct their birth certifi-
cates likely chose not to try because they knew they would not meet the
requirements of the established policies; for example, they may not have had
a required surgery. The data appear to confirm this, with higher rates of
attempting to change one's gender marker among those who have had
surgery:

---

53. Gender associations of first names are somewhat arbitrary and have a tendency to
    change over time. *See, e.g.*, Stanley Lieberson, Susan Dumais & Shyon Baumann,
    *The Instability of Androgynous Names: The Symbolic Maintenance of Gender Bounda-
    ries*, 105 AM. J. SOC. 1249 (2000) (describing 80 years of naming practices in Ohio
    and noting how names changed with regard to being considered feminine or
    masculine).

54. The National Transgender Discrimination Survey, conducted in 2008–09 both in
    paper and online, had 6,456 respondents from all fifty states, D.C., the U.S. Virgin
    Islands, Puerto Rico, and Guam. For a detailed description of the methodology, see
    JAIME M. GRANT ET. AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL
    TRANSGENDER DISCRIMINATION SURVEY 12–15 (2011).

55. *Id.* at 143. Five percent of the respondents selected "not applicable" in response to
    the birth certificate question. These individuals likely either "did not have a birth
    certificate or they did not desire to change it." *Id.*

| Description of Respondents[56] | % Who Attempted to Correct Birth Certificate[57] |
|---|---|
| Transgender Women with Some Type of Surgery | 65% |
| Transgender Men with Some Type of Surgery | 56% |
| Transgender Women with No Surgery | 28% |
| Transgender Men with No Surgery | 12% |

In addition, those who have had some type of surgery were more than six times as likely to have been able to correct their gender marker than those who have not had any surgery (39% compared to 6%).[58] Yet, notably, even surgery does not guarantee the approval of a gender marker correction. Twenty percent (20%) of people who had some surgery were still denied the correction.[59] Some courts and state agencies also appear to consider the *type* of surgery undergone, summarized in the following chart.[60]

| Description of Respondent | % Who Received a Corrected Birth Certificate |
|---|---|
| Transgender Women with Any Surgery | 43% |
| Transgender Women with Breast Surgery | 32% |
| Transgender Women with Orchiectomy[61] or Vaginoplasty[62] | 74% |
| Transgender Men with Any Surgery | 37% |
| Transgender Men with Chest Surgery | 56% |
| Transgender Men with Metoidioplasty[63] | 82% |
| Transgender Men with Phalloplasty[64] | 78%[65] |

---

56. Transgender woman refers to a person who was assigned male at birth and now lives as a woman. Transgender man refers to a person who was assigned female at birth and now lives as a man.

57. GRANT ET AL., *supra* note 54, at 143–44.

58. *Id.* at 144.

59. *Id.*

60. *Id.* at 143–44.

61. Orchiectomy refers to the "surgical removal of the testes (the scrotum and testicles)." *Id.* at 181.

62. Vaginoplasty refers to the "surgical creation of a vagina." *Id.*

63. Metoidioplasty is a "surgical procedure to create a neopenis by releasing and extending the clitoris, often combined with surgery to allow for urination through the penis." *Id.* at 181.

64. Phalloplasty refers to the "surgical creation of a penis." *Id.* at 181.

65. Note that the different rates of ability to change their birth certificates between metoidioplasty (82%) and phalloplasty (78%) may not be meaningful because of the

These data show that courts and agencies are looking at the specific types of surgeries[66] individuals undergo and are making the determination that many do not meet the standard in their current law or policy to receive a gender marker correction.

### D. The Importance of an Accurate Birth Certificate

#### 1. Purpose of a Birth Certificate

According to the Office of Inspector General at the Department of Health and Human Services, birth certificates provide "vital information about the person whose name appears on the certificate (e.g., legal proof of parentage, citizenship, date, place, and time of birth)."[67] While originally intended as a record of the existence and circumstances of birth, the birth certificate is now used widely in determining eligibility for employment, obtaining other documents (e.g., driver's licenses, Social Security cards, passports, and other state identification documents), establishing school records, proving age, and enrolling in government programs.[68] Thus, the birth certificate is currently used as an identity document[69] and has evolved away from being a simple historical or statistical record.

#### 2. Legal and Practical Implications of an Inaccurate Gender Designation

There are many practical, legal, and social realities that result from having an inaccurate gender marker, some of them with potentially fatal consequences. Although the gender recorded on a person's birth certificate may not be considered legally binding,[70] in many circumstances, it is an

---

low numbers of transgender men who have had these surgeries in the survey sample. *Id.*

66. *See infra* note 114 and accompanying text.

67. OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OEI-07-99-00570, BIRTH CERTIFICATE FRAUD at 2 (2000), *available at* http://oig.hhs. gov/oei/reports/oei-07-99-00570.pdf.

68. "[Birth certificates] are also used extensively for employment purposes, to obtain benefits or other documents (e.g., driver's licenses, Social Security cards, and passports), to assist in determining eligibility for public assistance and other benefits, to enroll children in school, and as proof of age eligibility for sports and other age restricted activities." *Id.* at 6.

69. Federal experts caution that a birth certificate should not be used alone as an identity document because it is impossible be sure that the holder of the certificate is the person appearing before the agency. *See id.* at 20.

70. Because of this, some have pursued gender change orders that declare a person's legal gender (unrelated to birth certificate corrections). Interview with Janson Wu, Staff Attorney, Gay & Lesbian Advocates & Defenders (confirmed Feb. 11, 2012). Gender change orders can be particularly helpful for people who are at higher risk of

392          MICHIGAN JOURNAL OF GENDER & LAW          [Vol. 19:373

important factor in determining whether or how an individual's gender is
recognized as a practical matter. In addition, transgender people holding
birth certificates that are not corrected following gender transition risk hav-
ing their transgender histories revealed, which can lead to a number of seri-
ous harms. This is not an abstract issue; inspection of one's birth certificate
(or documents it generates) can lead directly to discrimination and even
violence, especially when a situation involves interactions with security of-
ficers, employment, or access to sex-segregated facilities. The following sub-
sections describe areas in which an incorrect gender designation and one's
transgender status, as revealed by the gender on one's birth certificate, can
be especially consequential in the United States, either because of the mean-
ing attached to the gender designation, or because the disclosure of one's
transgender status may lead to harm.

a.   Initial Gender Designation on Governmental Identity Documents
and Those Governmental and Non-Governmental
Documents Derived Therefrom

Birth certificates establish the initial gender designation for other gov-
ernmental identity documents, such as driver's licenses, passports and Social
Security records.[71] The birth certificate, as well as these other government
documents, in turn breed[72] many other identity documents, such as school
records, college ID cards, work identification, and commercial licenses.

---

having their gender challenged by interested third parties, such as parents or children
who would gain a right to inherit if their transgender relative's marriage is held
invalid.

71. Although generally not written formally in policy, a person's initial gender on a
driver's license/state ID will match that on one's birth certificate. Although it is less
common, at least two state Departments of Motor Vehicles require a corrected gen-
der on one's birth certificate before updating the gender on one's driver's license
(Montana and Kentucky). See Driver's License Policy by State, NAT'L CTR. FOR
TRANSGENDER EQUAL., http://transequality.org/Resources/DL/DL_policies.html
(last visited Sept. 20, 2012). Similarly, to establish a person's initial gender on a
passport, the birth certificate gender (or gender on other citizenship/identity evi-
dence) is generally used. See 7 DEPT. OF STATE FOREIGN AFF. MANUAL 1310 app.
M (2011) ("This appendix provides policy and procedures that passport specialists
and consular officers must follow in cases in which an applicant requests a gender on
the passport application different from the one reflected on some or all of the sub-
mitted citizenship and/or identity evidence, including a prior passport.").

72. In fact, birth certificates and driver's licenses are both referred to as "breeder" docu-
ments because once a person had these forms of identification, other identity docu-
ments can be created, with birth certificates being the primary breeder document.
See John Mercer, Breeder Documents: The Keys to Identity, 29 KEESING J. OF DOCU-
MENTS & IDENTITY 14, 14 (2009), available at http://www.naphsis.org/NAPHSIS/
files/ccLibraryFiles/Filename/000000001179/breeder_documents_the_keys_to_
identity.pdf.

Zzyym v. Tillerson - AR 0239

Regulations under the REAL ID Act, which has been partially implemented in the U.S.,[73] require persons to show they are a U.S. citizens or are in the U.S. lawfully, as well as "establish their identity" to obtain a driver's license.[74] Accepted documents include birth certificates and passports (as well as various immigration documents).[75] Among U.S. citizens, birth certificates are more commonly used because only 28% of the U.S. population have passports.[76]

### b.  Discrimination in Employment

Some employers may discriminate against a transgender person, especially in the hiring process, when the employer inspects identity documents that do not match a person's gender presentation. In much of the United States, this discrimination may be viewed as legal.[77] For example, U.S. employers are required to fill out the I-9 Employment Eligibility Verification Form for each employee at the time of hire. Although various documents can be used to show eligibility for work, if a U.S. citizen does not have a passport or a Social Security card, he or she must show a birth certificate to

---

73. *Real ID Deadlines Looms*, HOMELAND SECURITY NEWS WIRE (Jan. 31, 2012), http://www.homelandsecuritynewswire.com/dr20120131-real-id-deadlines-looms.

74. Real ID Act, Pub. L. No. 109-13 § 202(c)(2)(b) (2005). Because the Real ID Act also required gender to appear on the license, some state motor vehicle agencies were concerned that it would curtail their authority to set policies on gender corrections. However, the regulations issued by the Department of Homeland Security in 2008 indicated the opposite. *See* 6 C.F.R. § 37.17 (2008).

75. 6 C.F.R. § 37.11 (2011) (listing acceptable documents as a U.S. passport, a birth certificate, a Consular Report of Birth Abroad, a Permanent Resident Card, a U.S. visa, Certificate of Naturalization or Citizenship, a REAL ID-compliant driver's license or identification card).

76. U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-08-891, STATE DEPARTMENT: COMPREHENSIVE STRATEGY NEEDED TO IMPROVE PASSPORT OPERATIONS 11 (2008), *available at* http://www.gao.gov/new.items/d08891.pdf.

77. Although "sex" in Title VII of the Civil Rights Act of 1964 should be interpreted to prohibit employment discrimination against transgender people, not all federal courts have agreed with this proposition. *Compare* Schroer v. Billington, 577 F. Supp. 2d 293, 300 (D.D.C. 2008) (holding that "sex" in Title VII protects the transgender plaintiff), *and* Glenn v. Brumby, 663 F.3d 1312, 1320 (11th Cir. 2011) (holding that plaintiff's termination due to transgender status was sex discrimination in violation of the Equal Protection Clause), *with* Etsitty v. Utah Transit Authority, 502 F.3d 1215, 1221 (10th Cir. 2007) (holding that the sex discrimination prohibition does not protect a transgender plaintiff). Therefore, discrimination is only clearly illegal in the 16 states and over 150 local jurisdictions that have gender identity/expression protections explicit in the law, which cover 45% of the US's population. NAT'L GAY & LESBIAN TASK FORCE, JURISDICTIONS WITH EXPLICITLY-TRANSGENDER INCLUSIVE NONDISCRIMINATION LAWS (2012), *available at* http://www.thetaskforce.org/downloads/reports/fact_sheets/all_jurisdictions_w_pop_6_12.pdf.

Zzyym v. Tillerson – AR 0240

satisfy this requirement. If a person does have a Social Security card and therefore can avoid showing a birth certificate, the person must also show an identity document like a driver's license or school identity card. However, these documents may also have an inaccurate gender marker on them if they were derived from an inaccurate birth certificate. Employers may also learn of a person's transgender status if a background check reveals the gender assigned at birth, based on documents derived from a birth certificate.

The National Transgender Discrimination Survey found that 90% of transgender people had experienced mistreatment or discrimination at work or took actions to avoid such discrimination.[78] Nearly 47% of those surveyed lost their jobs, were denied a promotion, or were denied a job as a direct result of being transgender.[79] Hiring discrimination was also rampant, and rates of discrimination were higher for those whose driver's license gender marker did not match their gender identity.[80] The percentages of those experiencing hiring discrimination rose from 52% of those with corrected driver's licenses to 64% for those without corrected driver's licenses.[81] For understandable reasons, many transgender people desire to keep their transgender identity private from employers at the time of hiring, yet may be unable to do so because of birth certificate policies in their jurisdiction of birth.

Other discrimination can arise when a person goes through gender transition while remaining in the same workplace. One of the primary issues that can arise is which bathroom a person should use. Many employers think a fair policy is to have persons switch bathrooms when they have corrected the gender on their driver's licenses, state identification documents, or less commonly, their birth certificates. Because the gender on a driver's license often is generated by the gender on a person's birth certificate, the state's failure to correct gender on birth certificates can prevent a transgender person from being able to access the appropriate gender-specific restroom facility at the workplace.

---

78. GRANT ET AL., *supra* note 54, at 51.
79. *Id.*
80. *Id.* at 139.
81. *Id.* at 154.

c. Police, Security Personnel, and Others who Inspect Identification
During Daily Life and Travel

Unfortunately, it is not uncommon for police, security personnel, and others to respond in violent or discriminatory ways when they discover a person is transgender.[82]

In addition, a police or security officer, or any other person who inspects ID (such as a store clerk) may share information about a transgender person's status with others in the community, who in turn may cause the person harm. For example, consider the case of a person who lives in a small community who presents identification with an inaccurate gender marker to a Transportation Security Officer at the local airport, or a store clerk to verify identity when using a credit card at the local market. When the clerk or officer discusses this information with others in the community, the transgender individual could be fired from his or her job or become the victim of a bias-motivated assault.

The National Transgender Discrimination Survey found that 40% of people who presented identification that did not match their gender presentation were harassed at some point due to the mismatch, 15% were asked to leave an establishment, and 3% were assaulted.[83] Higher numbers of people of color were assaulted, with 9% of African Americans and Latino/Latinas and 6% of multiracial respondents reporting assault when presenting ID that did not match their gender presentation.[84]

The data is supported by published reports of violence and discrimination that have occurred after a person is outed as transgender. For example, in an incident brought to public consciousness by an award-winning movie, Brandon Teena was sexually assaulted and later murdered by those who knew him as a man when they discovered, due to a printed police report in the newspaper, that his legal name was "Teena Brandon."[85] In a less violent case, a transgender woman was sent a threatening letter and DVD saying that homosexuals should be put to death by the DMV clerk who had processed her gender correction.[86]

---

82. 22% of respondents reported harassment, 6% reported physical assault, and 2% reported sexual assault by police officers due to being transgender. GRANT ET AL., *supra* note 54, at 160.

83. *Id.* at 153.

84. *Id.*

85. THE BRANDON TEENA STORY (Bless Bless Productions 1998); BOYS DON'T CRY (Fox Searchlight Pictures 1999).

86. Bob Egelko, *Transgender Woman Settles DMV Suit*, S.F. CHRONICLE (Aug. 16, 2011, 5:01 PM), http://articles.sfgate.com/2011-08-16/bay-area/29891260_1_transgender-woman-amber-yust-dmv; http://www.huffingtonpost.com/2011/08/16/amber-yust-settlement_n_928285.html.

The actual discrimination, disclosure, and violence, as well as the fear
of it, can cause transgender people to limit interactions where their identity
documents will be inspected, especially travel. Furthermore, as proving one's
lawful presence in the U.S. becomes more important as a political and/or
criminal matter, showing one's actual birth certificate—not just documents
derived from it—may become a more common practice. Already several
states have passed laws that allow police to require people to show proof of
citizenship.[87] The Supreme Court approved the part of the Arizona law that
allows officers to ask for documentation of citizenship of those that they
suspect may be undocumented.[88]

### d.   Marriage Recognition

Transgender people should also be able to marry, and be recognized as
legally married to their partners. Because forty-one states restrict marriage to
different-sex couples,[89] a transgender person's gender is of great legal signifi-
cance in those states. Being legally married, or not, is of great legal conse-
quence to whether or not a person has rights to child custody and visitation.
Additionally, marital status is important for intestate inheritance,[90] ability to
sue for wrongful death,[91] spousal support after marriage, eligibility for So-
cial Security benefits after death of a spouse, and potentially, the ability to
be granted a divorce and have marital property divided. For bi-national
couples, marriage recognition is critically important for the ability to reside
legally in the United States. During the marriage, being recognized as a
spouse by third parties can be important to determine eligibility for a host
of benefits, including health insurance, ability to make medical decisions for

---

87.  *Anti-Immigrant Arizona Copy Cat Laws*, ACLU, http://www.aclu.org/arizonas-sb-
1070-and-copycat-laws (last visited Dec. 10, 2012) (stating that five states - Ala-
bama, Georgia, Indiana, South Carolina and Utah - have passed laws similar to that
in Arizona that allow police to ask documentation of a person's citizenship).

88.  Arizona v. United States, 567 U.S. ___ (2012).

89.  As of November 2012, Connecticut, Iowa, Maine, Maryland, Massachusetts, New
Hampshire, New York, Vermont, Washington and the District of Columbia are the
only U.S. jurisdictions that perform and recognize same-sex marriage. *See* Teresa
Walsh, *Will the Gay Marriage Election Results Have a National Impact?*, U.S. NEWS &
WORLD REPORT, November 8, 2012, http://www.usnews.com/opinion/articles/
2012/11/08/will-the-gay-marriage-election-results-have-a-national-impact.

90.  J'Noel Gardiner lost her inheritance, due to her as a wife, when her husband died
intestate and the Kansas Supreme Court decided that she was legally male and thus,
not married to her husband. *In re* Estate of Gardiner, 42 P.3d 120, 121-122 (Kan.
2002).

91.  Christie Lee Littleton's wrongful death case relating to medical malpractice commit-
ted against her husband was dismissed by Texas courts, which declared her a legal
male and as such did not have standing as a spouse. Littleton v. Prange, 9 S.W.3d
223 (Tex. Ct. App. 1999).

each other, tax filing status, and numerous others. Transgender people in different-sex marriages often worry their marriage will be nullified by a judge's decision that they have not validly and legally changed their gender. Although there is no single place where one's "legal gender" is recorded, the gender on a person's birth certificate is sometimes given at least some legal deference by courts.[92]

Because most of the marriage cases involving a transgender spouse indicate that having a corrected gender marker on one's birth certificate is not a controlling factor, the *practical* effect, in the form of discouraging third parties from challenging the legality of a marriage, is likely more important than the actual *legal* effect during a challenge.

The story of a New Jersey couple—a non-transgender woman and a transgender man who had problems getting a marriage license—is illustrative. Because the transgender man's birth certificate still designated him as female, the local clerk refused to issue a marriage license and instead said she could only issue them a civil union license. This issue was resolved only after they consulted with an attorney, who helped the man get his birth certificate amended. This process took several months, delaying many of the couple's life plans, as well as requiring a significant financial outlay.[93]

### e.  Health and Health Insurance Records

Birth certificates and the documents they influence can also affect what gender people are considered to be by their health insurance providers, their health systems, their state's medical assistance program, or Medicare. Depending on what gender is recorded in these records, certain treatments, screenings and procedures may be disallowed, despite the fact that the best practice is to screen and treat all of a person's bodily organs, regardless of a person's gender identity and regardless of whether or not the treatment relates to gender transition. For example, a transgender man might be denied hormone therapy on the basis that he should not be receiving testosterone when his records indicate *female*. Or a transgender woman may be denied needed gynecological services because they are only covered for females.[94]

---

92. *See* Kantaras v. Kantaras, 884 So. 2d 155, 161 (Fla. Dist. Ct. App. 2004); *In re* Lovo-Lara, 23 I. & N. Dec. 746, 753 (B.I.A. 2005).

93. Email from Angie Gambone, attorney, to author (Feb. 13, 2012, 9:08 EST) (on file with author).

94. AM. C. OF OBSTETRICIANS AND GYNECOLOGISTS, COMMITTEE OPINION NUMBER 512: HEALTH CARE FOR TRANSGENDER INDIVIDUALS (December, 2011) http://www.acog.org/Resources_And_Publications/Committee_Opinions/Committee_on_Health_Care_for_Underserved_Women/Health_Care_for_Transgender_Individuals.

Zzyym v. Tillerson – AR 0244

### f.  Access to, and Treatment in, Sex-Segregated Facilities

A small but important number of facilities are sex-segregated. These range from those needed on a daily basis—such as bathrooms—to those in otherwise non-segregated spaces—such as locker rooms in gyms. Further, there are a number of gender-segregated residential or quasi-residential facilities, programs or services that can be critically important and life-sustaining, such as homeless shelters, group foster homes, substance abuse facilities (including court-mandated drug programs), and domestic violence shelters. In these places, transgender people can be kept out of the correct facility, or forced into the wrong facility, because of the gender on their identity documents, and violence can sometimes result. For example, although it is contrary to best practices developed nationally,[95] in homeless shelters, transgender people are typically housed with others of their sex assigned at birth, which can create dangerous conditions.[96] According to the National Transgender Discrimination Survey, 55 percent of transgender people who stayed at a shelter were harassed there and 22 percent were sexually assaulted there.[97] In addition, 29 percent who sought shelter were denied outright.[98] In many emergency housing facilities, transgender people are processed by low-level intake staff who make on-the-spot decisions about where to place a person. Therefore, the gender markers on a person's identification documents take on heightened importance.[99]

Although there is no case law on the question of how relevant a person's gender marker on his or her birth certificate is when it comes to having a legal right to access these sex-segregated facilities, certainly one can imagine that disputes with regard to access to any of these facilities could in part hinge on gender markers on birth certificates.

### g.  College Admissions

In 2011, the "Common Application," a standardized college application for admission used by over 400 colleges, included new instructions which state: "Federal guidelines mandate that we collect data on the legal sex of all applicants. Please report the sex currently listed on your birth certificate."[100] Given the highly burdensome medical requirements and procedures for changing birth certificates, most transgender college-age youth

---

95. *See infra* notes 169–170 and accompanying text.
96. *Housing and Homelessness*, NAT'L CTR. FOR TRANSGENDER EQUAL., http://transequality.org/Issues/homelessness.html (last visited Sept. 26, 2012).
97. GRANT ET AL., *supra* note 54, at 106.
98. *Id.*
99. *See* Spade, *supra* note 4, at 775.
100. *How Should I Answer the Sex Question?*, COMMONAPP.ORG, https://www.commonapp.org/commonapp/helpinline.aspx?src=sexHelp (last visited Sept. 26, 2012).