markers on birth certificates are not considered in placing inmates. These new policies are being established because of the very real levels of sexual violence transgender women face when housed in male areas of jails, prisons, and juvenile justice facilities. According to a University of California-Irvine study in 2007, transgender women in male units experience thirteen times more sexual assault than non-transgender men in the unit.[195]

Last, it is also important to note that one court has found that a female inmate had no right to a different cellmate after she had been placed with a transgender woman who had not had genital surgery. In this case, the court considered whether the inmate possessed a clear constitutional right to be housed with someone having the same anatomical structure and concluded that they did not.[196] Thus, the only court to consider whether there was a right for an inmate to be housed with an anatomically similar inmate has concluded that no such right exists.

Ultimately, transgender women using or living in sex-segregated facilities do not create or increase threats to non-transgender women, regardless of whether those facilities are bathrooms, jails, prisons, homeless shelters, foster care group homes, or college dormitories. In fact, many of these facilities long ago voluntarily abandoned surgical or anatomy-based requirements, recognizing that safety and fairness dictate that transgender people be provided access to the facility that matches their gender identity. Thus, while updating the legal standard for correcting birth certificates will have some positive effects for some transgender people who are currently denied access to sex-segregated facilities because of their lack of government identity documents, overall, there will be little to no noticeable effect on the

---

recommendation after interviewing the transgender inmate based on safety/security needs, housing availability, gender identity, and genitalia); KING COUNTY, WASHINGTON DEP'T OF ADULT AND JUVENILE DETENTION, ADULT DIVISIONS, GENERAL POLICY MANUAL 6.03.007 TRANSGENDER INMATES (2006) (assigning inmates' housing based on their safety/security needs, housing availability, gender identity, and genitalia).

195. VALERIE JENNESS ET AL., VIOLENCE IN CALIFORNIA CORRECTIONAL FACILITIES: AN EMPIRICAL EXAMINATION OF SEXUAL ASSAULT, UNIV. OF CALIFORNIA-IRVINE 3 (2007), *available* at http://ucicorrections.seweb.uci.edu/pdf/FINAL_PREA_REPORT.pdf.

196. "Expert medical opinion informed Jail officials that housing Lamson [a transgender woman] with the female population would best satisfy Lamson's unique psychological needs and that there was *no risk to the female inmates*. . . . Although it is clear that there is a constitutional right to privacy, I conclude that the contours of that right are not clear when it comes to the determination of where to house transsexuals. Such a constitutional right was not 'clearly established in its more particularized sense' under these circumstances." Crosby v. Reynolds, 763 F. Supp. 666, 669–70 (D. Me. 1991) (emphasis added).

safety of sex-segregated facilities for non-transgender people if birth certificate laws and policies are modernized to eliminate the surgical standard.

### 5. Surgical Requirements Raise Serious Constitutional Concerns

The surgical requirement for gender correction raises both Equal Protection and Substantive Due Process concerns.

There is a well-founded Equal Protection Clause argument to be made that a surgical requirement discriminates against the class of transgender people—who all must have surgery or else be denied an accurate birth certificate—compared to non-transgender people who have accurate birth certificates without being required to undergo surgery.[197] Depending on which level of scrutiny the court would apply to the class of transgender people, at minimum, there would have to be a legitimate state interest that the surgical policy was rationally related to advancing. None of the policy reasons related to fraud, permanence, and sex-segregated facilities, which were articulated and dismissed in this Section, should be considered rationally related to a legitimate[198] state interest.[199]

---

197. A second approach under the Equal Protection Clause would be to compare transgender people who have had surgery versus those who have not had surgery. This type of distinction, based on surgical status, is more likely to receive rational basis review.

198. Interests of prevention of fraud and security, and safety, may all be legitimate, however, the surgical rule fails because it is not *rationally related* to advancing these interests.

199. Presumably, the government might also make an argument that a surgical standard is simply easier to administrate than other options. Given the multitude of different surgeries that a person may receive, as well as the fact that the way most agencies determine that surgery has been undergone is through a letter or other document from a health care provider, it should not be *more* difficult to process a letter or other document from a provider stating that the person has had appropriate treatment for the purpose of gender transition. Thus, the argument that surgery is an easier standard to administrate is faulty.

Moreover, there is a sound argument that transgender people deserve either heightened[200] or strict scrutiny[201] in Equal Protection analysis. If the former, the reasons for the policy would need to be "important" and the policy would need to be "substantially related" to forwarding that interest. If the latter, the policy reasons would need to be "compelling" and the policy would need to be "narrowly-tailored" to advancing that interest. Even if a court was to declare that the state interests were "legitimate" and the classification was rationally related to meeting that interest, which would enable it to pass rational basis review, these policy justifications should certainly fail under heightened review or strict scrutiny.

There are also a series of rights implicated by surgical requirements that could be protected by the Substantive Due Process protections of the

---

200. Heightened or "intermediate" scrutiny is provided for all classifications based on gender. *See* United States v. Virginia, 518 U.S. 515 (1996). A good argument can be made that this issue qualifies for heightened scrutiny because at its most basic level, the government is making a classification based on gender when it is determining which gender marker is appropriate and it is potentially judging or classifying a person based on their sexual characteristics, which may be related to sex stereotypes about what makes a man and a woman. *See* Glenn v. Brumby, 663 F.3d 1312, 1316 (11th Cir. 2011) (reasoning that a "person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes" and therefore that discrimination against transgender individuals on the basis of their gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause, which receives heightened scrutiny). In addition, the Department of Justice released a report saying that all LGBT people should receive heightened scrutiny. U.S. DEP'T OF JUSTICE, CIVIL RIGHTS DIV., INVESTIGATION OF THE NEW ORLEANS POLICE DEPARTMENT 33 (2011) *available at*, http://www.justice.gov/crt/about/spl/nopd_report.pdf ("[W]e note that a number of factors weigh in favor of applying heightened scrutiny in the context of discrimination by law enforcement on the basis of sexual orientation and gender identity, including a long history of animus and deeply-rooted stereotypes about lesbian, gay, bisexual, and transgender ('LGBT') individuals.").

201. In determining whether to apply a heightened level of scrutiny, the Supreme Court has set forth two requirements: (1) that the group affected have been historically victims of discrimination by the government, and (2) that the characteristics that differentiate the group bear "no relation" to the ability of members of that group to contribute to society. *See* Mass. Bd. of Retirement v. Murgia, 427 U.S. 307, 313 (1976); Frontiero v. Richardson, 411 U.S. 677, 686 (1973). In addition, courts have sometimes considered whether the characteristics that define the group are immutable and whether the group is politically powerless. *See* Nyquist v. Mauclet, 432 U.S. 1, 9 n.11 (1977) (demonstrating the flexibility of immutability by holding that classifications based on alienage warrant heightened scrutiny even though they can naturalize); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 28 (1973) (finding that poor families are not politically powerless). Transgender people should be able to meet the two required factors and also satisfy the two other characteristics that courts have considered. Therefore, they should be deemed a "suspect class" for purposes of applying Equal Protection analysis.

Constitution. First, there is a long-established right to be free of unwanted medical treatment.[202] Second, there is a long line of cases establishing the right to choose parenthood and control one's reproductive capacity.[203] Third, there is a right to be free of sterilization.[204] The latter two rights are restricted by surgical requirements because sterilization and other effects on one's reproductive capacity are inherent in many sex reassignment surgeries. In addition, a good argument can be made for a previously unrecognized right to gender self-determination.[205] Thus, if the government desires to limit any of these rights—which a surgical requirement does[206]—the government action would need to be justified by a compelling state interest, with the policy narrowly tailored to forwarding that interest.[207] As previously discussed, however, the articulated policy reasons for a surgical requirement do not meet that standard.

All of the Substantive Due Process arguments should also be considered valid public policy concerns, even if a court would not accept them as constitutionally guaranteed freedoms. For example, some would argue that the highly personal and private nature of a person's decisions regarding surgical options should not be interfered with by the government, that an individual's bodily integrity should be protected against government intrusion, and finally, that sterilization should not be required of any citizen without a serious public policy justification.

---

202. *See, e.g.*, Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261 (1990).

203. *See, e.g.*, Griswold v. Connecticut, 381 U.S. 479 (1965); Roe v. Wade 410 U.S. 113 (1973); Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833 (1992).

204. *See, e.g.*, Skinner v. Oklahoma, 316 U.S. 535 (1942).

205. This argument would be based on *Lawrence* and, more generally, existing Substantive Due Process jurisprudence that recognizes a person's intimate and personal decisions should be respected absent government need to the contrary. Lawrence v. Texas, 510 U.S. 538 (2003). There is also international support for the existence of this right. *See* Goodwin v. United Kingdom, Eur. Ct. H.R. 1 (2002).

206. A surgical requirement can interfere with these rights for several reasons. First, for many, surgery is unwanted medical treatment. Second, a side effect of surgery is often sterilization, which would interfere with one's ability to parent and control one's reproductive capacity. Third, a person's right to gender self-determination is interfered with when the government insists upon providing official government documents that contradict one's self-determination and disclosing this information to third parties.

207. The rights listed are typically referred to as *fundamental* rights, although the Court may be shifting to a "liberty interest" frame, where the requirement that rights be connected to or established by our nation's history is no longer present. In addition, the test for the restriction of fundamental rights may be becoming less rigid. For a discussion of the evolution of substantive due process analysis, see Laurence H. Tribe, Lawrence v. Texas: *The "Fundamental Right" That Dare Not Speak Its Name*, 117 HARV. L. REV. 1893, 1897–98 (2004).

Regardless of the strength of these arguments, state governments should be concerned that they will be subject to litigation, potentially based on state or federal constitutional provisions. Two lawsuits were filed in 2011 challenging surgical requirements for updating birth certificates and driver's licenses.[208]

### C. Specific Recommendation for Legal Standard for Gender Correction

Individuals should be permitted to correct the gender marker on their birth certificates if they make a gender transition that is medically recognized, using a modern medical understanding of transgender people. As official government records, birth certificates must remain reliable documents; therefore, it is important to establish a process to ensure that the amendments are reliable. Usually, agencies require external verification when individuals wish to make other corrections to their birth certificates (e.g. name, paternity, etc.). In order to put forth a statute that will be acceptable by government agencies, some compromise[209] in the form of external verifica-

---

208. In Alaska, the state ACLU challenged the driver's license / state identification card policy of requiring surgery on the grounds that it violated substantive/fundamental rights protected by the Alaska Constitution. *See* Brief of Appellant, K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05431 (Alaska Super. Ct. July 18, 2011), *available at* http://www.akclu.org/InTheCourts/KLvAlaska.AppellantsBrief.pdf. In a Memorandum of Decision, the judge determined that the surgery-based policy was not enacted with appropriate procedure, thus struck it down, not reaching the larger constitutional claims brought by the plaintiffs. However, the judge did determine that the agency not having a gender correction policy at all constituted a breach of the right to privacy of the transgender licensee. K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05431, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012) (memorandum decision). In New York, the New York City birth certificate policy of requiring proof of surgical treatment was challenged on the basis that it violated the city's Administrative Procedure Act, was an arbitrary and capricious agency action, and was a violation of numerous provisions of the New York City Human Rights Law. *See* Press Release, Transgender Legal Defense and Education Fund, Transgender Rights Group Files Lawsuit Against New York City Over Refusal to Correct Transgender Birth Certificates (March 22, 2011), *available at* http://tldef.org/press_show.php?id=327.

209. Some may favor a self-identity based policy. *See, e.g.*, TRANSGENDER EQUAL. NETWORK IR., A TIME FOR RECOGNITION: RESPECT, RECOGNITION AND EQUALITY FOR TRANSGENDER PEOPLE 9, *available at* http://www.teni.ie/attachments/714a4ffb-3240-496b-8905-06002a24d6c7.pdf ("TENI would propose that a statutory declaration rather than an affidavit would be appropriate for gender recognition and that the person swear that they have given the matter careful consideration and declare their wish to change their gender and have this recognized legally."). In Argentina, a self-identity based policy, with no external verification, is now national law. *See supra* notes 38–40 and accompanying text. Yet, given the lack of even any U.S. driver's license policies, seen as less legally meaningful, being based entirely on self-identity with no external verification, it seems unlikely that a jurisdiction would

tion is necessary. However, it can be done without obstructing a person's constitutional rights and can be done in a way that comports with contemporary medical understanding.

Although the complete model law is presented in Part V.,[210] the relevant portion regarding the standard of proof is the following:

> A notarized statement from the registrant's licensed treating or evaluating physician or health care provider stating that the registrant *has undergone surgical, hormonal, or other treatment appropriate for that individual for the purpose of gender transition, based on contemporary medical standards*, or stating that the registrant has an intersex condition, and that in the *provider's professional opinion* the registrant's gender designation should be changed accordingly.

There are seven important features to this model language:

(1) First, the language uses the term "licensed physician or health care provider" because, as the Standards of Care recognize, a number of physicians and non-physician health care providers can be appropriately involved in a person's gender transition and have the requisite knowledge to make a competent evaluation. This language is broad enough to include therapists, psychologists, psychiatrists, social workers, as well as other physicians who are licensed to provide health care.

(2) Second, there is no requirement that the provider personally conducted or supervised the person's treatment—a provider

---

agree to a solely self-identity based policy for birth certificates. In addition, there are some that want gender removed entirely from the birth certificate. *See* Spade, *supra* note 4, at 805–08. This is more feasible than one might think because the government health statisticians who want gender data can get it on the more detailed health questionnaire that is filled out at the same time with the birth certificate. For example, the health questionnaire typically asks race, whether or not pre-natal care was received, and the health of the baby as delivered. While I am sympathetic to this way of thinking, at this point it is not politically realistic to suggest to state legislatures to remove gender entirely. Also, as discussed in *supra* Part I.D.2., there are important practical and legal reasons that a person may need to have some official record of gender to present to authorities. A gender-less birth certificate cannot meet that need.

210. *See infra* Part V.

who has completed an evaluation should be considered
qualified.[211]

(3) Third, the language uses the phrase "has undergone" as op-
posed to "complete," which is sometimes found in existing
statutes and implies that the treatment has ended.

(4) Fourth, the language is clear that it is an *individual* standard
and no specific medical treatment is required. This is due to
the use of the conjunctive in "surgical, hormonal, *or* other
treatment" as well as the important phrase "appropriate for
that individual."

(5) Fifth, the reference to "contemporary medical standards" in
the statute is included to help ensure that as medicine
evolves, so does the statute.[212]

(6) Sixth, the language ensures that providers are exercising their
professional judgment, based on the treatment they pro-
vided or based on their evaluation, with the phrase "in the
provider's professional opinion."

(7) Seventh, the language has an alternative standard for those
with intersex conditions so that they do not have to demon-
strate treatment of gender transition. For people with inter-
sex conditions, it is sufficient to only require that their
provider deem it appropriate for the gender marker on their
birth certificate to be corrected.[213]

III. DEVELOPING AN ACCESSIBLE AND EFFICIENT PROCEDURE FOR
GENDER MARKER CORRECTIONS

The procedure for correcting gender markers on birth certificates must
be examined in light of two primary goals. First, the process for gender

---

211. This is in large part about convenience and practicality. Some people receive treat-
ment from doctors in other countries. Also, occasionally, the specific provider who
treated a person retires, dies, or is otherwise not easily locatable. Thus, any doctor
who can evaluate the person should be eligible to provide the information about the
person's treatment.

212. The inclusion of this "contemporary medical standards" phrase should also help leg-
islators support the measure because they know that what they are endorsing is sup-
ported by modern medicine, which otherwise may not be obvious.

213. This is similar to the U.S. Department of State policy related to Consular Reports of
Birth Abroad and Passports, which requires only the provider review the gender-
related history of the applicant to determine which gender marker should be male or
female. U.S. Dep't of St., 7 FOREIGN AFFAIRS MANUAL 1300, App. M, Intersex
Conditions (2011) *available at* http://www.state.gov/documents/organization/1431
60.pdf.

correction should be as accessible as possible so that transgender people who
warrant the correction can access it, regardless of their income or other per-
sonal factors. Relevant to this inquiry is primarily whether a court order
process is used or whether a person can go directly to the agency with a
provider's statement. Second, the process should be as efficient as possible to
conserve government resources.

### A. Existing Laws and Policies Related to Process

While the MSVSA requires a court order, only twenty-two states, the
Commonwealth of Northern Mariana Islands, District of Columbia, and
U.S. Virgin Islands require court orders.[214] In nineteen states, New York
City, and Guam, a doctor's affidavit or other documentation submitted di-
rectly to the vital statistics agency is sufficient evidence of a gender transi-
tion.[215] Three states allow a person to use either process.[216] Procedures are
unclear in several other jurisdictions.[217]

One of the consequences of using a court order system, especially
when the statutory standard is nonexistent or vague, is that individual
judges are likely to establish or apply their own standards of eligibility for a
gender correction based on their individual knowledge. Even if the word
"surgery" is used in the statute, some judges may distinguish between the
types of surgery they deem would make a petitioner eligible for the correc-
tion. This problem is exacerbated in states where people are required to go
to court in their county of birth or residence, and thus are not able to go to
an area of the state where judges might be more familiar with, and less
biased against, transgender people and gender transition.[218] Similarly, if

---

214. The states are Alabama, Alaska, Arkansas, California, Colorado, Delaware, Georgia,
Indiana, Louisiana, Maryland, Missouri, Mississippi, Montana, Nevada, New
Hampshire, Oregon, South Dakota, Utah, Virginia, Vermont, Wisconsin, and Wyo-
ming. *See infra* app. A

215. The nineteen states are Arizona, Connecticut, Florida, Hawaii, Iowa, Illinois, Kan-
sas, Kentucky, Massachusetts, Maine, Michigan, North Carolina, North Dakota,
Nebraska, New Jersey, New Mexico, New York, Rhode Island, and Washington. *See
infra* app. A.

216. These are Minnesota, Pennsylvania, and West Virginia. *See infra* app. A.

217. These are Oklahoma, South Carolina, Texas, and American Samoa. *See infra* app. A.

218. For example, in Vermont, people have to go to the probate judge in their county of
birth. VT. STAT. ANN. tit. 18, § 5075 (West 2011). Each county has one elected
probate judge. Although Vermont's probate judicial system is relatively easy to access
and can be utilized without an attorney, this system remains highly restrictive be-
cause it increases the potential for someone having to appeal (and hire an attorney) if
the elected judge in the county of birth denies the correction. Anecdotally, we know
that the ability to go to certain judges or to the courts in a large geographic area,
where most judges are more educated about and less biased toward transgender peo-
ple, is an important survival technique. A system that forces a person to go to a

Zzyym v. Tillerson - AR 0275

judges are attempting to determine what treatment is "appropriate" for the individual, one can imagine that different judges will come to different conclusions.

In an attempt to mitigate the problems of judicial inexpertise, both California[219] and Vermont adopted statutory language to limit judges' ability to determine what qualifies as appropriate medical treatment. In Vermont, the statute says that the documentation from the medical provider is "sufficient evidence,"[220] and in California, the documentation should be considered "conclusive proof" of the change in gender.[221] Furthermore, in California, the gender change process is already facilitated by a series of court-created, consumer-friendly forms that reduce the need for an attorney.[222]

In the twenty-four states without requirements for a court order, typically a doctor's statement (nine states), certificate (two states), letter (two states), or affidavit (nine states) must be provided directly to the vital statistics agency. Two jurisdictions require that the documentation be "sworn"[223] and seven require that the documentation be notarized.[224] Nine states require that the physician signing the letter or statement is the actual surgeon who performed the surgery.[225] Two states have more burdensome require-

---

specific judge or area of the state makes it more likely a person will be unable to steer away from discrimination. Interview with Kristina Wertz, *supra* note 114 (noting variation on outcome based on judge when California had a surgical requirement).

219. The new law could still be improved by eliminating the requirement of receiving a court order entirely. Conversations with transgender advocates in California indicate that they decided to address primarily the surgical requirement with this legislation. Additional, they have already attempted to minimize the burden of needing to go to court by creating a combined process for name and gender corrections and easy-to-use forms. Interview with Kristina Wertz, *supra* note 115.

220. VT. STAT. ANN. tit. 18, § 5112(b) (West 2011).

221. CA. HEALTH & SAFETY CODE § 103430 (West 2012). However, the strength of the "conclusive proof" statement is somewhat tempered by a later statement that "[a]t the conclusion of the hearing the court shall grant the petition if the court determines that the physician's affidavit shows that the person has undergone clinically appropriate treatment for the purpose of gender transition." *Id.*

222. The Judicial Council of California promulgates a variety of forms, including forms for the applicant, medical affidavits, and judicial orders and decrees. *See Browse All Forms*, CALIFORNIA COURTS, http://www.courts.ca.gov/forms.htm?filter=NC (last visited Dec. 27, 2011) (including relevant forms for name and gender changes: NC-200, NC-210, NC-220, NC-230, NC-300, NC-310, NC-320, and NC-330).

223. These are Kentucky and Guam. *See infra* app. A.

224. These are Iowa, Massachusetts, Maine, Nebraska, North Carolina, Rhode Island, and West Virginia. *See infra* app. A.

225. These are Connecticut, Illinois, Maine, North Dakota, Nebraska, New Mexico, Pennsylvania, Virginia, and West Virginia. *See infra* app. A.

ments for post-surgical reports or descriptions of procedures.[226] For Consular Reports of Birth Abroad, a letter on letterhead is required to be given directly to the State Department.[227]

Although it is not found as a written part of these policies, presumably these documents are examined for authenticity by agency staff. Requiring only a letter or notarized statement, as opposed to an "affidavit," should be easier for a non-lawyer to understand how to produce.[228] In addition, both the Consular Reports of Birth Abroad policy and the new California statute provide suggested language for the medical provider to include in a letter or statement. This also can be helpful for a non-lawyer to navigate the system.

Another important feature, which currently only exists in Connecticut, is a provision relating to the jurisdiction of judges to issue court orders to correct a current resident's gender on his/her birth certificate when they were born in a different state that requires a court order. Because of the time, money, travel, and other costs associated with traveling to the place of birth to hire an attorney and appear in court, it is significantly easier for individuals to file for a court order from their current state of residence. Connecticut's statute provides:

> In the case of a person who is a resident of this state and was born in another state or in a foreign jurisdiction, if such other state or foreign jurisdiction requires a court decree in order to amend a birth certificate to reflect a change in gender, the probate courts in this state shall have jurisdiction to issue such a decree.[229]

---

226. For New York, this involves "a letter from the surgeon specifying date, place, and type of sex reassignment surgery performed; an operative report from the sex reassignment surgery; and some additional medical documentation." For Virginia, the applicant needs a "preoperative diagnosis, postoperative diagnosis and description of procedure." *See infra* app. A.

227. U.S. Dep't of St., 7 FOREIGN AFFAIRS MANUAL, *supra* note 29, at 1320 app. M(b).

228. Affidavits, depending on the state law, can require additional formatting or other requirements that a lay person would have to research in order to complete properly. However, most non-lawyers know what a "notarized" statement is; thus, this is more accessible.

229. CONN. GEN. STAT. ANN. § 19a-42b(1) (West 2011).

Zzyym v. Tillerson - AR 0277

This clarification is important because it reduces the likelihood that courts[230] will express concern about lack of jurisdiction over an executive agency in another state or country.[231]

### B. Issues to Consider When Designing a Correction Process

Approximately half of jurisdictions currently have a court order process instead of a direct-to-agency process. These jurisdictions need to consider the various consequences of this policy. For many, the court order process can be an insurmountable practical or financial barrier to obtain a corrected birth certificate. It also compromises privacy, leads to problems caused by lack of judicial inexpertise and bias, as well as raises serious constitutional questions.

#### 1. Practical Concerns with the Court Order Process

Administrative processes are a critical feature of government record keeping and daily life. The government keeps records on our lives in many ways. If people had to hire attorneys or visit judges for all of the government record-keeping features of their lives, the cost of running the government would exponentially increase. Imagine if everyone had to hire an attorney and go to court for every interaction they had with the government, such as having a child and needing to establish a birth record, getting a driver's license, registering the ownership of a car, getting married, recording a death, etc. Because of their easy accessibility, efficiency, and lower cost, administrative processes are often used in lieu of judicial action for record-keeping functions. The judicial process is utilized when there is a need for judicial oversight to prevent fraud or for an investigation where facts are contested.

Requiring people to get court orders to correct the gender markers on their birth certificates is typically a significant burden. There are many expenses associated with it: hiring an attorney competent in the matter, taking time off work or school to meet with an attorney and appear in court, traveling to the courtroom and attorney's office (the cost of which, especially for non-residents of the state, may be significant and time consum-

---

230. *In re* Heilig, 816 A.2d 68, 84 (Md. 2003) (noting that a lower court in Maryland had held that it did not have power over the Secretary of State of Pennsylvania to order a change in the individual's birth certificate and, in dicta, stating "[o]bviously, the Legislature cannot direct officials in other States to change birth certificates issued in those States but may deal only with birth certificates issued or issuable in Maryland . . . ").

231. Of course, the receptive state or country may not accept the order, but many states are known to do so as a practical matter.

ing), and court fees. Although court forms may be created to simplify the process somewhat and court fee waivers may be available to those with low incomes, in general, a court order process is significantly more burdensome than an administrative process.

Thus, to reduce costs to both the government and the individual, states should provide an administrative process for birth certificate gender corrections.

### 2. Privacy Concerns with the Court Order Process

There is no public policy reason to require a person to discuss their intimate feelings regarding their birth sex, gender identity, or the medical treatments they have received in open court. Privacy of the details of one's sex, gender identity, and medical treatment, or the facts surrounding one's gender transition or transgender status, should not depend on the happenstance of who is in the courtroom[232] or whether the judge agrees to seal or redact the judicial records.

Furthermore, depending on the system, the very instigation of the court proceeding can create permanent court records that document the proceeding in some way regardless of attempted confidentiality.[233] The future availability of court records to members of the public can also cause psychological distress.

As will be discussed fully in Part IV-B, the mere disclosure of a person's transgender status, or his or her medical treatment related to being transgender, is likely to be a constitutional privacy violation. One effective

---

232. This concern may be mitigated in systems in which the person only appears before the judge, not in open court. However, at the minimum, the judge and potentially a clerk will be listening to these intimate details. In a direct-to-agency procedure, less private and intimate details are disclosed by the medical provider's statement, and there may be only one person who examines the provider's statement. In California, the Transgender Law Center has recommended to people worried about disclosures in open court that they ask to go last or ask to speak with the judge in closed court if questions come up that they would prefer not to answer in open court. TRANS-GENDER LAW CENTER, ID PLEASE . . 9–22, 31–32 (2010) *available at* http://transgenderlawcenter.org/issues/id/id-please.

233. This concern may be mitigated if the record is sealed by the judge, which, depending on the system, may only be allowed at the judge's discretion. However, in some states even a sealed record will be available in the court index. See, e.g. LEGAL VOICE, Family LAW COURT RECORDS AND YOUR PRIVACY 5 (2008) *available at* http://www.legalvoice.org/pdf/self_help/Family_Law_Court_Records_%20and_Your_Privacy.pdf ("When the court seals a file or a document, the court means to protect it from examination by the public. The existence of the sealed file can be found on a court index with the case number and the names of the parties and the notation 'case sealed'. However, the contents of the case will not be available to the public.").

way to deal with this potential privacy violation is to avoid it by not going through the court system in the first place.[234]

### 3. Concerns about Lack of Judicial Education and Bias Toward Surgery

Judges are often called upon to make a factual determination with regard to medical facts, including in the most complicated cases of medical malpractice, and they do so competently. However, to do so, they rely in large part on medical and scientific experts. When it comes to transgender medicine, judges' views may be similar to those of the general public. Absent testimony from medical experts, judges may not be aware of the current well-accepted Standards of Care or how inaccessible surgical treatment can be. There is a greater risk that a judge will misapply the standard "appropriate treatment . . . based on contemporary medical standards" than there is in having a medical professional apply the standard.

That judges are not fully educated on transgender medical issues has been documented in other areas of the law. Judges often have required surgery as a condition for gender recognition, especially in cases related to marriage, even when there is no medical or legal basis for that requirement.[235] Moreover, certain judges have required proof of surgery for *name* changes for transgender people, which according to longstanding common law principles are to be granted except in the narrowest circumstances. The fact that many judges have applied a surgical standard where none exists indicates that many share the belief that anatomical presentation is what determines gender. Battles over proof of surgery in the name change context have bubbled up to appellate courts in New Jersey, Pennsylvania, and New York,[236]

---

234. Another alternative would be to require in the statute that the court proceeding be conducted in private and to be sealed afterwards. This lessens some of the confidentiality concerns but does not entirely eradicate them.

235. *See* Tobin, *Against the Surgical Requirement*, *supra* note 4, at 413–17.

236. Longstanding common law principles establish a person's right to change their name, with an affirmative right to do so absent harm to another person, fraud, or other public policy interest. Judges may consider whether the name would create other fraudulent issues, such as someone adopting the name of a well-respected professional in order to get business fraudulently, whether or not the name is overly long or ridiculous, or profane. *In re* Falcucci, 50 A.2d 200, 202–03 (Pa. 1947). Some judges in New York required documentation of sex reassignment surgery before granting a simple name change from a traditionally male name to a female name. This happened throughout New York until a series of appellate decisions appear to have definitively declared that proof of medical treatment was not required. *In re* Winn-Ritzenberg, 891 N.Y.S.2d 220, 221 (N.Y. App. Term 2009) (per curiam) ("There is no sound basis in law or policy to engraft upon the statutory provisions an additional requirement that a transgendered-petitioner present medical substantiation for the desired name change."); *see also In re* Guido, 771 N.Y.S.2d 789 (N.Y. Civ. Ct. 2003) (reversing the court's own decision after initially requiring medical

and include a case where a judge denied a transgender woman a name change from "Brian" to "Lisa" who had been living as Lisa for 22 years.[237] In other areas of the country, denials of name changes based on lack of medical evidence still happen on a regular basis.[238] That this continues to be a problem, despite clear case law that surgery should not be required, demonstrates the persistence of the judges' views that surgery is properly required before recognizing a person's gender.

In order to remedy a judge's possible lack of education about transgender medicine, an applicant would potentially need to hire a medical expert, or experts, to provide this expertise to the judge.[239] This is a costly burden. In the alternative, the judge could defer to the physician who provides a statement that the person in question has undergone appropriate medical treatment, in the way suggested by California and Vermont's statutes. In that scenario, the judge is not performing any fact-finding beyond determining that the physician is a real person who signed the paper. The role that judges play in these places could be filled as competently, or more competently, by an official in the vital records office who regularly inspects documents for authenticity.

It is helpful to analogize this situation to one where a person with epilepsy had to obtain a court order to drive. Certainly a judge is capable of determining that the person has been adequately medicated by examining the testimony of experts or that person's doctor. However, a more efficient system is one that allows the DMV to process the provided medical infor-

---

evidence). Appellate courts in Pennsylvania and New Jersey have also overruled lower judges on this question. *See In re* McIntylre, 715 A.2d 400, 402–03 (Pa. 1998) ("Here, it was undisputed that Appellant was judgment free and was not seeking a name change to avoid any financial obligations or commit fraud. The fact that he is a transsexual seeking a feminine name should not affect the disposition of his request."); *In re* Eck, 584 A.2d 859, 860–61 (N.J. Super. Ct. App. Div. 1991) ("Absent fraud or other improper purpose a person has a right to a name change whether he or she has undergone or intends to undergo a sex change through surgery, has received hormonal injections to induce physical change, is a transvestite, or simply wants to change from a traditional "male" first name to one traditionally "female," or vice versa.").

237. *In re* Harris, 707 A.2d 225 (Pa. Super. Ct. 1997).

238. Interview with Dru Levasseur, *supra* note 115.

239. The highest court in Maryland appeared to realize its limitations in knowledge of transgender medical issues in *In re Heilig*, 816 A.2d 68, 72 (Md. 2003). The court asserted it is not qualified to write a medical text on the subject of transgender medicine and noting that it is unable to evaluate that field "unguided by expert testimony." *Id.* Despite this statement, the court then wrote ten pages summarizing medical research into transsexualism and intersex conditions, presumably showing willingness to venture into areas of scientific knowledge despite being unguided by expert testimony. *Id.* at 71–79.

mation; in fact, this is generally how this issue is handled.[240] It is simply inefficient—a waste of judicial resources—and prone to error to have a judge make or supervise the medical determination instead of a person's doctor.

### 4. Constitutional Problems with a Court Order Process

There is a novel argument that requiring a court order is a substantial, and therefore invalid, burden upon a person's right to determine his or her gender. First, the court would need to recognize that there is a right to self-determination of gender, discussed previously in Section II.B.5.

Once the right is established, the burden of going to court must be analyzed. Certainly, as previously discussed, the process of getting a court order typically requires money for court fees, hiring an attorney, time to prepare for and make a court appearance, and potentially travel to one's state or county of birth. Furthermore, it may compromise the privacy of one's transgender or medical status. Thus, going through the court process is legitimately considered a real burden for those attempting to update the gender on their birth certificate. If the burden is considered significant or substantial,[241] the court order process is unconstitutional, unless it is justified by sufficiently important government interests and closely tailored to meet them.[242]

### C. Specific Recommendation for the Gender Correction Process

In order to maximize both the accessibility of the gender marker change and the efficiency of the government in making the change, an administrative process in which an individual goes directly to the agency with the relevant documentation should be the standard method for gender

---

240. DMVs have slightly different rules on how to determine when a person with epilepsy should be cleared to drive, but none of the states have any judicial involvement. *See* Robert S. Fisher, *Driving and Epilepsy*, EPILEPSY THERAPY PROJECT, (Mar. 2009) http://www.epilepsy.com/epilepsy/newsletter/mar09_driving.

241. *See* Zablocki v. Redhail, 434 U.S. 374 (1978).

242. *See Zablocki*, 434 U.S. at 388 ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."); *See also* Bullock v. Carter, 405 U.S. 134, 144 (1972) (finding that a law infringing on a constitutional right "must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster"). I plan to explore this argument further in a future article.

marker corrections on birth certificates.[243] A notarized statement from a doctor, with the relevant information, should be sufficient documentation to ensure that the applicant has a bona fide need for a corrected gender marker. Using the term "notarized statement" is more desirable than "affidavit" because the general public is more aware of how to get a statement notarized than how to write an affidavit, the format of which may be highly technical and differs from state-to-state.

In the case of bias or misapplication of the relevant standard by the agency official, the statute should make clear that there is an appeals process through the courts that an individual may pursue if denied a gender marker correction. The MSVSA has such language relating to all potential corrections, and a number of states have also adopted it.[244]

In addition, the statute should give courts of that state clear authority to provide court orders that residents can use in their state or country of birth where court orders are still required. This is relatively straightforward and should be included as a matter of course until there are no longer states or countries that require court orders. If this provision is not included, judges may be concerned that they lack authority to issue such an order.[245]

---

243. My proposed statute dictates that the administrative process is the only process. In joint recommendations to the U.S. Department of Health and Human Services, organizations have recommended that the statute allow that an individual can either submit a court order to the agency or submit a statement from the physician. *See* Harper Jean Tobin, Nat'l Ctr. for Transgender Equality, Comments of Legal and Public Policy Organizations on Corrected Birth Certificates for Transgender People (Sept. 8, 2009) (on file with author). I have omitted the court order option from this proposed statute in large part to avoid suggesting that states should choose which option to include in their statute. In reality, including both court order and administrative processes as options for an individual to use in the state's statute or policy, is also an acceptable outcome. In that case, a person who finds that the court order process is a burden can use the administrative process. The benefit of also including a court order option is that people who need a court order declaring their legal gender for other reasons may potentially be able to avoid the difficulties of acquiring statements from their health provider.

244. MODEL STATE VITAL STATISTICS ACT § 21(e) (Ctr. for Disease Control & Prevention 1992). *See* ARK. CODE ANN. § 20-18-307 (West 2005) ("When an applicant does not submit the minimum documentation required in the regulations for amending a vital record or when the state registrar has cause to question the validity or adequacy of the applicant's sworn statements or the documentary evidence and if the deficiencies are not corrected, the state registrar shall not amend the vital record and shall advise the applicant of the reason for this action. The state registrar shall advise the applicant of his or her right of appeal to a court of competent jurisdiction."); COLO. REV. STAT. ANN. §25-2-115 (West 2010); IDAHO CODE ANN. § 39-250 (2010); OR. REV. STAT. § 432.235 (2007).

245. *See In re* Heilig, 816 A.2d 68.

IV. ESTABLISHING COMPREHENSIVE PRIVACY PROTECTIONS

The state may be violating an individual's right to privacy if it reveals information regarding a person's gender assigned at birth, gender transition, or transgender status. In creating a policy related to privacy, policymakers should consider the impact of government disclosure on transgender people as well as constitutional privacy rights that may be implicated.

The transgender person's right to privacy can be implicated by a birth certificate policy in three ways. First, if the agency refuses to provide a transgender person an updated gender marker, then the individual is "outed" as transgender to all who inspect the certificate. Second, in the process of pursuing and executing the gender correction, there are records created and altered that may leave a publicly available paper trail, including a visibly amended birth certificate. Here, how the gender marker correction is dealt with is only part of the issue, since policies related to how a change of name is recorded also matter. Third, the government staff involved in the process may learn of and disclose a person's transgender status to others. This Section deals primarily with the latter two issues—i.e. how to avoid privacy violations in the process and recording of gender correction as well as the role that government officials play. The first was fully addressed by recommendations in Sections II and III.

### A. Existing Privacy Protections

#### 1. Privacy Protections in the MSVSA

##### a. New Versus Amended Certificates

The MSVSA provides a general rule for any kind of amendment: it should be shown on the face of the document unless otherwise provided for by regulation.[246] Thus, unless a state adopts a regulation setting forth a different policy, the fact that an amendment has been made will be plain *on the face* of the certificate in some way.

The Model Regulations that accompany the MSVSA list the various ways in which a birth certificate can be amended so that the amendment, or the fact that an item was amended, is visible (or not) to those who inspect it: (1) by preparing a new certificate with a note that the item number was amended and on what date; (2) by drawing a single line through the incorrect information (without obliterating the underlying entry) and writing the

---

246. "A certificate or report that is amended under this section shall indicate that it has been amended, except as otherwise provided in this section or by regulation." MODEL STATE VITAL STATISTICS ACT § 21(e) (Ctr. for Disease Control & Prevention 1992).

correct data above or to the side; (3) by creating a special amendment form
that includes the correct information and is attached to the original, unal-
tered certificate; and, (4) for electronic records, by changing the item, not-
ing the date, and retaining the original information. The MSVSA Model
Regulation provides these in brackets, indicating that they are all "op-
tional,"[247] with the implication that states choose the provision(s) that they
prefer. At the end of the list of options, there is a provision that specifically
applies to gender correction, which is indicated through cross-referencing
Section 21(d), the gender correction provision:

> (f) A certificate of birth amended pursuant to the provisions of
> (Section 21(d) of the Model Act) shall be amended by preparing
> a *new* certificate. *The item numbers of the entries that were
> amended shall not, however, be identified on the new certificate or
> on any certified copies that may be issued of that certificate.*[248]

Thus, the MSVSA Model Regulations treat gender correction as an
amendment that *should* be kept private from those who are permitted to
inspect the certificate. However, the provision could go unnoticed as an
option to be used, or alternatively, policymakers could assume that it is one
option of many when viewed in conjunction with the other options listed in
this section. This is compounded by the fact that this optional provision's
application to gender markers was only indicated through cross-referencing.

In fact, presumably because of the lack of clarity caused by the cross-
referencing used in subsection (f), or otherwise lack of attention to detail by
state policymakers, some states have adopted the MSVSA statutory language
related to gender corrections *without* adopting the accompanying regulation
in (f). Of course, some states may have also intentionally not adopted the
provision because they wanted gender marker corrections to be visible. Yet,
remarkably, some jurisdictions (such as Alabama, the Commonwealth of the
Northern Mariana Islands, Kentucky, and Oregon)[249] have the exact
MSVSA language that directs gender on one's birth certificate to be
"amended as provided by regulation" but do not have *any* regulation in-
structing how amendments are to be made. Thus, in many states following
part of the MSVSA, gender corrections are processed and marked as
amended in the same way that other amendments are processed and
marked, whether through a single-line cross out or another method.

---

247. "In cases where recommendations were considered optional, brackets, '[ ],' have been
placed around the word or phrase." *Id.* at 1.
248. *Id.* at §11.8(f) (emphasis added).
249. For citations of these statutes, see *infra* app. A.

### b.  Treatment of Name Changes in the MSVSA

How a policy treats name changes is an important part of privacy analysis since the revelation of a name change has the potential to disclose that someone is transgender, even if the gender marker correction is kept private. The MSVSA requires a court-ordered name change to amend a name on the birth certificate.[250] Except in cases of adoption, or for name changes before the age of one, names will be amended visibly on the face of the document itself, following whichever amendment process the state chooses.[251]

However, the MSVSA's gender correction provision, Section 21(d), also refers to name changes that occur due to a change in gender. Accordingly, the fact and details of a transgender person's name change presumably should remain confidential on the certificate if the MSVSA Model Regulation's provision related to privacy is adopted.[252] However, the MSVSA's lack of clarity on this point renders it insufficient to ensure adequate privacy protections.

### c.  Records Storage and Accessibility in the MSVSA

The MSVSA generally limits access to copies of birth certificates to registrants; the registrant's spouses, children, parents or guardians; the legal representatives of any of them; or a person who is able to show that the certificate is necessary to determine or protect a property interest.[253]

---

250. "Upon receipt of a certified copy of an order of (a court of competent jurisdiction) changing the name of a person born in this State and upon request of such person or his or her parents, guardian, or legal representative, the State Registrar shall amend the certificate of birth to show the new name." MODEL VITAL STATISTICS ACT, *supra* note 1, § 21(c), at 10.

251. The Model State Vital Statistics Act's Regulations list possible options states could choose. *Id.* at §11.8.

252. *Id.* at Reg. 11.8(f) ("A certificate of birth amended pursuant to the provisions of (Section 21(d) of the Model Act) shall be amended by preparing a new certificate. The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate.").

253. *Id.* at § 24(a) ("The State Registrar [and other custodian(s) of vital records authorized by the State Registrar to issue certified copies] shall, upon receipt of an application, issue a certified copy of a vital record in his or her custody or a part thereof *to the registrant, his or her spouse, children, parents, or guardian, or their respective authorized representative. Others may be authorized to obtain certified copies when they demonstrate that the record is needed for the determination or protection of his or her personal or property right.* The State Agency may adopt regulations to further define those who may obtain copies of vital records filed under this Act.") (emphasis added).

Zzyym v. Tillerson - AR 0286

The MSVSA also ensures that the documents used to justify an amendment, including the correction of gender or name, must be kept by the vital statistics agency:

> A record shall be maintained which identifies the evidence upon which the amendment was based, the date of the amendment, and the identity of the person making the amendment.[254]

There is some ambiguity with regard to the documentation that must be preserved. It could be argued that, at a minimum, the official must make a note identifying the type of documentation received (physician's letter, court order, etc.). However, this language may also be read to mean that the documents themselves must be preserved as well.

Whether these records are sealed or available to those authorized to receive a copy of the certificate is not clear because the topic is not explicitly addressed by the MSVSA or Model Regulation. If a state also adopts the Model Regulation provision related to privacy,[255] which states that individuals requesting a copy of a birth certificate should only be given the *new* birth certificate, then that state has at least demonstrated evidence of the intent to protect privacy in the context of gender corrections. Potentially, then, all of the retained records should be kept confidential as well.[256]

## 2. State Laws and Policies Related to Privacy

Of the fifty-three jurisdictions that allow gender marker corrections to documentation, seventeen states,[257] the District of Columbia, and Guam have procedures that allow for amending the original birth certificate but do

---

254. *Id.* at Reg. 21(b).

255. *Id.* at Reg. 11.8(f) ("A certificate of birth amended pursuant to the provisions of (Section 21(d) of the Model Act) shall be amended by preparing a new certificate. The item numbers of the entries that were amended shall not, however, be identified on the new certificate or on any certified copies that may be issued of that certificate.").

256. Although the regulations do not specify that these records will be sealed, other provisions regarding instances where "new" birth certificates are issued very clearly indicate that the old certificate and its information will be sealed and not available to anyone without a court order. MODEL STATE VITAL STATISTICS ACT § 12(g) (Ctr. for Disease Control & Prevention 1992) ("When a new certificate of birth is established by the State Registrar, all copies of the original certificate of birth in the custody of any other custodian of vital records in this State shall be sealed from inspection or forwarded to the State Registrar, as he or she shall direct.").

257. These are Alaska, Alabama, Arkansas, Arizona, Colorado, Kansas, Kentucky, Massachusetts, Maryland, Missouri, North Dakota, New Mexico, Oregon, South Carolina, Utah, and West Virginia. *See infra* app. A.

Zzzym v. Tillerson - AR 0287

not allow issuance of a new birth certificate. Sixteen states[258] and New York City issue a new certificate. In seventeen jurisdictions, it is unclear what is done or it depends on instructions in the court order.[259] Only eighteen jurisdictions clearly seal their records, blocking access to the original certificate and ensuring the privacy of the medical records related to the gender correction.[260]

Name changes are generally allowed on birth certificates when an individual produces a court-ordered[261] name change directly to the state vital statistics agency. For name changes unrelated to gender transition, often the previous and new names both appear on the certificate. In thirteen jurisdictions, there is a clear statute or policy that a name change related to a gender correction should not appear on the face of the certificate.[262] In addition, at least one jurisdiction appears to *require* that people change their name when changing gender.[263]

States vary in their policies regarding access to birth certificates and other records. Most states have a policy similar to the MSVSA, which restricts access to immediate family members, their legal representatives, and those that have a proven property interest.[264] However, at least ten states allow either certified or informational copies of birth certificates to be provided to members of the public.[265]

---

258. These are California, Connecticut, Georgia, Hawaii, Iowa, Illinois, Louisiana, Maine, Michigan, Minnesota, North Carolina, Nebraska, New Hampshire, New Jersey, Nevada, and Vermont. *See infra* app. A.

259. These are Delaware, Florida, Indiana, New York, Pennsylvania, Rhode Island, South Dakota, Texas, Virginia, Washington, American Samoa, the Northern Mariana Islands, and the U.S. Virgin Islands. *See infra* app. A. In Montana, Oregon, Wisconsin, and Wyoming, it depends on the order. *See id.*

260. These are Arizona, California, Connecticut, Hawaii, Illinois, Iowa, Louisiana, Maine, Michigan, Minnesota, Nebraska, New Jersey, New York City, North Carolina, North Dakota, South Dakota, Vermont, and Wisconsin. *See infra* app. A.

261. In Hawaii, official name changes are processed by the office of Lieutenant Governor, not the judicial system. *Name Changes*, HAW. OFFICE OF THE LIEUTENANT GOVERNOR, http://hawaii.gov/ltgov/office/name (last visited Dec. 28, 2011).

262. These are Arkansas, California, Connecticut, Delaware, Georgia, Kansas, Maine, Minnesota, Nebraska, New Jersey, New York, State, Vermont, and New York City. *See infra* app. A.

263. D.C. CODE § 7-217(d) (2011) ("Upon receipt of a certified copy of an order of the Court indicating that the sex of an individual born in the District has changed by surgical procedure and that such individual's name has been changed, the certificate of birth of such individual shall be amended as prescribed by regulation.").

264. MODEL STATE VITAL STATISTICS ACT § 24 (Ctr. for Disease Control & Prevention 1992).

265. The public can receive certified copies in Kentucky, Ohio, Massachusetts, Vermont, and Washington. *See Kentucky Birth Certificates*, KY. CABINET FOR HEALTH & FAMILY SERVS., http://chfs.ky.gov/dph/vital/birthcert.htm (last visited June 24, 2011); *Obtaining Certified Copies of Vital Records*, MASS. DEP'T OF HEALTH & HUMAN

One of the states with the strongest policy of protecting privacy is Nebraska. Although other features of Nebraska's policy are in need of updating, the privacy protections are comprehensive.[266] The statute states that:

> [T]he department shall prepare a new certificate of birth in the new name and sex of such person in substantially the same form as that used for other live births. The evidence from which the new certificate is prepared and the original certificate of birth shall be available for inspection only upon the order of a court of competent jurisdiction.[267]

There are three important features of this policy. First, a new, not amended, certificate is prepared. Second, only the new certificate, not the former one, is available for viewing. Third, the documentation that the registrant provided, as well as the old certificate, are both confidential and only available by a court order. These privacy protections could be marginally improved if the word "sealed"[268] was used; however, the meaning is clear in the statute.

---

SERVS., http://www.mass.gov/eohhs/consumer/basic-needs/vitals/obtaining-certified-copies-of-vital-records.html (last visited Feb. 3, 2011); OHIO DEP'T OF HEALTH, FREQUENTLY ASKED QUESTIONS CONCERNING VITAL RECORDS, *available at* http://www.odh.ohio.gov/~/media/ODH/ASSETS/Files/vs/general/frequentlyaskedquestionsonvitalrecords.ashx (last updated Sept. 29, 2010); VT. DEP'T OF HUMAN SERVS., ACCESS TO BIRTH AND DEATH CERTIFICATES: RECOMMENDATIONS FOR LEGISLATIVE CHANGES 9 (2010), *available at* http://healthvermont.gov/admin/legislature/documents/VitalRecords_legislative_recommendations_091310.pdf; WASH. DEP'T OF HEALTH, Center for Health Statistics Mail-In Request Form, *available at* http://www.doh.wa.gov/Portals/1/Documents/Pubs/422-044-MailinRequestForm.pdf (last visited Dec. 4, 2012). The public can receive "informational" or "uncertified" copies in California, New Jersey (unclear if it includes gender), North Carolina, South Dakota, and Wisconsin (except in limited cases). *See* CAL. HEALTH & SAFETY CODE § 103526 (West 2011); *Frequently Asked Questions*, N.J. DEP'T OF HEALTH & SENIOR SERVS., http://www.state.nj.us/health/vital/faq.shtml#BIR (last visited June 24, 2011); N.C. GEN. STAT. § 130A-93(c) (2011); *Data, Statistics and Vital Records*, S.D. DEP'T OF HEALTH, http://doh.sd.gov/vitalrecords/order.aspx#Eligibility (last visited June 24, 2011); WISC. STAT. § 69.21 (2011).

266. Nebraska requires sex reassignment surgery and a court order. NEB. REV. STAT. § 71-604.01 (2011). Also, the fact that the physician signing the affidavit has to be the surgeon that "performed" the surgery is unduly limiting.

267. *Id.*

268. I use, as is custom, "sealed" to refer to the process of blocking from public view unless a party has a court order to open the record. Depending on the state, "confidential" may have the same implication and "sealed" may not. *Compare* BLACK'S LAW DICTIONARY 1467 (9th ed. 2009) (defining sealing of records as "[t]he act or practice of officially preventing access to particular . . . records, in the absence of a court order.") *with id.* at 339 (defining confidential as "meant to be kept secret").

Similarly, under the policy in Washington State, a new birth certificate is prepared, rather than amending the original.[269] The policy further stipulates that the medical documentation submitted by the individual in support of the gender marker correction, including the doctor's letter, will be sealed.[270] However, the policy does not specify that the original birth certificate must be kept confidential, nor does it explain how name changes would or would not show on the face of the new certificate.

In Vermont, a new certificate is also prepared, with a requirement that the information about the correction be kept "confidential."[271] In California, the new statute retained the existing privacy protections, ensuring that the new certificate does not show the previous gender or name and that records related to the correction are "sealed."[272]

### 3. Privacy for Consular Reports of Birth Abroad

With regard to Consular Reports of Birth Abroad, the serial number is slightly modified to indicate that it is an amended document, but it does not indicate the previous gender or name of the registrant.[273] The documents that are submitted to the agency and retained by the agency are considered confidential, covered by the Privacy Act.[274]

### 4. Privacy Protections in the U.K. and Argentina

The Gender Recognition Act in the United Kingdom also ensures privacy, as does the recently-passed law in Argentina. The U.K. disallows disclosure of the information presented in the application for a Gender Recognition Certificate.[275] In Argentina, original birth certificates are un-

---

269. WASH. DEP'T OF HEALTH, *supra* note 121.

270. "The department retains documentation from the physician or hospital in a sealed file." *Id.*

271. VT. STAT. ANN. tit. 18, § 5112(c) (2011).

272. CAL. HEALTH & SAFETY CODE § 103430 (West 2012) .

273. U.S. Dep't of St., 7 FOREIGN AFFAIRS MANUAL, *supra* note 29 at 1447.4 ("The serial number assigned to an amended Form FS-240, Consular Report of Birth Abroad of a Citizen of the United States of America, will be the same as the number on the original, but will be followed by a dash and a number indicating it is not the original issuance (e.g., -1 for the first amendment).").

274. *Id.* at 1449.3-1 ("Information contained in the Form FS-240, Consular Report of Birth Abroad of a Citizen of the United States of America, including Form DS-2029, Application for Consular Report of Birth Abroad of a Citizen of the United States of America, the Form FS-240, as well as data in the ACS System, is subject to the Privacy Act."). The Privacy Act is a federal statute that protects against the disclosure of records without the consent of the "individual to whom the record pertains." Privacy Act of 1974, 5 U.S.C. § 552a (2006).

275. Gender Recognition Act, 2004, c. 7, § 22 (U.K.).

available except by court order.[276] The Gender Recognition Act specifically notes that with regard to birth certificates, the new birth certificate is the only version available to the public. There is also no note or other information indicating that the person has a previous version of the certificate or went through the gender recognition process.[277]

### B. Issues to Consider When Developing Privacy Policies

#### 1. The Individual Importance of Privacy

Given the risk of violence and discrimination that comes with being known as transgender, it is understandable that some people desire to keep information about their transgender status limited to only those whom they choose to tell. Of course not all transgender people want to be "closeted" all of the time, but generally, people do want to have control over how they present and manage information related to being transgender. Even if the risk of violence is not present, being able to decide with whom and when to have a "coming out" conversation should be a matter of individual choice. The harms discussed above from having an incorrect gender marker can also result from being "outed" by an insufficiently private procedure for correcting gender. The person whose gender transition is revealed may be subject to increased scrutiny because of the possibility of fraudulent documents, often being subjected to questioning about his or her body and identity.[278]

#### 2. Constitutional Right to Privacy

If a governmental entity does not protect the privacy of a transgender person and reveals his or her status—either through issuing visibly amended birth certificates or by providing access to records that indicate a person is transgender—it may be in violation of the right to privacy guaranteed by the U.S. Constitution.[279] Whether the U.S. Supreme Court has officially recognized a constitutionally derived right to privacy that guarantees people to be free of governmental "disclosure of personal matters" is not entirely

---

276. Regime for Recognition and Respect for Gender Identity (File 8126-D-2010) (Argentina), *available at* http://www1.hcdn.gov.ar/proyxml/expediente.asp?funda mentos=si&numexp=8126-D-2010. (An English translation is available at http://www.msmgf.org/files/msmgf/Advocacy/Argentina_GenderIdentity_Law.pdf).

277. Gender Recognition Act, 2004, c. 7 § 10 sch. 3 (U.K.).

278. Spade, *supra* note 4, at 738.

279. This right to privacy should not be confused with the other well-established right to privacy, generally understood as the right to make decisions about intimate details of one's life. "[T]his right to privacy can be characterized as a right to 'confidentiality,' to distinguish it from the right to autonomy and independence in decision-making for personal matters." Doe v. City of New York, 15 F.3d 264, 267 (2d Cir. 1994).

clear.[280] While the Court has considered the issue, and has "assumed without deciding" that such a right exists, it has only done so in limited contexts that are not directly applicable to privacy claims related to birth certificate records.[281]

However, while the Supreme Court has not yet definitively ruled on the existence of this privacy right and certainly has not made a decision regarding disclosure of transgender status by a government actor, the Second Circuit has done so. In *Powell v. Shriver*,[282] the Court of Appeals held that the constitutional right to privacy protects transgender people from unnecessary government disclosure of their transgender status.[283] The appellate court concluded that, "[t]he excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate."[284]

Thus, the only court to rule on this question has decided that there clearly is a privacy right to protect information regarding transgender status, and other judges have cited this decision with approval.[285] In addition, although less dispositive on a federal constitutional right to privacy claim, a judge in Alaska determined it was a violation of a transgender person's right to privacy under the Alaska Constitution to not be able to update the gender on one's driver's license.[286] Accordingly, policymakers should recognize

---

280. Whalen v. Roe, 429 U.S. 589, 599 (1976) (describing one type of privacy protection apparently protected by the Constitution as "the individual interest in avoiding disclosure of personal matters").

281. In a recent case, the Court assumed that there was such a privacy right. NASA v. Nelson, 131 S. Ct. 746, 751 (2011) ("We assume, without deciding, that the Constitution protects a privacy right of the sort mentioned in Whalen and Nixon."); *see also Whalen*, 429 U.S. 589 (1976) (relating to a state statutory scheme mandating confidential reporting of prescriptions of certain controlled substances to the state department of health, which was monitoring for fraud and abuse); Nixon v. Adm'r of Gen. Services, 433 U.S. 425, 457 (1977) ("We may agree with appellant that, at least when Government intervention is at stake, public officials, including the President, are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity. . . . In sum, appellant has a legitimate expectation of privacy in his personal communications.").

282. 175 F.3d 107 (2d Cir. 1999) (finding a violation of a constitutional right to confidentiality when corrections officers revealed an inmate's transgender identity and HIV status to other inmates).

283. The court determined that there was no "legitimate penological interest" in disclosing this information to fellow inmates as well as staff members. *Powell*, 175 F.3d at 113.

284. *Powell*, 175 F.3d at 111.

285. *See, e.g.*, Franklin v. McCaughtry, 110 F. App'x 715, 719 (7th Cir. 2004); Moore v. Prevo, 379 F. App'x 425, 428 (6th Cir. 2010).

286. K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles, No. 3AN-11-05431, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012) (memorandum decision).

the potential legitimacy of this constitutional right on the federal level and
develop privacy policies to protect it.

### C. Specific Recommendations Related to Privacy Protections

In order to protect a person's privacy, a new birth certificate should be
issued with no markings of any kind indicating that it was amended.[287]

Both the original birth certificate and the documents related to the
gender marker correction should be sealed and only made available upon
court order or upon request of the individual. The original birth certificate
and the documents related to the gender marker correction should be availa-
ble to the individual because the person may need to establish continuous
identity.[288]

The statute should provide privacy protections for related name
changes, regardless of whether the name change is acquired simultaneously,
before, or after the gender correction. If the agency's policy is to make visi-
ble amendments for name changes, an exception should be made for name
changes related to gender corrections. Thus, although a change of name that
precedes a gender correction will be visible, at the time of gender correction,
the name change should become confidential. Similarly, a gender-related
name change occurring after the gender correction should also be made
confidential. The statute needs to explicitly discuss each of these situations
so the determination is made correctly regardless of timing.

The statute should also prohibit further inquiry into medical informa-
tion. To respect the individual's medical privacy, staff should not either offi-
cially or casually ask the applicant for additional medical or other
information beyond what is required by the statute. In addition to protect-
ing privacy concerns, this also streamlines the administrative process and
ensures that staff will treat applicants respectfully and consistently with how
other applicants for documentation corrections are treated. Furthermore,
any information received about a gender correction should be kept confi-
dential, unless disclosure is necessary in the course of conducting official
business.

---

287. Spade, *supra* note 4, at 770 (discussing the importance of having a "clean" birth
certificate).

288. Name change orders may also be helpful to show continuous identity, but not every-
one changes names or has those records easily available. Where exactly one might
need the original copy of one's birth certificate is not entirely clear, but it does
appear to be in rare situations where multiple forms of proof are required. For exam-
ple, a bank may request multiple forms of identification from a customer who seeks
to use his or her funds, to ensure that the person is the same customer with a
different name. Interview with Alison Gill, D.C. Trans Coalition, in Washington,
D.C. (Confirmed Oct. 12, 2012).

Zzzym v. Tillerson - AR 0293