ICAO/PPC – FOURTH REPORT                    – 10 –

of 85.72 mm = 3.37" by 125 mm = 4.9") on the basis that the proposed new format would be equal to twice the size of the ISO standardized credit card and would therefore be machine readable also for commercial purposes. The Panel, however, saw no particular merit in harmonizing the size of the Passport Card with that of commercial credit cards and therefore decided not to adopt the ISO proposal. Another aimed at a smaller size, known as DIN* A7, used in Germany and some other States but arguments in favour of this format were not sufficiently convincing to Panel Members to decide in favour of a change from the previously agreed format.

22.          The Panel did agree, however, to an amendment in the text relating to this item to make it absolutely clear that the overall dimensions agreed upon and mentioned at the outset of para. 21 above referred to the outer limits of the document in question, whether issued in card or book form and that a 2 mm margin must be left alongside each edge before inserting data in clear print or coded form. The Panel then approved the text of Recommendation No. 2 as shown in para. 39 in Part III of this Report. No substantial changes were made in the sections entitled "The Clear Print Zone of the Passport Card" and "Information to be Included".

Explanatory Notes on Various Items

23.          Under this heading the meeting undertook to review different country codes which might possibly be recommended for inclusion in the clear–print and machine–readable zones of the Card. They included a) the code developed for that purpose by the last meeting of the Panel, b) the United Nations Code for Road and Motor Transport in the Geneva Convention of 1949, c) the numeric code used for export trade statistics and d) the two-letter ICAO communications code for Location Indicators as contained in Doc 7910/17. Most Members felt that it would be preferable to focus the Panel's attention on a code that has been in existence and become internationally well-known rather than concentrate on the entirely new country code as developed previously by the Panel for the sole purpose of inclusion in passport cards. The Panel therefore discussed at some length the merits and demerits of each of the remaining three codes referred to above. It finally agreed that the United Nations Code for Road and Motor Transport as used in automobile transport throughout the world would seem to be the most suitable code for this purpose, partly because it presented a link between the Passport Card as a travel document on the one hand

---

*Deutsche Industrie Norm = German Industrial Standard.

Zzyym v. Tillerson – AR 0387

and transportation and, thereby, tourism on the other. Although the code may consist of one, two or three letters, depending on the country, no particular problems were foreseen in connexion with its machine-readability. Nevertheless, in order to safeguard against any possible errors in this context, the Panel decided to recommend that, in the case of a country code with less than three letters, the empty spaces should always be filled by a dash.

24.           In proceeding to examine further the text of PPC/4-WP/2, the Panel also decided to delete a reference to the cardholder's nationality in coded form within the clear-print zone since no practical purpose appeared to be served with the addition of this code in that zone.

25.           Additional space was then provided in the clear-print zone for the column concerning the cardholder's sex since issuing countries with a language other than English or French would presumably wish to insert abbreviations concerning the holder's sex in their language before adding thereafter the letter M or F as either English or French translation.

26.           The Panel further agreed to an amendment of the text in PPC/4-WP/2, relating to the place of birth column in the clear-print zone to the effect that the name of the country should be indicated by using the official spelling adopted by the United Nations for the designation of States.

27.           As far as the photograph is concerned, it was emphasized that the size of the image is very important for identification purposes and although the Panel was not in a position to recommend exact specifications concerning, e.g. distance between eyes or between eyes and chin, it wished to stress that it should be a recent photograph, the image in the photograph should be well in focus and should fill the entire space reserved for this purpose, i.e. 45 x 35 mm and be in accordance with the specifications existing in the country of issue.

The Embossed Zone

28.           At its previous meetings, the Panel had considered the possibility of including embossed data on the Passport Card - a technique that was readily available and appeared attractive at that time. A small majority had felt that imprints to be made from such characters at the time of entry and departure might facilitate cardholders in

Zzyym v. Tillerson - AR 0388

ICAO/PPC — FOURTH REPORT                    - 12 -

clearance controls in those States which would continue to require some form of entry and
departure records but would not be prepared to use electronic data equipment for some time
to come. The hope was expressed at the time that such imprints would be progressively
acceptable to clearance authorities in lieu of E/D Cards and that the latter could thereby
be eliminated.

29.            The Panel now reviewed the question as to whether it should recommend the
inclusion of an embossed zone on the Card in the light of present-day technology and known
administrative practices in States. In carefully evaluating the advantages and dis-
advantages of featuring embossed information in the Card, the meeting was guided by three
basic principles which were enumerated during the discussions, namely a) the overall cost
factors involved, b) the possible benefit to States and c) security considerations.

30.            In relation to the costs involved, it was pointed out that the price of wipe-
off equipment was, by itself, very low and the use of embossed information might therefore
continue to be attractive to a number of States. When examining more closely the system as
a whole, however, it emerged from the discussions that the cost of issuing the card would
rise significantly with the insertion of embossed characters thereon. To begin with, a
heavier base material would be required, extra machinery for embossing with its related
energy use was needed as were increasingly numerous man hours for operational and checking
purposes, etc. In countries receiving cardholders with embossed data, the costs of
administering the sheets with imprinted data had also to be borne in mind.

31.            In connexion with b) above, doubts were expressed as to the actual
usefulness of the embossed zone to receiving States. It was pointed out, amongst other
things, that sheets of paper with data from the embossed zone did not lend themselves to
indexing in the same way as E/D Cards did and acceptability of the embossed information
in lieu of that on present E/D Cards may indeed be limited. Certain information items now
shown on the international E/D Card (Annex 9, 7th Edition, Appendix 4) were not contemplated
for inclusion in the embossed zone nor could some of them ever be included, such as "port
of embarkation". In addition, national requirements often called for one or more
additional items to be completed on E/D Cards, compounding the problem.

32.            In regard to security aspects (cf. c) above), the embossed zone was
considered to be the most insecure zone since it was relatively easy to falsify embossed

Zzyym v. Tillerson - AR 0389

characters.  In the light of technical progress made over the past few years and expected
to be made in the years ahead, the use of embossed data on the Card simply seemed to be an
out-dated technique.  For those and other reasons the Panel decided to refrain from
recommending the inclusion of an embossed zone on the Passport Card and consequently
deleted all reference thereto in the text of Part III of this Report.

## The Machine-Readable Zone of the Document

33.          The Panel spent considerable time discussing in great technical detail the
machine-readable zone of the document.  There were several possibilities from which the
Panel had to make a choice:  a) OCR (optical character reading), i.e. the machine-reading
of the clear-print zone; b) the perforated magnetic tape which could be read either
optically or magnetically; c) the magnetic track, discussed at earlier Panel meetings,
which could be read with a magnetic head only; related thereto a system of magnetizing
the entire inside back page of the document for encoding data; and d) OPR (optical pattern
reading) referred to in paras. 12-14 of this Report.

34.          It became clear at the outset that the OCR technique, also referred to as
optical scanning, must be seen as the ultimate goal, but unfortunately, had to be ruled
out as a practical possibility for many years to come because of the continuing high costs
of the reader facilities.  It was therefore necessary for the Panel to decide on a code
system that would be inserted in the document for machine readability, repeating essential
personal information contained in the clear-print zone.

35.          The meeting thus proceeded to examine the balance of the above techniques
and in so doing bore in mind the following criteria:  the availability of equipment for
producing and reading the machine-readable zone, economic viability, social acceptability,
alphanumeric capability, adequacy of space for accommodating desired data and the security
of the zone.

36.          Looking closely at the perforated tape in the light of the above criteria,
it was noted that, although it had been proposed at the Third Meeting of the Panel, the
initial proposal had not been followed up by further data for consideration by the Panel,
especially those relating to its costs.  However, on the basis of studies conducted later
by the Panel Member from France, the development of the technique appeared likely to be
more costly than, for example, the magnetic track.  Some Members had doubts about the

Zzyym v. Tillerson - AR 0390

tape's capability of accommodating all the required information and, possibly, additional
data if so desired by the issuing State. The meeting was reminded, however, that the
Panel had decided upon a limited number of data to be included in the tape for a number of
reasons. The meeting was furthermore assured that, on technical grounds, the system was
workable and that the technique of coding by way of punched holes had been used, although
in a simpler form than proposed (i.e. in perforated paper tape), for a long time all over
the world. The problem of invasion of privacy did not arise since it was envisaged that
a code key would be issued to the owner along with his document. A number of Members,
however, were reluctant to recommend a system which was no doubt technically feasible,
but not yet proven through actual operation and whose costs were uncertain.

37.            In connexion with the magnetic recording system, the meeting generally
agreed that this technique had been well tested over many years in all fields of automation,
e.g. on bank cards, credit cards, transportation tickets, etc. It was considered to be one
of the least costly, the best known and the most widespread of the machine-readable tech-
niques. The main objection raised against this system was the inability of the holder to
verify readily the information encoded on the track. In reply, it was mentioned that the
installation of display screens at points of issue or clearance control points may solve
this problem, although it was acknowledged that this would, of necessity, raise the cost
of the overall system. On the security side, some Members pointed out that much forgery
had occurred with magnetic tracks on credit cards, tickets, etc., but others maintained
that fraudulent insertion of additional data was restricted by the length of the tape in
the document, change of certain information was made difficult through the use of check
characters, erasure and re-recording of data required powerful equipment to act through
the plastic protection over the track and that copying data from the magnetic track
through the application of heat was bound to distort the plastic cover.

38.            In the case of OPR, this system had been developed more recently for reading
numeric data on a 4-bit code but was expandable to include alphanumeric characters in 7 or
8-bit code. Primarily, it offered a higher degree of security than the perforated tape as
well as the magnetic track, since the code was to be embedded right in the security paper
of the document. The Panel was informed that the cost of the reading equipment, which was
too high for serious consideration by the Panel at its Third Meeting, was now estimated to
be comparable with that for magnetic readers, but precise data were not available as yet.

Zzyym v. Tillerson - AR 0391

Case No. 1:15-cv-02362-RBJ   Document 64-16   filed 09/11/17   USDC Colorado   pg
6 of 22

Like the perforated tape, the code was optically readable and presented no problem
concerning the holder's privacy since the encoded information could be verified through a
code key. From the technical point of view, however, this system was still in a development
stage and, therefore, lacked the test of time. Although it appeared promising to some,
most Members were hesitant to endorse a coding technique of that nature at this time.

39.          There were other points raised and discussed in detail in connexion with
one or the other code systems, such as patent rights, the use of standard ISO code, the
use of the machine-readable zone for other than governmental purposes, the speed with which
automatic equipment could read the various codes, the speed of transmission of data between
terminals and central computer, problems associated with issuing coded Cards in decentral-
ized issuing systems, etc. In approaching a decision on the question of which code system
is to be used on the Card, the Panel unanimously reaffirmed its opposition to the use of
any technique which would entail the payment of royalties. Furthermore, it laid down the
principle of reciprocal communication of all information concerning the industrial
production of the equipment concerned.

40.          Having carefully weighed all aspects, the Panel finally came to a conclusion
first on the basic question of optical versus magnetic coding system and decided in favour
of recommending a magnetic system. Second, the Panel expressed a preference for the
magnetic track over the perforated tape.

41.          Having decided to recommend the magnetic track for inclusion in the machine-
readable zone of the Passport Card, the Panel realized that the following procedures were
desirable to protect the privacy of the individual:

   a) the information recorded on the magnetic track should be easily readable by the
      cardholder with the help of readily available reading equipment;

   b) any unused space available on the magnetic track after recording the approved
      personal information (cf. Recommendation No. 3) will be "frozen" and thus made
      incapable of being used for the recording of any additional information.

42.          The Panel recognized that further research might develop other techniques
desinged to protect the privacy of individuals which would make the restrictions concerning
"freezing" unnecessary. Therefore, those restrictions should not be interpreted as
inhibiting the implementation of machine-readable Passport Cards for use in the immediate
future.

Zzyym v. Tillerson - AR 0392

ICAO/PPC — FOURTH REPORT                    - 16 -

43.            Due to the lack of time the Panel had to leave aside a technical decision
concerning magnetic bit density and the encoding system for passport readability.  At least
three systems were under consideration:  1) the 210 bpi (bits per inch) International Air
Transport Association (IATA) system 2) the 75 plus-minus 3% bpi — American Banking
Association (ABA) system and 3) a combination of the IATA and ABA systems.  The Panel
felt that additional studies of these encoding systems were required.  As indicated in
paras. 55 and 56 of this Report, the Panel anticipates continued technical liaison between
the Members' Technical Advisers; this matter will be given high priority in their
considerations and the results will be communicated to ICAO as soon as possible.

The Zone Reserved for Travel Restrictions
44.            The Panel approved the text shown under this heading in PPC/4-WP/2 with
some minor amendments.

Agenda Item 3:  Minimum Security Requirements for the Passport Card

Materials to be used for producing the Passport Card
45.            In discussing this aspect, the meeting made some changes to the text
presented in WP/2 as a result of its earlier decision to exclude an embossed zone from
the Passport Card.  In the second introductory sentence, the text was aligned more closely
to that of para. 19 as far as the safeguards of the document were concerned and additional
examples of safeguards against falsifications were included in the text, referring to
certain printing techniques.  When considering draft Recommendation No. 5 (renumbered as
No. 4 in Part III of this Report), the meeting decided after some discussion to remove the
last part dealing with the responsibility of each issuing State for the Card's manufacture,
etc., and include the essence of that sentence at the outset of the preceding paragraph.
Some amendments were adopted to clause b) of the Recommendation which was concerned with
the creation of a counterfeit card in contrast to para. a) dealing with possible
alterations of a genuine card.  Those amendments were aimed at obtaining wider acceptance
by States of this Recommendation and also clarifying its meaning.

List of certain properties of materials applying to the Passport Card as a whole
46.            Amendments made to the text in WP/2 under this heading included the
deletion of references to polyvinyl chloride and polyvinyl chloride acetate mentioned
in connexion with deformation properties.  In order to avoid restricting unnecessarily the

Zzyym v. Tillerson - AR 0393

choice of materials to be used for producing the Card, the meeting agreed to delete
references to inflammability and insensibility to chemical effects and to adjust temper-
ature stability and humidity resistance to somewhat less restrictive ranges. Some amend-
ments were also introduced to the text concerning toxicity and durability.

Listing of certain properties of materials effecting the machine-readability

47.            The Panel agreed on the usefulness of a text concerning properties related
to optical reading. In this context it referred to OCR, also known as scanning, which
might become economically feasible at some future date. The meeting therefore adjusted
the text, originally drafted for the reading of optical code, accordingly.

48.            In connexion with properties related to magnetic reading, a simplified
text was adopted in place of that presented. Subsequently, Recommendation No. 6
(renumbered as No. 5 in Part III) was adopted with some drafting changes.

Agenda Item 4:  Procedures and Systems for use in connexion with the Passport Card

Equipment required for production of the Passport Card

49.            The Panel examined the draft presented in WP/2 under this heading and
agreed to an amendment of the text referring, as an example, to a system which an issuing
State might wish to follow whereby personal data for inclusion in the clear-print and
magnetic zones of each Card need to be entered into that system only once. The table
concerning production operations and corresponding equipment was replaced by an improved
version.

Equipment for use at Clearance Control Points

50.            Amendments made to the draft text in this section were in consequence of
the Panel's earlier decisions to exclude the embossed zone from the Card and to
substitute perforated magnetic tape by magnetic tracks. With these amendments, the
Panel approved the text in PPC/4-WP/2.

Agenda Item 5:  Estimated Cost Figures in connexion with the Production and Use of
                the Passport Card

Estimation of costs associated with the production and use of the Passport Card

51.            In the discussions on this point, differing opinions were expressed on the
approach to be taken concerning the presentation of cost figures. Some Members wished to
see general text only under this heading in Part III relating to estimated costs, including

Zzyym v. Tillerson — AR 0394

a statement indicating the relationship of expected production costs for the Passport Card
in comparison with those for producing the conventional passport. Others mentioned that
any figures shown, even though they were identified as approximations only, were likely
to change in the near future due to inflactionary pressures and would, therefore, be mis-
leading to the reader in a few years hence.

52.         Further, it was pointed out that, apart from the figures presented by the
French Member in PPC/4-WP/2, other major studies undertaken in Members' States on the
Passport Card also included estimates of costs associated with the production and/or use
of the Passport Card and might be of equal interest to States when considering the
issuance or acceptance of the Passport Card.

53.         In the light of the various points made, the Panel finally agreed to
maintain only general statements on cost estimates in the body of the Report including a
sentence to the effect that the cost of producing the Passport Card would not appear
significantly different from that of producing the conventional passport. A reference
was also included in this part to the cost estimates in the studies carried out in
certain countries, i.e. Canada, Germany, Sweden and the USA with an indication as to where
more detailed information may be obtained, if desired.

54.         The more specific cost estimates based on research carried out in France
were up-dated and transferred to new Appendices 'F' and 'G'. It was decided to present
such figures in French Francs only, leaving it to the State concerned to convert these
figures into their own currency, if desired and to insert appropriate text so as to
indicate clearly the nature of these figures to the reader.

Agenda Item 6:  Any Other Business

55.         A suggestion was made to the effect that continuing liaison between the
Members' Technical Advisers would be considered desirable. It was pointed out in this
context that a certain time lag must be expected to occur between the closing of the
present Panel meeting and the implementation, after ICAO approval, of the Recommendations
contained in the document (Part III). During this time, certain remaining technical
questions should be resolved and others might usefully be reviewed in the light of
rapidly advancing technology.

Zzyym v. Tillerson - AR 0395

ICAO/PFC - FOURTH REPORT

56.          The Panel agreed that, for this purpose, liaison should be maintained
primarily by correspondence and the Panel Member of France accepted a suggestion to act as
liaison officer between the various technical advisers while keeping the Panel and the
ICAO Secretariat informed in this respect.

### Closing formalities

57.          The Panel Member of France, supported in turn by each Panel Member,
expressed gratitude to the Chairman, Mr. C.F. Woodiss, for the excellent manner in which he
had conducted the meeting while the Secretary, Mr. H.A. Seidelmann, was commended for the
speed and efficiency with which he had performed his work.  In response, the Chairman
thanked Panel Members, their Technical Advisers and the Observers for their co-operation
and the Secretary for his valuable assistance.

- - - - - - - -

Zzyym v. Tillerson - AR 0396

Zzyym v. Tillerson - AR 0397

– 21 –                           ICAO/PPC – FOURTH REPORT

## PART III

## A STANDARDIZED PASSPORT CARD

Zzyym v. Tillerson – AR 0398

ICAO/PPC — FOURTH REPORT                    − 22 −

Note:  The term Passport Card as used
throughout this document includes a
passport in card format as well as an
improved conventional passport, both
possessing machine-readable characteristics.

Zzyym v. Tillerson − AR 0399

ICAO/PPC - FOURTH REPORT

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................ 25

    Initial action by the Facilitation Division of ICAO ..................... 25

    Action by the Air Transport Committee and Council of ICAO .............. 25

    Panel on Passport Cards ................................................. 26

    Completion of the Panel's work and final action thereon ............... 27

SUMMARY .................................................................... 28

GENERAL OBSERVATIONS CONCERNING THE USE OF THE PASSPORT CARD ................ 30

    Objectives of the Passport Card ........................................ 30

    Advantages of the Passport Card over Conventional Passports ........... 31

    Suggested alternative means of providing Cardholders with visas ........ 32

    Issuance and acceptance of Passport Cards .............................. 34

FORMAT AND LAYOUT OF THE PASSPORT CARD ..................................... 35

    Dimensions of the Passport Card, its various zones, etc. ............... 35

    The Clear-print zone of the Passport Card ............................. 36

    - Information to be included .......................................... 36

    - Explanatory Notes on various items ................................. 37

    The Magnetic Zone of the Passport Card ............................... 39

    - Items to be included in the Magnetic Tape .......................... 40

    The Zone reserved for Travel Restrictions ............................ 40

MINIMUM SECURITY REQUIREMENTS FOR THE PASSPORT CARD AS A WHOLE ............. 41

    Materials to be used for producing the Passport Card .................. 41

    Listing of certain properties of materials applying to
    the Passport Card as a whole ......................................... 42

    - Deformation Properties ............................................. 42

    - Hazards ............................................................ 42

Zzyym v. Tillerson - AR 0400

ICAO/PPC — FOURTH REPORT                    — 24 —

|  | Page |
|---|---|
| – Temperature Stability ................................................ | 42 |
| – Humidity Resistance ................................................ | 42 |
| – Durability ............................................................ | 42 |
| Listing of certain properties of materials effecting the machine-readability ................................................ | 42 |
| – Properties related to OCR (Optical Character Reading) .............. | 42 |
| – Properties related to Magnetic Reading ............................. | 43 |
| PROCEDURES AND SYSTEMS FOR USE IN CONNEXION WITH THE PASSPORT CARD ......... | 44 |
| Equipment required for production of the Passport Card ................ | 44 |
| Equipment for use at Clearance Control Points ......................... | 46 |
| ESTIMATION OF COSTS ASSOCIATED WITH THE PRODUCTION AND USE OF THE PASSPORT CARD ..................................................... | 48 |
| Estimating the costs of producing the Passport Card ................... | 48 |
| Estimated costs of Automatic Reading of the Passport Card ............. | 49 |
| INDEX OF RECOMMENDATIONS .................................................. | 62 |

- - - - - - - -

Zzyym v. Tillerson — AR 0401

## INTRODUCTION

### Initial action by the Facilitation Division of ICAO

1.          The Seventh Session of ICAO's Facilitation Division, held in Montreal in
May 1968, was deeply concerned over the FAL implications of ever-increasing volumes of
passenger traffic, particularly in the light of the impending introduction on many inter-
national routes of high-capacity aircraft. The Division recognized that new ways and
means had to be found in order to process such growing passenger volumes through govern-
mental clearance controls at a faster pace and thus keep delays on the ground to a
minimum. One proposal aimed in this direction concerned the possible development and
introduction of a Passport Card which might eventually replace the conventional passport
and which was expected to accelerate individual clearance through passport controls
either by using the Card as an electronically readable document or, where the volume of
traffic did not warrant the installation of electronic data processing equipment, faster
visual inspection than would be possible with a conventional passport.

2.          Since time limitations did not permit the Division to go deeper into this
subject, it adopted a Recommendation (Rec. No. B-2) calling for the establishment of a
small Panel of suitably qualified experts to study this matter.

### Action by the Air Transport Committee and Council of ICAO

3.          The Council subsequently approved this Recommendation (cf. Supplement
No. 1 to the Division's Report, Doc 8750-FAL/564), thereby deciding that the Air Transport
Committee should set up such a Panel for the purpose indicated above. The Panel's terms
of reference as approved by the Air Transport Committee were as follows:

"To study and make recommendations to the Air Transport Committee on the following:

    a) The establishment of an appropriate document such as a passport card,
       a normal passport or an identity document with electronically or
       mechanically readable (as well as visually readable) inscriptions
       that meet the requirements for document control;

Zzyym v. Tillerson - AR 0402

ICAO/PPC — FOURTH REPORT                    — 26 —

    b) To determine the best types of procedures, systems (electronic
       or mechanical) and types of equipment for use with the above
       documents that are within the resources and capability of
       Member States;

    c) Determine the feasibility of standardizing the requisite control
       information and methods of providing this information through
       automated processes, provided that these processes will meet the
       requirements of security, speed of handling and economy of operation.

In carrying out the above objectives, the Panel should note the various solutions
suggested in working papers FAL/7—WPs 37, 56, 83 and 108 and make the necessary
evaluation of those proposals along with the consideration of any additional
concepts that may be developed."

## Panel on Passport Cards

4.        The Air Transport Committee established the Panel in November 1968 when
approving the nominations it had received from eight Contracting States (Australia,
Canada, France, Federal Republic of Germany, India, Kenya, Sweden and the United States)
and agreed to invite the International Criminal Police Organization and the International
Air Transport Association as Observers on the Panel. In October 1973 the Air Transport
Committee approved the addition of a Member to the Panel, nominated by the Union of
Soviet Socialist Republics and in March 1974 the addition of a further Member to the
Panel, nominated by the United Kingdom.

5.        The Panel commenced its work by correspondence and convened its First
Meeting in Montreal in June 1969. At this meeting the Panel laid the groundwork for its
future studies and research which led to the Second Meeting in Paris in May 1970. Sub-
sequent research studies carried out by various Members and circulated among the group
called for a further meeting which was held in Montreal in January 1972. It adopted
five Recommendations concerning the production and use of the Card. However, the Panel
at that time did not consider its work as being entirely completed since certain
technical problems still had to be solved and new techniques were expected to become
available in the near future which could result in possible further improvements. It
therefore expressed itself in favour of an extension of its work for another year or two.

Zzyym v. Tillerson — AR 0403

## Completion of the Panel's work and final action thereon

6.          In view of the expected convening of the Eighth FAL Division Session in
1973, the Air Transport Committee decided to submit the Panel's Reports on its three
meetings to Contracting States for their comments, to be received in time for the
Division to review the Panel's work, along with these comments. The Division, held in
Dubrovnik in March 1973, did so and adopted Recommendation No. B-5 which, in essence,
aimed at conclusion of the Panel's work through a final meeting by mid-1974, publication
by ICAO of the results of the study and, thereafter, consideration of the desirability
of placing the matter under the auspices of some other appropriate international
organization.

7.          The Council of ICAO, on 6 June 1973, approved this Recommendation and
directed the Secretary General to take appropriate action. As a result, the Panel's
Fourth Meeting was held in July 1974 in Montreal at which time the Panel, inter alia,
approved the text of the present document in fulfillment of the above FAL Division
Recommendation.

8.      (TO BE COMPLETED AFTER ACTION BY THE AIR TRANSPORT COMMITTEE.)

Zzyym v. Tillerson – AR 0404

Case No. 1:15-cv-02362-RBJ   Document 64-16   filed 09/11/17   USDC Colorado   pg 19 of 22

## SUMMARY

9.          The Passport Card described in this document was developed over a five-year period by a Panel of experts in the field of immigration controls, passport issuance, computer science, etc., nominated by ten Contracting States of ICAO and two international organizations.

10.          The term Passport Card as used throughout this document includes a passport in card format as well as an improved conventional passport, both possessing machine-readable characteristics.

11.          The purpose of developing such a Passport Card was primarily for expediting the clearance at international airports of ever-growing volumes of passengers. At the same time, care was taken to ensure that the Card would be suitable for use at border crossing points in connexion with surface transport.

12.          It is expected that the Passport Card would mainly benefit those passengers travelling as temporary visitors as defined in Chapter 1 of Annex 9 to the Chicago Convention and by the United Nations in its Recommendations on International Travel and Tourism (Rome, 1963).

13.          The Passport Card contains, on the front side, a clear-print zone which may be read visually and, on the reverse side, a magnetic zone for automatic reading as well as a zone for insertion of travel restrictions, if any.

14.          It is expected that Passport Cards will initially be issued and accepted by a limited number of States and that more widespread issuance/acceptance of the Card would probably be progressive and involve a number of years.

15.          The use of the Passport Card does not involve any expenses whatsoever, apart from producing it, to a State which does not wish to use automatic readers.

16.          All essential personal information to identify the cardholder has been included in the Passport Card. If a Card-issuing State has a need for additional information, it is free to require such additional data on the application forms for Passport Cards which will be kept on file and could be used for tracing any wanted person.

Zzyym v. Tillerson — AR 0405

ICAO/PPC - FOURTH REPORT

17.            States issuing Passport Cards are requested strictly to adhere to the technical specifications and measurements set forth in this document. They are free in their choice of materials for producing the Card, but are invited at the same time to observe certain guidelines so as to ensure that the Card is tamper-proof and has a life-span, under normal use, of at least five years.

18.            The production operations and corresponding equipment are outlined in the last part of this document. For those States which are planning to install automatic reader equipment at busy clearance control points, some cost estimates are offered based on research undertaken so far in one State.

- - - - - - -

## GENERAL OBSERVERSATIONS CONCERNING THE USE OF THE PASSPORT CARD

### Objectives of the Passport Card

19.          The use of a Passport Card in lieu of a conventional passport was conceived at the 7th Session of ICAO's Facilitation Division in 1968 as a means of accelerating the clearance process of ever-growing passenger volumes at international airports.  Since the laws and regulations of States pertaining to travel documents do not normally differentiate between the various types of transport, however, the Card to be developed had to be suitable also for use at border crossing points in connexion with surface transport. Furthermore, the document to be developed had to (a) present safeguards equal to or better than those of conventional passports and (b) satisfy those control requirements already met by conventional passports (and other travel documents) currently in use throughout the world.

20.          This was considered essential since it was expected that for some time, a certain number of States may not wish or be in a position to issue the new document or adopt new procedures and/or acquire new equipment for the use of this document for frontier control purposes.  Thus it was anticipated that a Passport Card system and convential passport procedures would operate in parallel in the foreseeable future.  Once Passport Cards are issued and/or accepted initially by some countries, a more widespread issuance/ acceptance would probably be progressive and involve a number of years.

21.          The possibility of countries deciding to issue Passport Cards and/or to introduce automatic reader facilities at their own entry points will be influenced by a number of considerations including capital costs of equipment.  It should be emphasized that, apart from production costs, the use of the Passport Card involves no expenses whatever to a State which does not wish to install and operate automatic reader facilities. In cases where the use of automatic reader facilities are contemplated the costs would need to take into account the number of regular entry points and the volumes of entry at those points.  This would control the number of reader units and the extent of supporting equipment to be installed (for further details, cf. paras. 88, 89 and Appendix 'G').

Zzyym v. Tillerson - AR 0407

22.          In developing the Passport Card, the Organization was concerned, first and
foremost, with those passengers forming the bulk of all air travellers, i.e. temporary
visitors*, who would benefit from simplified clearance control procedures by using the
Passport Card while other types of travellers, such as immigrants and seasonal workers,
would continue to be subject to more detailed formalities. As far as children are
concerned it has been recognized that their inclusion in the father's or mother's Passport
Card would be impractical and it is suggested that individual Cards be issued to them.
States, of course, are free to admit children, at their discretion, who do not have a
Passport Card of their own.

23.          A related point made during consideration of this subject was the
desirability of standardizing the type of information and its layout in the conventional
passport. The United Nations has made considerable efforts over many years towards this
end but complete standardization has not been obtained as yet on a worldwide basis.
Standardization in conventional passports, it was felt, would also be of assistance to
passport control officials in clearing passengers and States which are unable to issue
Passport Cards for the time being should be encouraged to include in their conventional
passports the control information in the same standard format as in the clear-print zone
of the Passport Card (cf. Recommendation No. 1 in para. 34 below).

Advantages of the Passport Card over Conventional Passports

24.          Any future travel with passports in card format is expected to provide
the holder with increased travel facilitation when travelling to countries which have
introduced automatic reader facilities and there is no visa requirement. The
facilitation aspects could include:

_____

*The term is defined in Chapter 1 of Annex 9, 7th Edition as follows:

   "Temporary visitor. Any person, without distinction as to race, sex, language or
   religion, who disembarks and enters the territory of a Contracting State other than
   that in which that person normally resides; remains there for not more than three
   months for legitimate non-immigrant purposes, such as touring, recreation, sports,
   health, family reasons, study, religious pilgrimages, or business; and does not
   take up any gainful occupation during his stay in the territory visited."

Zzyym v. Tillerson - AR 0408