| Field/ zone no. | Data element | Specifications | Maximum no. of character positions | References and notes* |
|---|---|---|---|---|
| 13/II (Optional element in mandatory zone) | Optional personal data elements | Optional personal data elements e.g. personal identification number or fingerprint, at the discretion of the issuing State or organization. If a fingerprint is included in this field, it should be presented as a 1:1 representation of the original. If a date is included it shall follow the form of presentation described in Doc 9303-3. | Variable | Notes a, b, c, e, g, i. |
| 14/III (Mandatory) | Date of issue | For details see Doc 9303-3. | Variable | Notes a, b, c, g, i, l. |
| 15/III (Mandatory) | Authority or issuing organization | Authority or issuing organization for the MRP. This field shall be used to indicate the issuing authority or issuing organization and, optionally, its location, which may be personalized within this field. For additional details see Doc 9303-3. | Variable | Notes a, b, c, f, g, j, l. |
| 16/III (Mandatory) | Date of expiry | Date of expiry of the MRP. For additional details see Doc 9303-3. | Variable | Notes a, b, c, g, l. |
| 17/III Optional element in mandatory zone | Optional document data elements | Optional data elements relating to the document. For additional details see Doc 9303-3. | Variable | Notes a, b, c, e, g. |
| 18/IV (Mandatory) | Holder's signature or usual mark | At the discretion of the issuing State or organization, the signature or usual mark may be located in Zone VI. The size of the field to be allocated to the signature or usual mark on the adjoining page shall be at the discretion of the issuing State or organization, subject to the overall dimensional limits of the MRP. For additional details see Doc 9303-3. | Variable | Notes e, j. |

Zzyym v. Tillerson – AR 0540

| Field/<br>zone no. | Data element | Specifications | Maximum no.<br>of character<br>positions | References<br>and notes* |
|---|---|---|---|---|
| 19/V<br>(Mandatory) | Identification<br>feature | This field shall contain a<br>portrait of the holder. The<br>portrait shall not be larger than<br>45.0 mm x 35.0 mm<br>(1.77 in x 1.38 in) nor smaller<br>than 32.0 mm x 26.0 mm<br>(1.26 in x 1.02 in). The position<br>of the field concerned shall be<br>aligned to the left of Zones II, III<br>and IV.<br>See Doc 9303-3 for additional<br>specifications for the portrait. | | Note d. |
| 20/VI<br>(Optional) | Optional data<br>elements | Additional optional data<br>elements at the discretion of<br>the issuing State or<br>organization. For additional<br>details see Doc 9303-3. | | Notes a, b, c, e, g,<br>i. |

\* Notes can be found following paragraph 4.2.2.2.

## 4.2   Machine Readable Zone (MRZ) (Zone VII)

### 4.2.1   Data position, data elements and print position in the MRZ

#### 4.2.1.1   Data position

The MRZ is located on the front of the MRP data page. Figure 3 defines the location of the MRZ and the nominal position of the data therein.

#### 4.2.1.2   Data elements

The data elements corresponding to Fields 03 to 09, 11 and 16 of the VIZ shall be personalized in machine readable form, in the MRZ, beginning with the left most character position in each field in the sequence indicated in the data structure specifications shown below. Figure 15 indicates the structure of the MRZ.

#### 4.2.1.3   Print position

The position of the left-hand edge of the first character shall be 6.0 ± 1.0 mm (0.24 ± 0.04 in) from the left-hand edge of the document. Reference centre lines for the OCR lines and the minimum starting position for the first character of each line are shown in Figure 3. The positioning of the characters is indicated by those reference lines and by the printing zones for the two code lines in Figure 7.

Zzyym v. Tillerson – AR 0541

**4.2.2    Data structure of machine readable data for the MRP data page**

*4.2.2.1    Data structure of the upper machine readable line*

| MRZ character positions (line 1) | Field no. in VIZ | Data element | Specifications | Number of characters | References and notes* |
|---|---|---|---|---|---|
| 1 to 2 | 03 | Document code | The first character shall be P to designate an MRP. One additional letter may be used, at the discretion of the issuing State or organization, to designate a particular MRP. If the second character position is not used for this purpose, it shall be filled by the filler character (<). | 2 | Notes a, d, m. |
| 3 to 5 | 04 | Issuing State or organization | The three-letter code specified in Doc 9303-3 shall be used. Spaces shall be replaced by filler characters (<). | 3 | Notes a, d, f. |
| 6 to 44 | 06, 07 | Name | For details see Doc 9303-3. | 39 [Primary identifier(s), secondary identifier(s) and fillers] | Notes a, c, d. |
| | | Punctuation in the name | Representation of punctuation is not permitted in the MRZ. For details on apostrophes, hyphens, commas, etc., see Doc 9303-3. | | |
| | | Name prefixes and suffixes | For details see Doc 9303-3. | | |
| | | Filler | When all components of the primary and secondary identifiers and required separators (filler characters) do not exceed 39 characters in total, all name components shall be included in the MRZ and all unused character positions shall be completed with filler characters (<) repeated up to position 44 as required. | | |
| | | Truncation of the name | When the primary and secondary identifiers and required separators (filler characters) exceed the number of character positions available for names (i.e. 39), they shall be truncated as follows: | | Notes a, d. |

Zzyym v. Tillerson - AR 0542

| MRZ character positions (line 1) | Field no. in VIZ | Data element | Specifications | Number of characters | References and notes* |
|---|---|---|---|---|---|
| | | | Characters shall be removed from one or more components of the primary identifier until three character positions are freed, and two filler characters (<<) and the first character of the first component of the secondary identifier can be inserted. The last character (position 44) shall be an alphabetic character (A through Z). This indicates that truncation may have occurred. | | |
| | | | Further truncation of the primary identifier may be carried out to allow characters of the secondary identifier to be included, provided that the name field shall end with an alphabetic character (position 44). This indicates that truncation may have occurred. | | |
| | | | When the name consists of only a primary identifier which exceeds the number of character positions available for the name, i.e. 39, characters shall be removed from one or more components of the name until the last character in the name field is an alphabetic character. | | |

* Notes can be found following paragraph 4.2.2.2.

### 4.2.2.2   Data structure of the lower machine readable line

| MRZ character positions (line2) | Field no. in VIZ | Data element | Specifications | Number of characters | References and notes* |
|---|---|---|---|---|---|
| 1 to 9 | 05 | Passport number | As given by the issuing State or organization to uniquely identify the document. Any special characters or spaces in the passport number as shown in the VIZ shall be replaced by the filler character (<). The number shall be followed by the filler character (<) repeated up to position 9 as required. | 9 | Notes a, b, d. |

Zzyym v. Tillerson – AR 0543

Part 4.   Specifications for Machine Readable Passports (MRPs)
and other TD3 Size MRTDs                                                              19

| MRZ character positions (line2) | Field no. in VIZ | Data element | Specifications | Number of characters | References and notes* |
|---|---|---|---|---|---|
| 10 | | Check digit | Shall be calculated as specified in Doc 9303-3 and positioned as specified in paragraph 4.2.4. | 1 | Notes b, d. |
| 11 to 13 | 08 | Nationality | As a three-letter code representing the holder's nationality as listed in Doc 9303-3. Spaces are replaced by filler characters. | 3 | Notes a, d, f. |
| 14 to 19 | 9 | Date of birth | See Doc 9303-3 for details. | 6 | Notes b, d, i. |
| 20 | | Check digit | Shall be calculated as specified in Doc 9303-3 and positioned as specified in paragraph 4.2.4. | 1 | Notes b, d. |
| 21 | 11 | Sex | F = female; M = male; < = unspecified. | 1 | Notes a, d. |
| 22 to 27 | 16 | Date of expiry | See Doc 9303-3 for details. | 6 | Notes b, d, i. |
| 28 | | Check digit | Shall be calculated as specified in Doc 9303-3 and positioned as specified in paragraph 4.2.4. | 1 | Notes b, d. |
| 29 to 42 | 10 | Personal number or other optional data elements | Any special characters, including spaces in the personal identification number given to the holder by the issuing State or organization, shall be replaced by the filler character (<). The number shall be followed by the filler character (<) repeated up to position 42 as required.<br><br>When the personal number field is not used, the character positions 29 to 42 in the second MRZ line should be completed with filler characters (<) (see also under "check digit", character position 43 below). | 14 | Notes a, b, d. |
| 43 | | Check digit | Shall be calculated as specified in Doc 9303-3 and positioned as specified in paragraph 4.2.4.<br><br>When the personal number field is not used and filler characters (<) are used in positions 29 to 42, the check digit | 1 | Notes b, d. |

Zzyym v. Tillerson – AR 0544

*Machine Readable Travel Documents*

| MRZ character positions (line2) | Field no. in VIZ | Data element | Specifications | Number of characters | References and notes* |
|---|---|---|---|---|---|
| | | | may be zero or the filler character (<) at the option of the issuing State or organization. | | |
| 44 | | Composite check digit | Composite check digit for characters of machine readable data of the lower line in positions 1 to 10, 14 to 20 and 22 to 43, including values for letters that are a part of the number fields and their check digits. Shall be calculated as specified in Doc 9303-3. | 1 | Notes b, d. |

*\* Notes to the Visual and Machine Readable data element directories:*

a)    Alphabetic characters (A to Z) as defined in Doc 9303-3.

b)    Numeric characters (0 to 9) as defined in Doc 9303-3.

c)    Punctuation may be included in the VIZ. In the MRZ only the filler character specified in Doc 9303-3 may be used.

d)    The field caption is not printed on the document.

e)    The use of a caption to identify the field is at the option of the issuing State.

f)    In the case of the United Nations laissez-passer, Field 01 (Issuing State or Organization) in the VIZ shall be completed with the words "UNITED NATIONS — NATIONS UNIES". In keeping with the international character of United Nations officials, neither nationality nor place of birth shall be shown. The caption for Field 08 (Nationality) shall read instead: "Official of/Fonctionnaire des" and the words "UNITED NATIONS/ NATIONS UNIES" entered instead of nationality. Field 12 (Place of birth) shall be left blank. The codes to be used in Field 04 (Code for issuing State or organization) in the VIZ as well as in character positions 3 to 5 (Issuing State or Organization) in the upper line of the MRZ and in character positions 11 to 13 (Nationality) in the lower line shall be as specified in Doc 9303-3.

g)    A blank space (or spaces) is included. Blank spaces between words shall count towards the maximum number of characters permitted in the field.

h)    Intentionally omitted from the Data Element Directory. In the sixth and earlier editions of Doc 9303, this Note provided for stick-in portrait photographs the use of which is no longer permitted in an MRP.

i)    The method of writing dates is given in Doc 9303-3.

j)    The space reserved for Field 15 may be expanded to include additionally the space for Field 18 when the option is taken of locating the holder's signature or usual mark on the adjacent page. In this instance, the authority or issuing organization may be expressed as two lines of variable numbers of character positions.

Zzyym v. Tillerson - AR 0545

k)   When the name cannot be accommodated in the space provided for it in the VIZ, a notation giving the full name may be written on another page of the MRP. Alternatively, a smaller type font may be selected for use in the VIZ only.

l)   The field caption shall be printed on the document.

m)   In documents other than passports, e.g. United Nations laissez-passer, seafarer's identity document or refugee travel document, the official title of the document shall be indicated instead of "Passport". However, the first character of the document code shall be P.

n)   In Machine Readable Convention Travel Documents (MRCTDs) the words "Travel Document" shall be indicated instead of "Passport".

o)   In MRCTDs States may include or omit the nationality data element. If nationality is included, it is recommended that States enter "Stateless Person" or "Refugee". This ensures consistency between the VIZ and the MRZ (where the three-letter code for Stateless Persons – XXA, and for Refugees – XXB, appears).

### 4.2.3   Truncation of names in the MRZ

The name field in the MRZ of the MRP allows for a maximum of 39 characters in the upper line. If the primary and secondary identifiers using the above procedure exceed the available character positions, then truncation shall be carried out using the procedure set out in the following paragraphs. If the total number of characters in the name, including filler characters, is 39 or fewer the name shall not be truncated.

In truncating the name components, the last character of the name field shall be an alpha character (A to Z inclusive) as an indication that truncation has occurred (see the Data Element Directory of the MRZ in 4.2.2).

> *Note.— Where long names extend to the last character position in the name field, the presence of an alpha character means that the name must be treated as though truncation had occurred.*

### 4.2.3.1   Examples of name of the holder in the MRZ

> *Note.— In the following examples, the document is assumed to be a passport issued by the State of Utopia. The first five characters of the upper machine readable line are P<UTO.*

a)   Usual representation:
      Name:   Anna Maria Eriksson
      VIZ:   ERIKSSON, ANNA MARIA
      MRZ:   `P<UTOERIKSSON<<ANNA<MARIA<<<<<<<<<<<<<<<<`

b)   Central primary identifier:
      Name:   Deborah Heng Ming Lo
      VIZ:   HENG, DEBORAH MING LO
      MRZ:   `P<UTOHENG<<DEBORAH<MING<LO<<<<<<<<<<<<<<<`

c)   Hyphen as part of the name:
      Name:   Susie Margaret Smith-Jones
      VIZ:   SMITH-JONES, SUSIE MARGARET
      MRZ:   `P<UTOSMITH<JONES<<SUSIE<MARGARET<<<<<<<<<<`

Zzyym v. Tillerson – AR 0546

*Machine Readable Travel Documents*

d)  Apostrophe as part of the name:
        Name:   Enya Siobhan O'Connor
        VIZ:    O'CONNOR, ENYA SIOBHAN
        MRZ:    P<UTOOCONNOR<<ENYA<SIOBHAN<<<<<<<<<<<<<<<<<

e)  Multiple name components:
        Name:   Martin Van Der Muellen
        VIZ:    VAN DER MUELLEN, MARTIN
        MRZ:    P<UTOVAN<DER<MUELLEN<<MARTIN<<<<<<<<<<<<<<<

f)  No secondary identifier:
        Name:   Arkfreith
        VIZ:    ARKFREITH
        MRZ:    P<UTOARKFREITH<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<

### 4.2.3.2   *Truncated names — Secondary identifier truncated*

a)  One or more name components truncated to initials:
        Name:   Nilavadhanananda Chayapa Dejthamrong Krasuang
        VIZ:    NILAVADHANANANDA, CHAYAPA DEJTHAMRONG KRASUANG
        MRZ:    P<UTONILAVADHANANANDA<<CHAYAPA<DEJTHAMRONG<K

b)  One or more name components truncated:
        Name:   Nilavadhanananda Arnpol Petch Charonguang
        VIZ:    NILAVADHANANANDA, ARNPOL PETCH CHARONGUANG
        MRZ:    P<UTONILAVADHANANANDA<<ARNPOL<PETCH<CHARONGU

### 4.2.3.3   *Truncated names — Primary identifier truncated*

a)  One or more components truncated to initials:
        Name:   Dingo Potoroo Bennelong Wooloomooloo Warrandyte Warnambool
        VIZ:    BENNELONG WOOLOOMOOLOO WARRANDYTE WARNAMBOOL, DINGO POTOROO
        MRZ:    P<UTOBENNELONG<WOOLOOMOOLOO<WARRANDYTE<W<<DI

b)  One or more components truncated:
        Name:   Dingo Potoroo Bennelong Wooloomooloo Warrandyte Warnambool
        VIZ:    BENNELONG WOOLOOMOOLOO WARRANDYTE WARNAMBOOL, DINGO POTOROO
        MRZ:    P<UTOBENNELONG<WOOLOOM<WARRAND<WARNAM<<DINGO

c)  One or more components truncated to a fixed number of characters:
        Name:   Dingo Potoroo Bennelong Wooloomooloo Warrandyte Warnambool
        VIZ:    BENNELONG WOOLOOMOOLOO WARRANDYTE WARNAMBOOL, DINGO POTOROO
        MRZ:    P<UTOBENNEL<WOOLOO<WARRAN<WARNAM<<DINGO<POTO

*Part 4.  Specifications for Machine Readable Passports (MRPs)*
*and other TD3 Size MRTDs*                                                                                      23

4.2.3.4   *Names that just fit, indicating possible truncation by letter in the last position of the name field, but which are*
*not truncated*

> Name:   Jonathon Warren Trevor Papandropoulous
> VIZ:    PAPANDROPOULOUS, JONATHON WARREN TREVOR
> MRZ:    P<UTOPAPANDROPOULOUS<<JONATHON<WARREN<TREVOR

> *Note.— Even though there is an alpha character in the 44th position of this passport upper machine*
> *readable line, this name has not been truncated but it must be assumed that it has been truncated.*

### 4.2.4   Check digits in the Machine Readable Zone

The data structure of the lower machine readable line specified in paragraph 4.2.2.2 provides for the inclusion of five check digits as follows:

| Check digit | Character positions (lower MRZ line) used to calculate check digit | Check digit position (lower MRZ line) |
|---|---|---|
| Passport number | 1-9 | 10 |
| Date of birth | 14-19 | 20 |
| Date of expiry | 22-27 | 28 |
| Personal number | 29-42 | 43 |
| Composite check digit | 1-10, 14-20, 22-43 | 44 |

*Note.— Positions 11-13 and 21 are excluded when*
*calculating the composite check digit.*

### 4.3   Representation of the Issuing State or Organization and Nationality of Holder in the MRZ and the VIZ

Use of three-letter Country codes is mandatory in the MRZ and Field 04 in the VIZ and optional for the holder's nationality in the VIZ. Specific locations are defined in the following table:

| | Zone | Field no. | Character position no. | Number of character positions |
|---|---|---|---|---|
| Issuing State or organization | VIZ<br>MRZ<br>(upper line) | 04 | 3-5 | 3<br>3 |
| Holder's nationality | VIZ<br>MRZ<br>(lower line) | 08 | 11-13 | variable<br>3 |

Zzyym v. Tillerson - AR 0548

*Machine Readable Travel Documents*

# 5.  REFERENCES (NORMATIVE)

ISO/IEC 7810        ISO/IEC 7810:2003, Identification cards – Physical characteristics.

ISO/IEC 18745-1        ISO/IEC 18745-1:2014, Information technology – Test methods for machine readable travel documents (MRTD) and associated devices – Part 1: Physical test methods for passport books (durability).

— — — — — — —

Zzyym v. Tillerson – AR 0549

## Appendix A To Part 4

# EXAMPLES OF A PERSONALIZED MRP DATA PAGE (INFORMATIVE)



**Figure 11.    Example of an MRP data page that conforms to the recommended practice layout.**



**Figure 12.    Example of an MRP data page excluding Zone IV (the holder's signature or usual mark) and including Optional Data Field 13, for optional personal details (e.g. occupation) in Zone II.**

*App A-1*

App A-2

*Machine Readable Travel Documents*



**Figure 13.** Example of an MRP data page appearing on an interior page of the book. The name of the issuing State or organization and the name of the document have appeared on an earlier page and are therefore omitted from the data page. The example also illustrates Zone V (the portrait) moved vertically upwards with Zone IV (the signature) overlaying the portrait, and the personal number from Zone II placed beneath the portrait.



**Figure 14.** Example of an MRP data page with the layout adjusted to accommodate a displayed fingerprint in Zone II.

— — — — — — —

Zzyym v. Tillerson – AR 0551

## Appendix B To Part 4

# CONSTRUCTION OF THE MACHINE READABLE ZONE OF THE PASSPORT DATA PAGE (INFORMATIVE)



**Figure 15.    Example showing the sequence and content of data elements in the MRZ**

*Note 1.— * Three letter codes are given in Doc 9303-3.*

*Note 2.— Dotted lines indicate data fields; these, together with arrows and comment boxes, are shown for the reader's understanding only and are not printed on the document.*

*Note 3.— Data is inserted into a field beginning at the first character position starting from the left. Any unused character positions shall be occupied by filler characters (<).*

— END —

*App B-1*

Zzyym v. Tillerson - AR 0552



ISBN 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-793-4



International Civil Aviation Organization

**INFORMATION PAPER**

TAG/MRTD/21-IP/4
20/11/12
**English Only**

## TECHNICAL ADVISORY GROUP ON MACHINE READABLE TRAVEL DOCUMENTS (TAG/MRTD)

### TWENTY-FIRST MEETING

### Montréal, 10 to 12 December 2012

**Agenda Item 5: Country and Organization Reports**

## A REVIEW OF THE REQUIREMENT TO DISPLAY THE HOLDER'S GENDER ON TRAVEL DOCUMENTS

(Presented by New Zealand)

**1.    INTRODUCTION**

1.1    The New Zealand Passport Office has produced the paper "Displaying the holder's gender on travel documents: Is it still appropriate in the age of e-travel documents". The paper is presented in Appendix A of this information paper.

1.2    This information paper summarises the key points of the paper presented in Appendix A and outlines a course of action for the TAG/MRTD.

1.3    When the paper refers to travel documents, it is referring to all machine readable travel documents.

**2.    BACKGROUND**

2.1    Under 8.6 - Data element directory in IV - Technical Specifications for Machine Readable Passports of Part 1 Volume 1 Doc 9303 6th edition, travel documents are required to display the gender of the holder.

2.2    Displaying detailed biodata information about the holder, including their gender, has enabled travel documents to be used more effectively to identify the holder.

2.3    There have been significant changes in the technology travel documents use to identify the holder since the introduction of e-travel documents. The use of facial recognition technology and other biometric

(10 pages)
TAG/MRTD/21

Zzyym v. Tillerson - AR 0554

TAG/MRTD/21-IP/4                          - 2 -

identification methods provide an opportunity to look beyond relying on the biodata displayed on travel documents, including gender, to confirm an identity.

## 3. KEY COSTS OF CHANGE

3.1    Removing the requirement to display a holder's gender on travel documents would complicate the operations of border authorities. Some border authorities use the gender field as an input into risk assessment before passengers arrive and to identify passengers travelling through border points.

3.2    Changing the requirement would impose significant costs on border authorities. Border control software would need to be upgraded and modified to handle travel documents that do not display the holder's gender.

3.3    The complications to border operations may have a corresponding effect of longer check in times for passengers and people encountering problems when travelling on a travel document that does not display their gender.

## 4. KEY BENEFITS OF CHANGE

4.1    Border authorities would not have to deal with passengers travelling on a travel document displaying a gender that does not reflect the holder's identity. Transgender passengers would be less likely to encounter problems travelling.

4.2    Issuance offices may not have to collect gender information about applicants and would issue fewer travel documents with incorrect biodata information.

4.3    Removing the mandatory requirement to display a holder's gender on travel documents could pre-empt calls for change and show ICAO is a future focused organisation.

## 5. CONCLUSION

5.1    The costs of the removing the requirement to display the holder's gender on travel documents outweigh the benefits at this stage. The costs of the change would be more significant given the adverse affects on the operations of border authorities and the potential inconvenience for passengers. However, the tangible benefits of not requiring travel documents to display the holder's gender mean there is still a significant opportunity for ICAO in changing the mandatory requirement in the future.

## 6. RECOMMENDATIONS

6.1    The New Zealand Passport Office recommends ICAO:

    a)    maintains the requirement to display the holder's gender at this stage;

    b)    reassesses this requirement when future border control systems would be less affected by the removal of the gender field; and

    c)    standardises any change to the requirement to display the holder's gender across all travel documents to minimise the complications for border authorities.

Zzyym v. Tillerson – AR 0555

TAG/MRTD/21-IP/4                              - 3 -

## 7.    ACTION BY THE TAG/MRTD

7.1     The New Zealand Passport Office invites the TAG/MRTD to:

   a)   note the contents of the paper "Displaying the holder's gender on travel documents: still
        useful in the age of e-travel documents" presented in Appendix A; and

   b)   periodically review the mandatory requirement to display the holder's gender on travel
        documents in the future.

Zzyym v. Tillerson - AR 0556

TAG/MRTD/21-IP/4                    - 4 -

**APPENDIX A**                    TAG-MRTD/21-IP/4
                                 **Appendix A**

# Displaying the holder's gender on travel documents: Is it still appropriate in the age of e-travel documents

## *Executive Summary*

*Purpose*
*This paper:*
- *presents the results from the New Zealand Passport Office's research into the ICAO requirement to display the holder's gender on travel documents for identity purposes;*
- *explains the consequences of removing the gender field for official agencies and passengers; and*
- *recommends a course of action for ICAO.*

*Introduction*
*ICAO is a specialised agency of the United Nations that sets the standards necessary for safe and efficient international civil aviation. The inclusion of a travel document holder's gender was made a mandatory requirement for travel documents in the standards set out in ICAO Document 9303, first introduced in 1980. Displaying the holder's gender has enabled travel documents to be used more effectively to identify the holder. However, the introduction of e-travel documents and the advanced identification methods these documents use creates the argument that it is no longer necessary for travel documents to display the holder's gender.*

*ICAO gender requirements for travel documents were discussed during a Five Nations conversation on transgender issues. New Zealand agreed to review the wider issue of gender on travel documents on behalf of the Five Nations group.*

*Findings*
*From consultation with officials from Immigration New Zealand and the New Zealand Customs Service, the New Zealand Passport Office found some border authorities use information about a person's gender to:*
- *input into risk assessments before passengers arrive;*
- *identify passengers travelling through border points;*
- *process passport information while using travel document readers; and*
- *collect statistical information about passengers to provide to agencies who monitor changes in population.*

*The New Zealand Passport Office's research has also shown that:*
- *the gender field is not always a reliable way to confirm an identity as a holder's gender can change; and*
- *over the July 2011 to June 2012 period, approximately 0.009% of the travel documents despatched from the New Zealand Passport Office had the wrong gender displayed.*

*Conclusions*

Zzyym v. Tillerson - AR 0557

TAG/MRTD/21-IP/4                                        - 5 -

*Based on these initial findings, we can conclude that removing details of the holder's gender on travel
documents may have the negative consequences of:*

- *weakening the ability of border authorities to risk assess before passengers arrive and undermine
  the performance of electronic border systems, resulting in slower passenger processing and more
  interventions from border officials;*
- *passengers encountering problems when travelling on a travel document that does not display their
  gender to a country which does not accept these travel documents;*
- *requiring border authorities to modify their software at a significant cost to process travel
  documents with and without the gender field; and*
- *requiring passengers to provide their gender details in other formats to agencies and other parties
  who want this information.*

*Not displaying the holder's gender on travel documents may have the benefits of:*

- *preventing border officials dealing with travel documents that display a gender that does not reflect
  the holder's identity and reduce the risk of transgender people encountering problems while
  travelling;*
- *reducing the number of travel documents with incorrect biodata issued; and*
- *allowing issuance offices to avoid the time and cost required to collect gender information about
  applicants.*

**Recommendations**
*We recommend that ICAO:*

1. *maintains the requirement for travel documents to display the holder's gender at this stage as the
   costs of the change outweigh the benefits;*
2. *reassesses this requirement when future border control systems would be less affected by the
   removal of the gender field; and*
3. *standardises any change to the requirement to display the holder's gender across all travel
   documents to minimise the complications for border authorities.*

Zzyym v. Tillerson - AR 0558

TAG/MRTD/21-IP/4                              - 6 -

### Discussion
This section of the paper sets out:
- ICAO standards;
- Technology developments that may make the gender field less relevant;
- the costs of changing the mandatory requirement; and
- the benefits of changing the mandatory requirement.

### ICAO standards
International travel documents have historically displayed information to indicate the gender of the holder. When international standards for travel documents were put in place, the historic practice of displaying the gender was made a mandatory requirement for all machine readable travel documents. Using detailed biodata information about a person, including their gender, on travel documents reduces the risk of these documents being issued to the wrong identity or multiple documents being issued to one identity. Displaying the holder's gender also helps border officials to verify an identity by doing a quick visual check of the gender on the travel document compared to the holder.

### Technology developments that may make the gender field less relevant
There have been significant changes in the technology used in travel documents to identify the holder since the introduction of e-travel documents. These changes, outlined below, show the advanced identification methods which may remove the need to display the holder's gender on travel documents.

### Facial Recognition Technology
The international move to e-travel documents reduces the risk of illegitimate applicants obtaining legitimate documents. All e-travel documents use Facial Recognition Technology (FRT) to confirm the identity of a person and bind it to a legitimate document. FRT enables:
- one-to-one matches when e-travel documents are renewed to ensure the document is issued to the correct identity; and
- one-to-many matches that help to prevent a person obtaining travel documents over multiple identities.

Border authorities who use facial recognition systems can analyse the facial image contained in an e-travel document and seek to match that with the person presenting it.

The movement towards an international system based on e-travel document technology is ongoing. E-travel documents are not mandatory under ICAO standards and it will take some countries a significant amount of time to introduce these documents. Even in countries where e-travel documents have been introduced, the technology to process the documents is not in place at all border points.

While the use of FRT is currently limited, this advanced identification method is likely to be widely used and become more useful over time. The older method of displaying detailed biodata information, including gender, may become less necessary to confirm an identity.

### Optional biometrics
ICAO standards allow e-travel documents to store a holder's fingerprints or iris biometrics, which enables the use of further advanced identification methods. A number of European countries store fingerprint biometrics in e-travel documents and border authorities are increasingly capturing fingerprint information as part of identity management systems. As this technology matures and is integrated into border systems, it may provide an effective way to quickly identify passengers.

### Modern databases
Advances in database systems are another technological change that means knowing a person's gender is less important for identity purposes. Old databases typically searched based on surnames and initials. In

Zzyym v. Tillerson - AR 0559

TAG/MRTD/21-IP/4                    - 7 -

these databases, knowing a person's gender significantly narrows the results of a search in systems that hold information about a large number of people. However, searches in modern databases are often based on full names. Unless the name is unisex, adding the gender often does not narrow down the search results in the modern databases increasingly used by official agencies.

**The costs of changing the mandatory requirement**
If ICAO changes the requirement to display the holder's gender on travel documents, the agencies most adversely affected would be border authorities. Unlike issuance offices, which generally can determine their own internal processes as long as they comply with ICAO standards, border authorities deal with passengers travelling on travel documents of many nationalities.

It is useful for border authorities to have access to information on the gender of passengers travelling through border points. Knowing a passenger's gender helps improve security as it allows border authorities to categorise passengers and do risk assessments before they arrive to be processed. Border authorities who process passengers using systems designed according to international best practice use gender as an input to increase the speed passengers are processed. Not knowing a passenger's gender would adversely affect their systems in the ways outlined below.

**Border authorities' ability to risk assess would be reduced**
Border authorities would be less able to establish the context of a passenger's travel and do risk assessments before passengers arrive. Knowing the passenger's gender is useful in determining if someone matches the profile of a person of interest. This cannot always be done using a passenger's name because some names are unisex.

Border authorities may need to rely more on assessing passengers at border points. Passengers who may be a person of interest would have to be screened carefully by border officials. A shift to doing risk assessments on passenger arrival could lead to a greater reliance on a wider screening of passengers based on anxiety, hostility or other suspicious characteristics.

**Increased risk of fraudulent travel documents**
There is a small risk that border officials may have to process more passengers using fraudulent travel documents. If the holder's gender is not displayed, it may be easier for fraudulent travel documents to be used by both males and females for travel under a false identity. This is particularly the case with photo-substituted travel documents. However, this risk is limited for the following reasons.
- An imposter would need to match the photo in the travel document if unaltered.
- The common method for forgery is to replace the entire biodata page with information tailored to the person attempting to travel on the document.
- Professional forgers are likely to possess a travel document with the desired gender.

**The effectiveness of detection systems would be reduced**
A significant problem for border officials is the detection systems used to process passengers would be less reliable. Automatic systems such as watchlist checks would bring up more false matches if a passenger's gender information is not entered in border control systems. Excessive false alarms may undermine security as officials are more likely to ignore alerts if they are constantly dealing with false matches. These false matches would also decrease the speed passengers are processed.

**The efficiency of electronic systems would be reduced**
The speed which passengers are processed would likely be further affected by electronic systems performing less efficiently. Many electronic systems that process passenger information use the gender

Zzyym v. Tillerson - AR 0560

TAG/MRTD/21-IP/4                    - 8 -

field during calculations and for name matching routines. The consequences of a reduction in speed of the electronic systems would be significant given the numbers of international travellers that need to be processed.

**Systems would need to handle different types of travel documents**
The electronic systems used by border authorities would have to deal with the challenge of processing travel documents with and without the gender field. The systems would need to be modified to ensure travel documents with no entry in the gender field are not treated as an error. If this was managed by the software recognising the data on the various travel document nationalities, border authorities would have to modify their software whenever a country removed the gender field from their travel documents.

Upgrading and modifying software would impose significant costs on border authorities and airlines. Ongoing costs would be high as the systems used to read travel documents would have to handle processing the two types of travel documents for a significant period of time. If ICAO made not displaying the gender field mandatory, this period would be around 10 years. If displaying the gender field became optional, this period of having to modify software to process the different types of travel documents would be indefinite.

**Less statistical information may be available for other agencies**
Border authorities would not be able to use their software to compile statistical information about the gender of passengers if this information is not available. This would limit their ability to provide information to agencies that are interested in the gender of people entering and exiting border points. Some agencies may find it problematic if they can't obtain this information as it is useful for making population estimates and determining:
- health and education needs;
- economic strategies; and
- projected fertility, crime and electoral enrolment rates.

The costs of changing the mandatory requirement outlined above indicate how removing details of the holder's gender on travel documents would complicate the operations of border authorities. A change that impacts negatively on how border authorities operate would have corresponding adverse effects on passengers.

**Check-in would be slower**
Passengers would probably have to wait longer to be processed through border points. This delay would partly be due to reduced efficiencies of electronic border control systems. Also, border officials would be more likely to intervene because of increased reliance on passenger screening and the need to deal with more false alerts. Border official interventions may mean that in some instances they would have to ask passengers to confirm their gender to ensure that an official of the appropriate gender conducts the search.

**Passengers may be required to provide gender information in other formats**
Passengers may be required to confirm their gender in other ways if it is not displayed on their travel document. Official agencies collecting passenger's information for statistical purposes may require gender details be supplied on a form as passengers enter or exit a country. Airlines may require a person's gender details to avoid the possibility of being held liable for not providing this information to official agencies where such information is required.

**Travel documents may not be readily accepted by all border authorities**
Passengers with a travel document that does not display their gender may encounter problems while travelling. Border officials in some countries may take time to recognise or understand such a change in

TAG/MRTD/21-IP/4                               - 9 -

ICAO standards. It may also take time for some border authorities to modify their electronic systems to handle travel documents that don't display the gender field.

A comprehensive international agreement to manage this change would be crucial. An agreement would help to ensure the different types of travel documents are widely recognised by border officials. The risk of passengers encountering problems travelling on a travel document that does not display their gender would be reduced further if a large number of countries used this type of travel document.

**A secondary use of travel documents may be undermined**
The common secondary use of travel documents to provide identification in non-travel situations may be undermined if the gender field is removed. People issued a travel document that does not display their gender would lose an official way to prove their gender. This may be inconvenient where someone is required to provide an official document that displays their gender, perhaps to access a service restricted to only males or females.

**The benefits of changing the mandatory requirement**
Given the significant negative consequences of travel documents not displaying the holder's gender for border authorities and passengers, the mandatory requirement should not be changed at this time. However, border authorities should consider moving towards systems that do not rely on knowing the gender details of passengers. If border authorities make this change, ICAO should reassess the mandatory requirement. There would be a number of benefits if travel documents did not display the holder's gender.

**Travel documents would not display a gender that does not appear to match the holder**
Border authorities would not have to deal with passengers travelling on a travel document displaying a gender that is not useful to confirm their identity. The holder's gender is not always a reliable way to confirm an identity for the following reasons.
- The holder can change the gender on their travel document in many countries if they go through the appropriate process.
- The process to change the gender on travel documents is inconsistent between countries, which creates the possibility of a person with travel documents under different nationalities having different genders on these documents.
- The risk of inconsistencies may increase if more countries follow Australia and New Zealand's lead and allow travel documents with the gender displayed as X. ICAO standards defines X as unspecified, which allows individual countries to determine who is eligible for this option.

It is true that only a very small percentage of people change their gender. However, the ability of people to change their gender creates a potential problem for agencies that rely on this information to verify an identity.

**The transgender community would benefit**
The risk of transgender people encountering problems while travelling would be reduced by removing the gender field on travel documents. Transgender people may experience an easier process as they would no longer have the problem of travelling on travel documents where the gender displayed doesn't match their appearance. Also, transgender people with their gender displayed as X would avoid dealing with border officials that do not recognise this option.

**Issuance offices may not have to collect gender information**
Removing the requirement to display the holder's gender on travel documents would streamline the process of issuing travel documents. As long as an applicant's gender is not required for another reason, passport application forms would not need to request this information. Issuance offices would not have to

Zzyym v. Tillerson - AR 0562

TAG/MRTD/21-IP/4                              - 10 -

capture and store the gender details of applicants in their databases. Processing officers would not be required to ensure the correct gender is printed on travel documents.

**There would be fewer travel documents issued with incorrect biodata information**
Issuance offices would issue significantly fewer travel documents with incorrect biodata information if travel documents did not display the holder's gender. It is an easy mistake for applicants to choose the wrong gender option on an application and for processing officers to miss this mistake. Of the over 600,000 travel documents issued by the New Zealand Passport Office from July 2011 to June 2012, approximately 0.009% displayed the wrong sex.  Not displaying the gender on travel documents would prevent:
- the inconvenience for customers of being issued a travel document with the wrong gender;
- issuance offices having to reissue travel documents due to the original document displaying the wrong gender; and
- border authorities having to process travel documents displaying the wrong gender.

**Changing the mandatory requirement may future proof ICAO standards**
ICAO could pre-empt calls for change by removing the requirement to display the holder's gender on travel documents if it becomes feasible to do so. While there may not be strong calls for this requirement to be changed now, this may change in the future. As the use of advanced identification methods based on biometrics increases, people may question why displaying their gender on travel documents is necessary. The requirement may also be hard to justify if there are moves to prevent discrimination of passengers based on their gender during processing through border points.

--- END —

Zzyym v. Tillerson - AR 0563

# WISCONSIN JOURNAL OF LAW, GENDER & SOCIETY

VOLUME XXX, NUMBER 2                                           FALL 2015

## COMMENTS

### GENDER AND SEX DESIGNATIONS FOR IDENTIFICATION PURPOSES: A DISCUSSION ON INCLUSIVE DOCUMENTATION FOR A LESS ASSIMILATIONIST SOCIETY

*Lauren Bishop*[*]

|   | INTRODUCTION | 131 |
|---|---|---|
| I. | BACKGROUND | 135 |
|   | A. Gender Designations in the United States | 137 |
|   | B. International Approaches Regarding Trans* Identification and Official Identification Documentation | 141 |
|   | C. The Indian Model | 144 |
|   | D. The Ontario Model | 145 |
|   | E. U.S. Treatment of Trans* Detainees Based on Gender Characterization | 146 |
| II. | ANALYSIS | 147 |
|   | A. Inadequacy of "Male/Female" as Official Document Fields | 147 |
|   | B. Gender Policing Based on Binary Assumptions | 150 |
|   | C. Gender Policing in Detention | 151 |
|   | D. Discussing Possible Solutions | 154 |
|   | E. Taking on the Passport Problem | 155 |
| III. | CONCLUSION | 156 |

### INTRODUCTION

The United States federal government and the individual U.S. states' failure to allow trans*[1] and gender non-conforming[2] persons a right to self-

---

[*]    J.D., University of Wisconsin Law School, 2015. The author would like to thank her editors and mentors for their guidance and support.

    1.    The term "trans*" will be used throughout to designate a catch-all umbrella for transgender, transsexual, two-spirit, transmasculine, transfeminine, transvestite, and other gender-nonconforming persons. The terms "gender non-conforming," transgender, transsexual, et. al. will be stated in the text when individual consideration of such identity is necessary to distinguish from the umbrella characterization. *See LGBTTIQQ2SAA+*

131

BISHOP COMMENT.DOCX (DO NOT DELETE)                                    1/4/2016 12:28 PM

132      *WISCONSIN JOURNAL OF LAW, GENDER & SOCIETY*      [Vol. 30:2

identify[3] on official documents causes an array of problems. Many such individuals experience identification-related difficulties in everyday life—in immigration, housing, and employment situations, among others.[4] American

---

*Definitions*, REVEL & RIOT, *available at* http://www.revelandriot.com/resources/lgbtq-and-trans-definitions/; *see also What Does the Asterisk in "Trans\*" Stand For?*, IT'S PRONOUNCED METROSEXUAL (Mar. 2015), *available at* http://itspronouncedmetrosexual.com/2012/05/what-does-the-asterisk-in-trans-stand-for/; Hugh Ryan, *What Does Trans\* Mean, and Where Did It Come From?*, OUTWARD (Jan. 10, 2014), http://www.slate.com/blogs/outward/2014/01/10/trans_what_does_it_mean_and_where_did_it_come_from.html.

2.  Dr. Eric Anthony Grollman, *What Is Gender "Non-Conformity"?*, KINSEY CONFIDENTIAL (March 8, 2011), http://kinseyconfidential.org/gender-nonconformity/ ("Gender non-conformity . . . is behaving and appearing in ways that are considered atypical for one's gender.").

3.  As noted below, many U.S. states require invasive medical procedures, other medical treatment, and professional consultation for individuals to have the sex designation changed on legal documentation. Moreover, the United States does not currently have any system in place for gender non-conforming individuals for whom a "male" or "female" designation is inaccurate, and would force such individuals to inhabit a role with which they do not identify: The problem of being discriminated against as a result of a person not appearing as the gender stated on legal documentation is well documented. *See* Andrew Cray & Jack Harrison, *ID Accurately Reflecting One's Gender Identity Is a Human Right*, CTR. FOR AM. PROGRESS (Dec. 18, 2012), *available at* https://cdn.americanprogress.org/wp-content/uploads/2012/12/TransgenderID-4.pdf (public policy scholars estimate some 25,000 transgender U.S. voters could become disenfranchised as a result of stringent state voter ID laws due to anti-transgender discrimination and because such individuals may not appear to be the person on their voter identification).

4.  When not seen as their true genders, trans\* people are commonly placed into institutions based on, or considered as an "other" that institutions are unable to accommodate, or categorized with regard to their sex organs. Such a system often leads to traumatic experiences for the individuals in these positions. *See. e.g.*, Jorge Rivas, *New Yorkers Brave the Cold To Rally for Transgender Asylum Seeker*, FUSION (March 5, 2015), http://fusion.net/story/59091/new-yorkers-brave-the-cold-to-rally-for-transgender-asylum-seeker/ (Guatemalan transgender detainee Nicoll Hernandez-Polanco seeking asylum in the United States has been held since October 2014 in a room with 12+ men at an immigration detention facility in Arizona, where she has been the victim of physical and emotional assault. Activists in New York, Los Angeles, Arizona, and Washington D.C. to convey the message to the Obama Administration that "detention harms LGBTQ people," and that transgender women face particularly awful conditions in detention. In detention, Nicoll is forced to sleep and shower next to cisgender men, and has been the victim of transphobic treatment by fellow detainees and guards. Advocates say she has been sexually assaulted by a male detainee, has been groped numerous times. Prison guards have groped her breasts, pulled her hair, and a prison cook has referred to her as "the woman with balls" on multiple occasions.). Trans\* jobseekers have a notoriously high unemployment rate—reported around 14%  in 2011—over twice the national average. As a result of transphobic job discrimination, trans\* persons often are forced to sell sex in order to survive, work that is both illegal and places them at high risk of violence. Keisha Allen states that she has worked as a prostitute since being kicked out of her house as a teenager, and is now middle-aged. She has applied for many other jobs, including dishwashing and cashier positions, and has not been considered for any past the first interview. Because her "name doesn't match [her] ID, and [her] body doesn't match what it says on [her] ID," she has not been considered for employment. Moreover, as a homeless person, she is relegated to the male section of a

2015]                    *GENDER AND SEX DESIGNATIONS*                    133

society meets trans\* issues with an air of disregard and misunderstanding –
especially the concept of *self-identification*[5] – a reality which perpetuates the
mistreatment of the trans\* community, and maintains an unavailability of
resources for its members. An overhaul of our conception of trans\* and other
gender non-conforming people is vital to the well-being of the American trans\*
community and those trans\* persons who seek support as they evade
persecution.

This Comment compares recent international and domestic measures
taken to alleviate trans\* alienation and human rights violations to reveal
possible solutions for the United States. This writing focuses heavily on
background information exactly because much is missing in our society's
understanding of the needs of the trans\* community in terms of
accommodations, rights, identities, and infrastructure. Because the proposed
reforms essentially require building American gender consciousness from the
ground up, background information helps illustrate how, why, and where
American trans\* accommodation is lacking.

The background section begins the Comment with an exposition of gender
as a social concept, and starts to explain how a binary Male/Female
dichotomous paradigm falls short of representing the wide variety of ways that
people actually perform,[6] relate to, and identify with their gender. The section

---

shelter, despite identifying as a woman. Another transgender woman states that despite 40+
years in the auto industry, she was fired after telling her employer she intended to transition
from male to female. She says that word of her transgender identity spread throughout the
industry, and she was only able to obtain employment, hundreds of applications later, in a
position that paid less than half of what she was previously earning. As a result of such a
significant pay cut, she has struggled to keep her home. Blake Ellis, *Transgender Job
Seekers    Face    Uphill    Battle*,    CNN    MONEY    (Feb.    22,    2013),
http://money.cnn.com/2013/02/22/pf/transgender-unemployment/.

5. Self-identification also appears in the critical race jurisprudence, through the
concept sometimes termed "elective race" theory. *See generally* Camille Gear Rich, *Elective
Race: Recognizing Race Discrimination in the Era of Racial Self-Identification*, 102
GEORGETOWN L. REV. 1501, 1505 (2014) (author notes modern anti-discrimination laws and
the legal community must tackle the "dignity concerns of individuals as they attempt to
control the terms upon which their bodies are assigned racial meaning").

6. To "perform gender" can be understood as portraying one's gender through action,
to physically act it out. Gender performance as a concept was popularized by renowned
gender theorist and cultural critic Judith Butler, who posits that gender should not be
conceived of as fixed, but that it shifts and changes.

> [G]ender is in no way a stable identity or locus of agency from which various
> acts proceed; rather, it is an identity tenuously constituted in time—an identity
> instituted through a *stylized repetition of acts*. Further, gender is instituted
> through the stylization of the body and, hence, must be understood as the
> mundane way in which bodily gestures, movements, and enactments of various
> kinds constitute the illusion of an abiding gendered self.

Judith Butler, *Performative Acts and Gender Constitution: An Essay in Phenomenology and
Feminist Theory*, 40 THEATRE J. 519, 519-520 (Dec. 1988). *See generally* Juliet Jacques,
*Gender Is a Performance – For Everyone, Not Just Transsexuals*, THE GUARDIAN (Dec. 29,
2010),        http://www.theguardian.com/lifeandstyle/2010/dec/29/gender-performance-stage
("Underlying some of those stares and taunts is the assumption that my gender itself is a
'performance': that is, false (or less real than other people's). Well, it is largely performative,

134    *WISCONSIN JOURNAL OF LAW, GENDER & SOCIETY*    [Vol. 30:2

continues by examining U.S. institutions' progress and shortfalls in accommodating trans* citizens who wish to alter their legal identification documentation to accurately reflect their gender. The section emphasizes sex-gender conflation and some aspects of assimilationism.[7]

Next, this Comment looks at recent steps taken in other countries for the purpose of accommodating trans* citizens' needs for legal documentation. The types of documentation discussed include birth certificates, driver's licenses, and passports. This emphasizes foreign processes that do not mandate binary male or female identification. The countries this Comment focuses on most include India, Australia, and Canada, as those countries have made significant strides toward the inclusion of trans* rights in this area.[8] This section of the Comment acts as a backdrop for the "solutions" section toward the end of the Comment. The last part of the analysis discusses routes the United States may take if it decides to address the non-binary identification needs of the trans* community. This final section compares the measures of the aforementioned

---

as it is for everyone: my style and mannerisms develop in relation to my personality, changing over time, and I enjoy the creative potential inherent in this.").

   7. Assimilation and assimilationism refer to appearing, acting, or otherwise "passing" within a dominant paradigm. Here, I refer to trans* persons assimilating to dominant conceptions of queer culture—or rather, passing within society's most accepted notions of LGBT. This notion is based on inherent privileges of whiteness, of looking "traditionally male" or "traditionally female," as engaging in two-person relationships, and other constructs of identity that do not explicitly defy social norms of acceptable lifestyles and identities. In *Seeking Queer Visibility, Rejecting Assimilation*, author Lucas Waldron describes the privileges he recognizes as a white trans* person who "passes" as a man in social situations. He writes:

> For me, assimilation is especially accessible. As a passing white transsexual man with a degree in political science, a job that pays for my San Francisco apartment, and a boyish appearance that makes elderly women at the grocery store smile at me with trusting eyes, it's easy for me to be satisfied with my own experience of assimilation into a society that already acknowledges white men as actively more powerful than others. I know, however, that the political and cultural successes my community has experienced in recent years disproportionately affect and favor me and leave much of my community in the margins, grasping for tangible change.

Lucas Waldron, *Seeking Queer Visibility, Rejecting Assimilation*, HUFFPOST GAY VOICES (Jan. 7, 2014), http://www.huffingtonpost.com/lucas-waldron/seeking-queer-visibility-_b_4525703.html. Author Sally Hines discusses varying opinions on the appropriateness of assimilation into dominant lesbian and gay culture among trans* persons. Hines notes, "[w]hile some interviewees considered gender assimilation to be both desirable and necessary for the protection of transgender civil rights, others offered a challenge to the notion of assimilation, proposing a (trans)gender politics in which difference is considered as a site of importance and celebration in its own right." Hines further writes, that "[w]hole some [transgender persons construct] distinct transgender identity positions, consciously created in opposition to traditional ways of thinking about gender, sexuality and transition, others [articulate] individualism and [are] reluctant to position themselves as members of a collective transgender culture." SALLY HINES, TRANSFORMING GENDER: TRANSGENDER PRACTICES OF IDENTITY, INTIMACY AND CARE 187 (Policy Press 2007).

   8. Additionally, Canada is the United States' "neighbor to the north," and arguably a country our government might look to first when contemplating how to address trans* inclusion measures.

countries and attempts to formulate a hypothetical framework for the United States—while accounting for concerns that have remained or arisen following changes in the "model" countries.

This Comment does not intend to solve the problem of the United States' lack of non-binary designation options for official identification documents. Instead, this Comment aims to give the reader the information to spark discussion about a variety of approaches and possibilities for solving the issue. Full inclusion of non-binary-identified and trans* people will require substantial planning and reform. With that in mind, this Comment strives to provide many different outlooks on a difficult and nuanced subject, so that we might arrive at a more inclusive and safe society for trans* people.

## I. BACKGROUND

"[G]ender is each person's deeply felt internal and individual experience [thereof], which may or may not correspond with the sex assigned at birth, including personal sense of the body . . . and other expressions of gender, including dress, speech, and mannerisms."[9] Although the majority of trans* identified individuals continuously identify as man or woman, others identify somewhere along the spectrum[10] of gender identity, and may feel at home as man and woman, or as neither binary gender.[11]

People with nonbinary identities are members of the trans* community who identify outside of a gender binary comprised of the mutually exclusive categories of man and woman. Some trans* people have static gender identities of which they are definitively aware from very early childhood, while others have fluid identities that may change or evolve over the course of their lives.[12]

There has been a marked push in recent years in countries around the globe to respond to trans* communities' demands for recognition of non-binary gender identity. Some countries have responded by recognizing a need for non-traditional gender and sex identifiers on legal identification documentation.[13]

---

9.  Olga Tomchin, *Bodies and Bureaucracy: Legal Classification and Marriage-Based Immigration for Trans* People*, 101 CAL. L. REV. 813, 819 (2013).

10.  A basic binary concept of gender based on the physical does not account for the variations between individuals, other than distinctions between men and women. The gender spectrum is a way to help explain that facets of a person's life intersect to form their gender identity, that gender is nuanced, and comprises self-expression, biology, etc., to create a "multidimensional array of possibilities." *Understanding Gender*, GENDER SPECTRUM, https://www.genderspectrum.org/quick-links/understanding-gender/.

11.  *See* Tomchin, *supra* note 9, at 820.

12.  *Id.*

13.  *See generally Australian Government Guidelines on the Recognition of Sex and Gender*, AUSTL.  GOV'T  2-8 (July  2013),  *available  at* http://www.ag.gov.au/Publications/Documents/AustralianGovernmentGuidelinesontheRecog nitionofSexandGender/AustralianGovernmentGuidelinesontheRecognitionofSexandGender. PDF; Arshiya Khullar, *The Transgender Community: Legally Invisible No More?*, CNN (April 17, 2014), http://www.cnn.com/2014/04/17/world/asia/countries-introduce-gender-neutral-policies-for-transgenders/ (discussing recent "victories" for nonbinary gender

Zzyym v. Tillerson - AR 0568

BISHOP COMMENT.DOCX (DO NOT DELETE)    1/4/2016 12:28 PM

136    *WISCONSIN JOURNAL OF LAW, GENDER & SOCIETY*    [Vol. 30:2

These measures are significant because trans* persons fall by the wayside in societies where most individuals identify as a binary gender; that is, man *or* woman.[14] This can be observed in everyday American life: public restrooms that presuppose an individual's identity fits neatly into a metaphorical box implicitly labeled "born male-bodied – Men" or "born female-bodied – Women."[15] By and large, American society does not account for gender identities outside the traditional binary system, nor does it really even consider trans* existence except perhaps as a passing thought during Pride Week or, recently, tokenized and fetishized on television.[16] Even so, mainstream "gender equality" and "LGBTQ" organizations rarely call attention to the trans* community or its related social issues[17] other than in drag and Pride-related contexts.[18] As a result, most Americans remain under-informed or hold

identification in India (recognition of a third or "other" gender), Australia (third gender recognition), Germany (allowing intersex children's birth certificates to be marked "X")).

14. *See* Nico Dacumos, *All Mixed Up with No Place to Go: Inhabiting Mixed Consciousness on the Margins*, *in* NOBODY PASSES: REJECTING THE RULES OF GENDER AND CONFORMITY 20-36 (Mattilda ed., 2006) (author recounts how they do not know exactly how to character their gender identity; that it's "not quite FTM and still emotionally, historically, and politically attached to butchness;" that "any . . . honest articulation of my gender identity will never convince [those healthcare providers] who [base] access to medical treatments like gender reassignment surgery and hormone therapy based on a narrow and pathologizing understanding of "transsexuality," to allow me self-determination over how I choose to modify my body").

15. There are accounts of transgender students being denied access to facilities that appropriately accommodate their non-conforming gender identity. Harper Jean Tobin & Jennifer Levi, *Securing Equal Access to Sex-Segregated Facilities for Transgender Students*, 28 WIS. J.L. GENDER & SOC'Y 301, 301 (2013) ("Denial of equal access to facilities that correspond to a student's gender identity singles out and stigmatizes transgender students, inflicts humiliation and trauma, interferes with medical treatment, and empowers bullies.").

16. *See, e.g.*, Julie Zeilinger, *No, TV Industry, Being Transgender Is Not a "Hot" Trend*, MIC (March 31, 2015), http://mic.com/articles/114140/no-tv-industry-being-transgender-is-not-a-hot-trend; E. Jessica Groothis, *The Rayon Effect: What Cisgender Actors Bring to Transgender Characters*, TRANSADVOCATE (April 5, 2014), http://www.transadvocate.com/the-rayon-effect-what-cisgender-actors-bring-to-transgender-characters_n_13344.htm; Alissa Scheller & Cameron Love, *Transgender People Are More Visible Than Ever, But It's Still Legal to Discriminate Against Them in Most States*, HUFFINGTON POST (June 3, 2015 3:07 PM), http://www.huffingtonpost.com/2015/06/03/transgender-discrimination-laws_n_7502266.html (juxtaposing media frenzy surrounding Caitlyn Jenner with extreme disregard for important issues like trans* homelessness and violence toward transpeople).

17. The Human Rights campaign, which happens to be the most-recognizable gay rights in the United States today, has a long and sordid history of excluding transgender considerations from bills, from working for the organization, and from even consulting with the trans* community for input in its crusade for nationwide same-sex marriage. Executive Director of HRC Elizabeth Burch is infamously quoted as stating that including trans* protections in the Employment Non-Discrimination Act would happen "over her dead body." Monica Roberts, *Why the Transgender Community Hates HRC*, TRANSGRIOT (OCT. 8, 2007), http://transgriot.blogspot.com/2007/10/why-transgender-community-hates-hrc.html.

18. Noting that transgender activist Sylvia Rivera is lauded in the LGBT rights movement as a leader of the Stonewall protests (largely seen as the kick-off of the U.S. movement toward LGBT equality), and transwomen celebrities Laverne Cox and Janet

2015]            *GENDER AND SEX DESIGNATIONS*            137

misconceptions about the trans* community. Thus, the community and its needs remain all too invisible to the public.

### A.    Gender Designations in the United States

The federal government and all states allow an individual to change a driver's license gender designation to or from Male/Female on account of gender identity.[19] The requirements for such an alteration vary, though most states require the applicant to submit a document indicating that the applicant's gender has changed,[20] and many require writings from health care professionals showing whether an individual requesting a designation change suffers from a physical or mental condition and has undergone appropriate treatment.[21] The District of Columbia requires a professional affirmation that the applicant's gender is either male or female and is expected to continue as such for the foreseeable future.[22] Some states still require surgery before a gender

---

Mock had been chosen to grand marshal 2014 Pride events in New York City and San Francisco, Meredith Talusman argues that trans people are forgotten when the LGBT Pride celebrations end. Talusman remarks that the story of trans people being marginalized within the LGBT rights movement and tokenized where convenient, is never given enough attention. Meredith Talusman, *45 Years After Stonewall, the LGBT Movement Has a Transphobia Problem*, THE AM. PROSPECT (June 25, 2014), http://prospect.org/article/45-years-after-stonewall-lgbt-movement-has-transphobia-problem    (Talusman staunchly criticizes HRC for billing itself as an organization that champions rights for all humans (evident in part by the organization's very name), but in reality apportions "resources primarily towards gay and lesbian rights causes, at a time when the trans people have become the most marginalized group in the American struggle for civil rights." Talusman further argues that "[i]f HRC's rhetoric is founded on the notion that it fights for the right to be human, then [it] must acknowledge that trans people are the most dehumanized group fighting for civil rights in the United States today. To have relied on [the human rights] argument at a time when that mantle belonged to gays and lesbians, then to disavow it when another group has come into existence as a greater priority, only reinforces the shameful truth that the Human Rights Campaign only prioritizes the cause of human rights when those humans happen to be gay and lesbian—but not trans.").

    19. *ID Documents Center*, NAT'L CTR. TRANSGEND. EQUAL., http://www.transequality.org/documents (last updated Oct. 19, 2015).

    20. For instance, the State of California requires that an applicant complete the Medical Certification and Authorization (Gender Change) form, which includes a physician or psychologist's certification of the applicant's gender identification, "gender demeanor," and whether applicant's gender identification is "transitional" or "complete." For minors, a parent's signature is required. CAL. DEP'T OF MOTOR VEHICLES, MEDICAL CERTIFICATION AND AUTHORIZATION (GENDER CHANGE) (2008), *available at* www.dmv.ca.gov/portal/wcm/connect/683f91d7-5c27-4260-970e-c23139bb8e22/dl329.pdf?MOD=AJPERES; *see Changing Your Legal Identification in California*, TRANSGEND. LAW CTR., http://transgenderlawcenter.org/issues/id/changing-your-legal-identification-in-california (applicants under the age of 18 must provide parent's signature to request gender designation change for a driver's license). *See also Changing Your Driver's License*, TRANS ROAD MAP, http://www.tsroadmap.com/reality/drivers-license.html (listing of requirements by state).

    21. *See, e.g.*, CAL. DEP'T OF MOTOR VEHICLES, *supra* note 20.

    22. *See ID Documents Center*, *supra* note 19 (under the requirements for Washington D.C.).