The Standards of Care
7TH VERSION

## Irreversible Interventions

Genital surgery should not be carried out until (i) patients reach the legal age of majority in a given country, and (ii) patients have lived continuously for at least 12 months in the gender role that is congruent with their gender identity. The age threshold should be seen as a minimum criterion and not an indication in and of itself for active intervention.

Chest surgery in FtM patients could be carried out earlier, preferably after ample time of living in the desired gender role and after one year of testosterone treatment. The intent of this suggested sequence is to give adolescents sufficient opportunity to experience and socially adjust in a more masculine gender role, before undergoing irreversible surgery. However, different approaches may be more suitable, depending on an adolescent's specific clinical situation and goals for gender identity expression.

## Risks of Withholding Medical Treatment for Adolescents

Refusing timely medical interventions for adolescents might prolong gender dysphoria and contribute to an appearance that could provoke abuse and stigmatization. As the level of gender-related abuse is strongly associated with the degree of psychiatric distress during adolescence (Nuttbrock et al., 2010), withholding puberty suppression and subsequent feminizing or masculinizing hormone therapy is not a neutral option for adolescents.



# VII
# Mental Health

Transsexual, transgender, and gender nonconforming people might seek the assistance of a mental health professional for any number of reasons. Regardless of a person's reason for seeking care, mental health professionals should have familiarity with gender nonconformity, act with appropriate cultural competence, and exhibit sensitivity in providing care.

This section of the *SOC* focuses on the role of mental health professionals in the care of adults seeking help for gender dysphoria and related concerns. Professionals working with gender dysphoric children, adolescents, and their families should consult section VI.

Zzyym v. Tillerson – AR 0670

The Standards of Care
7TH VERSION

## Competency of Mental Health Professionals Working with Adults Who Present with Gender Dysphoria

The training of mental health professionals competent to work with gender dysphoric adults rests upon basic general clinical competence in the assessment, diagnosis, and treatment of mental health concerns. Clinical training may occur within any discipline that prepares mental health professionals for clinical practice, such as psychology, psychiatry, social work, mental health counseling, marriage and family therapy, nursing, or family medicine with specific training in behavioral health and counseling. The following are recommended minimum credentials for mental health professionals who work with adults presenting with gender dysphoria:

1. A master's degree or its equivalent in a clinical behavioral science field. This degree or a more advanced one should be granted by an institution accredited by the appropriate national or regional accrediting board. The mental health professional should have documented credentials from a relevant licensing board or equivalent for that country.

2. Competence in using the *Diagnostic Statistical Manual of Mental Disorders* and/or the *International Classification of Diseases* for diagnostic purposes.

3. Ability to recognize and diagnose co-existing mental health concerns and to distinguish these from gender dysphoria.

4. Documented supervised training and competence in psychotherapy or counseling.

5. Knowledgeable about gender nonconforming identities and expressions, and the assessment and treatment of gender dysphoria.

6. Continuing education in the assessment and treatment of gender dysphoria. This may include attending relevant professional meetings, workshops, or seminars; obtaining supervision from a mental health professional with relevant experience; or participating in research related to gender nonconformity and gender dysphoria.

In addition to the minimum credentials above, it is recommended that mental health professionals develop and maintain cultural competence to facilitate their work with transsexual, transgender, and gender nonconforming clients. This may involve, for example, becoming knowledgeable about current community, advocacy, and public policy issues relevant to these clients and their families. Additionally, knowledge about sexuality, sexual health concerns, and the assessment and treatment of sexual disorders is preferred.

Zzyym v. Tillerson – AR 0671

Mental health professionals who are new to the field (irrespective of their level of training and other experience) should work under the supervision of a mental health professional with established competence in the assessment and treatment of gender dysphoria.

## Tasks of Mental Health Professionals Working with Adults Who Present with Gender Dysphoria

Mental health professionals may serve transsexual, transgender, and gender nonconforming individuals and their families in many ways, depending on a client's needs. For example, mental health professionals may serve as a psychotherapist, counselor, or family therapist, or as a diagnostician/assessor, advocate, or educator.

Mental health professionals should determine a client's reasons for seeking professional assistance. For example, a client may be presenting for any combination of the following health care services: psychotherapeutic assistance to explore gender identity and expression or to facilitate a coming out process; assessment and referral for feminizing/masculinizing medical interventions; psychological support for family members (partners, children, extended family); or psychotherapy unrelated to gender concerns or other professional services.

Below are general guidelines for common tasks that mental health professionals may fulfill in working with adults who present with gender dysphoria.

## Tasks Related to Assessment and Referral

### 1. Assess gender dysphoria

Mental health professionals assess clients' gender dysphoria in the context of an evaluation of their psychosocial adjustment (Bockting et al., 2006; Lev, 2004, 2009). The evaluation includes, at a minimum, assessment of gender identity and gender dysphoria, history and development of gender dysphoric feelings, the impact of stigma attached to gender nonconformity on mental health, and the availability of support from family, friends, and peers (for example, in person or online contact with other transsexual, transgender, or gender nonconforming individuals or groups). The evaluation may result in no diagnosis, in a formal diagnosis related to gender dysphoria, and/or in other diagnoses that describe aspects of the client's health and psychosocial adjustment. The role

Zzyym v. Tillerson – AR 0672

The Standards of Care
7TH VERSION

of mental health professionals includes making reasonably sure that the gender dysphoria is not secondary to or better accounted for by other diagnoses.

Mental health professionals with the competencies described above (hereafter called "a qualified mental health professional") are best prepared to conduct this assessment of gender dysphoria. However, this task may instead be conducted by another type of health professional who has appropriate training in behavioral health and is competent in the assessment of gender dysphoria, particularly when functioning as part of a multidisciplinary specialty team that provides access to feminizing/masculinizing hormone therapy. This professional may be the prescribing hormone therapy provider or a member of that provider's health care team.

## 2. Provide information regarding options for gender identity and expression and possible medical interventions

An important task of mental health professionals is to educate clients regarding the diversity of gender identities and expressions and the various options available to alleviate gender dysphoria. Mental health professionals then may facilitate a process (or refer elsewhere) in which clients explore these various options, with the goals of finding a comfortable gender role and expression and becoming prepared to make a fully informed decision about available medical interventions, if needed. This process may include referral for individual, family, and group therapy and/or to community resources and avenues for peer support. The professional and the client discuss the implications, both short- and long-term, of any changes in gender role and use of medical interventions. These implications can be psychological, social, physical, sexual, occupational, financial, and legal (Bockting et al., 2006; Lev, 2004).

This task is also best conducted by a qualified mental health professional, but may be conducted by another health professional with appropriate training in behavioral health and with sufficient knowledge about gender nonconforming identities and expressions and about possible medical interventions for gender dysphoria, particularly when functioning as part of a multidisciplinary specialty team that provides access to feminizing/masculinizing hormone therapy.

## 3. Assess, diagnose, and discuss treatment options for co-existing mental health concerns

Clients presenting with gender dysphoria may struggle with a range of mental health concerns (Gómez-Gil, Trilla, Salamero, Godás, & Valdés, 2009; Murad et al., 2010) whether related or unrelated to what is often a long history of gender dysphoria and/or chronic minority stress. Possible concerns include anxiety, depression, self-harm, a history of abuse and neglect, compulsivity, substance abuse, sexual concerns, personality disorders, eating disorders, psychotic disorders, and autistic spectrum disorders (Bockting et al., 2006; Nuttbrock et al., 2010; Robinow, 2009). Mental health professionals should screen for these and other mental health concerns and incorporate

Zzyym v. Tillerson – AR 0673

the identified concerns into the overall treatment plan. These concerns can be significant sources of distress and, if left untreated, can complicate the process of gender identity exploration and resolution of gender dysphoria (Bockting et al., 2006; Fraser, 2009a; Lev, 2009). Addressing these concerns can greatly facilitate the resolution of gender dysphoria, possible changes in gender role, the making of informed decisions about medical interventions, and improvements in quality of life.

Some clients may benefit from psychotropic medications to alleviate symptoms or treat co-existing mental health concerns. Mental health professionals are expected to recognize this and either provide pharmacotherapy or refer to a colleague who is qualified to do so. The presence of co-existing mental health concerns does not necessarily preclude possible changes in gender role or access to feminizing/masculinizing hormones or surgery; rather, these concerns need to be optimally managed prior to or concurrent with treatment of gender dysphoria. In addition, clients should be assessed for their ability to provide educated and informed consent for medical treatments.

Qualified mental health professionals are specifically trained to assess, diagnose, and treat (or refer to treatment for) these co-existing mental health concerns. Other health professionals with appropriate training in behavioral health, particularly when functioning as part of a multidisciplinary specialty team providing access to feminizing/masculinizing hormone therapy, may also screen for mental health concerns and, if indicated, provide referral for comprehensive assessment and treatment by a qualified mental health professional.

### 4. If applicable, assess eligibility, prepare, and refer for hormone therapy

The *SOC* provide criteria to guide decisions regarding feminizing/masculinizing hormone therapy (outlined in section VIII and Appendix C). Mental health professionals can help clients who are considering hormone therapy to be both psychologically prepared (for example, has made a fully informed decision with clear and realistic expectations; is ready to receive the service in line with the overall treatment plan; has included family and community as appropriate) and practically prepared (for example, has been evaluated by a physician to rule out or address medical contraindications to hormone use; has considered the psychosocial implications). If clients are of childbearing age, reproductive options (section IX) should be explored before initiating hormone therapy.

It is important for mental health professionals to recognize that decisions about hormones are first and foremost the client's decisions – as are all decisions regarding healthcare. However, mental health professionals have a responsibility to encourage, guide, and assist clients with making fully informed decisions and becoming adequately prepared. To best support their clients' decisions, mental health professionals need to have functioning working relationships with their clients and sufficient information about them. Clients should receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services.

Zzyym v. Tillerson – AR 0674

The Standards of Care
7TH VERSION

## Referral for feminizing/masculinizing hormone therapy

People may approach a specialized provider in any discipline to pursue feminizing/masculinizing hormone therapy. However, transgender health care is an interdisciplinary field, and coordination of care and referral among a client's overall care team is recommended.

Hormone therapy can be initiated with a referral from a qualified mental health professional. Alternatively, a health professional who is appropriately trained in behavioral health and competent in the assessment of gender dysphoria may assess eligibility, prepare, and refer the patient for hormone therapy, particularly in the absence of significant co-existing mental health concerns and when working in the context of a multidisciplinary specialty team. The referring health professional provides documentation – in the chart and/or referral letter – of the patient's personal and treatment history, progress, and eligibility. Health professionals who recommend hormone therapy share the ethical and legal responsibility for that decision with the physician who provides the service.

The recommended content of the referral letter for feminizing/masculinizing hormone therapy is as follows:

1. The client's general identifying characteristics;

2. Results of the client's psychosocial assessment, including any diagnoses;

3. The duration of the referring health professional's relationship with the client, including the type of evaluation and therapy or counseling to date;

4. An explanation that the criteria for hormone therapy have been met, and a brief description of the clinical rationale for supporting the client's request for hormone therapy;

5. A statement about the fact that informed consent has been obtained from the patient;

6. A statement that the referring health professional is available for coordination of care and welcomes a phone call to establish this.

For providers working within a multidisciplinary specialty team, a letter may not be necessary, rather, the assessment and recommendation can be documented in the patient's chart.

### 5. If applicable, assess eligibility, prepare, and refer for surgery

The *SOC* also provide criteria to guide decisions regarding breast/chest surgery and genital surgery (outlined in section XI and Appendix C). Mental health professionals can help clients who are considering surgery to be both psychologically prepared (for example, has made a fully informed

Zzyym v. Tillerson – AR 0675

decision with clear and realistic expectations; is ready to receive the service in line with the overall treatment plan; has included family and community as appropriate) and practically prepared (for example, has made an informed choice about a surgeon to perform the procedure; has arranged aftercare). If clients are of childbearing age, reproductive options (section IX) should be explored before undergoing genital surgery.

The *SOC* do not state criteria for other surgical procedures, such as feminizing or masculinizing facial surgery; however, mental health professionals can play an important role in helping their clients to make fully informed decisions about the timing and implications of such procedures in the context of the overall coming out or transition process.

It is important for mental health professionals to recognize that decisions about surgery are first and foremost a client's decisions – as are all decisions regarding healthcare. However, mental health professionals have a responsibility to encourage, guide, and assist clients with making fully informed decisions and becoming adequately prepared. To best support their clients' decisions, mental health professionals need to have functioning working relationships with their clients and sufficient information about them. Clients should receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services.

### Referral for surgery

Surgical treatments for gender dysphoria can be initiated with a referral (one or two, depending on the type of surgery) from a qualified mental health professional. The mental health professional provides documentation – in the chart and/or referral letter – of the patient's personal and treatment history, progress, and eligibility. Mental health professionals who recommend surgery share the ethical and legal responsibility for that decision with the surgeon.

- One referral from a qualified mental health professional is needed for breast/chest surgery (e.g., mastectomy, chest reconstruction, or augmentation mammoplasty).

- Two referrals – from qualified mental health professionals who have independently assessed the patient – are needed for genital surgery (i.e., hysterectomy/salpingo-oophorectomy, orchi-ectomy, genital reconstructive surgeries). If the first referral is from the patient's psychothera-pist, the second referral should be from a person who has only had an evaluative role with the patient. Two separate letters, or one letter signed by both (e.g., if practicing within the same clinic) may be sent. Each referral letter, however, is expected to cover the same topics in the areas outlined below.

The recommended content of the referral letters for surgery is as follows:

1. The client's general identifying characteristics;

Zzyym v. Tillerson – AR 0676

The Standards of Care
7TH VERSION

2. Results of the client's psychosocial assessment, including any diagnoses;

3. The duration of the mental health professional's relationship with the client, including the type of evaluation and therapy or counseling to date;

4. An explanation that the criteria for surgery have been met, and a brief description of the clinical rationale for supporting the patient's request for surgery;

5. A statement about the fact that informed consent has been obtained from the patient;

6. A statement that the mental health professional is available for coordination of care and welcomes a phone call to establish this.

For providers working within a multidisciplinary specialty team, a letter may not be necessary, rather, the assessment and recommendation can be documented in the patient's chart.

### Relationship of Mental Health Professionals with Hormone-Prescribing Physicians, Surgeons, and other Health Professionals

It is ideal for mental health professionals to perform their work and periodically discuss progress and obtain peer consultation from other professionals (both in mental health care and other health disciplines) who are competent in the assessment and treatment of gender dysphoria. The relationship among professionals involved in a client's health care should remain collaborative, with coordination and clinical dialogue taking place as needed. Open and consistent communication may be necessary for consultation, referral, and management of postoperative concerns.

## Tasks Related to Psychotherapy

### 1. Psychotherapy is not an absolute requirement for hormone therapy and surgery

A mental health screening and/or assessment as outlined above is needed for referral to hormonal and surgical treatments for gender dysphoria. In contrast, psychotherapy – although highly recommended – is not a requirement.

The SOC do not recommend a minimum number of psychotherapy sessions prior to hormone therapy or surgery. The reasons for this are multifaceted (Lev, 2009). First, a minimum number of sessions tends to be construed as a hurdle, which discourages the genuine opportunity for personal growth. Second, mental health professionals can offer important support to clients throughout all

Zzyym v. Tillerson – AR 0677

phases of exploration of gender identity, gender expression, and possible transition – not just prior to any possible medical interventions. Third, clients differ in their abilities to attain similar goals in a specified time period.

## 2. Goals of psychotherapy for adults with gender concerns

The general goal of psychotherapy is to find ways to maximize a person's overall psychological well-being, quality of life, and self-fulfillment. Psychotherapy is not intended to alter a person's gender identity; rather, psychotherapy can help an individual to explore gender concerns and find ways to alleviate gender dysphoria, if present (Bockting et al., 2006; Bockting & Coleman, 2007; Fraser, 2009a; Lev, 2004). Typically, the overarching treatment goal is to help transsexual, transgender, and gender nonconforming individuals achieve long-term comfort in their gender identity expression, with realistic chances for success in their relationships, education, and work. For additional details, see Fraser (Fraser, 2009c).

Therapy may consist of individual, couple, family, or group psychotherapy, the latter being particularly important to foster peer support.

## 3. Psychotherapy for transsexual, transgender, and gender nonconforming clients, including counseling and support for changes in gender role

Finding a comfortable gender role is, first and foremost, a psychosocial process. Psychotherapy can be invaluable in assisting transsexual, transgender, and gender nonconforming individuals with all of the following: (i) clarifying and exploring gender identity and role, (ii) addressing the impact of stigma and minority stress on one's mental health and human development, and (iii) facilitating a coming out process (Bockting & Coleman, 2007; Devor, 2004; Lev, 2004), which for some individuals may include changes in gender role expression and the use of feminizing/masculinizing medical interventions.

Mental health professionals can provide support and promote interpersonal skills and resilience in individuals and their families as they navigate a world that often is ill prepared to accommodate and respect transgender, transsexual, and gender nonconforming people. Psychotherapy can also aid in alleviating any co-existing mental health concerns (e.g., anxiety, depression) identified during screening and assessment.

For transsexual, transgender, and gender nonconforming individuals who plan to change gender roles permanently and make a social gender role transition, mental health professionals can facilitate the development of an individualized plan with specific goals and timelines. While the experience of changing one's gender role differs from person to person, the social aspects of the experience are usually challenging – often more so than the physical aspects. Because changing

Zzyym v. Tillerson – AR 0678

The Standards of Care
7TH VERSION

gender role can have profound personal and social consequences, the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role.

Many transsexual, transgender, and gender nonconforming people will present for care without ever having been related to or accepted in the gender role that is most congruent with their gender identity. Mental health professionals can help these clients to explore and anticipate the implications of changes in gender role, and to pace the process of implementing these changes. Psychotherapy can provide a space for clients to begin to express themselves in ways that are congruent with their gender identity and, for some clients, overcome fear about changes in gender expression. Calculated risks can be taken outside of therapy to gain experience and build confidence in the new role. Assistance with coming out to family and community (friends, school, workplace) can be provided.

Other transsexual, transgender, and gender nonconforming individuals will present for care already having acquired experience (minimal, moderate, or extensive) living in a gender role that differs from that associated with their birth-assigned sex. Mental health professionals can help these clients to identify and work through potential challenges and foster optimal adjustment as they continue to express changes in their gender role.

### 4. Family therapy or support for family members

Decisions about changes in gender role and medical interventions for gender dysphoria have implications for not only clients, but also their families (Emerson & Rosenfeld, 1996; Fraser, 2009a; Lev, 2004). Mental health professionals can assist clients with making thoughtful decisions about communicating with family members and others about their gender identity and treatment decisions. Family therapy may include work with spouses or partners, as well as with children and other members of a client's extended family.

Clients may also request assistance with their relationships and sexual health. For example, they may want to explore their sexuality and intimacy related concerns.

Family therapy might be offered as part of the client's individual therapy and, if clinically appropriate, by the same provider. Alternatively, referrals can be made to other therapists with relevant expertise to work with family members, or to sources of peer support (e.g., online or offline support networks of partners or families).

World Professional Association for Transgender Health

Zzyym v. Tillerson – AR 0679

### 5. Follow-up care throughout life

Mental health professionals may work with clients and their families at many stages of their lives. Psychotherapy may be helpful at different times and for various issues throughout the life cycle.

### 6. Etherapy, online counseling, or distance counseling

Online or etherapy has been shown to be particularly useful for people who have difficulty accessing competent psychotherapeutic treatment and who may experience isolation and stigma (Derrig-Palumbo & Zeine, 2005; Fenichel et al., 2004; Fraser, 2009b). By extrapolation, etherapy may be a useful modality for psychotherapy with transsexual, transgender, and gender nonconforming people. Etherapy offers opportunities for potentially enhanced, expanded, creative, and tailored delivery of services; however, as a developing modality it may also carry unexpected risk. Telemedicine guidelines are clear in some disciplines in some parts of the United States (Fraser, 2009b; Maheu, Pulier, Wilhelm, McMenamin, & Brown-Connolly, 2005) but not all; the international situation is even less defined (Maheu et al., 2005). Until sufficient evidence-based data on this use of etherapy is available, caution in its use is advised.

Mental health professionals engaging in etherapy are advised to stay current with their particular licensing board, professional association, and country's regulations, as well as the most recent literature pertaining to this rapidly evolving medium. A more thorough description of the potential uses, processes, and ethical concerns related to etherapy has been published (Fraser, 2009b).

## Other Tasks of the Mental Health Professional

### 1. Educate and advocate on behalf of clients within their community (schools, workplaces, other organizations) and assist clients with making changes in identity documents

Transsexual, transgender, and gender nonconforming people may face challenges in their professional, educational, and other types of settings as they actualize their gender identity and expression (Lev, 2004, 2009). Mental health professionals can play an important role by educating people in these settings regarding gender nonconformity and by advocating on behalf of their clients (Currah, Juang, & Minter, 2006)(Currah & Minter, 2000). This role may involve consultation with school counselors, teachers, and administrators, human resources staff, personnel managers and employers, and representatives from other organizations and institutions. In addition, health providers may be called upon to support changes in a client's name and/or gender marker on identity documents such as passports, driver's licenses, birth certificates, and diplomas.

Zzyym v. Tillerson - AR 0680

The Standards of Care
7TH VERSION

### 2. Provide information and referral for peer support

For some transsexual, transgender, and gender nonconforming people, an experience in peer support groups may be more instructive regarding options for gender expression than anything individual psychotherapy could offer (Rachlin, 2002). Both experiences are potentially valuable, and all people exploring gender issues should be encouraged to participate in community activities, if possible. Resources for peer support and information should be made available.

## Culture and its Ramifications for Assessment and Psychotherapy

Health professionals work in enormously different environments across the world. Forms of distress that cause people to seek professional assistance in any culture are understood and classified by people in terms that are products of their own cultures (Frank & Frank, 1993). Cultural settings also largely determine how such conditions are understood by mental health professionals. Cultural differences related to gender identity and expression can affect patients, mental health professionals, and accepted psychotherapy practice. WPATH recognizes that the *SOC* have grown out of a Western tradition and may need to be adapted depending on the cultural context.

## Ethical Guidelines Related to Mental Health Care

Mental health professionals need to be certified or licensed to practice in a given country according to that country's professional regulations (Fraser, 2009b; Pope & Vasquez, 2011). Professionals must adhere to the ethical codes of their professional licensing or certifying organizations in all of their work with transsexual, transgender, and gender nonconforming clients.

Treatment aimed at trying to change a person's gender identity and lived gender expression to become more congruent with sex assigned at birth has been attempted in the past (Gelder & Marks, 1969; Greenson, 1964), yet without success, particularly in the long term (Cohen-Kettenis & Kuiper, 1984; Pauly, 1965). Such treatment is no longer considered ethical.

If mental health professionals are uncomfortable with or inexperienced in working with transsexual, transgender, and gender nonconforming individuals and their families, they should refer clients to a competent provider or, at minimum, consult with an expert peer. If no local practitioners are available, consultation may be done via telehealth methods, assuming local requirements for distance consultation are met.

Zzyym v. Tillerson – AR 0681

The Standards of Care
7TH VERSION

## Issues of Access to Care

Qualified mental health professionals are not universally available; thus, access to quality care might be limited. WPATH aims to improve access and provides regular continuing education opportunities to train professionals from various disciplines to provide quality, transgender-specific health care. Providing mental health care from a distance through the use of technology may be one way to improve access (Fraser, 2009b).

In many places around the world, access to health care for transsexual, transgender, and gender nonconforming people is also limited by a lack of health insurance or other means to pay for needed care. WPATH urges health insurance companies and other third-party payers to cover the medically necessary treatment to alleviate gender dysphoria (American Medical Association, 2008; Anton, 2009; The World Professional Association for Transgender Health, 2008).

When faced with a client who is unable to access services, referral to available peer support resources (offline and online) is recommended. Finally, harm reduction approaches might be indicated to assist clients with making healthy decisions to improve their lives.



# VIII
# Hormone Therapy

### Medical Necessity of Hormone Therapy

Feminizing/masculinizing hormone therapy – the administration of exogenous endocrine agents to induce feminizing or masculinizing changes – is a medically necessary intervention for many transsexual, transgender, and gender nonconforming individuals with gender dysphoria (Newfield, Hart, Dibble, & Kohler, 2006; Pfäfflin & Junge, 1998). Some people seek maximum feminization/masculinization, while others experience relief with an androgynous presentation resulting from hormonal minimization of existing secondary sex characteristics (Factor & Rothblum, 2008). Evidence for the psychosocial outcomes of hormone therapy is summarized in Appendix D.

Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications, the presence of other medical conditions, and consideration of social and economic issues. Hormone therapy can provide significant comfort to patients who do not wish to make a social gender role transition or undergo surgery, or who are unable to do so (Meyer III, 2009).

Zzyym v. Tillerson – AR 0682

The Standards of Care
7TH VERSION

Hormone therapy is a recommended criterion for some, but not all, surgical treatments for gender dysphoria (see section XI and Appendix C).

**Criteria for Hormone Therapy**

Initiation of hormone therapy may be undertaken after a psychosocial assessment has been conducted and informed consent has been obtained by a qualified health professional, as outlined in section VII of the *SOC*. A referral is required from the mental health professional who performed the assessment, unless the assessment was done by a hormone provider who is also qualified in this area.

The criteria for hormone therapy are as follows:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *Standards of Care* outlined in section VI);

4. If significant medical or mental health concerns are present, they must be reasonably well-controlled.

As noted in section VII of the *SOC*, the presence of co-existing mental health concerns does not necessarily preclude access to feminizing/masculinizing hormones; rather, these concerns need to be managed prior to or concurrent with treatment of gender dysphoria.

In selected circumstances, it can be acceptable practice to provide hormones to patients who have not fulfilled these criteria. Examples include facilitating the provision of monitored therapy using hormones of known quality as an alternative to illicit or unsupervised hormone use or to patients who have already established themselves in their affirmed gender and who have a history of prior hormone use. It is unethical to deny availability or eligibility for hormone therapy solely on the basis of blood seropositivity for blood-borne infections such as HIV or hepatitis B or C.

In rare cases, hormone therapy may be contraindicated due to serious individual health conditions. Health professionals should assist these patients with accessing non-hormonal interventions for gender dysphoria. A qualified mental health professional familiar with the patient is an excellent resource in these circumstances.

Zzyym v. Tillerson - AR 0683

**Informed Consent**

Feminizing/masculinizing hormone therapy may lead to irreversible physical changes. Thus, hormone therapy should be provided only to those who are legally able to provide informed consent. This includes people who have been declared by a court to be emancipated minors, incarcerated people, and cognitively impaired people who are considered competent to participate in their medical decisions (see also Bockting et al., 2006). Providers should document in the medical record that comprehensive information has been provided and understood about all relevant aspects of the hormone therapy, including both possible benefits and risks and the impact on reproductive capacity.

**Relationship between the Standards of Care and Informed Consent Model Protocols**

A number of community health centers in the United States have developed protocols for providing hormone therapy based on an approach that has become known as the Informed Consent Model (Callen Lorde Community Health Center, 2000, 2011; Fenway Community Health Transgender Health Program, 2007; Tom Waddell Health Center, 2006). These protocols are consistent with the guidelines presented in the WPATH *Standards of Care, Version 7*. The *SOC* are flexible clinical guidelines; they allow for tailoring of interventions to the needs of the individual receiving services and for tailoring of protocols to the approach and setting in which these services are provided (Ehrbar & Gorton, 2010).

Obtaining informed consent for hormone therapy is an important task of providers to ensure that patients understand the psychological and physical benefits and risks of hormone therapy, as well as its psychosocial implications. Providers prescribing the hormones or health professionals recommending the hormones should have the knowledge and experience to assess gender dysphoria. They should inform individuals of the particular benefits, limitations, and risks of hormones, given the patient's age, previous experience with hormones, and concurrent physical or mental health concerns.

Screening for and addressing acute or current mental health concerns is an important part of the informed consent process. This may be done by a mental health professional or by an appropriately trained prescribing provider (see section VII of the *SOC*). The same provider or another appropriately trained member of the health care team (e.g., a nurse) can address the psychosocial implications of taking hormones when necessary (e.g., the impact of masculinization/feminization on how one is perceived and its potential impact on relationships with family, friends, and coworkers). If indicated, these providers will make referrals for psychotherapy and for the assessment and treatment of co-existing mental health concerns such as anxiety or depression.

Zzyym v. Tillerson – AR 0684

The Standards of Care
7TH VERSION

The difference between the Informed Consent Model and *SOC, Version 7* is that the *SOC* puts greater emphasis on the important role that mental health professionals can play in alleviating gender dysphoria and facilitating changes in gender role and psychosocial adjustment. This may include a comprehensive mental health assessment and psychotherapy, when indicated. In the Informed Consent Model, the focus is on obtaining informed consent as the threshold for the initiation of hormone therapy in a multidisciplinary, harm-reduction environment. Less emphasis is placed on the provision of mental health care until the patient requests it, unless significant mental health concerns are identified that would need to be addressed before hormone prescription.

## Physical Effects of Hormone Therapy

Feminizing/masculinizing hormone therapy will induce physical changes that are more congruent with a patient's gender identity.

- In FtM patients, the following physical changes are expected to occur: deepened voice, clitoral enlargement (variable), growth in facial and body hair, cessation of menses, atrophy of breast tissue, increased libido, and decreased percentage of body fat compared to muscle mass.

- In MtF patients, the following physical changes are expected to occur: breast growth (variable), decreased libido and erections, decreased testicular size, and increased percentage of body fact compared to muscle mass.

Most physical changes, whether feminizing or masculinizing, occur over the course of two years. The amount of physical change and the exact timeline of effects can be highly variable. Tables 1a and 1b outline the approximate time course of these physical changes.

Zzyym v. Tillerson – AR 0685

**TABLE 1A: EFFECTS AND EXPECTED TIME COURSE OF MASCULINIZING HORMONES [A]**

| Effect | Expected Onset[B] | Expected Maximum Effect[B] |
|---|---|---|
| Skin oiliness/acne | 1-6 months | 1-2 years |
| Facial/body hair growth | 3-6 months | 3-5 years |
| Scalp hair loss | >12 months[C] | variable |
| Increased muscle mass/strength | 6-12 months | 2-5 years[D] |
| Body fat redistribution | 3-6 months | 2-5 years |
| Cessation of menses | 2-6 months | n/a |
| Clitoral enlargement | 3-6 months | 1-2 years |
| Vaginal atrophy | 3-6 months | 1-2 years |
| Deepened voice | 3-12 months | 1-2 years |

[A] Adapted with permission from Hembree et al.(2009). *Copyright 2009, The Endocrine Society.*
[B] Estimates represent published and unpublished clinical observations.
[C] Highly dependent on age and inheritance; may be minimal.
[D] Significantly dependent on amount of exercise.

Zzyym v. Tillerson – AR 0686

The Standards of Care
7TH VERSION

**TABLE 1B: EFFECTS AND EXPECTED TIME COURSE OF FEMINIZING HORMONES [A]**

| Effect | Expected Onset[B] | Expected Maximum Effect[B] |
|---|---|---|
| Body fat redistribution | 3-6 months | 2-5 years |
| Decreased muscle mass/strength | 3-6 months | 1-2 years[C] |
| Softening of skin/decreased oiliness | 3-6 months | unknown |
| Decreased libido | 1-3 months | 1-2 years |
| Decreased spontaneous erections | 1-3 months | 3-6 months |
| Male sexual dysfunction | variable | variable |
| Breast growth | 3-6 months | 2-3 years |
| Decreased testicular volume | 3-6 months | 2-3 years |
| Decreased sperm production | variable | variable |
| Thinning and slowed growth of body and facial hair | 6-12 months | > 3 years[D] |
| Male pattern baldness | No regrowth, loss stops 1-3 months | 1-2 years |

[A]  Adapted with permission from Hembree et al. (2009). *Copyright 2009, The Endocrine Society.*
[B]  Estimates represent published and unpublished clinical observations.
[C]  Significantly dependent on amount of exercise.
[D]  Complete removal of male facial and body hair requires electrolysis, laser treatment, or both.

The degree and rate of physical effects depends in part on the dose, route of administration, and medications used, which are selected in accordance with a patient's specific medical goals (e.g., changes in gender role expression, plans for sex reassignment) and medical risk profile. There is no current evidence that response to hormone therapy – with the possible exception of voice deepening in FtM persons – can be reliably predicted based on age, body habitus, ethnicity, or family appearance. All other factors being equal, there is no evidence to suggest that any medically approved type or method of administering hormones is more effective than any other in producing the desired physical changes.

World Professional Association for Transgender Health

Zzyym v. Tillerson – AR 0687

## Risks of Hormone Therapy

All medical interventions carry risks. The likelihood of a serious adverse event is dependent on numerous factors: the medication itself, dose, route of administration, and a patient's clinical characteristics (age, co-morbidities, family history, health habits). It is thus impossible to predict whether a given adverse effect will happen in an individual patient.

The risks associated with feminizing/masculinizing hormone therapy for the transsexual, transgender, and gender nonconforming population as a whole are summarized in Table 2. Based on the level of evidence, risks are categorized as follows: (i) likely increased risk with hormone therapy, (ii) possibly increased risk with hormone therapy, or (iii) inconclusive or no increased risk. Items in the last category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

Additional detail about these risks can be found in Appendix B, which is based on two comprehensive, evidence-based literature reviews of masculinizing/feminizing hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009), along with a large cohort study (Asscheman et al., 2011). These reviews can serve as detailed references for providers, along with other widely recognized, published clinical materials (Dahl, Feldman, Goldberg, & Jaberi, 2006; Ettner, Monstrey, & Eyler, 2007).

Zzyym v. Tillerson - AR 0688

The Standards of Care
7TH VERSION

TABLE 2: RISKS ASSOCIATED WITH HORMONE THERAPY. BOLDED ITEMS ARE CLINICALLY SIGNIFICANT

| Risk Level | Feminizing hormones | Masculinizing hormones |
|---|---|---|
| Likely increased risk | Venous thromboembolic disease[A] <br><br> Gallstones <br><br> Elevated liver enzymes <br><br> Weight gain <br><br> **Hypertriglyceridemia** | Polycythemia <br><br> Weight gain <br><br> Acne <br><br> Androgenic alopecia (balding) <br><br> Sleep apnea |
| Likely increased risk with presence of additional risk factors[B] | Cardiovascular disease | |
| Possible increased risk | **Hypertension** <br><br> Hyperprolactinemia or prolactinom[A] | Elevated liver enzymes <br><br> **Hyperlipidemia** |
| Possible increased risk with presence of additional risk factors[B] | Type 2 diabetes[A] | **Destabilization of certain psychiatric disorders**[C] <br><br> **Cardiovascular disease** <br><br> **Hypertension** <br><br> Type 2 diabetes |
| No increased risk or inconclusive | **Breast cancer** | Loss of bone density <br><br> **Breast cancer** <br><br> Cervical cancer <br><br> Ovarian cancer <br><br> Uterine cancer |

[A]  Risk is greater with oral estrogen administration than with transdermal estrogen administration.

[B]  Additional risk factors include age.

[C]  Includes bipolar, schizoaffective, and other disorders that may include manic or psychotic symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone.

Zzyym v. Tillerson - AR 0689

## Competency of Hormone-Prescribing Physicians, Relationship with Other Health Professionals

Feminizing/masculinizing hormone therapy is best undertaken in the context of a complete approach to health care that includes comprehensive primary care and a coordinated approach to psychosocial issues (Feldman & Safer, 2009). While psychotherapy or ongoing counseling is not required for the initiation of hormone therapy, if a therapist is involved, then regular communication among health professionals is advised (with the patient's consent) to ensure that the transition process is going well, both physically and psychosocially.

With appropriate training, feminizing/masculinizing hormone therapy can be managed by a variety of providers, including nurse practitioners and primary care physicians (Dahl et al., 2006). Medical visits relating to hormone maintenance provide an opportunity to deliver broader care to a population that is often medically underserved (Clements, Wilkinson, Kitano, & Marx, 1999; Feldman, 2007; Xavier, 2000). Many of the screening tasks and management of co-morbidities associated with long-term hormone use, such as cardiovascular risk factors and cancer screening, fall more uniformly within the scope of primary care rather than specialist care (American Academy of Family Physicians, 2005; Eyler, 2007; World Health Organization, 2008), particularly in locations where dedicated gender teams or specialized physicians are not available.

Given the multidisciplinary needs of transsexual, transgender, and gender nonconforming people seeking hormone therapy, as well as the difficulties associated with fragmentation of care in general (World Health Organization, 2008), WPATH strongly encourages the increased training and involvement of primary care providers in the area of feminizing/masculinizing hormone therapy. If hormones are prescribed by a specialist, there should be close communication with the patient's primary care provider. Conversely, an experienced hormone provider or endocrinologist should be involved if the primary care physician has no experience with this type of hormone therapy, or if the patient has a pre-existing metabolic or endocrine disorder that could be affected by endocrine therapy.

While formal training programs in transgender medicine do not yet exist, hormone providers have a responsibility to obtain appropriate knowledge and experience in this field. Clinicians can increase their experience and comfort in providing feminizing/masculinizing hormone therapy by co-managing care or consulting with a more experienced provider, or by providing more limited types of hormone therapy before progressing to initiation of hormone therapy. Because this field of medicine is evolving, clinicians should become familiar and keep current with the medical literature, and discuss emerging issues with colleagues. Such discussions might occur through networks established by WPATH and other national/local organizations.

Zzyym v. Tillerson – AR 0690

The Standards of Care
7TH VERSION

## Responsibilities of Hormone-Prescribing Physicians

In general, clinicians who prescribe hormone therapy should engage in the following tasks:

1. Perform an initial evaluation that includes discussion of a patient's physical transition goals, health history, physical examination, risk assessment, and relevant laboratory tests.

2. Discuss with patients the expected effects of feminizing/masculinizing medications and the possible adverse health effects. These effects can include a reduction in fertility (Feldman & Safer, 2009; Hembree et al., 2009). Therefore, reproductive options should be discussed with patients before starting hormone therapy (see section IX).

3. Confirm that patients have the capacity to understand the risks and benefits of treatment and are capable of making an informed decision about medical care.

4. Provide ongoing medical monitoring, including regular physical and laboratory examination to monitor hormone effectiveness and side effects.

5. Communicate as needed with a patient's primary care provider, mental health professional, and surgeon.

6. If needed, provide patients with a brief written statement indicating that they are under medical supervision and care that includes feminizing/masculinizing hormone therapy. Particularly during the early phases of hormone treatment, a patient may wish to carry this statement at all times to help prevent difficulties with the police and other authorities.

Depending on the clinical situation for providing hormones (see below), some of these responsibilities are less relevant. Thus, the degree of counseling, physical examinations, and laboratory evaluations should be individualized to a patient's needs.

## Clinical Situations for Hormone Therapy

There are circumstances in which clinicians may be called upon to provide hormones without necessarily initiating or maintaining long-term feminizing/masculinizing hormone therapy. By acknowledging these different clinical situations (see below, from least to highest level of complexity), it may be possible to involve clinicians in feminizing/masculinizing hormone therapy who might not otherwise feel able to offer this treatment.

World Professional Association for Transgender Health

Zzyym v. Tillerson – AR 0691

### 1. Bridging

Whether prescribed by another clinician or obtained through other means (e.g., purchased over the internet), patients may present for care already on hormone therapy. Clinicians can provide a limited (1-6 month) prescription for hormones while helping patients find a provider who can prescribe long-term hormone therapy. Providers should assess a patient's current regimen for safety and drug interactions and substitute safer medications or doses when indicated (Dahl et al., 2006; Feldman & Safer, 2009). If hormones were previously prescribed, medical records should be requested (with the patient's permission) to obtain the results of baseline examinations and laboratory tests and any adverse events. Hormone providers should also communicate with any mental health professional who is currently involved in a patient's care. If a patient has never had a psychosocial assessment as recommended by the *SOC* (see section VII), clinicians should refer the patient to a qualified mental health professional if appropriate and feasible (Feldman & Safer, 2009). Providers who prescribe bridging hormones need to work with patients to establish limits as to the duration of bridging therapy.

### 2. Hormone therapy following gonad removal

Hormone replacement with estrogen or testosterone is usually continued lifelong after an oophorectomy or orchiectomy, unless medical contraindications arise. Because hormone doses are often decreased after these surgeries (Basson, 2001; Levy, Crown, & Reid, 2003; Moore, Wisniewski, & Dobs, 2003) and only adjusted for age and co-morbid health concerns, hormone management in this situation is quite similar to hormone replacement in any hypogonadal patient.

### 3. Hormone maintenance prior to gonad removal

Once patients have achieved maximal feminizing/masculinizing benefits from hormones (typically two or more years), they remain on a maintenance dose. The maintenance dose is then adjusted for changes in health conditions, aging, or other considerations such as lifestyle changes (Dahl et al., 2006). When a patient on maintenance hormones presents for care, the provider should assess the patient's current regimen for safety and drug interactions and substitute safer medications or doses when indicated. The patient should continue to be monitored by physical examinations and laboratory testing on a regular basis, as outlined in the literature (Feldman & Safer, 2009; Hembree et al., 2009). The dose and form of hormones should be revisited regularly with any changes in the patient's health status and available evidence on the potential long-term risks of hormones (See *Hormone Regimens,* below).

Zzyym v. Tillerson - AR 0692

The Standards of Care
7TH VERSION

### 4. Initiating hormonal feminization/masculinization

This clinical situation requires the greatest commitment in terms of provider time and expertise. Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications, the presence of other medical conditions, and consideration of social and economic issues. Although a wide variety of hormone regimens have been published (Dahl et al., 2006; Hembree et al., 2009; Moore et al., 2003), there are no published reports of randomized clinical trials comparing safety and efficacy. Despite this variation, a reasonable framework for initial risk assessment and ongoing monitoring of hormone therapy can be constructed, based on the efficacy and safety evidence presented above.

## Risk Assessment and Modification for Initiating Hormone Therapy

The initial evaluation for hormone therapy assesses a patient's clinical goals and risk factors for hormone-related adverse events. During the risk assessment, the patient and clinician should develop a plan for reducing risks wherever possible, either prior to initiating therapy or as part of ongoing harm reduction.

All assessments should include a thorough physical exam, including weight, height, and blood pressure. The need for breast, genital, and rectal exams, which are sensitive issues for most transsexual, transgender, and gender nonconforming patients, should be based on individual risks and preventive health care needs (Feldman & Goldberg, 2006; Feldman, 2007).

### Preventive care

Hormone providers should address preventive health care with patients, particularly if a patient does not have a primary care provider. Depending on a patient's age and risk profile, there may be appropriate screening tests or exams for conditions affected by hormone therapy. Ideally, these screening tests should be carried out prior to the start of hormone therapy.

### Risk assessment and modification for feminizing hormone therapy (MtF)

There are no absolute contraindications to feminizing therapy *per se*, but absolute contraindications exist for the different feminizing agents, particularly estrogen. These include previous venous thrombotic events related to an underlying hypercoagulable condition, history of estrogen-sensitive neoplasm, and end-stage chronic liver disease (Gharib et al., 2005).

Zzyym v. Tillerson – AR 0693

Other medical conditions, as noted in Table 2 and Appendix B, can be exacerbated by estrogen or androgen blockade, and therefore should be evaluated and reasonably well controlled prior to starting hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009). Clinicians should particularly attend to tobacco use, as it is associated with increased risk of venous thrombosis, which is further increased with estrogen use. Consultation with a cardiologist may be advisable for patients with known cardio- or cerebrovascular disease.

Baseline laboratory values are important to both assess initial risk and evaluate possible future adverse events. Initial labs should be based on the risks of feminizing hormone therapy outlined in Table 2, as well as individual patient risk factors, including family history. Suggested initial lab panels have been published (Feldman & Safer, 2009; Hembree et al., 2009). These can be modified for patients or health care systems with limited resources, and in otherwise healthy patients.

### Risk assessment and modification for masculinizing hormone therapy (FtM)

Absolute contraindications to testosterone therapy include pregnancy, unstable coronary artery disease, and untreated polycythemia with a hematocrit of 55% or higher (Carnegie, 2004). Because the aromatization of testosterone to estrogen may increase risk in patients with a history of breast or other estrogen dependent cancers (Moore et al., 2003), consultation with an oncologist may be indicated prior to hormone use. Co-morbid conditions likely to be exacerbated by testosterone use should be evaluated and treated, ideally prior to starting hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009). Consultation with a cardiologist may be advisable for patients with known cardio- or cerebrovascular disease.

An increased prevalence of polycystic ovarian syndrome (PCOS) has been noted among FtM patients even in the absence of testosterone use (Baba et al., 2007; Balen, Schachter, Montgomery, Reid, & Jacobs, 1993; Bosinski et al., 1997). While there is no evidence that PCOS is related to the development of a transsexual, transgender, or gender nonconforming identity, PCOS is associated with increased risk of diabetes, cardiac disease, high blood pressure, and ovarian and endometrial cancers (Cattrall & Healy, 2004). Signs and symptoms of PCOS should be evaluated prior to initiating testosterone therapy, as testosterone may affect many of these conditions. Testosterone can affect the developing fetus (Physicians' Desk Reference, 2011), and patients at risk of becoming pregnant require highly effective birth control.

Baseline laboratory values are important to both assess initial risk and evaluate possible future adverse events. Initial labs should be based on the risks of masculinizing hormone therapy outlined in Table 2, as well as individual patient risk factors, including family history. Suggested initial lab panels have been published (Feldman & Safer, 2009; Hembree et al., 2009). These can be modified for patients or health care systems with limited resources, and in otherwise healthy patients.

Zzyym v. Tillerson – AR 0694

The Standards of Care
7TH VERSION

# Clinical Monitoring during Hormone Therapy for Efficacy and Adverse Events

The purpose of clinical monitoring during hormone use is to assess the degree of feminization/ masculinization and the possible presence of adverse effects of medication. However, as with the monitoring of any long-term medication, monitoring should take place in the context of comprehensive health care. Suggested clinical monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009). Patients with co-morbid medical conditions may need to be monitored more frequently. Healthy patients in geographically remote or resource-poor areas may be able to use alternative strategies, such as telehealth, or cooperation with local providers such as nurses and physician assistants. In the absence of other indications, health professionals may prioritize monitoring for those risks that are either likely to be increased by hormone therapy or possibly increased by hormone therapy but clinically serious in nature.

### Efficacy and risk monitoring during feminizing hormone therapy (MtF)

The best assessment of hormone efficacy is clinical response: Is a patient developing a feminized body while minimizing masculine characteristics, consistent with that patient's gender goals? In order to more rapidly predict the hormone dosages that will achieve clinical response, one can measure testosterone levels for suppression below the upper limit of the normal female range, and estradiol levels within a premenopausal female range but well below supraphysiologic levels (Feldman & Safer, 2009; Hembree et al., 2009).

Monitoring for adverse events should include both clinical and laboratory evaluation. Follow-up should include careful assessment for signs of cardiovascular impairment and venous thromboembolism (VTE) through measurement of blood pressure, weight, and pulse; heart and lung exams; and examination of the extremities for peripheral edema, localized swelling, or pain (Feldman & Safer, 2009). Laboratory monitoring should be based on the risks of hormone therapy described above, a patient's individual co-morbidities and risk factors, and the specific hormone regimen itself. Specific lab monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009).

### Efficacy and risk monitoring during masculinizing hormone therapy (FtM)

The best assessment of hormone efficacy is clinical response: Is a patient developing a masculinized body while minimizing feminine characteristics, consistent with that patient's gender goals? Clinicians can achieve a good clinical response with the least likelihood of adverse events by maintaining testosterone levels within the normal male range while avoiding supraphysiological

46

Zzyym v. Tillerson – AR 0695

levels (Dahl et al., 2006; Hembree et al., 2009). For patients using intramuscular (IM) testosterone cypionate or enanthate, some clinicians check trough levels while others prefer midcycle levels (Dahl et al., 2006; Hembree et al., 2009; Tangpricha, Turner, Malabanan, & Holick, 2001; Tangpricha, Ducharme, Barber, & Chipkin, 2003).

Monitoring for adverse events should include both clinical and laboratory evaluation. Follow-up should include careful assessment for signs and symptoms of excessive weight gain, acne, uterine break-through bleeding, and cardiovascular impairment, as well as psychiatric symptoms in at-risk patients. Physical examinations should include measurement of pressure, weight, pulse, and skin; and heart and lung exams (Feldman & Safer, 2009). Laboratory monitoring should be based on the risks of hormone therapy described above, a patient's individual co-morbidities and risk factors, and the specific hormone regimen itself. Specific lab monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009).

## Hormone Regimens

To date, no controlled clinical trials of any feminizing/masculinizing hormone regimen have been conducted to evaluate safety or efficacy in producing physical transition. As a result, wide variation in doses and types of hormones have been published in the medical literature (Moore et al., 2003; Tangpricha et al., 2003; van Kesteren, Asscheman, Megens, & Gooren, 1997). In addition, access to particular medications may be limited by a patient's geographical location and/ or social or econonomic situations. For these reasons, WPATH does not describe or endorse a particular feminizing/masculinizing hormone regimen. Rather, the medication classes and routes of administration used in most published regimens are broadly reviewed.

As outlined above, there are demonstrated safety differences in individual elements of various regimens. The Endocrine Society Guidelines (Hembree et al., 2009) and Feldman and Safer (2009) provide specific guidance regarding the types of hormones and suggested dosing to maintain levels within physiologic ranges for a patient's desired gender expression (based on goals of full feminization/masculinization). It is strongly recommend that hormone providers regularly review the literature for new information and use those medications that safely meet individual patient needs with available local resources.

Zzyym v. Tillerson – AR 0696