The Standards of Care
7TH VERSION

**Regimens for feminizing hormone therapy (MtF)**

Estrogen

Use of oral estrogen, and specifically ethinyl estradiol, appears to increase the risk of VTE. Because of this safety concern, ethinyl estradiol is not recommended for feminizing hormone therapy. Transdermal estrogen is recommended for those patients with risks factors for VTE. The risk of adverse events increases with higher doses, particular those resulting in supraphysiologic levels (Hembree et al., 2009). Patients with co-morbid conditions that can be affected by estrogen should avoid oral estrogen if possible and be started at lower levels. Some patients may not be able to safely use the levels of estrogen needed to get the desired results. This possibility needs to be discussed with patients well in advance of starting hormone therapy.

Androgen reducing medications ("anti-androgens")

A combination of estrogen and "anti-androgens" is the most commonly studied regimen for feminization. Androgen reducing medications, from a variety of classes of drugs, have the effect of reducing either endogenous testosterone levels or testosterone activity, and thus diminishing masculine characteristics such as body hair. They minimize the dosage of estrogen needed to suppress testosterone, thereby reducing the risks associated with high-dose exogenous estrogen (Prior, Vigna, Watson, Diewold, & Robinow, 1986; Prior, Vigna, & Watson, 1989).

Common anti-androgens include the following:

- Spironolactone, an antihypertensive agent, directly inhibits testosterone secretion and androgen binding to the androgen receptor. Blood pressure and electrolytes need to be monitored because of the potential for hyperkalemia.

- Cyproterone acetate is a progestational compound with anti-androgenic properties. This medication is not approved in the United States because of concerns over potential hepatotoxicity, but it is widely used elsewhere (De Cuypere et al., 2005).

- GnRH agonists (e.g., goserelin, buserelin, triptorelin) are neurohormones that block the gonadotropin releasing hormone receptor, thus blocking the release of follicle stimulating hormone and luteinizing hormone. This leads to highly effective gonadal blockade. However, these medications are expensive and only available as injectables or implants.

- 5-alpha reductase inhibitors (finasteride and dutasteride) block the conversion of testosterone to the more active agent, 5-alpha-dihydrotestosterone. These medications have beneficial effects on scalp hair loss, body hair growth, sebaceous glands, and skin consistency.

Zzyym v. Tillerson — AR 0697

Cyproterone and spironolactone are the most commonly used anti-androgens and are likely the most cost-effective.

## Progestins

With the exception of cyproterone, the inclusion of progestins in feminizing hormone therapy is controversial (Oriel, 2000). Because progestins play a role in mammary development on a cellular level, some clinicians believe that these agents are necessary for full breast development (Basson & Prior, 1998; Oriel, 2000). However, a clinical comparison of feminization regimens with and without progestins found that the addition of progestins neither enhanced breast growth nor lowered serum levels of free testosterone (Meyer III et al., 1986). There are concerns regarding potential adverse effects of progestins, including depression, weight gain, and lipid changes (Meyer III et al., 1986; Tangpricha et al., 2003). Progestins (especially medroxyprogesterone) are also suspected to increase breast cancer risk and cardiovascular risk in women (Rossouw et al., 2002). Micronized progesterone may be better tolerated and have a more favorable impact on the lipid profile than medroxyprogesterone does (de Lignières, 1999; Fitzpatrick, Pace, & Wiita, 2000).

### Regimens for masculinizing hormone therapy (FtM)

## Testosterone

Testosterone generally can be given orally, transdermally, or parenterally (IM), although buccal and implantable preparations are also available. Oral testosterone undecenoate, available outside the United States, results in lower serum testosterone levels than non-oral preparations and has limited efficacy in suppressing menses (Feldman, 2005, April; Moore et al., 2003). Because intramuscular testosterone cypionate or enanthate are often administered every 2-4 weeks, some patients may notice cyclic variation in effects (e.g., fatigue and irritability at the end of the injection cycle, aggression or expansive mood at the beginning of the injection cycle), as well as more time outside the normal physiologic levels (Jockenhövel, 2004). This may be mitigated by using a lower but more frequent dosage schedule or by using a daily transdermal preparation (Dobs et al., 1999; Jockenhövel, 2004; Nieschlag et al., 2004). Intramuscular testosterone undecenoate (not currently available in the United States) maintains stable, physiologic testosterone levels over approximately 12 weeks and has been effective in both the setting of hypogonadism and in FtM individuals (Mueller, Kiesewetter, Binder, Beckmann, & Dittrich, 2007; Zitzmann, Saad, & Nieschlag, 2006). There is evidence that transdermal and intramuscular testosterone achieve similar masculinizing results, although the timeframe may be somewhat slower with transdermal preparations (Feldman, 2005, April). Especially as patients age, the goal is to use the lowest dose needed to maintain the desired clinical result, with appropriate precautions being made to maintain bone density.

Zzyym v. Tillerson – AR 0698

The Standards of Care
7TH VERSION

### Other agents

Progestins, most commonly medroxyprogesterone, can be used for a short period of time to assist with menstrual cessation early in hormone therapy. GnRH agonists can be used similarly, as well as for refractory uterine bleeding in patients without an underlying gynecological abnormality.

**Bioidentical and compounded hormones**

As discussion surrounding the use of bioidentical hormones in postmenopausal hormone replacement has heightened, interest has also increased in the use of similar compounds in feminizing/masculinizing hormone therapy. There is no evidence that custom compounded bioidentical hormones are safer or more effective than government agency-approved bioidentical hormones (Sood, Shuster, Smith, Vincent, & Jatoi, 2011). Therefore, it has been advised by the North American Menopause Society (2010) and others to assume that, whether the hormone is from a compounding pharmacy or not, if the active ingredients are similar, it should have a similar side-effect profile. WPATH concurs with this assessment.



# IX

# Reproductive Health

Many transgender, transsexual, and gender nonconforming people will want to have children. Because feminizing/masculinizing hormone therapy limits fertility (Darney, 2008; Zhang, Gu, Wang, Cui, & Bremner, 1999), it is desirable for patients to make decisions concerning fertility before starting hormone therapy or undergoing surgery to remove/alter their reproductive organs. Cases are known of people who received hormone therapy and genital surgery and later regretted their inability to parent genetically related children (De Sutter, Kira, Verschoor, & Hotimsky, 2002).

Health care professionals – including mental health professionals recommending hormone therapy or surgery, hormone-prescribing physicians, and surgeons – should discuss reproductive options with patients prior to initiation of these medical treatments for gender dysphoria. These discussions should occur even if patients are not interested in these issues at the time of treatment, which may be more common for younger patients (De Sutter, 2009). Early discussions are desirable, but not always possible. If an individual has not had complete sex reassignment surgery, it may be possible to stop hormones long enough for natal hormones to recover, allowing the production of mature

Zzyym v. Tillerson – AR 0699

gametes (Payer, Meyer III, & Walker, 1979; Van den Broecke, Van der Elst, Liu, Hovatta, & Dhont, 2001).

Besides debate and opinion papers, very few research papers have been published on the reproductive health issues of individuals receiving different medical treatments for gender dysphoria. Another group who faces the need to preserve reproductive function in light of loss or damage to their gonads are people with malignances that require removal of reproductive organs or use of damaging radiation or chemotherapy. Lessons learned from that group can be applied to people treated for gender dysphoria.

MtF patients, especially those who have not already reproduced, should be informed about sperm preservation options and encouraged to consider banking their sperm prior to hormone therapy. In a study examining testes that were exposed to high-dose estrogen (Payer et al., 1979), findings suggest that stopping estrogen may allow the testes to recover. In an article reporting on the opinions of MtF individuals towards sperm freezing (De Sutter et al., 2002), the vast majority of 121 survey respondents felt that the availability of freezing sperm should be discussed and offered by the medical world. Sperm should be collected before hormone therapy or after stopping the therapy until the sperm count rises again. Cryopreservation should be discussed even if there is poor semen quality. In adults with azoospermia, a testicular biopsy with subsequent cryopreservation of biopsied material for sperm is possible, but may not be successful.

Reproductive options for FtM patients might include oocyte (egg) or embryo freezing. The frozen gametes and embryo could later be used with a surrogate woman to carry to pregnancy. Studies of women with polycystic ovarian disease suggest that the ovary can recover in part from the effects of high testosterone levels (Hunter & Sterrett, 2000). Stopping the testosterone briefly might allow for ovaries to recover enough to make eggs; success likely depends on the patient's age and duration of testosterone treatment. While not systematically studied, some FtM individuals are doing exactly that, and some have been able to become pregnant and deliver children (More, 1998).

Patients should be advised that these techniques are not available everywhere and can be very costly. Transsexual, transgender, and gender nonconforming people should not be refused reproductive options for any reason.

A special group of individuals are prepubertal or pubertal adolescents who will never develop reproductive function in their natal sex due to blockers or cross gender hormones. At this time there is no technique for preserving function from the gonads of these individuals.

Zzyym v. Tillerson – AR 0700

The Standards of Care
7TH VERSION



# Voice and Communication Therapy

Communication, both verbal and nonverbal, is an important aspect of human behavior and gender expression. Transsexual, transgender, and gender nonconforming people might seek the assistance of a voice and communication specialist to develop vocal characteristics (e.g., pitch, intonation, resonance, speech rate, phrasing patterns) and non-verbal communication patterns (e.g., gestures, posture/movement, facial expressions) that facilitate comfort with their gender identity. Voice and communication therapy may help to alleviate gender dysphoria and be a positive and motivating step towards achieving one's goals for gender role expression.

## Competency of Voice and Communication Specialists Working with Transsexual, Transgender, and Gender Nonconforming Clients

Specialists may include speech-language pathologists, speech therapists, and speech-voice clinicians. In most countries the professional association for speech-language pathologists requires specific qualifications and credentials for membership. In some countries the government regulates practice through licensing, certification, or registration processes (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia; Vancouver Coastal Health, Vancouver, British Columbia, Canada).

The following are recommended minimum credentials for voice and communication specialists working with transsexual, transgender, and gender nonconforming clients:

1. Specialized training and competence in the assessment and development of communication skills in transsexual, transgender, and gender nonconforming clients.

2. A basic understanding of transgender health, including hormonal and surgical treatments for feminization/masculinization and trans-specific psychosocial issues as outlined in the *SOC*; and familiarity with basic sensitivity protocols such as the use of preferred gender pronoun and name (Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia).

Zzyym v. Tillerson – AR 0701

The Standards of Care
7TH VERSION

3. Continuing education in the assessment and development of communication skills in trans-sexual, transgender, and gender nonconforming clients. This may include attendance at professional meetings, workshops, or seminars; participation in research related to gender identity issues; independent study; or mentoring from an experienced, certified clinician.

Other professionals such as vocal coaches, theatre professionals, singing teachers, and movement experts may play a valuable adjunct role. Such professionals will ideally have experience working with, or be actively collaborating with, speech-language pathologists.

## Assessment and Treatment Considerations

The overall purpose of voice and communication therapy is to help clients adapt their voice and communication in a way that is both safe and authentic, resulting in communication patterns that clients feel are congruent with their gender identity and that reflect their sense of self (Adler, Hirsch, & Mordaunt, 2006). It is essential that voice and communication specialists be sensitive to individual communication preferences. Communication – style, voice, choice of language, etc. – is personal. Individuals should not be counseled to adopt behaviors with which they are not comfortable or which do not feel authentic. Specialists can best serve their clients by taking the time to understand a person's gender concerns and goals for gender role expression (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia).

Individuals may choose the communication behaviors that they wish to acquire in accordance with their gender identity. These decisions are also informed and supported by the knowledge of the voice and communication specialist and by the assessment data for a specific client (Hancock, Krissinger, & Owen, 2010). Assessment includes a client's self-evaluation and a specialist's evaluation of voice, resonance, articulation, spoken language, and non-verbal communication (Adler et al., 2006; Hancock et al., 2010).

Voice and communication treatment plans are developed by considering the available research evidence, the clinical knowledge and experience of the specialist, and the client's own goals and values (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia; Vancouver Coastal Health, Vancouver, British Columbia, Canada). Targets of treatment typically include pitch, intonation, loudness and stress patterns, voice quality, resonance, articulation, speech rate and phrasing, language, and non-verbal communication (Adler et al., 2006; Davies & Goldberg, 2006; de Bruin, Coerts, & Greven, 2000; Gelfer, 1999; McNeill, 2006; Oates & Dacakis, 1983). Treatment may involve individual and/or group sessions. The frequency and duration of treatment will vary according to a client's needs. Existing protocols for voice and

Zzyym v. Tillerson – AR 0702

communication treatment can be considered in developing an individualized therapy plan (Carew, Dacakis, & Oates, 2007; Dacakis, 2000; Davies & Goldberg, 2006; Gelfer, 1999; McNeill, Wilson, Clark, & Deakin, 2008; Mount & Salmon, 1988).

Feminizing or masculinizing the voice involves non-habitual use of the voice production mechanism. Prevention measures are necessary to avoid the possibility of vocal misuse and long-term vocal damage. All voice and communication therapy services should therefore include a vocal health component (Adler et al., 2006).

## Vocal Health Considerations after Voice Feminization Surgery

As noted in section XI, some transsexual, transgender, and gender nonconforming people will undergo voice feminization surgery. (Voice deepening can be achieved through masculinizing hormone therapy, but feminizing hormones do not have an impact on the adult MtF voice.) There are varying degrees of satisfaction, safety, and long-term improvement in patients who have had such surgery. It is recommended that individuals undergoing voice feminization surgery also consult a voice and communication specialist to maximize the surgical outcome, help protect vocal health, and learn non-pitch related aspects of communication. Voice surgery procedures should include follow-up sessions with a voice and communication specialist who is licensed and/ or credentialed by the board responsible for speech therapists/speech-language pathologists in that country (Kanagalingam et al., 2005; Neumann & Welzel, 2004).



XI

# Surgery_

## Sex Reassignment Surgery Is Effective and Medically Necessary

Surgery – particularly genital surgery – is often the last and the most considered step in the treatment process for gender dysphoria. While many transsexual, transgender, and gender nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria (Hage

Zzyym v. Tillerson – AR 0703

& Karim, 2000). For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity. Moreover, surgery can help patients feel more at ease in the presence of sex partners or in venues such as physicians' offices, swimming pools, or health clubs. In some settings, surgery might reduce risk of harm in the event of arrest or search by police or other authorities.

Follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes such as subjective well being, cosmesis, and sexual function (De Cuypere et al., 2005; Gijs & Brewaeys, 2007; Klein & Gorzalka, 2009; Pfäfflin & Junge, 1998). Additional information on the outcomes of surgical treatments are summarized in Appendix D.

## Ethical Questions Regarding Sex Reassignment Surgery

In ordinary surgical practice, pathological tissues are removed to restore disturbed functions, or alterations are made to body features to improve a patient's self image. Some people, including some health professionals, object on ethical grounds to surgery as a treatment for gender dysphoria, because these conditions are thought not to apply.

It is important that health professionals caring for patients with gender dysphoria feel comfortable about altering anatomically normal structures. In order to understand how surgery can alleviate the psychological discomfort and distress of individuals with gender dysphoria, professionals need to listen to these patients discuss their symptoms, dilemmas, and life histories. The resistance against performing surgery on the ethical basis of "above all do no harm" should be respected, discussed, and met with the opportunity to learn from patients themselves about the psychological distress of having gender dysphoria and the potential for harm caused by denying access to appropriate treatments.

Genital and breast/chest surgical treatments for gender dysphoria are not merely another set of elective procedures. Typical elective procedures involve only a private mutually consenting contract between a patient and a surgeon. Genital and breast/chest surgeries as medically necessary treatments for gender dysphoria are to be undertaken only after assessment of the patient by qualified mental health professionals, as outlined in section VII of the *SOC*. These surgeries may be performed once there is written documentation that this assessment has occurred and that the person has met the criteria for a specific surgical treatment. By following this procedure, mental health professionals, surgeons, and of course patients, share responsibility for the decision to make irreversible changes to the body.

Zzyym v. Tillerson - AR 0704

The Standards of Care
7TH VERSION

It is unethical to deny availability or eligibility for sex reassignment surgeries solely on the basis of blood seropositivity for blood-borne infections such as HIV or hepatitis C or B.

# Relationship of Surgeons with Mental Health Professionals, Hormone-Prescribing Physicians (if Applicable), and Patients (Informed Consent)

The role of a surgeon in the treatment of gender dysphoria is not that of a mere technician. Rather, conscientious surgeons will have insight into each patient's history and the rationale that led to the referral for surgery. To that end, surgeons must talk at length with their patients and have close working relationships with other health professionals who have been actively involved in their clinical care.

Consultation is readily accomplished when a surgeon practices as part of an interdisciplinary health care team. In the absence of this, a surgeon must be confident that the referring mental health professional(s), and if applicable the physician who prescribes hormones, are competent in the assessment and treatment of gender dysphoria, because the surgeon is relying heavily on their expertise.

Once a surgeon is satisfied that the criteria for specific surgeries have been met (as outlined below), surgical treatment should be considered and a preoperative surgical consultation should take place. During this consultation, the procedure and postoperative course should be extensively discussed with the patient. Surgeons are responsible for discussing all of the following with patients seeking surgical treatments for gender dysphoria:

- The different surgical techniques available (with referral to colleagues who provide alternative options);

- The advantages and disadvantages of each technique;

- The limitations of a procedure to achieve "ideal" results; surgeons should provide a full range of before-and-after photographs of their own patients, including both successful and unsuccessful outcomes;

- The inherent risks and possible complications of the various techniques; surgeons should inform patients of their own complication rates with each procedure.

Zzyym v. Tillerson - AR 0705

These discussions are the core of the informed consent process, which is both an ethical and legal requirement for any surgical procedure. Ensuring that patients have a realistic expectation of outcomes is important in achieving a result that will alleviate their gender dysphoria.

All of this information should be provided to patients in writing, in a language in which they are fluent, and in graphic illustrations. Patients should receive the information in advance (possibly via the internet) and given ample time to review it carefully. The elements of informed consent should always be discussed face-to-face prior to the surgical intervention. Questions can then be answered and written informed consent can be provided by the patient. Because these surgeries are irreversibile, care should be taken to ensure that patients have sufficient time to absorb information fully before they are asked to provide informed consent. A minimum of 24 hours is suggested.

Surgeons should provide immediate aftercare and consultation with other physicians serving the patient in the future. Patients should work with their surgeon to develop an adequate aftercare plan for the surgery.

## Overview of Surgical Procedures for the Treatment of Patients with Gender Dysphoria

**For the male-to-female (MtF) patient, surgical procedures may include the following:**

1. Breast/chest surgery: augmentation mammoplasty (implants/lipofilling);

2. Genital surgery: penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty;

3. Non-genital, non-breast surgical interventions: facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid cartilage reduction, gluteal augmentation (implants/lipofilling), hair reconstruction, and various aesthetic procedures.

**For the female-to-male (FtM) patient, surgical procedures may include the following:**

1. Breast/chest surgery: subcutaneous mastectomy, creation of a male chest;

2. Genital surgery: hysterectomy/ovariectomy, reconstruction of the fixed part of the urethra, which can be combined with a metoidioplasty or with a phalloplasty (employing a pedicled or free vascularized flap), vaginectomy, scrotoplasty, and implantation of erection and/or testicular prostheses;

Zzyym v. Tillerson – AR 0706

3. Non-genital, non-breast surgical interventions: voice surgery (rare), liposuction, lipofilling, pectoral implants, and various aesthetic procedures.

# Reconstructive Versus Aesthetic Surgery

The question of whether sex reassignment surgery should be considered "aesthetic" surgery or "reconstructive" surgery is pertinent not only from a philosophical point of view, but also from a financial point of view. Aesthetic or cosmetic surgery is mostly regarded as not medically necessary and therefore is typically paid for entirely by the patient. In contrast, reconstructive procedures are considered medically necessary – with unquestionable therapeutic results – and thus paid for partially or entirely by national health systems or insurance companies.

Unfortunately, in the field of plastic and reconstructive surgery (both in general and specifically for gender-related surgeries), there is no clear distinction between what is purely reconstructive and what is purely cosmetic. Most plastic surgery procedures actually are a mixture of both reconstructive and cosmetic components.

While most professionals agree that genital surgery and mastectomy cannot be considered purely cosmetic, opinions diverge as to what degree other surgical procedures (e.g., breast augmentation, facial feminization surgery) can be considered purely reconstructive. Although it may be much easier to see a phalloplasty or a vaginoplasty as an intervention to end lifelong suffering, for certain patients an intervention like a reduction rhinoplasty can have a radical and permanent effect on their quality of life, and therefore is much more medically necessary than for somebody without gender dysphoria.

# Criteria for Surgeries

As for all of the *SOC*, the criteria for initiation of surgical treatments for gender dysphoria were developed to promote optimal patient care. While the *SOC* allow for an individualized approach to best meet a patient's health care needs, a criterion for all breast/chest and genital surgeries is documentation of persistent gender dysphoria by a qualified mental health professional. For some surgeries, additional criteria include preparation and treatment consisting of feminizing/masculinizing hormone therapy and one year of continuous living in a gender role that is congruent with one's gender identity.

These criteria are outlined below. Based on the available evidence and expert clinical consensus, different recommendations are made for different surgeries.

Zzyym v. Tillerson – AR 0707

The *SOC* do not specify an order in which different surgeries should occur. The number and sequence of surgical procedures may vary from patient to patient, according to their clinical needs.

**Criteria for breast/chest surgery (one referral)**

Criteria for mastectomy and creation of a male chest in FtM patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Hormone therapy is not a pre-requisite.

Criteria for breast augmentation (implants/lipofilling) in MtF patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Although not an explicit criterion, it is recommended that MtF patients undergo feminizing hormone therapy (minimum 12 months) prior to breast augmentation surgery. The purpose is to maximize breast growth in order to obtain better surgical (aesthetic) results.

Zzyym v. Tillerson - AR 0708

The Standards of Care
7TH VERSION

# Criteria for genital surgery (two referrals)

The criteria for genital surgery are specific to the type of surgery being requested.

Criteria for hysterectomy and ovariectomy in FtM patients and for orchiectomy in MtF patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled.

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

The aim of hormone therapy prior to gonadectomy is primarily to introduce a period of reversible estrogen or testosterone suppression, before the patient undergoes irreversible surgical intervention.

These criteria do not apply to patients who are having these procedures for medical indications other than gender dysphoria.

Criteria for metoidioplasty or phalloplasty in FtM patients and for vaginoplasty in MtF patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

6. 12 continuous months of living in a gender role that is congruent with their gender identity;

World Professional Association for Transgender Health

Zzyym v. Tillerson – AR 0709

Although not an explicit criterion, it is recommended that these patients also have regular visits with a mental health or other medical professional.

Rationale for a preoperative, 12-month experience of living in an identity-congruent gender role:

The criterion noted above for some types of genital surgeries – i.e., that patients engage in 12 continuous months of living in a gender role that is congruent with their gender identity – is based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery. As noted in section VII, the social aspects of changing one's gender role are usually challenging – often more so than the physical aspects. Changing gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role. Support from a qualified mental health professional and from peers can be invaluable in ensuring a successful gender role adaptation (Bockting, 2008).

The duration of 12 months allows for a range of different life experiences and events that may occur throughout the year (e.g., family events, holidays, vacations, season-specific work or school experiences). During this time, patients should present consistently, on a day-to-day basis and across all settings of life, in their desired gender role. This includes coming out to partners, family, friends, and community members (e.g., at school, work, other settings).

Health professionals should clearly document a patient's experience in the gender role in the medical chart, including the start date of living full time for those who are preparing for genital surgery. In some situations, if needed, health professionals may request verification that this criterion has been fulfilled: They may communicate with individuals who have related to the patient in an identity-congruent gender role, or request documentation of a legal name and/or gender marker change, if applicable.

## Surgery for Persons with Psychotic Conditions and Other Serious Mental Illnesses

When patients with gender dysphoria are also diagnosed with severe psychiatric disorders and impaired reality testing (e.g., psychotic episodes, bipolar disorder, dissociative identity disorder, borderline personality disorder), an effort must be made to improve these conditions with psychotropic medications and/or psychotherapy before surgery is contemplated. Reevaluation by a mental health professional qualified to assess and manage psychotic conditions should be

Zzyym v. Tillerson – AR 0710

The Standards of Care
7TH VERSION

conducted prior to surgery, describing the patient's mental status and readiness for surgery. It is preferable that this mental health professional be familiar with the patient. No surgery should be performed while a patient is actively psychotic (De Cuypere & Vercruysse, 2009).

## Competency of Surgeons Performing Breast/Chest or Genital Surgery

Physicians who perform surgical treatments for gender dsyphoria should be urologists, gynecologists, plastic surgeons, or general surgeons, and board-certified as such by the relevant national and/or regional association. Surgeons should have specialized competence in genital reconstructive techniques as indicated by documented supervised training with a more experienced surgeon. Even experienced surgeons must be willing to have their surgical skills reviewed by their peers. An official audit of surgical outcomes and publication of these results would be greatly reassuring to both referring health professionals and patients. Surgeons should regularly attend professional meetings where new techniques are presented. The internet is often effectively used by patients to share information on their experience with surgeons and their teams.

Ideally, surgeons should be knowledgeable about more than one surgical technique for genital reconstruction so that they, in consultation with patients, can choose the ideal technique for each individual. Alternatively, if a surgeon is skilled in a single technique and this procedure is either not suitable for or desired by a patient, the surgeon should inform the patient about other procedures and offer referral to another appropriately skilled surgeon.

## Breast/Chest Surgery Techniques and Complications

Although breast/chest appearance is an important secondary sex characteristic, breast presence or size is not involved in the legal definitions of sex and gender and is not necessary for reproduction. The performance of breast/chest operations for treatment of gender dysphoria should be considered with the same care as beginning hormone therapy, as both produce relatively irreversible changes to the body.

For the MtF patient, a breast augmentation (sometimes called "chest reconstruction") is not different from the procedure in a natal female patient. It is usually performed through implantation of breast prostheses and occasionally with the lipofilling technique. Infections and capsular fibrosis are rare complications of augmentation mammoplasty in MtF patients (Kanhai, Hage, Karim, & Mulder, 1999).

World Professional Association for Transgender Health

Zzyym v. Tillerson – AR 0711

For the FtM patient, a mastectomy or "male chest contouring" procedure is available. For many FtM patients, this is the only surgery undertaken. When the amount of breast tissue removed requires skin removal, a scar will result and the patient should be so informed. Complications of subcutaneous mastectomy can include nipple necrosis, contour irregularities, and unsightly scarring (Monstrey et al., 2008).

## Genital Surgery Techniques and Complications

Genital surgical procedures for the MtF patient may include orchiectomy, penectomy, vaginoplasty, clitoroplasty, and labiaplasty. Techniques include penile skin inversion, pedicled colosigmoid transplant, and free skin grafts to line the neovagina. Sexual sensation is an important objective in vaginoplasty, along with creation of a functional vagina and acceptable cosmesis.

Surgical complications of MtF genital surgery may include complete or partial necrosis of the vagina and labia, fistulas from the bladder or bowel into the vagina, stenosis of the urethra, and vaginas that are either too short or too small for coitus. While the surgical techniques for creating a neovagina are functionally and aesthetically excellent, anorgasmia following the procedure has been reported, and a second stage labiaplasty may be needed for cosmesis (Klein & Gorzalka, 2009; Lawrence, 2006).

Genital surgical procedures for FtM patients may include hysterectomy, ovariectomy (salpingo-oophorectomy), vaginectomy, metoidioplasty, scrotoplasty, urethroplasty, placement of testicular prostheses, and phalloplasty. For patients without former abdominal surgery, the laparoscopic technique for hysterectomy and salpingo-oophorectomy is recommended to avoid a lower-abdominal scar. Vaginal access may be difficult as most patients are nulliparous and have often not experienced penetrative intercourse. Current operative techniques for phalloplasty are varied. The choice of techniques may be restricted by anatomical or surgical considerations and by a client's financial considerations. If the objectives of phalloplasty are a neophallus of good appearance, standing micturition, sexual sensation, and/or coital ability, patients should be clearly informed that there are several separate stages of surgery and frequent technical difficulties, which may require additional operations. Even metoidioplasty, which in theory is a one-stage procedure for construction of a microphallus, often requires more than one operation. The objective of standing micturition with this technique can not always be ensured (Monstrey et al., 2009).

Complications of phalloplasty in FtMs may include frequent urinary tract stenoses and fistulas, and occasionally necrosis of the neophallus. Metoidioplasty results in a micropenis, without the capacity for standing urination. Phalloplasty, using a pedicled or a free vascularized flap, is a lengthy, multi-stage procedure with significant morbidity that includes frequent urinary complications and

Zzyym v. Tillerson – AR 0712

unavoidable donor site scarring. For this reason, many FtM patients never undergo genital surgery other than hysterectomy and salpingo-oophorectomy (Hage & De Graaf, 1993).

Even patients who develop severe surgical complications seldom regret having undergone surgery. The importance of surgery can be appreciated by the repeated finding that quality of surgical results is one of the best predictors of the overall outcome of sex reassignment (Lawrence, 2006).

## Other Surgeries

Other surgeries for assisting in body feminization include reduction thyroid chondroplasty (reduction of the Adam's apple), voice modification surgery, suction-assisted lipoplasty (contour modeling) of the waist, rhinoplasty (nose correction), facial bone reduction, face-lift, and blepharoplasty (rejuvenation of the eyelid). Other surgeries for assisting in body masculinization include liposuction, lipofilling, and pectoral implants. Voice surgery to obtain a deeper voice is rare but may be recommended in some cases, such as when hormone therapy has been ineffective.

Although these surgeries do not require referral by mental health professionals, such professionals can play an important role in assisting clients in making a fully informed decision about the timing and implications of such procedures in the context of the social transition.

Although most of these procedures are generally labeled "purely aesthetic," these same operations in an individual with severe gender dysphoria can be considered medically necessary, depending on the unique clinical situation of a given patient's condition and life situation. This ambiguity reflects reality in clinical situations, and allows for individual decisions as to the need and desirability of these procedures.

# XII


# Postoperative Care and Follow-up

Long-term postoperative care and follow-up after surgical treatments for gender dysphoria are associated with good surgical and psychosocial outcomes (Monstrey et al., 2009). Follow-up is important to a patient's subsequent physical and mental health and to a surgeon's knowledge about the benefits and limitations of surgery. Surgeons who operate on patients coming from long

Zzyym v. Tillerson - AR 0713

distances should include personal follow-up in their care plan and attempt to ensure affordable local long-term aftercare in their patients' geographic region.

Postoperative patients may sometimes exclude themselves from follow-up by specialty providers, including the hormone-prescribing physician (for patients receiving hormones), not recognizing that these providers are often best able to prevent, diagnose, and treat medical conditions that are unique to hormonally and surgically treated patients. The need for follow-up equally extends to mental health professionals, who may have spent a longer period of time with the patient than any other professional and therefore are in an excellent position to assist in any postoperative adjustment difficulties. Health professionals should stress the importance of postoperative follow-up care with their patients and offer continuity of care.

Postoperative patients should undergo regular medical screening according to recommended guidelines for their age. This is discussed more in the next section.



# Lifelong Preventive and Primary Care

Transsexual, transgender, and gender nonconforming people need health care throughout their lives. For example, to avoid the negative secondary effects of having a gonadectomy at a relatively young age and/or receiving long-term, high-dose hormone therapy, patients need thorough medical care by providers experienced in primary care and transgender health. If one provider is not able to provide all services, ongoing communication among providers is essential.

Primary care and health maintenance issues should be addressed before, during, and after any possible changes in gender role and medical interventions to alleviate gender dysphoria. While hormone providers and surgeons play important roles in preventive care, every transsexual, transgender, and gender nonconforming person should partner with a primary care provider for overall health care needs (Feldman, 2007).

## General Preventive Health Care

Screening guidelines developed for the general population are appropriate for organ systems that are unlikely to be affected by feminizing/masculinizing hormone therapy. However, in areas such

Zzyym v. Tillerson – AR 0714

as cardiovascular risk factors, osteoporosis, and some cancers (breast, cervical, ovarian, uterine, and prostate), such general guidelines may either over- or underestimate the cost-effectiveness of screening individuals who are receiving hormone therapy.

Several resources provide detailed protocols for the primary care of patients undergoing feminizing/masculinizing hormone therapy, including therapy that is provided after sex reassignment surgeries (Center of Excellence for Transgender Health, UCSF, 2011; Feldman & Goldberg, 2006; Feldman, 2007; Gorton, Buth, & Spade, 2005). Clinicians should consult their national evidence-based guidelines and discuss screening with their patients in light of the effects of hormone therapy on their baseline risk.

## Cancer Screening

Cancer screening of organ systems that are associated with sex can present particular medical and psychosocial challenges for transsexual, transgender, and gender nonconforming patients and their health care providers. In the absence of large-scale prospective studies, providers are unlikely to have enough evidence to determine the appropriate type and frequency of cancer screenings for this population. Over-screening results in higher health care costs, high false positive rates, and often unnecessary exposure to radiation and/or diagnostic interventions such as biopsies. Under-screening results in diagnostic delay for potentially treatable cancers. Patients may find cancer screening gender affirming (such as mammograms for MtF patients) or both physically and emotionally painful (such as Pap smears offer continuity of care for FtM patients).

## Urogenital Care

Gynecologic care may be necessary for transsexual, transgender, and gender nonconforming people of both sexes. For FtM patients, such care is needed predominantly for individuals who have not had genital surgery. For MtF patients, such care is needed after genital surgery. While many surgeons counsel patients regarding postoperative urogenital care, primary care clinicians and gynecologists should also be familiar with the special genital concerns of this population.

All MtF patients should receive counseling regarding genital hygiene, sexuality, and prevention of sexually transmitted infections; those who have had genital surgery should also be counseled on the need for regular vaginal dilation or penetrative intercourse in order to maintain vaginal depth and width (van Trotsenburg, 2009). Due to the anatomy of the male pelvis, the axis and the dimensions

Zzyym v. Tillerson - AR 0715

of the neovagina differ substantially from those of a biologic vagina. This anatomic difference can affect intercourse if not understood by MtF patients and their partners (van Trotsenburg, 2009).

Lower urinary tract infections occur frequently in MtF patients who have had surgery because of the reconstructive requirements of the shortened urethra. In addition, these patients may suffer from functional disorders of the lower urinary tract; such disorders may be caused by damage of the autonomous nerve supply of the bladder floor during dissection between the rectum and the bladder, and by a change of the position of the bladder itself. A dysfunctional bladder (e.g., overactive bladder, stress or urge urinary incontinence) may occur after sex reassignment surgery (Hoebeke et al., 2005; Kuhn, Hiltebrand, & Birkhauser, 2007).

Most FtM patients do not undergo vaginectomy (colpectomy). For patients who take masculinizing hormones, despite considerable conversion of testosterone to estrogens, atrophic changes of the vaginal lining can be observed regularly and may lead to pruritus or burning. Examination can be both physically and emotionally painful, but lack of treatment can seriously aggravate the situation. Gynecologists treating the genital complaints of FtM patients should be aware of the sensitivity that patients with a male gender identity and masculine gender expression might have around having genitals typically associated with the female sex.

# XIV

## Applicability of the Standards of Care to People Living in Institutional Environments

The *SOC* in their entirety apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons or long-/intermediate-term health care facilities (Brown, 2009). Health care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community.

All elements of assessment and treatment as described in the *SOC* can be provided to people living in institutions (Brown, 2009). Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess

Zzyym v. Tillerson – AR 0716

The Standards of Care
7TH VERSION

and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.

People with gender dysphoria in institutions may also have co-existing mental health conditions (Cole et al., 1997). These conditions should be evaluated and treated appropriately.

People who enter an institution on an appropriate regimen of hormone therapy should be continued on the same, or similar, therapies and monitored according to the *SOC*. A "freeze frame" approach is not considered appropriate care in most situations (Kosilek v. Massachusetts Department of Corrections/Maloney, C.A. No. 92-12820-MLW, 2002). People with gender dysphoria who are deemed appropriate for hormone therapy (following the *SOC*) should be started on such therapy. The consequences of abrupt withdrawal of hormones or lack of initiation of hormone therapy when medically necessary include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality (Brown, 2010).

Reasonable accommodations to the institutional environment can be made in the delivery of care consistent with the *SOC*, if such accommodations do not jeopardize the delivery of medically necessary care to people with gender dysphoria. An example of a reasonable accommodation is the use of injectable hormones, if not medically contraindicated, in an environment where diversion of oral preparations is highly likely (Brown, 2009). Denial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the *SOC* (Brown, 2010).

Housing and shower/bathroom facilities for transsexual, transgender, and gender nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety. Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the external genitalia may not be appropriate and may place the individual at risk for victimization (Brown, 2009).

Institutions where transsexual, transgender, and gender nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents.

Zzyym v. Tillerson - AR 0717



# Applicability of the Standards of Care to People With Disorders of Sex Development

## Terminology

The term *disorder of sex development* (DSD) refers to a somatic condition of atypical development of the reproductive tract (Hughes, Houk, Ahmed, Lee, & LWPES1/ESPE2 Consensus Group, 2006). DSDs include the condition that used to be called *intersexuality*. Although the terminology was changed to *DSD* during an international consensus conference in 2005 (Hughes et al., 2006), disagreement about language use remains. Some people object strongly to the "disorder" label, preferring instead to view these congenital conditions as a matter of diversity (Diamond, 2009) and to continue using the terms *intersex* or *intersexuality*. In the *SOC*, WPATH uses the term *DSD* in an objective and value-free manner, with the goal of ensuring that health professionals recognize this medical term and use it to access relevant literature as the field progresses. WPATH remains open to new terminology that will further illuminate the experience of members of this diverse population and lead to improvements in health care access and delivery.

## Rationale for Addition to the SOC

Previously, individuals with a DSD who also met the *DSM-IV-TR*'s behavioral criteria for Gender Identity Disorder (American Psychiatric Association, 2000) were excluded from that general diagnosis. Instead, they were categorized as having a "Gender Identity Disorder - Not Otherwise Specified." They were also excluded from the WPATH *Standards of Care*.

The current proposal for *DSM-5* (www.dsm5.org) is to replace the term *gender identity disorder* with *gender dysphoria*. Moreover, the proposed changes to the *DSM* consider gender dysphoric people with a DSD to have a subtype of gender dysphoria. This proposed categorization – which explicitly differentiates between gender dysphoric individuals with and without a DSD – is justified: In people with a DSD, gender dysphoria differs in its phenomenological presentation, epidemiology, life trajectories, and etiology (Meyer-Bahlburg, 2009).

Zzyym v. Tillerson - AR 0718

The Standards of Care
7TH VERSION

Adults with a DSD and gender dysphoria have increasingly come to the attention of health professionals. Accordingly, a brief discussion of their care is included in this version of the SOC.

## Health History Considerations

Health professionals assisting patients with both a DSD and gender dysphoria need to be aware that the medical context in which such patients have grown up is typically very different from that of people without a DSD.

Some people are recognized as having a DSD through the observation of gender-atypical genitals at birth. (Increasingly this observation is made during the prenatal period by way of imaging procedures such as ultrasound.) These infants then undergo extensive medical diagnostic procedures. After consultation among the family and health professionals – during which the specific diagnosis, physical and hormonal findings, and feedback from long-term outcome studies (Cohen-Kettenis, 2005; Dessens, Slijper, & Drop, 2005; Jurgensen, Hiort, Holterhus, & Thyen, 2007; Mazur, 2005; Meyer-Bahlburg, 2005; Stikkelbroeck et al., 2003; Wisniewski, Migeon, Malouf, & Gearhart, 2004) are considered – the newborn is assigned a sex, either male or female.

Other individuals with a DSD come to the attention of health professionals around the age of puberty through the observation of atypical development of secondary sex characteristics. This observation also leads to a specific medical evaluation.

The type of DSD and severity of the condition has significant implications for decisions about a patient's initial sex assignment, subsequent genital surgery, and other medical and psychosocial care (Meyer-Bahlburg, 2009). For instance, the degree of prenatal androgen exposure in individuals with a DSD has been correlated with the degree of masculinization of gender-related *behavior* (that is, *gender role and expression*); however, the correlation is only moderate, and considerable behavioral variability remains unaccounted for by prenatal androgen exposure (Jurgensen et al., 2007; Meyer-Bahlburg, Dolezal, Baker, Ehrhardt, & New, 2006). Notably, a similar correlation of prenatal hormone exposure with gender *identity* has not been demonstrated (e.g., Meyer-Bahlburg et al., 2004). This is underlined by the fact that people with the same (core) gender identity can vary widely in the degree of masculinization of their gender-related behavior.

Zzyym v. Tillerson - AR 0719

# Assessment and Treatment of Gender Dysphoria in People with Disorders of Sex Development

Very rarely are individuals with a DSD identified as having gender dysphoria *before* a DSD diagnosis has been made. Even so, a DSD diagnosis is typically apparent with an appropriate history and basic physical exam – both of which are part of a medical evaluation for the appropriateness of hormone therapy or surgical interventions for gender dysphoria. Mental health professionals should ask their clients presenting with gender dysphoria to have a physical exam, particularly if they are not currently seeing a primary care (or other health care) provider.

Most people with a DSD who are born with genital ambiguity do not develop gender dysphoria (e.g., Meyer-Bahlburg et al., 2004; Wisniewski et al., 2004). However, some people with a DSD will develop chronic gender dysphoria and even undergo a change in their birth-assigned sex and/or their gender role (Meyer-Bahlburg, 2005; Wilson, 1999; Zucker, 1999). If there are persistent and strong indications that gender dysphoria is present, a comprehensive evaluation by clinicians skilled in the assessment and treatment of gender dysphoria is essential, irrespective of the patient's age. Detailed recommendations have been published for conducting such an assessment and for making treatment decisions to address gender dysphoria in the context of a DSD (Meyer-Bahlburg, in press). Only after thorough assessment should steps be taken in the direction of changing a patient's birth-assigned sex or gender role.

Clinicians assisting these patients with treatment options to alleviate gender dysphoria may profit from the insights gained from providing care to patients without a DSD (Cohen-Kettenis, 2010). However, certain criteria for treatment (e.g., age, duration of experience with living in the desired gender role) are usually not routinely applied to people with a DSD; rather, the criteria are interpreted in light of a patient's specific situation (Meyer-Bahlburg, in press). In the context of a DSD, changes in birth-assigned sex and gender role have been made at any age between early elementary-school age and middle adulthood. Even genital surgery may be performed much earlier in these patients than in gender dysphoric individuals without a DSD if the surgery is well justified by the diagnosis, by the evidence-based gender-identity prognosis for the given syndrome and syndrome severity, and by the patient's wishes.

One reason for these treatment differences is that genital surgery in individuals with a DSD is quite common in infancy and adolescence. Infertility may already be present due to either early gonadal failure or to gonadectomy because of a malignancy risk. Even so, it is advisable for patients with a DSD to undergo a full social transition to another gender role only if there is a long-standing history of gender-atypical behavior, and if gender dysphoria and/or the desire to change one's gender role has been strong and persistent for a considerable period of time. Six months is the time period of full symptom expression required for the application of the gender dysphoria diagnosis proposed for *DSM-5* (Meyer-Bahlburg, in press).

Zzyym v. Tillerson – AR 0720

## Additional Resources

The gender-relevant medical histories of people with a DSD are often complex. Their histories may include a great variety of inborn genetic, endocrine, and somatic atypicalities, as well as various hormonal, surgical, and other medical treatments. For this reason, many additional issues need to be considered in the psychosocial and medical care of such patients, regardless of the presence of gender dysphoria. Consideration of these issues is beyond what can be covered in the *SOC*. The interested reader is referred to existing publications (e.g., Cohen-Kettenis & Pfäfflin, 2003; Meyer-Bahlburg, 2002, 2008). Some families and patients also find it useful to consult or work with community support groups.

There is a very substantial medical literature on the medical management of patients with a DSD. Much of this literature has been produced by high-level specialists in pediatric endocrinology and urology, with input from specialized mental health professionals, especially in the area of gender. Recent international consensus conferences have addressed evidence-based care guidelines (including issues of gender and of genital surgery) for DSD in general (Hughes et al., 2006) and specifically for Congenital Adrenal Hyperplasia (Joint LWPES/ESPE CAH Working Group et al., 2002; Speiser et al., 2010). Others have addressed the research needs for DSD in general (Meyer-Bahlburg & Blizzard, 2004) and for selected syndromes such as 46,XXY (Simpson et al., 2003).

● ● ●

# References

Abramowitz, S. I. (1986). Psychosocial outcomes of sex reassignment surgery. *Journal of Consulting and Clinical Psychology, 54*(2), 183-189. doi:10.1037/0022-006X.54.2.183

ACOG Committee of Gynecologic Practice. (2005). Committee opinion #322: Compounded bioidentical hormones. *Obstetrics & Gynecology, 106*(5), 139-140.

Adler, R. K., Hirsch, S., & Mordaunt, M. (2006). *Voice and communication therapy for the transgender/transsexual client: A comprehensive clinical guide.* San Diego, CA: Plural Pub.

American Academy of Family Physicians. (2005). *Definition of family medicine.* Retrieved August 10, 2009, from http://www.aafp.org/online/en/home/policy/policies/f/fammeddef.html

Zzyym v. Tillerson – AR 0721

American Medical Association. (2008). *Resolution 122 (A-08)*. Retrieved from http://www.ama-assn.org/ama1/pub/upload/mm/471/122.doc

American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders DSM-IV-TR* (4th ed., text rev.). Washington, DC: Author.

American Speech-Language-Hearing Association. (2011). *Scope of practice*. Retrieved from www.asha.org

Anton, B. S. (2009). Proceedings of the American Psychological Association for the legislative year 2008: Minutes of the annual meeting of the council of representatives, February 22-24, 2008, Washington, DC, and August 13 and 17, 2008, Boston, MA, and minutes of the February, June, August, and December 2008 meetings of the board of directors. *American Psychologist, 64*, 372-453. doi:10.1037/a0015932

Asscheman, H., Giltay, E. J., Megens, J. A. J., de Ronde, W., van Trotsenburg, M. A. A., & Gooren, L. J. G. (2011). A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. *European Journal of Endocrinology, 164*(4), 635-642. doi:10.1530/EJE-10-1038

Baba, T., Endo, T., Honnma, H., Kitajima, Y., Hayashi, T., Ikeda, H., . . . Saito, T. (2007). Association between polycystic ovary syndrome and female-to-male transsexuality. *Human Reproduction, 22*(4), 1011-1016. doi:10.1093/humrep/del474

Bakker, A., Van Kesteren, P. J., Gooren, L. J., & Bezemer, P. D. (1993). The prevalence of transsexualism in the Netherlands. *Acta Psychiatrica Scandinavica, 87*(4), 237-238. doi:10.1111/j.1600-0447.1993.tb03364.x

Balen, A. H., Schachter, M. E., Montgomery, D., Reid, R. W., & Jacobs, H. S. (1993). Polycystic ovaries are a common finding in untreated female to male transsexuals. *Clinical Endocrinology, 38*(3), 325-329. doi:10.1111/j.1365-2265.1993.tb01013.x

Basson, R. (2001). Towards optimal hormonal treatment of male to female gender identity disorder. *Journal of Sexual and Reproductive Medicine, 1*(1), 45-51.

Basson, R., & Prior, J. C. (1998). Hormonal therapy of gender dysphoria: The male-to-female transsexual. In D. Denny (Ed.), *Current concepts in transgender identity* (pp. 277-296). New York: Garland Publishing, Inc.

Benjamin, H. (1966). *The transsexual phenomenon*. New York: Julian Press.

Besnier, N. (1994). Polynesian gender liminality through time and space. In G. Herdt (Ed.), *Third sex, third gender: Beyond sexual dimorphism in culture and history* (pp. 285-328). New York: Zone Books.

Bockting, W. O. (1999). From construction to context: Gender through the eyes of the transgendered. *Siecus Report, 28*(1), 3-7.

Zzyym v. Tillerson – AR 0722