15.     A person's gender identity refers to a person's inner sense of belonging to a particular gender, such as male or female.

16.     Gender identity is a deeply felt and core component of a person's identity.

17.     Everyone has a gender identity.

18.     Children usually become aware of their gender identity early in life.

19.     Most people have a gender identity that aligns with the sex they were assigned at birth.  However, for some people, their deeply felt, core identification and self-image as a particular gender does not align with the sex they were assigned at birth. This lack of alignment can create significant distress for individuals with this experience and can be felt in children as young as 2 years old.

20.     Gender identity cannot be voluntarily altered including for individuals whose gender identity does not align with their birth-assigned sex.

21.     Although research regarding the precise determinant of gender identity is still ongoing, evidence strongly suggests that gender identity is innate or fixed at a young age and that gender identity has a strong biological basis.

22.     Both post-mortem and functional brain studies that have been done on the brains of individuals with gender dysphoria show that these individuals have brain structure, connectivity, and function that do not match their birth-assigned sex. Variations in these studies include overall brain size, intra- and inter-hemispheric connectivity (number of connections within each half of the brain and between halves of the brain).  Differences have been shown in visuospatial and verbal fluency tasks and their activation patterns in the brain.  Variations in cortical thickness in the sensory motor

4

Zzyym v. Tillerson - AR 0780

areas, the white matter microstructure, and regional cerebral blood flow are also present in those with gender incongruence compared to those without.

## HOW DO EXPERTS ASSIGN OR "DETERMINE" SEX?

23.    From a medical perspective, the appropriate determinant of sex is gender identity.

24.    For many people, gender identity aligns with the sex assigned to the individual at birth, so assigning sex based on sex-characteristics such as external genitalia is a proxy for assigning sex based on one's gender identity.

25.    For transgender people and people with differences or disorders of sex development, however, there is not complete alignment among sex-related characteristics. Medicine and science require that where a more careful consideration of sex assignment is needed that it be based on gender identity rather than other sex characteristics.

26.    In the past, when mental health and medical practitioners identified a disconnect between a person's gender identity and assigned sex at birth, treatment often focused on efforts to bring the individual's gender identity into alignment with the assigned sex. These practices were unsuccessful and incredibly harmful. Deep depression, psychosis, and suicide frequently resulted.

27.    Medical science has since recognized that appropriate treatment for individuals who are transgender must focus on alleviating distress through supporting outward expressions of the person's gender identity and bringing the body into alignment with that identity to the extent deemed medically appropriate based on assessments

5

Zzyym v. Tillerson – AR 0781

between individual patients and their medical and mental health providers. These
treatments have been very successful.

28.     In infants with sex-characteristics associated with both males and females,
if an assignment is made that later conflicts with gender identity, then the only
appropriate medical course is to re-assign or re-classify the individual's sex to align with
gender identity.

29.     It is harmful to make sex assignments based on characteristics other than
gender identity. For example, in cases where surgery was done prior to the ability of the
child to understand and express their gender identity, there has been significant distress in
these individuals who then have to endure further surgeries to reverse the earlier
treatments. It has become standard practice to wait until the gender identity is clear to
make permanent surgical changes in these patients unless the changes are required to
maintain the life or health of the child.

30.     A person's gender identity (regardless of whether that identity matches
other sex-related characteristics) is fixed, cannot be changed by others, and is not
undermined or altered by the existence of other sex-related characteristics that do not
align with it.

31.     Today, medical and mental health care providers who specialize in the
treatment of these individuals with gender dysphoria recognize that being transgender is a
normal developmental variation.

32.     For individuals with gender dysphoria and individuals with differences of
sex development, gender identity is the only medically supported determinant of sex
when sex assignment as male or female is necessary. It would be unethical and

6

extremely harmful to, for example, force a man with congenital adrenal hyperplasia, discussed below, to be classified as a woman simply because he was classified as female at birth. Likewise it would be unethical and extremely harmful to force a man who has gender dysphoria to be classified as female simply because he was assigned female at birth.

33.    The cost of not assigning sex based on gender identity is dire. It is counter to medical science to use chromosomes, hormones, internal reproductive organs, external genitalia, or secondary sex characteristics to override gender identity for purposes of classifying someone as male or female. Gender identity does and should control when there is a need to classify an individual as a particular sex.

34.    With the exception of some serious childhood cancers, gender dysphoria is the most fatal condition that I treat because of the harms that flow from not properly recognizing gender identity. Attempted suicide rates in the transgender community are over 40%, which is a risk of death that far exceeds most other medical conditions. The only treatment to avoid this serious harm is to recognize the gender identity of patients with gender dysphoria and differences of sex development.

## WHAT IS "BIOLOGICAL SEX"?

35.    Rather than assign sex based on gender identity, North Carolina, because of H.B. 2, now by law requires sex assignment in single-sex facilities within public buildings to be based on "biological sex," defined as "the physical condition of being male or female, which is stated on a person's birth certificate." In addition to being

Zzyym v. Tillerson - AR 0783

counter to medical science as explained above, this definition and conception of "biological sex" is inherently flawed.

36.     Although we generally label infants as "male" or "female" based on observing their external genitalia at birth, external genitalia do not account for the full spectrum of sex-related characteristics nor do they "determine" one's sex. Instead, sex-related characteristics include external genitalia, internal reproductive organs, gender identity, chromosomes, secondary sex characteristics and genes. These sex-related characteristics do not always align as completely male or completely female in a single individual. In fact, this occurs frequently enough that doctors use a scale called the Prader Scale to describe the genitalia on a spectrum from male to female.

37.     Particularly for individuals with a difference or disorder of sex development, sex assignment at birth can involve the evaluation of the sex chromosomes, the external genitalia, the internal genitalia, hormonal levels, and sometimes, specific genes. There are also cases in which the appearance of the external genitalia can change at puberty as well as variations in the appearance of secondary sex characteristics that may signal that there is a difference in sex development in a person.

38.     Many individuals, including individuals who have intersex traits or gender dysphoria, have biological, sex-related characteristics that are typically associated with both men and women. For example:

    a.     Individuals with Complete Androgen Insensitivity have 46-XY chromosomes, which are typically associated with males, but do not have the tissue receptors that respond to testosterone or other androgens. The body, therefore, does not develop external genitalia or secondary sex

8

characteristics typically associated with males but does, generally, have
testes. At birth, based on the appearance of the external genitalia,
individuals with Complete Androgen Insensitivity are generally assigned
female.

b. Individuals with Klinefelter Syndrome have 47-XXY chromosomes and
internal and external genitalia typically associated with males, however,
the testicles in individuals diagnosed with Klinefelter Syndrome lose
function over time. This may lead to breast development and infertility in
addition to a number of other health issues.

c. Individuals with Turner Syndrome have 45-XO chromosomes, which
means they have one less chromosome than everyone else. In utero, these
individuals form sex characteristics typically associated with females
including all internal structures but the ovaries begin to die soon after birth
and the individuals are unable to make estrogen. Without treatment,
individuals with Turner Syndrome do not develop secondary sex
characteristics typically associated with women.

d. Individuals with Mosaic Turner Syndrome may have two different sets of
chromosomes. They lose a sex chromosome in the early stages of
embryonic development. The cells that are descendants of the cell that
lost a chromosome will have Turner Syndrome features. The cells that are
descendants of the cells that did not lose a sex chromosome will have
features of the embryo's initial chromosomal sex. Sometimes this initial
sex was XX and sometimes it is XY. When there are cells with XY

9

chromosomes present, the fetus produces testosterone and there is at least
some testicular tissue.  There may also be ovarian tissue.  The external
genitalia can then be a mixture of external genitalia typically associated
with both males and females.

e.  Individuals with congenital adrenal hyperplasia (CAH) are individuals
who have XX chromosomes and external genitalia typically associated
with women but are born with extra androgens, including testosterone, and
from early in gestation, their brains are exposed to high levels of
androgen.  Despite frequently being assigned female at birth because of
external genitalia, many individuals with this condition have a male
gender identity.

f.  Individuals with 5-alpha reductase are chromosomally XY but they have
an enzyme deficiency that does not allow them to convert testosterone to
dihydrotestosterone, the active form of testosterone.  At birth, based on
external genitalia, they are often assigned female, but their gender identity
is almost always male as adults.  Their external genitalia also changes at
puberty because hormonal changes allow them to make more
dihydrotestosterone which is needed for the physical changes that occur
causing the development of external genitalia typically associated with
males.  During early development there is enough testosterone to affect the
brain, which often results in a male gender identity.

g.  Individuals with cloacal exstrophy have external genitalia at birth that is
often split in half and most of their internal pelvic organs are located on

10

the outside of their bodies. They are born with both XX and XY
chromosomes. However, because of the severity of the changes in their
external genitalia, most of the XY patients had sex reassignment in
infancy and were raised as females. Follow-up studies of these patients as
adults show that almost all of the XY patients have a gender identity of
male, despite their female sex assignment. This is powerful evidence that
one's core gender identity cannot be changed.

h. A transgender person who transitioned at a young age and takes hormone
blockers would not develop the secondary sex characteristics typically
associated with their birth-assigned sex. This process suspends their
pubertal development until the blockers are stopped or until gender
affirming hormones are added.

i. A woman who is transgender may have XY chromosomes, undergo
hormone treatment and surgery, and have external genitalia and secondary
sex characteristics typically associated with women.

j. A man who is transgender may undergo hormone therapy, have hormone
levels comparable to non-transgender men, and thus develop masculine
secondary sex characteristics.

39.    As the examples above underscore, "biological sex" as used in H.B. 2 is
not an accurate or useful medical term with respect to individuals whose sex-related
characteristics are not in alignment with each other. Rather, the medically appropriate
determinant of sex is gender identity.

11

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on $5/13$, 2016.

By: _____
Deanna Adkins, M.D.

12

Zzyym v. Tillerson - AR 0788

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:16-cv-425 |
| STATE OF NORTH CAROLINA; | ) | |
| PATRICK MCCRORY, in his official | ) | |
| capacity as Governor of North Carolina; | ) | |
| NORTH CAROLINA DEPARTMENT | ) | |
| OF PUBLIC SAFETY; UNIVERSITY | ) | |
| OF NORTH CAROLINA; and BOARD | ) | |
| OF GOVERNORS OF THE | ) | |
| UNIVERSITY OF NORTH CAROLINA, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| STATE OF NORTH CAROLINA; | ) | |
| PATRICK MCCRORY, in his official | ) | |
| capacity as Governor of North Carolina; | ) | |
| NORTH CAROLINA DEPARTMENT | ) | |
| OF PUBLIC SAFETY, | ) | |
| | ) | |
| Counterclaim Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |
| | ) | |

## EXPERT DECLARATION OF DEANNA ADKINS, MD, IN SUPPORT
## OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

Zzyym v. Tillerson – AR 0789

### Qualifications and Background

1.      I have been retained by counsel for United States as an expert in connection

with the above-captioned litigation.  I have also been retained by counsel for the

Plaintiffs in the related matter of *Carcaño, et al. v. McCrory, et al.*, No. 16-236, and

submitted a report in that case and the above-captioned case on August 12, 2016.  A true

and accurate copy of that report is attached as Exhibit A.  I have actual knowledge of the

matters stated in this declaration and in the report attached as Exhibit A.  My professional

background, experience, and publications are detailed in my curriculum vitae, a true and

accurate copy of which is included in Exhibit A.

2.      As detailed in my attached report and CV, I am currently the Fellowship

Program Director of Pediatric Endocrinology at Duke University School of Medicine and

the Director of the Duke Center for Child and Adolescent Gender Care.  *See* Exhibit A.

3.      I have extensive experience working with children with endocrine disorders

and I am an expert in the treatment of children with differences of sex development and

gender dysphoria.  As part of my practice, I stay familiar with the latest medical science

and treatment protocols related to differences of sex development and gender dysphoria.

4.      In preparing this declaration, I reviewed the materials listed in the

Bibliography included in Exhibit A as well as the expert declarations submitted in

opposition to the United States' motion for a preliminary injunction.  I may rely on those

documents as support for my opinions.  I have also relied on my years of experience in

this field, as set out in my CV and on the materials listed therein.  *See* Exhibit A.  The

materials I have relied upon in preparing this declaration are the same types of materials

2

that experts in my field of study regularly rely upon when forming opinions on the subject.

5.      In the past four years, I have testified as an expert at trial or deposition in the following matter: *United States v. Oversby, Brandon R.*, SPC, U.S. Army, B Company (Second Judicial Circuit, Fort Bragg Oct. 15, 2014).

### Standards of Care for Treatment of Gender Dysphoria

6.      In my current practice, I treat over 125 patients who have gender dysphoria.

7.      I treat my patients based on their individual medical needs and follow the protocols for treatment set out by the World Professional Association for Transgender Health (WPATH) Standards of Care and clinical guidelines for treatment of gender dysphoria developed by the Endocrine Society. These standards recommend gender transition, including social transition, hormone therapy, and surgery depending on the age and medical needs of the patient.

8.      The WPATH Standards of Care are recognized by the major medical and mental health groups in the United States–including the American Medical Association, the American Psychiatric Association, and the American Psychological Association–as the authoritative protocols for treating gender dysphoria.

9.      Dr. Van Meter suggests that the WPATH Standards of Care should be disregarded because WPATH is "an agenda-driven advocacy organization." (Van Meter, ¶ 53). WPATH, like many other medical associations, is an organization of hundreds of professionals who work to share information about the best ways to treat a medical condition. Just like the American Diabetes Association or the American Heart

3

Association puts on conferences, develops guidelines for treatment, and educates its

members and the community, so too does WPATH.  Members of WPATH are invested in

the care of individuals with gender dysphoria just like members of the American Diabetes

Association are invested in the care of individuals with diabetes.  This is not a "social and

political agenda."  It is about improving outcomes and treatment for individuals with

medical needs.

       10.    The American College of Pediatricians, which rejects the well-established

medical protocols for the treatment of gender dysphoria, is not the major medical

association of pediatricians in this country.  In fact, I had never heard of them until my

involvement in this case.  The American Academy of Pediatrics, which is the major

pediatric professional association with approximately 66,000 members, has called for the

repeal of North Carolina's HB 2.  The CEO and Executive Director of the American

Academy of Pediatrics called for repeal of H.B. 2, saying: "Adolescents who are

transgender are already at heightened risk for violence, bullying and harassment, and are

already more prone to depression and engaging in self-harm, including suicide . . . HB2

and other measures making their way through state legislatures across the country

exacerbate those risks by creating hostile environments for transgender youth, all

implying the same message; 'you're different, something is wrong with you, you need to

change in order to fit in here.'" American Academy of Pediatrics, AAP News, "AAP

calls for repeal of N.C. transgender law" (April 20, 2016)

(http://www.aappublications.org/news/2016/04/20/Transgender042016

4

### The Consensus Regarding treatment of
### Adolescents and Adults with Gender Dysphoria

11.      The Defendants' experts mistakenly focus on questions related to the

treatment of pre-pubertal children (i.e., pre-Tanner Stage 2, generally around age 10) to

challenge well-established treatment protocols for adolescents and adults.  There are

different approaches within the community of experts treating gender dysphoria about

how to treat pre-pubertal children.  Some support social transition for pre-pubertal

children and others, like Dr. Kenneth Zucker—who is cited repeatedly by Defendants—

do not in most cases based in significant part on the fact that there are studies that found

that many children with gender incongruence in early childhood did not have gender

dysphoria by the time they reached adolescence.

12.      When it comes to adolescents and adults, there is no evidence that gender

incongruence ceases over time and there is a clear medical consensus recognized by the

major medical associations (and Dr. Zucker, who is an author of the most recent WPATH

Standards of Care) that gender transition–including social transition, hormone therapy

and/or surgeries where medically necessary–is appropriate treatment.  Defendants'

conflation of pre-pubertal children and adolescents reflects their lack of knowledge about

treatment in this field.  In fact, the Diagnostic & Statistic Manual (DSM) has completely

separate diagnoses for the condition in childhood and the condition in adolescence.  *See*

American Psychiatric Association, Diagnostic and Statistical Manual of Mental

Disorders, Fifth Ed., "Gender Dysphoria in Children" and "Gender Dysphoria in

Adolescents and Adults" (2013).

Zzyym v. Tillerson – AR 0793

13.    It is incorrect and unsupported by the data to suggest that studies on the

treatment of gender incongruence and gender dysphoria in children who are pre-Tanner

Stage 2 can be used to draw conclusions about the treatment of adolescents and adults

with the condition.  Such suggestions misrepresent the understanding and consensus view

of experts who research and treat gender dysphoria.

14.    For younger children who are pursuing social transition as part of a

medically supervised treatment plan, that social transition includes use of single-sex

spaces consistent with gender identity. For the young children that I treat, access to such

spaces has greatly improved their health and well-being.

15.    Dr. Van Meter's description of the nature of puberty blocking treatment for

gender dysphoric patients is not accurate.  This treatment has been used for decades on

children with precocious puberty and none of the potential health consequences cited by

Dr. Van Meter have been documented in that population.   We only administer hormone

blockers to delay the onset of puberty within the typical range. Even the articles cited by

Dr. Van Meter to support his contentions in fact say the opposite of what he claims. For

example, Dr. Van Meter claims that "[t]here is evidence that bone mineral density is

irreversibly decreased if puberty blockers are used."  (Van Meter, ¶ 44).  But the article

that Dr. Van Meter cites to support that claim says the opposite, concluding instead that

the use of puberty blockers "is safe and reversible for the reproductive system, [Bone

Mineral Density] BMD, and [Body Mass Index] BMI." (Van Meter, n. 25).

Zzyym v. Tillerson - AR 0794

## Sex Assignment and the Nature of Gender Identity

16.     Dr. Mayer's opinion that "biological sex can still be defined strictly in terms of the structure of reproductive systems" is an extremely outdated view of biological sex. (Mayer, ¶ 29).  In the past when assigning sex to an individual with sex-related characteristics that did not completely align as stereotypically male or stereotypically female, doctors would assign sex based solely on how the individual would be able to reproduce.  This has long since been abandoned as an approach as even Defendants' other experts recognize in favor of a more nuanced approach that takes into account the range of sex-related characteristics with the goal of assigning sex consistent with gender identity.

17.     The experience of Dr. John Money's patients discussed by Dr. Mayer demonstrates that a person's gender identity cannot be altered through socialization.  The lessons of Dr. Money's failed experiments have significantly influenced how endocrinologists and other doctors assign sex for individuals with differences of sex development (DSDs)—that assignment should be based on gender identity, once it is known.   For those of us involved in the care of infants with DSDs, we are deeply concerned about any permanent surgical treatment on an infant before the infant is able to communicate gender identity.

18.     The occurrence of intersex conditions (also known as DSDs) are not "rare" as Drs. Hruz and Van Meter suggest. (Hruz, ¶ 20; Van Meter, ¶ 14).  The statistic cited by Dr. Van Meter (one in every 4500 to 5500 births) refers to just one subset of intersex conditions—ambiguous genitalia at birth.  The article he cites for that statistic also notes

7

Zzyym v. Tillerson - AR 0795

that Klinefelter syndrome–a DSD–is estimated in one of 500 to 1000 births, and that

"when all congenital genital anomalies are considered . . . the rate may be as high as [one

in 200 to 300]."  Lee PA et al., Global Disorders of Sex Development Update since 2006:

Perceptions, Approach and Care, 2016 Horm Res Paediatr., at 159-60.  *See* Exhibit A, ¶¶

36-38 for a discussion of the nature of the more common intersex conditions. This makes

DSDs significantly more common than other common genetic variations such as Down

Syndrome, which occurs in approximately 1 in every 1,000 live births. See World Health

Organization, Genes and Human Disease,

http://www.who.int/genomics/public/geneticdiseases/en/index1.html.

### Defendants' Experts are not Individuals Known
### in the Field of Treatment of Gender Dysphoria

19.     To effectively treat my patients, I stay current on the research and literature

in the field of treatment for gender dysphoria and I attend conferences and lectures where

the latest research is discussed and clinicians share their experience.  I have never seen

any of the Defendants' experts at a conference or meeting regarding gender dysphoria;

nor do I recognize their names as individuals who publish in this field.

20.     Physicians who treat children and adolescents with gender dysphoria

regularly encounter each other at meetings and conferences regarding treatment, even

those of us who take different approaches to the management of the condition.  For

example, Dr. Kenneth Zucker, who is cited extensively by Drs. Hruz, Van Meter, and

Mayer, is a member of WPATH and speaks regularly at meetings regarding the treatment

of the condition.  I have seen him speak twice in the past year.

8

21.    As in any medical field, attending conferences and being part of a professional community of clinicians provides a doctor with an opportunity to learn about the clinical experience of hundreds of colleagues, which in turn informs the development of generally accepted practices of experts in the field.  Clinical experience is an important part of the body of knowledge about any medical condition, including gender dysphoria.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this __1 3__ day of __September__, 2016.

By: _____
Deanna Adkins, M.D.

9

# EXHIBIT 35

George Brown Declaration

Zzyym v. Tillerson – AR 0798

**·UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

UNITED STATES OF AMERICA,

     Plaintiff,

        v.

STATE OF NORTH CAROLINA;
PATRICK MCCRORY, in his official
capacity as Governor of North Carolina;
NORTH CAROLINA DEPARTMENT
OF PUBLIC SAFETY; UNIVERSITY
OF NORTH CAROLINA; and BOARD OF
GOVERNORS OF THE
UNIVERSITY OF NORTH CAROLINA,

     Defendants.

Case No. 1:16-cv-00425

**EXPERT DECLARATION OF GEORGE R. BROWN, MD, DFAPA**

**PRELIMINARY STATEMENT**

    1.    I have been retained by counsel for Plaintiff as an expert in connection with the above-captioned litigation. I have actual knowledge of the matters stated in this declaration.

    2.    I am a Professor of Psychiatry and Associate Chairman of the Department of Psychiatry at East Tennessee State University in Johnson City, Tennessee. I am board certified in adult psychiatry. I was named a Fellow of the American Psychiatric Association in 1998 and a Distinguished Fellow in 2003. Additional information about my professional background, experience, and publications are detailed in my curriculum vitae, which is attached as Exhibit A to this declaration.

1

3.     I have specialized training and expertise in the diagnosis and treatment of Gender Dysphoria, also known as Gender Identity Disorder.   I have authored or coauthored 38 papers in peer-reviewed journals and 19 book chapters on topics related to Gender Dysphoria, including the chapter on Gender Dysphoria in Treatments of Psychiatric Disorders (3d ed. 2001), a definitive text on the diagnosis and treatment of psychiatric disorders published by the American Psychiatric Association.

4.     I began seeing patients in 1983, and I have been a practicing psychiatrist since 1987.   Over the last 33 years, I have evaluated, treated, and/or conducted research with between 600 and 1000 individuals with gender disorders in person, and over 5100 patients with Gender Dysphoria during the course of research-related chart reviews.

5.     Since 1987, I have been extensively involved with the World Professional Association of Transgender Health ("WPATH"), an internationally recognized association of medical, surgical, and mental health professionals specializing in the evaluation and treatment of transgender and gender non-conforming people.   With over 1000 members worldwide, WPATH is comprised of physicians, psychiatrists, psychologists, social workers, surgeons, and other health professionals who specialize in the diagnosis and treatment of Gender Dysphoria and other gender-related issues.   I served on the Board of Directors of WPATH from 1993-1997, 2001-2007, and 2010-2014.   I also served on the Executive Committee of WPATH as Secretary-Treasurer from 2007-2009.

6.     In addition, I am a coauthor in the development and publication of WPATH's Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7 ("Standards of Care" or "SOC") (published in 2011 and currently in use), as I was in the previous two versions (Versions 5 and 6).   I served as a member of WPATH's

2

Zzyym v. Tillerson - AR 0800

Standards of Care Revision Committee from 1990-1998 and have been Co-Chairman or a member of that committee from 2001 to present.    The WPATH standards for the medical treatment of Gender Dysphoria represent the consensus of specialists in the field and have been recognized as the definitive standards by a number of jurisdictions in the United States and Canada.

      7.     My current responsibilities involve conducting the largest studies ever developed concerning the health of, and health disparities in, transgender / gender dysphoric people, as well as providing national training programs on transgender health care on a national basis in the Veterans Health Administration and for the Department of Defense.

      8.     In preparing this declaration, I relied on my scientific education and training, my research experience, my knowledge of the scientific literature in the pertinent fields (a non-exhaustive list of those references is included as Exhibit B to this document), and my 33 years of clinical experience in evaluating, treating, and conducting research with patients with Gender Dysphoria and other issues related to gender identity.    I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

      9.     I am being compensated at an hourly rate for actual time devoted, at the rate of $500 per hour for any clinical services, review of records, or preparation of reports or declarations; $600 per hour for deposition and trial testimony; $2000 per half day for travel time (or otherwise); and $4000 per full day spent out of the office.    My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

Zzyym v. Tillerson - AR 0801

## OPINIONS AND CONCLUSIONS

### DISCUSSION PART I – SCIENTIFIC UNDERSTANDING OF SEX

10.     In most cases, the sex assigned at birth to newborns on their birth certificate is based solely on a cursory examination of their external genitalia.   However, this method of assigning sex amounts to nothing more than a "best guess" of a child's sex.   At birth, sex can be recorded as only "male" or "female" and, as such, is an administrative binary terminology that does not take into account the complexity of human experience.   "Sex" is much more complicated, as it involves biological constructs that may or may not be readily observed, and includes the important component of gender identity (Richardson, 2013).

11.     A person's "sex" is not exclusively or solely defined by one's anatomy or ability to procreate as was often believed in the past (Ovesey & Person, 1973).   "Biological sex" is a broad and complex concept that consists of a number of variables that includes gender identity, genital anatomy (internal and externally visible), secondary sexual characteristics, brain anatomy, hormonal levels in the brain and body, and chromosomal complement.

12.     The American Psychological Association defines "sex" as "a person's biological status and is typically categorized as male, female, or intersex (i.e., atypical combinations of features that usually distinguish male from female)."

13.     Primary sexual characteristics are a factor when determining a person's sex. Genital anatomy, which includes both internal (not observable) and external (observable) components, is an example of a primary sexual characteristic.   The appearance of the observable external genitalia is usually the sole basis for determining whether a baby's sex is recorded on a birth certificate as either "male" or "female."   As a general category, however, primary sexual characteristics include those features that are not subject to the hormonal changes associated with

4

Zzyym v. Tillerson – AR 0802

puberty:  *e.g.*, testes, prostate, seminal vesicles, penis, ovaries, vagina, uterus, fallopian tubes, clitoris, and labia.

14.    Secondary sexual characteristics are yet another factor in determining a person's sex.    Secondary sexual characteristics are those physical features that develop under the influence of rising levels of sex steroid hormones beginning at puberty.    Examples include breasts in women; "Adam's Apple" (enlargement of the front part of the laryngeal cartilage) in men; facial hair in men; widening of the pelvis in women; deepening of the voice in men; and hip-to-waist measurement ratios that are higher in adult females, on average, compared to adult males.    The development of secondary sexual characteristics is dependent on production of adequate amounts of estrogens in females and testosterone in males.

15.    Brain anatomy is another determinant of a person's sex.    As discussed in greater detail below, many areas of the brain are different between males and females ("sexually dimorphic" areas of the brain) due to genetics and the amounts of sex steroid hormones present in the developing fetal brain (from any source, including from the woman carrying the fetus).

16.    The relative levels of the hormones estrogen and testosterone (and their metabolites, or what is left after they are processed by the body) present in the brain and body are also factors that determine a person's sex.    Both the brain and the body have receptors for estrogen and testosterone, which means that the brain and various organs in the body are changed by the presence, or absence, of these two major hormone classes.    For example, both testosterone and estrogen are present in all people, but the relative amount of estrogen compared to testosterone is typically far, far higher in female bodies than in male bodies, whereas the amount of testosterone is typically far greater in male bodies than in female bodies.

5

Zzyym v. Tillerson – AR 0803

17.    Variability in the amount of these sex hormones, both before and after birth, can have major consequences on the primary and secondary sexual characteristics and the gender identity of people with these variances.   Defects in prenatal sex hormone production can result in ambiguously appearing genitalia at birth, or misassignment of sex at birth (MacGillivray and Mazur 2005).   For example, babies with much higher levels of androgens early in life (*e.g.*, congenital adrenal hyperplasia, a genetic absence of an important sex steroid enzyme) may appear to have male genitalia at birth even though they have typically female chromosomes (46XX; see below) and a female gender identity.   There are many such conditions, which collectively are referred to as "intersex" conditions, disorders of sex development, or "atypical sexual development" (Mazur et al., 2007).

18.    Chromosomes are also a determinant of sex.   Typically, most people have 46 total chromosomes, two of which are "sex chromosomes" known as X and Y.   Babies assigned the female sex at birth based on the appearance of external genitalia typically have a 46XX pattern; likewise, babies assigned the male sex at birth based on the appearance of their external genitalia typically have a 46XY pattern. Uncommonly (but not rarely), there are genetic abnormalities in the fertilized egg that lead to chromosome patterns that are different from either 46XX or 46XY. Examples are numerous and can be found in Mazur et al., 2007.   Classic examples include Turners' Syndrome, estimated at 1:2500 live births (46XO, where one sex chromosome is missing), and Klinefelter's Syndrome, where extra chromosomes are present (for example, 47XXY, 48XXYY).   This nonheritable genetic abnormality is present in 1:600 live births (Nielsen and Wohlert, 1991).

6

Zzyym v. Tillerson - AR 0804

19.     Some, but not all, disorders of the sex chromosomes are associated with atypical

sexual organ appearance and higher rates of homosexuality, bisexuality, or asexuality (that is, little

to no sexual attraction to anyone or interest in having sexual relations).   Some people with

disorders of the sex chromosomes, but not all, may have atypical gender identity and/or gender

role development as well.   The key point is that the presence of a typical 46XX or 46XY

chromosome pattern is relevant for determining a person's sex, but not sufficient, in and of itself,

to determine a person's sex (Richardson, 2013).

20.     Gender identity is an internal sense of oneself as a particular gender, such as male

or female.   The American Psychiatric Association (APA) defines gender identity as a "category of

social identity and refers to an individual's identification as male, female, or occasionally, some

category other than male or female" (APA, Diagnostic and Statistical Manual of Mental Disorders

(DSM-5), 2013 at 451).   Everyone has a gender identity.

21.     Gender identity is usually established early in life, by the age of two to three years

old, and displays very little malleability over time for the vast majority of people (Stoller, 1968),

especially after the onset of puberty.   Children as young as one year old may display

gender-specific behaviors readily recognizable as associated with the "opposite" sex (Zucker &

Bradley, 1995, at 11).

22.     From a medical perspective, gender identity is a critical determinant of a person's

sex.   From a social perspective (which is also relevant when considering the appropriate medical

approach to these issues), the appropriate determinant of sex is gender identity, as that is the

underlying basis for how one presents oneself to others in society in ways that typically

communicate what sex one is in our culture.

7

Zzyym v. Tillerson - AR 0805

23.    The term "transgender" is a relatively recent term used as an umbrella concept for anyone who experiences any significant degree of "mismatch" between gender identity and physical anatomy.   The term "transgender" is also used to describe people who have transitioned to living as a gender different from what they were assigned at birth ("birth-assigned sex"). "Transgender," however, is not a medical or psychiatric diagnosis.

24.    Although the precise etiology of such gender identity issues is unknown (Ettner, 2007; Lev, 2004), most experts agree that there is likely a biological, rather than a psychological, basis for gender identity in general, including transgender identity.   Even those who espouse the idea that postnatal factors, such as familial interactions, play an important role in gender identity development suspect that biological factors play a role in "inducing a vulnerability that then allows the psychosocial factors within the family to exert their effect" (Bradley, 1985, at 175).   The evidence for gender identity arising from strictly, or mostly, postnatal influences (such as family interactions, social factors, maternal/paternal rearing styles) is neither persuasive nor compelling; nor is the notion that being transgender is "a lifestyle choice."

25.    Much of the evidence in support of a biological basis for gender identity is based on comparison studies of the brains of transgender persons[1] using imaging techniques with live subjects or measurements taken post-mortem (after death).   Such techniques were not possible a short time ago, but nonetheless, the concept of a "critical period effect" during fetal brain development was espoused decades ago as an explanation for why some (few) individuals develop a gender identity different from the sex assigned at birth (Kimura, 1992).   Although it is not

[1]   In some of the research that I am discussing, the subjects have been described as transsexual rather than as transgender.   The term "transsexualism" is no longer a diagnostic term, having been replaced by Gender Dysphoria, but the term "transsexual" is still used in professional circles, scholarly works, and treatment guidelines, and is usually used to refer to persons on the extreme end of a continuum of gender dysphoric symptoms (Coleman et al., 2012).   To avoid confusion, I will simply refer to such individuals as transgender.

8

possible to directly study the developing human brain before birth, it was proposed that the hormones present in the bloodstream surrounding the developing brain at certain, undetermined critical periods in brain sexual differentiation was altered to the extent that the "brain sex" did not align with other aspects of physical anatomy (*e.g.*, genitals). This theory more recently received support in a study of fetal testosterone exposures, which showed that the level of testosterone present in the amniotic fluid correlated positively with male-typical play patterns regardless of whether the fetus was female (XX chromosomes) or male (XY chromosomes) (Auyeung et al., 2009).

26.      It is well known that the brains of non-transgender men and non-transgender women differ in size in many regions of the brain. These include specific parts of the brain that are visible on MRI studies, including the hippocampus, caudate nucleus, and anterior cingulate gyrus, to name a few, that are larger in non-transgender women and the amygdala and gray matter volumes that are larger in non-transgender men. Most studies of male and female brains in non-transgender subjects also indicate that the right hemisphere is larger in men than in women.

27.      Zhou and others reported in 1995 that areas of the brain known to differ in size between men and women generally could be studied in transgender persons. At least one of these sexually dimorphic brain regions in transgender women (referred to in the literature as "male-to-female" or "MtF") was consistent with the size seen in non-transgender females, rather than non-transgender males.

Zzyym v. Tillerson - AR 0807

28.    Additional support for a biological basis for gender identity was reported by Luders and colleagues, who analyzed MRI data of 24 transgender women not yet treated with cross-sex hormones in order to determine whether gray matter volumes in their brains more closely resemble people who were assigned the same sex as birth as the transgender women (30 control men), or people who share their gender identity (30 control women).   Results revealed that transgender females showed a significantly larger volume of regional gray matter in the right putamen compared to the 30 control group men – non-transgender men assigned the male sex at birth. These researchers concluded that their findings provided new evidence that gender dysphoria (*i.e.*, being transgender) is associated with a distinct cerebral pattern, which supports the assumption that brain anatomy plays a role in gender identity.

29.    Savic and Stefan (2011) studied the brains of persons identified as MtF / transgender females compared to non-transgender control groups of the same sexual orientation. The brains of the transgender females subjects differed from the non-transgender male control group in several regions (*e.g.*, smaller volumes in the putamen and thalamus in transgender females).   They concluded:   "Gender dysphoria is suggested to be a consequence of sex atypical cerebral differentiation."

30.    Additional studies in support of the hypothesis that gender dysphoria is caused by sex atypical differentiation of parts of the brain before birth due to genetic and/or an early organizational effect of testosterone levels during fetal brain development include:   Giedd et al., 1997; Green & Keverne, 2000; van Goozen et al., 2002; and Swaab, 2007.

10

Zzyym v. Tillerson – AR 0808

31.     Finally, several other post-mortem studies have also found distinctive brain patterns in transgender subjects that differ from what would be expected to be seen in non-transgender subjects assigned the same sex at birth as the transgender subject (*i.e.*, non-transgender males compared to transgender women who were assigned the male sex at birth). Kruijver et al., 2000; Berglund et al., 2008.

32.     Consequently, clinical evidence supports the view that transgender females – *i.e.*, individuals who were assigned the male sex at birth but who have a female gender identity – should be considered to be women, and not men, whether or not they have had any surgery to alter the appearance or function of their genitalia.   Likewise, transgender men – *i.e.*, individuals who were assigned the female sex at birth but who have a male gender identity – should be considered to be men and not women irrespective of whether they have had any surgical interventions to change their bodies.

### DISCUSSION PART II – CLINICAL APPROACH TO GENDER DYSPHORIA

33.     When an individual experiences significant incongruity between the sex assigned at birth and one's gender identity, this can result in a set of clinically significant symptoms described in psychiatric manuals as gender dysphoria.   Not all people who experience some level of distress resulting from a lack of congruity between gender identity and other aspects of their sex, however, meet the threshold for a clinical diagnosis of Gender Dysphoria.

34.     As a set of symptoms, gender dysphoria is a mixture of mood symptoms (irritability, depression, anxiety) and mental distress or discomfort based on the experience of a mismatch between the sex assigned at birth, which (as noted previously) was likely based on the appearance of external genitalia, and the internal sense of gender.

11

Zzyym v. Tillerson – AR 0809

35.    Specifically, an individual who experiences gender dysphoria may have been assigned the male sex at birth, but feels female in their mind and emotions.    Individuals experiencing gender dysphoria are, in essence, psychologically in the "wrong body" and suffer significant emotional distress as a result.

36.    Gender dysphoric persons may live for a significant period of their lives in denial of those symptoms. Many people initially do not understand their cross-gender feelings and do not have a language for such feelings until well into adulthood. It is therefore not uncommon for adults later in life to first "come out" or acknowledge to others their transgender feelings (Lev, 2004).

37.    The Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association (DSM-5) (2013) is the current, generally recognized authoritative handbook on the diagnosis of mental disorders relied upon by mental health professionals in the United States, Canada, and other countries.    Its content reflects a non-ideological, science-based, and peer-reviewed process by experts in the field who have varying perspectives.

38.    The diagnosis of GD in the DSM-5 (pps. 451-459) involves two major diagnostic criteria for adolescents and adults, synopsized below:

a.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two of the following:

> 1.  A marked incongruence between one's experience/expressed gender and primary and/or secondary sex characteristics.
>
> 2.  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experience/expressed gender.
>
> 3.  A strong desire for the primary and/or secondary sex characteristics of the other gender.

12

Zzyym v. Tillerson – AR 0810

4.  A strong desire to be of the other gender.

5.  A strong desire to be treated as the other gender.

6.  A strong conviction that one has the typical feelings and reactions of the other
    gender.

b.      The condition is associated with clinically significant distress or impairment in
social, occupational, or other important areas of functioning.

39.     Diagnoses of Gender Dysphoria may also be designated by one, or both, of two
"specifiers."  One such specifier is "Gender Dysphoria *with a disorder of sex development*"
(emphasis added), which is a subcategory for gender dysphoric individuals with one of the
disorders of sex development described above.   Another is "*Post-transition* gender dysphoria"
(emphasis added), which would be used to refer to an individual who has socially transitioned, and
either has undergone, or is preparing to have, a medical intervention, such as hormonal treatment
or surgery.   Like all psychiatric diagnoses, symptoms must be of significant severity to cause
notable distress and/or dysfunction in a person's life.   The presence of gender nonconformity
alone is insufficient to warrant a psychiatric diagnosis.

40.     In spite of research evidence in support of a biological basis for Gender Dysphoria,
there are no commercially available or reliable biological, physical examination, or laboratory
tests that are used in clinical practice to diagnose Gender Dysphoria.   But this is true for virtually
all of the mental disorders in the DSM-5 and its predecessors.   In fact, Strategic Objective No. 1
of the National Institute of Mental Health (NIMH) is to "define the mechanisms of complex
behaviors," including molecules and genomic factors (NIMH, 2015).   This statement is in
recognition that even in 2016, we do not know the definitive root cause for mental disorders listed

13

in DSM-5, and we do not have objective tests of body, brain, or fluids that definitively diagnose any mental disorders.

41.    A diagnosis of Gender Dysphoria is made by a mental health professional who has training and experience with gender conditions and who conducts an in-depth evaluation of the patient, preferably with access to past medical records and collateral history from others who know the individual.   The American Psychiatric Association and WPATH (Coleman et al, *Standards of Care, Version 7*, 2012) recognize that such diagnoses can be made by a range of trained and experienced mental health professionals.

42.    Treatment of Gender Dysphoria is guided by the WPATH Standards of Care.   The SOC were first developed in 1979.   Currently in their seventh version, the SOC are considered to be authoritative for the evaluation and treatment of Gender Dysphoria and related gender conditions (Coleman et al., 2012).   There are no other comprehensive, widely accepted, medical standards of care for treating individuals with these issues.   As with all medical standards, the SOC are guidelines that can be modified based on the individualized patient circumstances and the health care professional's clinical judgment.   With appropriate treatment, individuals with a Gender Dysphoria diagnosis can be fully cured of all symptoms.

43.    A treatment plan for persons diagnosed with Gender Dysphoria involves both psychological and medical aspects.   Psychotherapy is often part of a treatment plan.   Social transition (*i.e.*, living in a gender role that is congruent with a patient's gender identity) is an important – and often the most important – component of a treatment plan.   Social transition has been commonly described as the "real life experience" of living publicly in the gender role consistent with gender identity.   Medical aspects of treatment may include hormonal reassignment to the experienced gender identity and surgery to change the genitalia and, in some

14

Zzyym v. Tillerson – AR 0812

cases, secondary sexual characteristics.   The combination of hormone therapy, social role
transition, and surgical intervention has been referred to as "triadic therapy."   What is required in
any individual case, however, may vary.   Moreover, other treatments may be sought, including
electrolysis, voice therapy, breast augmentation, facial reconstruction, etc. (Coleman et al., 2012).

44.     Social role transition is sometimes the first critical step in treatment for transgender
people who have the diagnosis of Gender Dysphoria, but even for those without this diagnosis,
social role transition is often embarked upon by transgender people who seek to lead an authentic
life as who they are rather than what their birth certificate would otherwise dictate.   The social
role transition occurs in all aspects of a person's life.   The purpose of this transition is to allow the
development of an integrated, consolidated identity.

45.     Access to sex-segregated bathrooms and changing facilities consistent with gender
identity is an essential part of the social role transition, as all people, transgender or not, need to
access these facilities multiple times each day.   Excluding transgender men from men's facilities
and transgender women from women's facilities can result in depression, anxiety, trauma, and
isolation that exacerbates the mental health issues associated with Gender Dysphoria (Burgess et
al., 2008; Grossman & D'augelli, 2008).

46.     Under the SOC, hormone therapy and surgery have established eligibility and
readiness criteria that should be met prior to approval for these medical interventions.   Eligibility
criteria generally involve timelines of successful experience with one mode of therapy before the
next step should be undertaken.   Readiness criteria involve the clinician's assessment of whether
the client has demonstrated sufficient consolidation of an evolving gender identity to move on to
the next step of transition.

15

Zzyym v. Tillerson - AR 0813

47.    Cross-sex hormone therapy has significant effects on a person's appearance and physiology.  In transgender adolescent boys and men, the voice permanently deepens; facial and body hair increase dramatically; body fat is redistributed in a male pattern; and overall muscle mass increases, most noticeably in the arms and chest.  For transgender adolescent girls and women, breasts develop; body fat is redistributed to the hips and breasts; the skin softens; muscle mass decreases; and body and facial hair lessens.  In addition, as a result of cross-sex hormone therapy, the penis, prostate and testes atrophy, which inhibits the normal functioning of the penis, particularly with respect to penetrative sexual intercourse.

48.    Transgender individuals undertaking cross-sex hormone therapy who had not previously begun the process of social transition will often do so after starting cross-sex hormones, due in part to the significant changes in physical appearance that result from this treatment.

49.    Most transgender people never undergo sex reassignment surgery (also referred to as gender affirming, or gender confirming, surgery).  This is also the case for transgender people who are severely gender dysphoric.  Other treatments–i.e., social role transition (including access to gender appropriate facilities), counseling, and, in some cases, hormone therapy–are frequently sufficient to alleviate their gender dysphoria, making invasive, expensive genital surgery unnecessary.

50.    Other transgender people who may be appropriate for, and desire, sex reassignment surgery may have medical problems that preclude surgical treatment.  Examples include neoplastic disease, severe cardiovascular disease, significant pulmonary disease, blood clotting abnormalities, and other conditions for which lengthy general anesthesia is contraindicated.

16

Zzyym v. Tillerson – AR 0814

51.     Even where sex reassignment surgery may be medically appropriate, for many

transgender people, surgery is out of the question because of the high cost and the fact that it is

frequently not covered by health insurance plans.

52.     The minimum criteria for genital reassignment surgery includes the requirement

that one have a persistent, well-documented history of gender dysphoria; the capacity to consent to

treatment; be of the age of majority; and have any significant medical or mental health care

conditions well controlled.   Lastly, a person seeking genital surgery must generally undergo 12

continuous months of living in a gender role that is congruent with the patient's identity, and

obtain two letters of referral from experienced clinicians in a qualifying mental health discipline.

Living in a gender role necessarily includes the use of facilities associated with the gender identity

of the person undergoing transition.

53.     Early attempts at treatment to change transgender individuals' gender identity to

that congruent with the sex assigned to them at birth were demonstrated to be ineffective in most

cases, prompting the American Medical Association (AMA) as early as 1972 to support medical

and surgical interventions as the treatment of choice for Gender Dysphoria (then called

"Transsexualism") (AMA, 1972).   Others noted that psychotherapy, often with associated

cross-sex hormonal treatment, was of benefit for some gender dysphoric people with respect to life

adjustment, but not for changing one's gender identity (Lothstein & Levine, 1981; Seikowski,

2007).   In fact, with respect to attempts to change an individual's gender identity to bring it into

alignment with the sex assigned at birth, it has been stated that there are no demonstrable,

successful "conversions" through the use of a form of psychotherapy (Monstrey et al., 2007, at 89),

known today as "reparative therapy" or "conversion therapy."   These types of therapy are widely

considered to be unethical by professional organizations not only because of their ineffectiveness,

17

Zzyym v. Tillerson - AR 0815

but also because of the emotional harm that has been demonstrated in many who have received such therapies in the past (Daniel et al., 2015).

54.    The federal Substance Abuse and Mental Health Services Administration recently issued a report showing that "conversion therapy" is not an appropriate therapeutic approach based on the evidence.   The report also included similar consensus statements developed by an expert panel held by the American Psychological Association in July 2015.   The professional organization that was arguably the most involved with attempting to convert both homosexual and transgender persons' identities decades ago has also come out strongly against the use of psychotherapy to attempt to change either sexual or gender identity:   "Psychoanalytic technique does not encompass purposeful attempts to 'convert,' 'repair,' change or shift an individual's sexual orientation, gender identity, or gender expression.   Such directed efforts are against fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by reinforcing damaging internalized attitudes." (American Psychoanalytic Association, 2012).

55.    Many people who identify as transgender do not come to clinical attention and therefore may not have a formal diagnosis of Gender Dysphoria or be under a specific treatment plan.   There are many reasons for this, including the fact that many transgender people lack access to health care providers who feel competent to treat gender identity issues.   Moreover, some transgender people have a stable gender identity different than the sex assigned at birth, but do not experience clinically significant distress as a result of the discontinuity between their gender identity and their physical anatomy.   For these individuals, social transition is all that is required to alleviate any dysphoria that would result from their trying to live according to their sex assigned at birth, rather than consistent with their gender identity.

18

Zzyym v. Tillerson - AR 0816

56.    Transgender people, irrespective of whether they have a clinical diagnosis, report enduring discrimination, teasing, bullying and other harmful attacks, including hate crimes that may result in death (Clements-Nolle et al., 2008; Stotzer, 2009; Altschiller, 2015). Discrimination can have negative and harmful effects on the daily functioning and emotional and physical health of transgender persons, whether or not they have a Gender Dysphoria diagnosis (Bradford et al., 2013; Herman et al., 2014; Nadal & Griffin, 2011; Nadal, 2010; Goldblum et al., 2012). Conversely, transgender people who live in states with antidiscrimination and hate crime legal protections based on gender identity status are less likely to suffer from a variety of mental illnesses and symptoms compared to those who do not live in states with these protections (Blosnich et al., 2016).

57.    Being denied access to gender appropriate single-sex bathrooms and changing facilities is one of the most common and acute forms of discrimination that transgender people experience. As such, restrictive restroom and locker room policies can contribute to negative general health and mental health outcomes for transgender people.

58.    In sum, laws and policies that require transgender women to be treated as though they were male (or, conversely, that require transgender men to be treated as though they were female) are psychologically harmful to those individuals, and are inconsistent with evidence-based best practices designed to promote the health and well-being of transgender people (Coleman, 2012).

Zzyym v. Tillerson - AR 0817

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States that the foregoing is true and correct.

Executed on this _20th_ day of _June_, 2016.

By: _____

George R. Brown, MD, DFAPA

20

# EXHIBIT A

Exhibit A to George Brown Declaration

Zzyym v. Tillerson - AR 0819

# CURRICULUM VITAE

GEORGE RICHARD BROWN, MD, DFAPA

Professor of Psychiatry
Associate Chairman for Veterans Affairs
East Tennessee State University

Research, Teaching, Consulting Psychiatrist
James H. Quillen VAMC
Mountain Home
Johnson City, TN

Mailing address:
549 Miller Hollow Road
Bluff City, Tennessee  37618-4103

(423) 676-5291 (cell)
(423) 538-8655 (fax)
Email: BrownGR@etsu.edu

Date of Preparation:  June 29, 2016

## EDUCATION:

Undergraduate:  University of Rochester, Rochester, New York, 1975-1979;
Bachelor of Science with Highest Honors and Distinction in Research, Summa Cum Laude.

Medical School:  University of Rochester School of Medicine, Early Acceptance Program
(Rochester Plan), 1979-1983; Doctor of Medicine with Honors; Health Professions Scholarship
Program.

Internship:  United States Air Force Medical Center, Wright-Patterson Air Force Base, Ohio,
1983-1984.

Residency:  Wright State University - United States Air Force Integrated Residency in Psychiatry,
Dayton, Ohio, 1984-1987.

## CREDENTIALS:

FLEX, December, 1983 (Behavioral Sciences, 94%; Psychiatry, 93%).
Full licensure to practice medicine, State of Ohio, December, 1983 to present; license
        #50119
Full licensure to practice medicine, State of Texas, August, 1989 to present; license
        #H5847
Full Licensure to practice medicine, Commonwealth of Kentucky, 1993 to 1995,
        #30100; allowed to expire with no intent of practicing in Kentucky.
Full licensure to practice medicine, State of Tennessee, 1994-present, license #25192

Psychiatry Resident In-Training Examinations;
1986: 98th percentile - all U.S. residents, psychiatry.
1985: 90th percentile - all U.S. residents, psychiatry.
1984: 98th percentile - all U.S. residents, psychiatry.

1

Zzyym v. Tillerson - AR 0820

1983: 98th percentile - all U.S. residents, psychiatry.
American Board of Psychiatry and Neurology, Part I, April 1988 (92nd percentile); Part II,
    June 1989; ABPN Certificate #31377.
Electroconvulsive Therapy Administration Certification,
    1985-1990.
Courtesy Staff Privileges, Charter Real Hospital, San Antonio, Texas, 1990-1994.
Courtesy Hospital Staff, Bexar County Hospital District, San Antonio, Texas, 1988-1994.
Full Admitting Privileges, Wilford Hall Medical Center, San Antonio, Texas, 1987-1993.
Full Admitting Privileges, James H. Quillen VAMC Hospital, Johnson City, TN, 1994-2016
Basic Life Support Certification, renewed March 2015

**PROFESSIONAL EXPERIENCE:**

Current Positions:

**Professor and Associate Chairman for Veterans Affairs, Department of Psychiatry and
Behavioral Sciences, Quillen College of Medicine, East Tennessee State University**. 1995-
present.  Advisory duties to the Chairman, signature authority in absence of the Chair,
contributing to administrative, teaching, and research missions of the Department, liaison
between the VAMC and ETSU psychiatry administrations.

**Research, Teaching, and Resident supervision appointment, James H. Quillen VAMC.**
February 1, 2016-present. Responsibilities include providing teaching, research services, clinical
consultation, and resident supervision/mentoring in the Psychiatry Service.

Past Positions:

**Staff Psychiatrist, Mental Health Outpatient Clinic, James H. Quillen VAMC**.  December,
2014-January 31, 2016.  Responsibilities included treating veterans with chronic, persistent,
mental illnesses in an outpatient setting and providing consultation services to junior staff and
residents in psychiatry. Direct supervision of third year psychiatry residents in the Mental Health
Clinic.

**Transgender Health Care Facility Lead, Mountain Home Health Care System.** 2014-January
31, 2016. Responsibilities included providing direct patient care for transgender veterans,
providing national training for VHA health care providers learning how to provide transgender
health care, direct supervision of other health care providers in teaching evaluation and treatment
techniques, leading a multidisciplinary team of health care providers assigned to provide
transgender health care in our 70,000 patient health care system.

**Program Officer, Health Care Outcomes, Office of Health Equity (10A6), VA Central Office,
Washington, D.C.**  December, 2012, to December, 2014.  Responsibilities included researching
medical and psychiatric health disparities in vulnerable populations of Veterans treated by the
Veterans Health Administration, and assisting top officials in VHA in the development of policies
that lead to elimination of health care outcome disparities in these subpopulations. Continued to
see patients at Mountain Home VAMC throughout this appointment.

**Chief of Psychiatry, James H. Quillen VAMC**. November 22, 1995-December 16, 2012.
Responsibilities included direct supervision of a staff of 34-42 professional staff, including 24-28
psychiatrists, 2 Clinical Nurse Specialists, and 9-12 psychiatric nurse practitioners.  Represented
the Department in all meetings requiring the input of the Chief of Service.  Attended executive

2

Zzyym v. Tillerson – AR 0821

meetings in the Medical Center and University.  Contributed to long range planning of services in the Medical Center.

**Research Appointment (WOC), VHA Center of Excellence for Suicide Prevention,**
Canandaigua, New York. 2011-2014. Responsibilities of this position included developing research protocols collaboratively with CoE staff that have national implications related to suicide in VHA.

**Director of Psychiatric Research, James H. Quillen VAMC Dept. of Psychiatry.** 1994-2012.
Responsibilities included creating a research program de novo and leading a research team at the VAMC,  teaching resident seminars, didactics, research electives, providing direct patient care for inpatients on research protocols (usually those with severe mental disorders), traveling to conferences to present research findings and providing Grand Rounds to other institutions and medical schools.  Major focus of research activities has been working with stigmatized/disenfranchised populations and addressing mental health care aspects and disparities in care.

**Staff psychiatrist, Another Chance Recovery Program**, Morristown, Tennessee. March 1995-1996. This is an intensive outpatient drug and alcohol treatment program with a heavy emphasis on dual diagnosis patients, outpatient detoxification from chemical dependency, and a blend of the medical and 12-Step approaches to treatment of the chemically dependent patient. One evening clinic per week.

**Senior Research Scientist and Director of Psychiatric/Neuropsychiatric
HIV Research**, Wilford Hall Medical Center, Henry M. Jackson Foundation for the Advancement of Military Medicine, San Antonio, Texas. 1 July 1991 to 1 October 93.  Responsibilities included hiring and then directing a team of approximately 15 civilian and military psychiatric researchers conducting HIV-related psychiatric research; Principal Investigator on longitudinal psychiatric natural history study of early HIV infection (males and females), 1989-1993; preparing manuscripts, presenting research findings at national and international meetings; designing and implementing new protocols; interviewing and assisting in the hiring of personnel; managing administrative and personnel issues.

**Private practice** of adult psychiatry. 1991-November 1993.  Part-time practice primarily focusing on sexuality and gender concerns, including endocrine care, and adult psychodynamic psychotherapy.

**Consulting Psychiatrist for Quality Assurance and Continuing Quality Improvement Programs**:
1) Charter Real Partial Hospitalization Program, San Antonio, Texas. 1990 to 12/93.
Responsibilities of this part time position included designing and implementing a medical quality assurance program and assisting Utilization Review personnel with implementing efficient resource utilization procedures.
2) Colonial Hills Hospital Inpatient Services and Adult Partial Hospitalization Program, San Antonio, Texas. 1992.  Responsibilities of this part time position included custom designing a four part program to address QA/CQI concerns on all inpatient units, coordinating the implementation of the program with hospital QA/UR personnel, and quantifying/ databasing physician charting performance to analyze trends.

**Staff Psychiatrist,** Wilford Hall Medical Center, Lackland Air Force Base, San Antonio, Texas:

1987-1989: Primary responsibility for inpatient ward of 25-33 patients, resident and medical student teaching, and professional presentations. 1040 admissions; average length of stay 13 days.

1989-1991: Outpatient Clinic service, responsible for evaluations and treatment of adult

3

Zzyym v. Tillerson - AR 0822

outpatients; supervision of PGY-3 residents in psychiatry and other staff working in the clinic (social workers, psychologists, and mental health technicians). Medical support for comprehensive Smoking Cessation Clinic.

1989-1991: Director of Psychiatric Research, half-time position; developed a research program primarily targeting psychiatric resident involvement with research and related activities, including presentations at regional and national professional meetings. Active in conducting research, reviewing and approving protocols, research design, editing publications submitted from the Department of Psychiatry, and organizing symposia; interviewing and selecting official for research personnel for multicenter collaborative HIV research grant.

## ACADEMIC APPOINTMENTS:

Professor of Psychiatry (1998-present), East Tennessee State University, Quillen College of Medicine. VA Academic Faculty appointment.

Adjunct Professor of Psychology, University of Tennessee at Knoxville (1997). Served on doctoral dissertation committee as supervisor and mentor for doctoral candidate in clinical psychology.

Associate Professor of Psychiatry (1994-1998), East Tennessee State University, Quillen College of Medicine. Full time geographic faculty appointment. Renewal of previously awarded academic ranking. Activities include serving on numerous committees (see below), teaching residents, providing electives, working collaboratively with staff to conduct new research projects, interviewing residency and faculty candidates.

Clinical Associate Professor of Psychiatry (1992-1994), University of Texas Health Science Center at San Antonio, San Antonio, Texas. 1987 to 1994. Primary responsibility of this position was teaching medical students and residents in individual, group, and lecture settings; provision of psychodynamic psychotherapy supervision. Lectures and seminars include core material on sexual dysfunction, treatment of paraphilias, gender identity disorders, homosexuality, and psychiatric aspects of HIV infection.

Clinical Associate Professor of Psychiatry (1992-1996), Uniformed Services University for the Health Sciences, School of Medicine, Bethesda, Maryland. Primary responsibility of this position was teaching medical students from the University who travel to San Antonio for clinical rotations in psychiatry and serving as a visiting lecturer for USUHS.

Full time faculty, Department of Psychiatry, Wilford Hall Medical Center, Lackland Air Force Base, San Antonio, Texas, 1987 to 1991. Adjunct clinical faculty, Department of Psychiatry, 1991 to 1993. Responsibilities included supervising psychiatric residents involved in research activities, sponsoring Distinguished Visiting Professors in conjunction with the Department, and teaching core didactic lectures and seminars.

Assistant Clinical Instructor, Wright State University School of Medicine, 1983-1987. Primary responsibility of this position was teaching medical students during clinical rotation in psychiatry.

Chief Resident in Psychiatry, November, 1986 to March, 1987, with administrative, teaching, and research responsibilities.

## CONSULTATION EXPERIENCE:

Psychiatric Liaison and Consultant to Oncology Unit, Good Samaritan Hospital, Dayton, Ohio,

4

Zzyym v. Tillerson - AR 0823

1985.
Clinical Supervisor and Psychiatric Consultant to Montgomery County Juvenile Court
    Diversion Program, Dayton, Ohio, 1986-1987.
Consultation/Liaison Rotation, Keesler AFB, MS, 1986.
Psychiatric Consultant to the United States Air Force Child Abuse Task Force (convened by
    the Surgeon General of the Air Force), 1989-1991.
Lorain Correctional Institution, psychiatric consultant for inmate mental health evaluations
    and treatment, July-August 1993.
State of Tennessee Mental Health and Mental Retardation, appointed as consultant to develop
    Best Practice Guidelines for all State programs for Bipolar Disorder.
Health Ed, The Patient Education Agency: consultant for development of patient education
    materials for chronic mental illnesses, 2006-2007.
Consultant to Batavia Independent School District in assisting on-the-job gender transition for a
    transgender high school teacher, 2006.
Consultant to Port Ewan/Kingston BOCES School Program in assisting on-the-job transition for a
    transgender principal,  2007.
Consultant to the Federal Bureau of Prisons on policies relating to medical management of
    transgender inmates, 2009, 2014.
Consultant to Department of Defense on policy and medical issues related to transgender service
    members, 2016-present.


**SPECIALIZED TRAINING EXPERIENCES:**

School of Aerospace Medicine, Course I, Brooks AFB, San Antonio, Texas, 1981.
Administrative Course for Chief Residents, Tarrytown, New York, June, 1985.
Combat Casualty Care Course, San Antonio, Texas, 1985.
Consultation and Liaison Psychiatry, Keesler AFB, Biloxi, Mississippi, 1986.
Center for the Treatment of Impotence, Case Western Reserve University, Cleveland, Ohio,
    July, 1986.
Forensic Psychiatry Course and associated clinical work, 6 months, 1986-87; ongoing case work
    in forensic psychiatry as expert witness and legal consultant, 1987-present.
Gender Identity Clinic, Case Western Reserve University, Cleveland, Ohio, July, 1986.
Paraphilias Clinic, Case Western Reserve University, Cleveland, Ohio, July, 1986.
Chemical Dependency Program, Samaritan Hall, Dayton, Ohio, August, 1986.
Advanced Study of Gender and Sexual Disorders, Institute of Living, Hartford, Connecticut,
    April, 1987.
Electroconvulsive Therapy Administration Training, Jan-June, 1985; June, 1987.
SCID training seminar, September, 1989.
American Board of Psychiatry and Neurology Examiner, 1991-present.
Administrative psychiatry and leadership training, James H. Quillen VAMC,1996 to 2012.
Physician Executive Training, American College of Physician Executives,  (PIM-I Course,
    31 hours; PIM-III Course, 31 hours), 1998-1999.
Masters and Johnson workshop on trauma, sexual compulsivity/addiction treatment, 11 hours,
    December, 2003.
Forensic Workshop on sex offenders, National Council on Sexual Addiction and Compulsivity,
    October, 2002
Forensic workshops, including PREA implementation, managing hunger strikes, mental health
    issues in prison, sponsored by National Commission on Correctional Health Care, 2010,
    2012.
Forensic workshops, including 3 hours of training on medical and legal aspects of providing
    health care for transgender inmates, sponsored by National Commission on Correctional
    Health Care, 2015.

Zzyym v. Tillerson - AR 0824

**COMMITTEE AND BOARD ACTIVITIES:**

Mohonasen Public School Board Member, Schenectady, New York, 1974-1975.
Social Chairman, Wright State University Psychiatry Residency, 1984.
Dayton Representative to the Member-in-Training Committee of the Ohio Psychiatric
        Association, 1984-1986.
Chairman, Member-in-Training Committee, Ohio Psychiatric Association, 1986-1987.
Chairman, Member-in-Training Committee, Dayton Psychiatric Society, 1985-1987.
Peer Review Committee, Ohio Psychiatric Association, 1986-1988.
Long Range Planning Committee, Ohio Psychiatric Association, 1986-1987.
American Psychiatric Association, Area IV Resident Caucus, Ohio Representative, 1987.
American Psychiatric Association, Committee of Residents of the Council on Medical
        Education and Career Development, Ohio Representative, 1986-1987.
Ohio Psychiatrist's Political Action Committee, Board of Directors, 1987.
Bexar County Psychiatric Society Committee on AIDS, 1990-1993.
World Professional Association for Transgender Health (WPATH) Committee to Revise the
        Standards of Care, 1990-present; Cochairman of Standards of Care Revision Committee,
        2001-2005.
Psychiatric Consultant to the Board of Directors, Boulton and Park Society, San Antonio, Texas,
        1988-1998.
President-elect, Society of Air Force Psychiatrists, 1990-1991.
Board of Directors, Alamo Area Resource Center (AIDS/HIV Service Organization), 1991-1992.
Board of Advisors, American Educational Gender Information Service (Atlanta, Georgia), 1992-
        1998.
Quality Assurance Committee, Texas Society of Psychiatric Physicians, 1992-1993.
Professional Standards Committee, Texas Society of Psychiatric Physicians, 1992-1993.
Board of Directors, Harry Benjamin International Gender Dysphoria Association (WPAth), 1993-
        1997; 2001-2007
Ethics Committee, Tennessee Psychiatric Association, 1994-present.
Advisory Committee on Publications and Advertising, Southern Medical Association,
        1994-1996.
Councilor to the Executive Committee, Tennessee Psychiatric Association, East Tennessee
        Region, 1995-2005.
Vice-Chairman, Section on Neurology and Psychiatry, Southern Medical Association, 1995-
        1996.
President, New Health Foundation, 2001-2003.
Secretary of the Section on Neurology and Psychiatry, Southern Medical Association, 1997-
        2000.
American Psychiatric Association PKSAP and Medical Education Committees, appointed by
        Herb Sachs, M.D. and Harold Eist, M.D. (APA Presidents), 1997-2001.
Scientific Affairs Committee, Southern Medical Association, 1997-1999.
Consultant to the Joint Commission on Public Affairs, American Psychiatric Association,
        appointed by Rod Munoz, M.D. (APA President), 1998-1999.
Scientific Program Committee, Southern Psychiatric Association, 1999-2000.
Resident Award Committee, Southern Psychiatric Association, 1997-2009.
Ethics Committee; HIV Committee; Harry Benjamin International Gender Dysphoria Association,
        1999-2005
Board of Directors, New Health Foundation, Chicago, IL, 2000-present.
Tennessee Department of Mental Health and Retardation Adult Committee on Best Practices
        (responsible for recommending guidelines for treatment of bipolar disorder),
        2000-2003.
Associate Counselor for Tennessee, Southern Medical Association, 2000-2008.
Resident Award Committee, Southern Psychiatric Association, 2003-2009.
Board of Directors, James H. Quillen VAMC Research Corporation, 2003-2010.

6

Zzyym v. Tillerson - AR 0825

HBIGDA Biennial Symposium Scientific Meeting Committee, 2006-2007.
Board of Regents, Southern Psychiatric Association, 2006.
Southern Medical Association, Section Secretary for Psychiatry and Neurology, 2004-2008.
Scientific Review Committee, World Professional Association for Transgender Health
      Symposium, 2007-2009; 2015-present.
Board of Regents, Second Year, Southern Psychiatric Association, 2007.
Chairman, Board of Regents, Southern Psychiatric Association, 2009.
WPATH Board of Directors, 3 terms totaling 13 years, with last term 2014 (mandatory rotation off
      the board).
Secretary-Treasurer, World Professional Association of Transgender Health, 2007-2009.
DSM-V workgroup on Gender Identity Disorders (WPATH advisory work group to American
      Psychiatric Association DSM-V GID task force), 2009.
World Health Organization advisory committee for ICD-11 (gender identity disorders), 2011-
      present.
Department of Veterans Affairs Transgender Directive Communication Plan Education Group,
      2011-2012.
VHA Transgender Training Workgroup, Patient Care Services, 2012- present.
Numerous VA Central Office national workgroups and committees, including the workgroup to
      add birth sex and gender identity data fields to all VA medical records, 2012-present.
Commissioner, Palm Center Commission on Transgender Military Service, Appointed by
      Joycelyn Elders, MD, 2013 to 2014.


## PROFESSIONAL ORGANIZATIONS:

American Psychiatric Association (1983-2015); #044933, Fellow, 1998; Distinguished Fellow,
      2003
Association for the Advancement of Psychotherapy (1985-1993)
World Professional Association for Transgender Health (1986-present)
Ohio Psychiatric Association (1983-1987)
Texas Society of Psychiatric Physicians (1988-1994)
Tennessee Psychiatric Association (1994-present)
American Medical Students Association (1977-1987)
American Medical Association (1983-1988; 2015-present)
Ohio State Medical Association (1983-1987)
Montgomery County Medical Society (1983-1987)
Dayton Psychiatric Society (1983-1987)
Society of United States Air Force Psychiatrists (1983-1991)
Bexar County, Texas, Psychiatric Society (1987-1990)
Southern Medical Association (1994-2010)
Southern Psychiatric Association (1997-2009)
New Health Foundation (advocacy organization for transgendered health care;
      1996-present)
American Psychological Association Society for the Psychological Study of Men and Masculinity,
      Division 51, 1996-2000.


## AWARDS AND SPECIAL RECOGNITION:

Valedictorian, Mohonasen High School, Schenectady, New York, 1975.
New York State Regents Scholarship, 1975-1979.
Bausch and Lomb Science Award and Scholarship, 1975-1979.
Phi Beta Kappa, junior year selection, 1977.
Donald Charles Memorial Award for Research in Biology, 1978.
Recognition for Highest Grade Point Average, Department of Biology-Geology, University
      of Rochester, 1979.

Zzyym v. Tillerson - AR 0826

Dean's Letters of Commendation for Academic Achievement, University of Rochester, 1975-
  1983.
Letter of Commendation for Excellence in Pathology, University of Rochester, 1981.
Alpha Omega Alpha Medical Honor Society, University of Rochester, 1983.
Wright State University Department of Psychiatry selectee for fellowship in the Group for  the
Advancement of Psychiatry (GAP), 1984.
Wright State University Department of Psychiatry nominee for Laughlin Fellowship of the
  American College of Psychiatrists, 1985, 1986.
Physician's Recognition Award of the American Medical Association, 1986 to present.
President's Award of the Ohio Psychiatric Association for outstanding service to the
  organization, 1987.
Chairman's Recognition Award For Scholarship and Research, Wright State University
  Department of Psychiatry, 1987.
Air Force Training Ribbon, 1980.
Air Force Outstanding Unit Decoration, 1987; first oak leaf cluster additional award, 1990.
Air Force Expert Marksman Ribbon, 1988.
Air Force Achievement Medal for research accomplishments, 1990.
1990 American Academy of Psychosomatic Medicine Dlin Fischer Award for Significant
  Achievement in Clinical Research; coreciptient.
Who's Who Among Human Services Professionals, 1990 to present.
West's Who's Who in Health and Medical Services, 1991 to present.
Marquis Who's Who of Board Certified Medical Specialists, 1992-present.
Bexar County Medical Society Certificate of Appreciation, 1991.
Air Force Meritorious Service Medal for distinguished clinical and research service to the
Department of   Psychiatry, Wilford Hall Medical Center, 1991.
Air Force National Defense Ribbon, Desert Storm Campaign, 1991.
Mohonasen High School Hall of Fame for Lifetime Achievement, 1992 inductee.
Health Care Professional of the Year Award, Boulton and Park Society, San Antonio, Texas,
  1992-93.
Special Citation Award, Society of Behavioral Medicine, with Coyle C, et al., for
  presentation at 1993 Society of Behavioral Medicine Annual Meeting, 1993.
Institute for Legislative Action, 1995 Honor Role.
Sterling Who's Who of Health Care Professionals, 1995.
Southern Medical Association 1995 Award for Medical Excellence (Best Scientific Oral
  Presentation in Neurology and Psychiatry), $1,000 Scholarship prize, 1995.
Janssen Clinical Scholar, 1995.
Mountain Home VAMC Group Special Contribution Award, 1995, 1997.
Marquis Who's Who in the South and Southwest, 1996-1998.
Marquis Who's Who in Medicine and Healthcare, 1997-1998.
Certificate of Appreciation, ETSU Psychiatry Residents, 1997, 1998, 1999.
Fellow, American Psychiatric Association, 1998-2002.
Resident Special Recognition Award, June, 2000.
Distinguished Fellow, American Psychiatric Association, January, 2003
Special Group Contribution Award, VAMC, 2003
Secretary of Defense Certificate of Recognition, Cold War Military Service, 2003
VA Performance Award, 2005
First Annual Irma Bland Award for Excellence in Teaching Residents, presented by the American
  Psychiatric Association, May, 2005
Special Contribution Award, Mountain Home VAMC, for assisting in obtaining over 2.5 million in
  new program monies from VA Central Office RFP process,  April 26, 2006
Top Psychiatrists of 2006, Consumer Research Council selectee
ETSU Resident Recognition Award for "dedication to the Resident's Journal Club", 2006
Fellow, Southern Psychiatric Association, 2006
ETSU Psychiatry Faculty Mentor of the Year Award, 2007
Cambridge Who's Who, Executive and Professional Registry, 2007
Southern Medical Association, Third Place Award for Scientific Poster Presentation, Dallas,

8

Zzyym v. Tillerson - AR 0827

Texas, December 5, 2009
Twenty-five year U.S. Government service award, January 10, 2010
Joint Commission recognition : "Top Performers on Key Quality Measures" (contributor), 2011
Robert W. Carey Quality Performance Excellence Award (contributor), 2011; Department
  of Veterans Affairs award using Baldrige criteria
James H. Quillen VAMC selected as VA to be featured in the Commonwealth Fund's article
  on successful efforts to improve patient safety (contributor), 2011
Gender Identity Research and Education Society (GIRES) 2011 award to the 34 members
  of the Standards of Care Revision Committee for their work on the WPATH Standards of
  Care, 7th Version.
Robert W. Carey Quality Trophy Award, Mountain Home VAMC.  This is the highest level
  of the Carey Award for those VAMC's seeking performance excellence using the Baldrige
  Criteria.  Awarded by the Secretary of the VA to the leadership team of which I was a
  Part, 2012.
Recognized by LGBT Health journal in March, 2016 as having first-authored the #1 and #3 most
  read articles in that journal since its inception.


## UNIVERSITY/VA COMMITTEE ACTIVITIES:

Learning Resources Advisory Committee (ETSU), 1995-1996.
Psychiatric Residency Training Committee /Educational Policy Committee (ETSU), 1993-present.
Peer Review Committee (VAMC), 1995-1996.
Chairman and Founder, Psychiatric Grand Rounds and Visiting Professor Program (ETSU),
  1993-1997; 2003-2004.
Clinical Executive Board (VAMC), 1995-2012.
Research and Development Committee, Dean's Appointment (VAMC), 1996-1998.
Chairman, VAMC Research and Development Committee, 1999-2000.
Co-Chairman, Mental Health Council (VAMC), 1995-2009.
Academic Partnership Committee (ETSU), member, 1995-2012.
Facility Master Plan and Space Utilization Committee (VAMC), 1995-2010.
Professional Standards Board (VAMC), 1995-2012.
Safety Committee, Department of Psychiatry, Chairman (VAMC)
ETSU Psychiatry Promotion and Tenure Committee, 1998-present.
Resident Selection Committee, ETSU Psychiatry Program, 1998-2012.
Chairman, VAMC Research and Development Committee, 2001-2002.
Veterans Health Affairs, VISN 9, Budget and Finance Committee, 2002-2004.
Institutional Review Board (ETSU/VAMC), member, 1996-2003; served as acting chair as
  needed.
Cameron University Department of Psychology, Dissertation Committee Consultant for Beth
  Ryan, Masters Thesis, 2004-2005 (gender identity disorder research).
VISN 9 Mental Health Leadership Committee.
ETSU/VAMC Subcommittee on Graduate Medical Education, 2008-2012.
Vanderbilt University Department of Nursing, Dissertation Committee member and consultant for
  Gerald Meredith, 2009-2010.
VA Transgender Directive Education Workgroup; VACO workgroup to advise the Undersecretary
  on how to educate and implement the 2011 Directive on providing healthcare to
  transgender and intersex Veterans, 2011-present.
Office of Health Equity (VACO) Health Equity Coalition, 2013-2014.
Numerous research committees and advisory panels for health equity research projects being
  conducted in VA, 2012-present.
Chairman, Educational Policy Committee (Residency Training Committee), East Tennessee State
  University Department of Psychiatry, 2015-present.
Self-Identified Gender Identity Data Field Training Workgroup (National VA work group to change
  electronic medical records data collection to include self-identified gender identity)
Research Committee, East Tennessee State University Department of Psychiatry, 2015-

Zzyym v. Tillerson – AR 0828

present.

**FORENSIC PSYCHIATRY ACTIVITIES:**

1. Military court proceedings, two occasions as expert witness at trial; U.S. Air Force, U.S. Army, c.1990-1992
2. Military Physical Evaluation Board Proceedings, expert testimony, 2/8/02
3. Farmer v. Hawk, United States District Court for the District of Columbia, expert opinion by affidavit on behalf of plaintiff, 1999
4. Yolanda Burt v. Federal Bureau of Prisons/Moritsugu, United States District Court for the District of Columbia, deposition testimony on behalf of plaintiff, 2000
5. Kosilek v. Maloney, 221 F.Supp 2d 156,186 (D.Mass. 2002), expert witness by trial testimony on behalf of plaintiff, 2001
6. Family Court expert witness trial testimony, Missouri, (custody issues for transgendered parent),1993
7. Thompson v. Idaho Department of Corrections (prison medical care Issues), consultant on behalf of plaintiff, 2002 (citation: Linda Patricia Thompson v. Dave Paskett, et al., Case No. CV00-388-S-BLW)
8. State of Missouri Medical Board, expert opinion by affidavit on behalf of physician, 10/2001
9. State of Tennessee Medical Board, expert opinion by affidavit on behalf of physician, 5/2002
10. Military Administrative Hearing, consultant, U.S. Army, December, 2002
11. Oiler v. Winn-Dixie Louisiana, Inc; USDC, Eastern District of Louisiana, No. 00-3114 "L" (3); consultant on behalf of defendant, 2001-2002
12. Moore v. State of Minnesota, consultant and deposition testimony on behalf of defendant, Attorney General's Office, State of Minnesota, 2003
13. Woods v. US Air Force, administrative discharge board, consultant, San Antonio, TX, 2003
14. Ophelia Azriel De'Lonta vs. Ronald Angelone and Prison Health Services, Inc. (Virginia Department of Corrections) United States District Court, Western District of Virginia, 330 F.3d 630,635 (4th Cir 2003) deposition testimony on behalf of plaintiff, 2003
15. Malpractice case, Tennessee, for defendant (primary care physician) consultant, 2004-2005
16. Josef v. Ontario Minister of Health, Attorney General of Ontario representing Her Majesty the Queen in Right of Ontario; Ontario Superior Court of Justice; expert opinion affidavit and consultant on behalf of plaintiff, 2004-2007.
17. Nubel v. New Jersey Board of Nursing, consultant and deposition testimony for defendant, 2004-2005
18. Malpractice case, Tennessee, consultant for defendant (psychiatrist), 2004-2005
19. Malpractice case, Kentucky, consultant for defendants (psychiatrists), 2005-2006
20. Kosilek v. Mass. Department of Corrections/ Kathleen Dennehy, expert witness by trial testimony and consultant on behalf of plaintiff, 2005-2006 ( Kosilek v. Spencer, 889 F.Supp.2d 190 (D. Mass. Sept. 4, 2012); "Kosilek I."
21. Gammett v. Idaho Department of Corrections, expert opinion affidavit and consultant for plaintiff, 2005-2007 (Gammett v. Idaho State Bd. of Corrections, No. CV05-257-S-MHW, 2007 WL 2186896 (D. Idaho July 27, 2007)
22. Isaak v. Idaho Department of Corrections, consultant, and deposition testimony on behalf of plaintiff, 2006-2008
23. May v. State of Tennessee and multiple codefendants; consultant on behalf of defendant, Attorney General's Office, State of Tennessee, 2006
24. Fields/Sundstrom v. Wisconsin Department of Corrections, consultant and deposition testimony on behalf of plaintiff, 2007 ( Fields v. Smith, 653 F.3d 550 (7th Cir. 2011)
25. Palmer v. State of TN; malpractice case; consultant and deposition testimony for defendant, Attorney General's Office, State of Tennessee 2007
26. Spray v. Temp Agency, consultant and expert opinion affidavits on behalf of plaintiff, 2007

10

Zzyym v. Tillerson - AR 0829

27. O'Donnabhain v. Internal Revenue Service/Department of the Treasury, expert witness by trial testimony on behalf of plaintiff, 2007 (O'Donnabhain v. Commissioner, 134 T.C. No. 4 (Feb. 2, 2010).
28. Battista v. Mass. Department of Corrections/Kathleen Dennehy, consultant and expert opinion affidavit for plaintiff, 2008-2011.
29. Plumley v. State of TN; malpractice case; consultant for defendant, 2009.
30. Kolestani v. State of Idaho, capital murder case, consultant and expert opinion affidavit for public defender's office, 2009.
31. Smith v. St. Mary's Medical Center, medical malpractice case, consultant for defendant, 2009-2011, expert witness by jury trial testimony, 2011.
32. Finch aka Destiny v. Idaho Department of Corrections, consultant for plaintiff, 2010-2011.
33. Soneeya v. Clarke, Civil Action No. 07-12325 (NG), Massachusetts, consultant for plaintiff, 2011. (see also Soneeya v. Spencer, 851 F.Supp.2d 228 (D. Mass. 2012)
34. Hoyle v. Saha, malpractice case; consultant for defendant, 2011- 2014.
35. Champouillon v. State of TN; malpractice case; consultant for defendant, 2012-present.
36. Equivel v. State of Oregon; access to transgender health care for Oregon State employees; consultant to Lamdba Legal, 2012.
37. Kosilek v. MA DOC, expert witness for plaintiff, 2012-present; ("Kosilek II").
38. Binney v. South Carolina DOC, consultant and expert opinion by affidavit for plaintiff, 2013-present.
39. De'Lonta v. Harold  W. Clarke et al. (Virginia Department of Corrections), consultant and expert opinion by affidavit to plaintiff, 2013-2014.
40. U.S. and Tudor v. Southeastern Oklahoma State University, expert consultant for plaintiff and the Department of Justice (Title VII discrimination case), by declaration for plaintiff, 2015-present.
41. Mott v. State of Kansas, consultant and expert opinion by affidavit for plaintiff (birth certificate change), 2015-present.
42. Fuller v. MA Department of Corrections; expert opinion by affidavit and deposition, for plaintiff, 2015-present.
43. Franklin v. Hardy, et al. (Illinois Department of Corrections); expert opinion by affidavit, for plaintiff, 2015-present.
44. Dunn et al. v. Dunn et al. (Alabama Department of Corrections), expert consultant for plaintiff, 2016-present.

## PUBLICATIONS:

1. Brown G R: Morphologic complexity and its relationship to taxonomic rates of evolution. J Undergrad Res, 3:139-168, 1978.
2. Brown G R: Stadol dependence: another case. JAMA, 254(7):910, 1985.
3. Brown G R: Letter to the Editor. Newsletter of the Ohio Psychiatric Association, 10(1):8, 1986.
4. Brown G R: Resident Rounds. Column for Newsletter of the Ohio Psychiatric Association. 10(2), 10(3), 11(1),11(2), 1986-1987.
5. Brown G R: Anorexia nervosa complicated by Mycobacterium xenopi pulmonary infection. J Nerv Ment Dis, 175(10):629-632, 1987.
6. Brown G R: Mycobacterium xenopi infection complicating anorexia nervosa. Proceedings of the 29th Annual Meeting of American College of Physicians (Air Force Regional Meeting), 22-25 March, 1987.
7. Brown G R: Buspar, a new anxiolytic. Letter to the Editor, Journal of the Ohio State Medical Association, Spring, 1987.
8. Brown G R: Transsexuals in the military: flight into hypermasculinity. Abstract. Proceedings of the 10th International Symposium on Gender Dysphoria (Amsterdam, The Netherlands) 7 June, 1987.
8. Brown G R: Transsexuals in the military: flight into hypermasculinity. Arch Sex Behav, 17(6):527-537, 1988.
10. Brown G R:  Therapeutic effect of silence: application to a case of borderline personality

II

Zzyym v. Tillerson - AR 0830

disorder.  Current Issues in Psychoanalytic Practice, 4(3-4):123-131, 1988.
11.  Brown G R: Bioethical issues in the management of gender dysphoria. Jefferson J
      Psychiatry, 6(1):33-44, 1988.
12.  Brown G R, Rundell J R: Psychiatric disorders at all stages of HIV infection.  Proceedings of
      the 1988 Annual Session of the Texas Medical Association (San Antonio, Texas), May,
      1988.
13.  Brown G R, Rundell J R: Suicidal tendencies in HIV-seropositive women.  Am J Psychiatry,
      146(4):556-557, 1989.
14.  Brown G R, Collier L: Transvestites' women revisited: a nonpatient sample. Arch Sex Behav,
      18(1):73-83, 1989.
15.  Brown G R, Pace J: Hypoactive sexual desire disorder in HIV-seropositive individuals. JAMA,
      261(17):2305, 1989.
16.  Brown G R: Prospective study of psychiatric morbidity in HIV-seropositive women.
      Psychosom Med, 51:246-247, 1989.
17.  Brown G R: Current legal status of transsexualism in the military. (Letter) Arch Sex Behav,
      18(4):371-373, 1989.
18.  Rundell J R, Brown G R: Use of home test kits for HIV is bad medicine. JAMA, 262(17):2385-
      2386, 1989.
19.  Rundell J R, Brown G R, Paolucci S L: Psychiatric diagnosis and attempted suicide in HIV-
      infected USAF personnel. Abstract. Proceedings of the Fifth International Conference on
      AIDS (Montreal, Canada), June, 1989.
20.  Brown G R: Current legal status of transsexualism in the military. Abstract. Proceedings of
      the Eleventh Inter-national Symposium on Gender Dysphoria (Cleveland, Ohio),
      September, 1989.
21.  Brown G R: A review of clinical approaches to gender dysphoria. J Clin Psychiatry,
      51(2):57-64, 1990.
22.  Pace J, Brown G R, Rundell J R, et al.: Prevalence of psychiatric disorders in a mandatory
      screening program for infection with human immunodeficiency virus: A pilot study.  Milit
      Med, 155:76-80, 1990.
23.  Rundell J R, Brown G R: Persistence of psychiatric symptoms in HIV seropositive
      persons. Am J Psychiatry, 147(5):674-675, 1990.
24.  Praus D, Brown G R, Rundell J R, et al.:  Associations between CSF parameters and high
      degrees of anxiety or depression in USAF personnel infected with HIV. J Nerv Ment Dis,
      178(6):392-395, 1990.
25.  Brown G R, Rundell J R: Prospective study of psychiatric morbidity in HIV-seropositive
      women without AIDS.  Gen Hosp Psychiatry, 12:30-35, 1990.
26.  Brown G R: The transvestite husband.  Med Aspects Human Sexuality, 24(6):35-42, 1990.
27.  Drexler K, Brown G R, Rundell J R: Psychoactive drug use and AIDS. JAMA, 263(3):371,
      1990.
28.  Brown G R, Rundell J R: Psychiatric morbidity in HIV-seropositive women without AIDS.
      Proceedings of the 143rd Annual Meeting of the American Psychiatric Association, pages
      75-76 (New York, New York), May, 1990.
29.  Rundell J R, Ursano R, Brown G R: HIV infection and perception of social support.
      Proceedings of the 143rd  Annual Meeting of the American Psychiatric Association, page
      76 (New York, New York), May, 1990.
30.  Rundell J R, Brown G R, McManis S, et al.:  Psychiatric predisposition and current
      psychiatric findings in HIV-infected persons. Proceedings of the Sixth International
      Conference on AIDS (San Francisco, California), June, 1990.
31.  Drexler K, Rundell J R, Brown G R, et al.: Suicidal thoughts, suicidal behaviors, and suicide
      risk factors in HIV-seropositives and alcoholic controls. Proceedings of the Sixth
      International Conference on AIDS (San Francisco, California), June, 1990.
31.  Brown G R: The inpatient database as a technique to prevent junior faculty
      burnout.  Acad Psychiatry, 14(4):224-229, 1990.
32.  Rundell J R, Wise M, Brown G R, et al: Relative frequency of HIV disease as a cause of
      mood disorder in a general hospital. Proceedings of the 1990 Update on Neurological
      and Neuropsychological Complications of HIV Infection, page PSY-4 (Monterrey,

Zzyym v. Tillerson - AR 0831

California), June, 1990.

33. Rundell J R, Praus D, Brown G R, et al:  CSF parameters, immune status, serum viral titers, anxiety, and depression in HIV disease.  Proceedings of the 1990 Update on Neurological and Neuropsychological Complications of HIV Infection, page PSY-5 (Monterrey, California), June, 1990.

34. Brown G R: Clinical approaches to gender dysphoria. Abstract.  Psychiatry Digest, 5:9-10, 1990.

35. Brown G R, Rundell J R, Temoshok L, et al:  Psychiatric morbidity in HIV-seropositive women:  Results of a three year prospective study.  Proceedings of the 37th Annual Meeting of the American Academy of Psychosomatic Medicine, 1990.

36. Rundell J R, Brown G R, Kyle K, et al:  Methods employed by and length of knowledge of HIV-seropositivity of HIV-infected suicide attempters.  Proceedings of the 37th Annual Meeting of the American Academy of Psychosomatic Medicine, 1990.

37. Brown G R: Unzufriedenheit mit dem eigenen Geschlecht:Klinische Behandlungsmoglichkeiten. Abstract for European readership.  Psychiatry Digest, 10:3-4, 1990.

38. Brown G R, Anderson B W: Credibility of patients in psychiatric research.  Amer J Psychiatry, 148(10):1423-1424, 1991.

39. Brown G R, Anderson B: Psychiatric morbidity in adult inpatients with childhood histories of physical and sexual abuse.  Amer J Psychiatry, 148(1):55-61, 1991.

40. Plotnick E, Brown G R: Use of intravenous haloperidol in nonviolent severely regressed adult psychiatric inpatients. Gen Hosp Psychiatry, 13:385-390, 1991.

41. Brock I, Brown G R, Jenkins R: Affect and health locus of control in early HIV infection. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 79, 1991.

42. Brock I, Brown G R, Jenkins R: Early HIV infection and health locus of control. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 79, 1991.

43. Brown G R, Pace J, Brock I, et al: Psychiatric morbidity in HIV-seropositive military women. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 208, 1991.

44. Pace J, Brown G R: Factors associated with length of inpatient psychiatric hospitalization in a military medical center.  Proceedings of the 144th Annual Meeting of the American Psychiatric  Association, 95, 1991.

45. Plotnick E, Brown G R: Sexual functioning in HIV-positive women without AIDS. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 80-81, 1991.

46. Hicks D, Stasko R, Rundell J, Norwood A, Brown G R: Psychiatric treatment in early HIV disease.  Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 208, 1991.

47. McManis S, Brown G R, Rundell J, et al: Subtle, early cognitive impairment in HIV disease. Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 77-78, 1991.

48. McManis S, Brown G R, Rundell J, et al: Cognitive impairment and CSF values in HIV disease.  Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 78, 1991.

49. McManis S, Brown G R, Zachary R, et al: Cognitive impairment and gender in HIV-positive persons.  Proceedings of the 144th Annual Meeting of the American Psychiatric Association, 78, 1991.

50. Carey M, Jenkins R, Brown GR, et al: Gender differences in psychosocial functioning in early stage HIV patients. Proceedings of the 7th International  Conference on AIDS, M.B. 4230, 1:447, 1991.

51. McManis S, Brown G R, Zachary R, et al: Neuropsychiatric impairment early in the course of HIV infection. Proceedings of the 7th International Conference on AIDS, M.B. 2064, 1:198, 1991.

52. Brown G R, Rundell J, Pace J, et al: Psychiatric morbidity in early HIV infection in women: results of a 4 year prospective study. Proceedings of the First International Conference

13

Zzyym v. Tillerson – AR 0832

on Biopsychosocial Aspects of HIV Infection, p 22, 1991.

53. Brown G R, Kendall S, Zachary R, et al: Psychiatric and psychosocial status of US Air Force HIV-infected personnel. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection,  p 121, 1991.

54. Brown G R, Zachary R, McManis S, et al: Gender effects on HIV-related neuropsychiatric impairment.  Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection, p 125, 1991.

55. Temoshok L, Smith M, Brown G R, Jenkins R: Perceptions of zidovudine (AZT) and cooperation with treatment or clinical trials. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection,  p 198, 1991.

56. Jenkins R, Patterson T, Brown G R, Temoshok L:  Social functioning in early stage HIV patients. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection, p P12, 1991.

57. Zachary R, Coyle C, Kendall S, Brown G R: Living with HIV: Mechanisms for coping with psychological distress. Proceedings of the First International Conference on Biopsychosocial Aspects of HIV Infection, p P13, 1991.

58. Brown G R, Rundell J, McManis S, Kendall S, Jenkins R: Neuropsychiatric morbidity in early HIV disease: Implications for military occupational function.  Proceedings of the Aerospace Medicine Symposium on Allergic, Immunological, and Infectious Disease Problems in Aerospace Medicine, AGARD Advisory Group for Aerospace Research and Development, AGARD-CP-518, (paper 16):1-14, 1992.

59. Brown G R: Single USAF AIDS center offers unique opportunity to research biopsychosocial aspects of HIV infection. San Antonio, M.D., 1(4):8-9,14-15, 1991.

60. Rundell J, Mapou R, Temoshok L, Brown G R: An overview of the U.S. military HIV testing policy. Proceedings of the American Psychological Association Annual Meeting, August, 1991, page 277.

61. Brown G R: The transvestite husband. J Gender Studies, 13(1):14-19, 1991.

62. Rundell J R, Kyle K, Brown G R, Thomasen J:  Factors associated with suicide attempts in a mandatory HIV-testing program.  Psychosomatics, 33(1):24-27, 1992.

63. Beighley P, Brown G R: Medication refusal in psychiatric inpatients in the military. Military Med, 157:47-49, 1992.

64. McManis S, Brown G R, Zachary R, et al: Screening for subtle neuropsychiatric deficits early in the course of HIV infection. Psychosomatics, 34(5):424-431, 1993.

65. Brown G R, Kendall S, Ledsky R: Sexual dysfunction in HIV-seropositive women without AIDS. J Psychol Human Sexuality, 7(1-2):73-97, 1995.

66. Brock I, Brown G R: Psychiatric length of stay determinants in a military medical center.  Gen Hosp Psychiatry,15(6):392-398, 1993.

67. Brown G R, Rundell J, McManis S, Kendall S, Jenkins R: Neuropsychiatric morbidity in early HIV disease: Implications for military occupational function. Vaccine, 11(5):560-569, 1993.

68. Brown G R, Rundell J: Prospective study of psychiatric aspects of early HIV   infection in women.  Gen Hosp Psychiatry, 15:139-147, 1993.

69. Brown G R, Rundell J, McManis S, Kendall S, Zachary R, Temoshok L: Prevalence of psychiatric disorders in early stages of HIV infection in United States Air Force Personnel. Psychosomatic Medicine, 54:588-601, 1992.

70. Beighley P, Brown G R, Thompson J:  DSM-III-R brief reactive psychosis among Air Force recruits. J Clin Psychiatry, 53(8):283-288, 1992.

71. Brown G R:  Letter to the editor.  Amer J Psychiatry, 149(4):541, 1992.

72. Lothstein L M, Brown G R: Sex reassignment surgery: current concepts.  Integ Psychiatry, 8(1):21-30, 1992.

73. Brown G R, Zachary R, Rundell J R: Suicidality before and after HIV seroconversion in men with early stage disease. Proceedings of the 50th Anniversary International Meeting of the American Psychosomatic Society, 43, 1992.

74. Brock I, Brown G R, Butzin C: Predictors of psychiatric inpatient length of stay.  Proceedings of the 145th Annual Meeting of the American Psychiatric Association, New Research Volume, 101, 1992.

Zzyym v. Tillerson – AR 0833

75. Rundell J R, Brown G R, Jenkins R, Temoshok L: Social support, psychiatric morbidity, and HIV disease.  CME Syllabus and Proceedings of the 145th Annual Meeting of the American Psychiatric Association, 281, 1992.

76. Plotnick E, Brown G R: IV haloperidol in severe nonviolent psychosis. Psychiatry Drug Alerts, 6(5):40, 1992.

77. Goethe K, Richie D, Brown G R, Kendall S: Longitudinal neuropsychological findings in HIV-positive males. Proceedings of the 8th International AIDS Conference, Vol. 2, Abstract PuB 3770, Amsterdam, The Netherlands, 1992.

78. Brown G R, Zachary R, McManis S, Coyle C, Kendall S, Kozjak J: Stability of personality disorder diagnoses in early HIV infection. Proceedings of the 8th International AIDS Conference, Vol 3, Abstract PuB 7063, Amsterdam, The Netherlands, 1992.

79. Mapou R, Goethe E, Law W, Kendall S, Rundell J, Brown G R, Nannis E, et al.: Minimal impact of self-reported mood on neuropsychological performance in HIV-infected military personnel.  Proceedings of the 8th International AIDS Conference, Vol 3, Abstract PuB 7338, Amsterdam, The Netherlands, 1992.

80. Nannis E, Temoshok L, Jenkins R, Rundell J, Brown G R, Patterson T: Noncompliance with zidovudine: Psychosocial factors. Proceedings of the 8th International AIDS Conference, Vol 3, Abstract PuB 7377, Amsterdam, The Netherlands, 1992.

81. Brown G R: 106 women in relationships with crossdressing men: a descriptive study from a nonclinical setting. Arch Sex Behav, 23(5), 515-530, October, 1994.

82. Nannis E, Temoshok L, Jenkins R, Blake S, Sharp E, Jenkins P, Brown G, Patterson T, Coyle C, Brandt U, Johnson C: Gender differences in transmission risk behavior, affect, and social support in HIV positive individuals.  Proceedings of the Fourteenth Annual Meeting of The Society of Behavioral Medicine, San Francisco, CA, 1993, #D17; Annals of Behavioral Medicine 15:S105.

83. Coyle C, Blake S, Brown GR, Ledsky R, Temoshok L: Methodological issues in assessing risk behaviors in an HIV seropositive military sample (Special Citation Award). Proceedings of the Fourteenth Annual Meeting of The Society of Behavioral Medicine, San Francisco, CA, March, 1993, #D02.  Also in Annals of Behavioral Medicine 15:S101.

84. Zachary R, Brown GR, Kendall S, Coyle C, McManis S: Psychosocial stressors and vulnerability to psychiatric distress in early-stage HIV. Proceedings of the Fourteenth Annual Meeting of The Society of Behavioral Medicine, San Francisco, CA, March, 1993, #D08.

85. Suter E, Cassem E, Murray G, Brown G R, et al: Violence in America-Effective solutions. Journal of the Medical Association of Georgia  84(6):253-263, 1995.

86. Brown G R: Use of methylphenidate in treating the cognitive decline associated with HIV disease.  Intl J Psychiatry Med, 25(1):21-37, 1995.

87. Brown G R: Teen transvestites. Psychiatric Times, Letter to the Editor, 11(11):9, 1994.

88. Brown G R: New onset of sexual dysfunction in HIV-seropositive women: Results of a prospective study. Proceedings of the 88th Annual Scientific Meeting of the Southern Medical Association, November 3, 1994, page S54.

89. Brown G R: Cross-dressing men lead double lives. Menninger Letter, April, 1995.

90. Richards J, McManis S, Brown G: Personality disorders in HIV-positive persons: association with other measures of psychiatric morbidity. (abstract) Proceedings  of the Annual Meeting of the American Psychiatric Association, NR1, page 53,  Philadelphia, PA, May 23, 1994.

91. Brown G R, Wise T, Costa P, Herbst J, Fagan P, Schmidt C: Personality characteristics and sexual functioning of 188 cross-dressing men.  J Nerv Ment Disease, 184(5):265-273, 1996.

92. Brown G R: The transvestite husband.  Tapestry 72:52-54, 1995 (substantially similar to publication #26 above).

93. Brown G R, Wise T, Costa P: Personality characteristics and sexual functioning of 188 American transgendered men: Comparison of patients with nonpatients. Proceedings of the 14th Harry Benjamin International Gender Dysphoria Symposium, pages 12-13, 1995.

94. Brown G R, Radford M, Greenwood K, Matthew  H: Sertindole Hydrochloride: A novel

Zzyym v. Tillerson - AR 0834

antipsychotic with a favorable side effect profile. Southern Medical Journal, (abstract), 88(10):S58, 1995.

95. Brown G R, Radford M: Sertindole Hydrochloride: A novel antipsychotic with a favorable side effect profile. Southern Medical Journal, 90(7):691-693, 1997.

96. Zimbroff D, Kane J, Tamminga C, et al: Controlled, dose-response study of sertindole and haloperidol in the treatment of schizophrenia. Amer J Psychiatry, 154(6):782-791, 1997.

97. Ceniceros S, Brown G R, Swartz C: Tattoos, body piercing, and psychiatric disorders. Proceedings of the Fourteenth Annual ETSU Student Research Forum, abstract 501; winner of the best scientific poster in resident/fellow category, 1998.

98. Ceniceros S, Brown G R, Swartz C: Tattoos, body piercing, and psychiatric disorders. Proceedings of the Annual Meeting of the American Psychiatric Association, Toronto, Canada, June 1, 1998.

99. Ceniceros S, Brown G R: Acupuncture: A review of its history, theories, and indications. Southern Medical Journal 91(12):1121-1125, 1998.

100. Levine S, Brown G R, Coleman E, et al.: The Standards of Care for Gender Identity Disorders. International Journal of Transgenderism, 2(2):2-20, 1998.

101. Ceniceros S, Brown GR, Swartz,C: Tattoos, body piercing, and psychiatric disorders. Southern Medical Journal 91(10):S52-53, 1998.

102. M N Miller, B E Miller, R Chinouth, B Coyle, GR Brown: Increased premenstrual dosing of nefazodone relieves premenstrual magnification of depression: a double-blind, crossover study. Proceedings of the 1999 Annual Meeting of the Society for Neuroscience, Miami Beach, Florida.

103. Brown G R: Gender identity comorbid with dissociative identity disorder. Proceedings of the XVI Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, London, England, August, 1999.

104. Levine SB, Brown G R, Coleman E, et al.: The newly revised Standards of Care for Gender Identity Disorders. J Sex Educ Therapy 24(3):117-127, 1999.

105. McKenzie D, Brown G R: A study of internet usage. Southern Medical Journal 93(10):S83, 2000.

106. M N Miller, B E Miller, R Chinouth, B Coyle, GR Brown: Increased premenstrual dosing of nefazodone relieves premenstrual magnification of depression. Depression and Anxiety 15:48-51, 2002.

107. Best Practice Guidelines, Adult Behavioral Health Services, Tennessee Department of Mental Health and Developmental Disabilities, Task Force coauthor (Chairman, Cliff Tennison), July 2002.

108. Brown GR: Application of the HBIGDA Standards of Care to the Prison Setting: Recent Victories for Transgender Care in the USA. Proceedings of the 18th Biennial Symposium of the HBIGDA, Gent, Belgium, 2003.

109. Ettner R, Brown GR, White T, Shah BJ: Family and Systems Aggression Towards Therapists Working with Transgendered Clients. . Proceedings of the 18th Biennial Symposium of the HBIGDA, Gent, Belgium, 2003.

110. Brown G R: Mental disorders among military personnel. American Journal of Psychiatry, letter to the editor, 160(6):1190-1191, 2003.

111. Brown G R, McBride L, Williford W, Bauer M: Impact of childhood sexual abuse on bipolar disorder. Proceedings of the 5th International Conference on Bipolar Disorders, Pittsburgh, PA, 2003.

112. Brown G R, Bauer M, McBride L, Williford W: Impact of childhood abuse on disease course in veterans with bipolar disorder. Southern Medical Journal Abstract Supplement 96(10):S34-S35, 2003.

113. Brown G R: Tinnitus: The ever-present tormentor. The Hearing Journal 57(4):52-53, 2004.

114. Ettner R, Brown G R, White T, Shah B: Transgender client aggression towards therapists. Proceedings of the XIX Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, p. 61, Bologna, Italy, April 9, 2005.

115. Brown G R: Gender identity disorder comorbid with dissociative identity disorder:

Zzyym v. Tillerson – AR 0835

review of the literature and 7 year followup case presentation. Proceedings of the XIX
Biennial Symposium of the Harry Benjamin International Gender
Dysphoria Association, p. 80-81, Bologna, Italy, April 9, 2005.

116. Brown G R, Bauer M S, McBride L, Williford W O: Impact of childhood abuse on the course
of bipolar disorder: A replication study in U.S. veterans.  Journal of Affective Disorders
89:57-67, 2006.

117. Ettner R, White T, Brown G R, Shah, B: Transgender client aggression towards therapists.
International Journal of Transgenderism, 9(2): 1-7, 2006. DOI: 10.1300/J485v09n02_01

118. Bauer M, McBride L, Williford W,  Glick H,  Kinosian B, Altshuler L,  Beresford T,  Kilbourne
A, Sajatovic, M, Brown G R, et al: Collaborative Care for Bipolar Disorder, Part I:
Intervention and Implementation in a Multi-Site Randomized Effectiveness Trial,
Psychiatric Services, 57(7):927-936, 2006.

119. Bauer M, McBride L, Williford W,  Glick H,  Kinosian B, Altshuler L,  Beresford T,  Kilbourne
A, Sajatovic, M, Brown G R, et al: Collaborative Care for Bipolar Disorder, Part II:
Impact, Clinical Outcome, Function, and Costs, Psychiatric Services 57(7):937-
945, 2006.   [Selected by journal for accompanying editorial, 57:909]

120. Brown G: Autocastration and Autopenectomy as Surgical Self-treatment in Incarcerated
Persons with Gender Identity Disorder. Proceedings of the XX Biennial Symposium of the
World Professional Association for Transgender Health, Chicago, Illinois, September,
2007.

121. Belkin A, Whitten T, Brown G, Melms, M: Gender Identity and the Military.
Abstract.  International Journal of Transgenderism 10(3):174, 2008.

122. Brown G, McDuffie E: Healthcare policies addressing transgender inmates in prison systems
in the United States,  Journal of Correctional Healthcare,  15(4):280-291, 2009. DOI:
10.1177/1078345809340423; online version:
http://jcx.sagepub.com/cgi/content/abstract/15/4/280.

123. Brown G: Recommended revisions to the World Professional Association for Transgender
Health's Standards of Care section on medical care for incarcerated persons with GID,
International Journal of Transgenderism, 11(2):133-139, 2009. DOI:
10.1080/15532730903008073.

124. McDuffie E, Brown G: 70 Veterans with Gender Identity Disturbances: A Descriptive Study,
International Journal of Transgenderism, 12(1), 2010. DOI:
10.1080/15532731003688962.

125. Brown G: Autocastration and autopenectomy as surgical self-treatment in incarcerated
persons with gender identity disorder, International Journal of
Transgenderism, 12(1):31-39, 2010. DOI: 10.1080/15532731003688970.

126. Brown GR, McDuffie E: 70 Veterans with Gender Identity Disturbances: A Descriptive Study.
(published abstract), Southern Medical Journal. 102(12):E10, December 2009. DOI:
10.1097/SMJ.0b013e3181c0401d

127. Rachlin  K, Dhejne C, Brown G: The Future of GID NOS in the DSM 5: Report of the GID NOS
Working Group of a Consensus Conducted by the World Professional Association
for Transgender Health. Interational Journal of Transgenderism 12(2):86-93,  2010. DOI:
10.1080/15532739.2010.509209

128. Crivera C, DeSourza C, Kozma C, Dirani R, et al: Resource utilization in patients with
schizophrenia who initiated risperidone long-acting therapy: results from the
schizophrenia outcomes utilization relapse and clinical evaluation (SOURCE),  BMC
Psychiatry 11:168, 2011 (contributor as Site Principal Investigator, but not author; refer to
acknowledgments) .

129. Macfadden W, DeSouza C, Crivera C, Kozma C, et al: Assessment of effectiveness
measures in patients with schizophrenia initiated on risperidone long-acting therapy: the
SOURCE study results.  BMC Psychiatry 11:167, 2011 (contributor as Site Principal
Investigator, not author; refer to Acknowledgements section)

130. Ettner R, White T, Brown G: Family and systems aggression toward therapists.
International  Journal of Transgenderism, 12(3):139-143,  2010. DOI:
10.1080/15532739.2010.514218.

131.  King  R, Brown G, McCrea C: Voice parameters that result in identification or

Zzyym v. Tillerson – AR 0836

misidentification of biological sex in male-to-female transgender veterans. International Journal of Transgenderism, 13(3):117-130, 2012.

132  Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Feldman J, Fraser L, Green J, Knudson G, Meyer WJ, Monstrey S, Adler RK, Brown GR, Devor AH, Ehrbar R, Ettner R, Eyler E, Garofalo R, Karasic DH, Lev AI, Mayer G, Meyer-Bahlburg H, Hall BP, Pfaefflin F, Rachlin K, Robinson B, Schechter LS, Tangpricha V, van Trotsenburg M, Vitale A, Winter S, Whittle S, Wylie KR, Zucker K: Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, International Journal of Transgenderism, 13:4,165-232 (2012).
http://dx.doi.org/10.1080/15532739.2011.700873

133.  Blosnich, J., Brown, G.R., Shipherd, J.C., Kauth, M., Piegari, R.I., & Bossarte, R. Prevalence of Gender Identity Disorder (GID) and suicide risk among transgender veterans utilizing Veterans Health Administration (VHA) care. Poster presented at the 140th Annual Meeting & Exposition of the American Public Health Association, San Francisco, CA, October 30, 2012.

134.  Blosnich J, Brown GR, Shipherd J, Kauth M, Piegari RI, Bossarte R: Prevalence of Gender Identity Disorder (GID) and suicide risk among transgender veterans utilizing Veterans Health Administration (VHA) care. American Journal of Public Health, 103(10):27-32, 2013.

135.  Brown GR: Qualitative analysis of transgender inmates' correspondence: Implications for Departments of Correction. Journal of Correctional Health Care, 20(4):334-342, 2014.

136.  Brown GR: Qualitative analysis of transgender inmates' letters: Implications for transgender healthcare disparities. Proceedings of the GLMA 31st Annual Conference, page 56, September, 2013.

137.  Blosnich J, Brown GR, Wojcio S, Jones KT, Bossarte RM: Mortality among veterans with transgender-related diagnoses in the Veterans Health Administration, FY2000-2009. LGBT Health, 1(4):269-276. 2014.

138.  Kauth M, Shipherd J, Lindsay J, Blosnich J, Brown GR, Jones KT: Access to Care for Transgender Veterans in VHA: 2006-2013. American Journal of Public Health, 104(S4):S532-4, 2014.

139.  Brown GR, Jones KT: Racial health disparities in a cohort of 5.135 transgender veterans. J Racial Ethnic Health Disparities, 1:257-266, 2014; published online ahead of print, doi: 10.1007/s40615-014-0032-4, July 16, 2014.

140.  Elders J, Brown GR, Coleman E, Kolditz TA: Medical aspects of transgender military service. Armed Forces and Society, 41(2): 199-220, 2015; published online ahead of print, DOI: 10.1177/0095327X14545625, August, 2014.

141.  Brown GR, Jones KT: Mental health and medical outcome disparities in 5,135 transgender veterans: a case-control study. Proceedings of the 32nd Annual Conference of the Gay and Lesbian Medical Association, September 11, 2014, Baltimore, MD, page 49.

142.  Brown GR, Jones KT: Incidence of breast cancer in a cohort of 5,135 transgender veterans. Breast Cancer Research and Treatment, 149(1): pp 191-198, 2015; published online ahead of print, DOI: 10.1007/s10549-014-3213-2, 2014.

143.  Brown GR, Jones KT: Health correlates of criminal justice involvement in 4,793 transgender veterans. LGBT Health, 2(4):297-305, 2015. DOI: 10.1089/lgbt.2015.0052

144.  Brown GR: Breast cancer in transgender veterans: A ten case series. LGBT Health, 2(1):77-80, 2015.

145.  Shipherd JC, Kauth MR, Firek AF, Garcia R,, Mejia S, Laski SJ, Walden B, Perez-Padilla S, Lindsay JA., Brown G, Roybal L, Keo-Meier C, Knapp H, Johnson L, Reese RL, & Byne W: Interdisciplinary transgender veteran care: Development of a core curriculum for VHA providers. Transgender Health, 1(1):54-62, 2016.

146.  Brown GR, Jones KT: Mental health and medical outcome disparities in 5135

Zzyym v. Tillerson - AR 0837

transgender veterans receiving health care in the Veterans Health Administration: A
case-control study. LGBT Health. 3(2):122-131, 2016.

147.  Feldman J, Brown G, et al: Priorities for transgender medical and mental health
care research.  Current Opinion in Endocrinology, Diabetes, and Obesity, February 2016
DOI: 10.1097/MED.0000000000000229

148.  Brown GR, Jones KT: Health correlates of criminal justice involvement in 4,793
transgender veterans.  Abstract publication, Proceedings of the Annual National
Conference on Correctional Health Care, p43, abstract 505, 2015.

149.  Blosnich J, Kauth M, Shipherd J, Gao S, Gordon A, Marsiglio M, Brown GR, Fine M: Mental
health of transgender veterans in US states with and without discrimination and hate
crime legal protection. Amer J Pub Health. 106(3):534-540, 2016

150. Reisner S, Deutsch M,  Bhasin S, Bockting W, Brown GR, Feldman J, et al:  Advancing
methods for US transgender health research.  Current Opinion in Endocrinology, Diabetes,
and Obesity. February 2016 DOI: 10.1097/MED.0000000000000229

151.  Brown GR, Jones KT: Utilization of pharmacy benefits by transgender veterans
receiving care in the Veterans Health Administration. In preparation, 2016.

**BOOK CHAPTERS:**

1.      Brown G R: Therapeutic Effect of Silence. In Strean H (ed.): Psychoanalytic Technique,
Haworth Press, New York, 1988.

2.      Brown G R: Gender reassignment: Psychiatric, endocrinologic, and surgical management
(with Leiter E, Futterweit W). Chapter 68. In Webster G, Kirby R, King L, Goldwasser B (eds.):
Reconstructive Urology, Blackwell Scientific Publications, London, 1992.

3.      Goldschmidt M, Temoshok L, Brown G R: Women and HIV/AIDS. In Niven C, Carroll D
(Eds.): The Health Psychology of Women, Harwood Academic Publishers, London, 1993.

4.      Brown G R, Philbrick K: Sexual and Gender Identity Disorders in the Consultation-Liaison
Psychiatry Setting. In  Rundell J, Wise M (Eds.): Textbook of Consultation-Liaison Psychiatry,
APA Press, Washington, D.C., 1996.

5.      Brown G R: Transvestism. Chapter 71, pages 1977-2000.  In Gabbard G (Ed.):
Treatments of Psychiatric Disorders: The DSM-IV Edition, APA Press, Washington, D.C., 1995.

6.      Brown G R: Women in the Closet: Relationships with Transgendered Men.
In Denny D (Ed.): Current Concepts in Cross-Gender Identity: A New Synthesis, Chapter 21, pp.
353-371, Garland Press, New York, 1998.

7.      Brown G R, Kendall S, Ledsky R: Sexual Dysfunction in HIV-Seropositive Women
Without AIDS. In Ross M (Ed): HIV/AIDS and Sexuality, Haworth Press, New York, 73-98, 1995.

8.      Brown G R: Gender Disorders and Sexual Dysfunctions. In Berkow R (Ed): The
Merck Manual, 17th (Centennial) Edition, Merck Research Labs, Rahway, N.J., 1999.

9.      Brown G R: Gender Disorders and Sexual Dysfunctions. In Berkow R (Ed): The Merck
Manual of Medical Information, Home Edition,  Merck Research Labs, Rahway, N.J., 1997.

10.     Brown G R, Philbrick K: Sexual and Gender Identity Disorders in the Consultation-Liaison
Psychiatry Setting. In  Rundell J, Wise M (Eds.): Concise Guide to the Textbook of Consultation-
Liaison Psychiatry, APA Press, Washington, D.C., 1999.

11.     Brown G R: Transvestism.  In Gabbard G and Atkinson S (Eds.): Synopsis of Treatments
of Psychiatric Disorders, Second Edition, APA Press, Washington, D.C., 829-836, 1996.

Zzyym v. Tillerson - AR 0838

12.    Brown G R: Transvestism and Gender Identity Disorders. .  In Gabbard G (Ed.):
Treatments of Psychiatric Disorders, Third Edition, APPI, Washington, D.C., Chapter  73, pages
2007-2067, 2001.

13.    Brown G R, Gass G, Philbrick K: Sexual and Gender Identity Disorders in the
Consultation-Liaison Psychiatry Setting. In  Rundell J, Wise M (Eds.): Textbook of Consultation-
Liaison Psychiatry, Second Edition, APA Press, Washington, D.C. Chapter 22, pages 455-476,
2002.

14.    Brown G R, Ceniceros S: Human Sexuality in Health and Disease. In Wedding D
(Ed.): Behavior and Medicine, 3rd Edition, Hogrefe & Huber, Seattle, Chapter 12, pages 171-183,
2001.

15.    Brown G R: Sexuality.  In Beers M (Ed): The Merck Manual of Medical Information, Home
Edition, 2nd Edition, Merck Research Labs, Rahway, N.J., 2003.

16.    Brown GR, Haaser RC: Sexual Disorders in the General Hospital Setting.  In Levenson J
(ed): Consultation-Liaison Psychiatry, American Psychiatric Press Inc., Washington, D.C.,
Chapter 17, pages 359-386, 2004.

17.    Brown G R: Gender Disorders and Sexual Dysfunctions. In Berkow R (Ed): The Merck
Manual of Medical Information,  18th edition,   Chapter 203, Merck Research Labs, Rahway, N.J.,
2006.

18.    Rahimian J, Bergman J, Brown G R, Ceniceros S: Human Sexuality. In Wedding D and
Stuber M (Ed): Behavior and Medicine, 4th Edition, Hogrefe & Huber, Seattle, Chapter 12, 2006
(currently being used as the core textbook in a number of medical school curricula, including
ETSU).

19.    Brown GR: Gender Disorders and Sexual Dysfunctions. The Merck Manual of Women's
and Men's Health. Simon & Schuster, Pocket Books, Chapter 2, pages 21-29, 2007.

20.    Brown G R: Gender Disorders and Sexual Dysfunctions. In Berkow R (Ed): The Merck
Manual of Medical Information,  19th edition,  Chapter 203, Merck Research Labs, Rahway, NJ,
July, 2011.

21.    Brown G R: Sexual Disorders. In Berkow R (Ed): The Merck Home Health Handbook,
Second Edition, Chapter 135, pages 627-630, Merck Research Labs, Whitehouse Station, NJ,
2009.

22.    Rahimian J, Bergman J, Brown G R, Ceniceros S: Human Sexuality. In Wedding D and
Stuber M (Ed): Behavior and Medicine, 5th Edition, Hogrefe & Huber, Seattle, Chapter 12, pages
153-164, 2010 (currently being used as the core textbook in a number of medical school
curricula).

23.    Brown G R: Gender Dysphoria and Sexual Dysfunctions. In Berkow R (Ed): The Merck
Manual of Medical Information, 20th edition, Chapter XX, Merck Research Labs, Rahway, NJ, in
press, 2016.

24.     Brown G R: Gender Dysphoria and Sexual Dysfunctions. In Berkow R (Ed): The Merck
Manual of Medical Information, Home Edition, 20th edition, Chapter XX, Merck Research Labs,
Rahway, NJ, in press, 2016.

Zzyym v. Tillerson – AR 0839